No. 23-3630

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

PARENTS DEFENDING EDUCATION,

Plaintiff-Appellant,

v.

OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, ET AL.,

Defendants-Appellees.

On Appeal from the United States District Court
for the Southern District of Ohio

## BRIEF OF APPELLANT PARENTS DEFENDING EDUCATION

Emmett E. Robinson
ROBINSON LAW FIRM LLC
6600 Lorain Ave. #731
Cleveland, OH 44102
Telephone: (216) 505-6900
Facsimile: (216) 649-0508
erobinson@robinsonlegal.org

J. Michael Connolly
Taylor A.R. Meehan
Cameron T. Norris
James F. Hasson
Thomas S. Vaseliou
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22201
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Appellant*

**CORPORATE DISCLOSURE STATEMENT**

Appellant Parents Defending Education is not a subsidiary or affiliate of a publicly owned corporation, and no corporation has a substantial financial interest in the outcome of this litigation.

# TABLE OF CONTENTS

Table of Authorities ..........................................................................................................iii

Statement in Support of Oral Argument ...................................................... viii

Statement of Jurisdiction .............................................................................................1

Statement of the Issues ................................................................................................1

Statement of the Case ...................................................................................................2

   I.     The First Amendment and Public Schools .........................................2

   II.    The Growing Use of Speech Codes to Punish Student Speech Regarding Gender Identity .........................................................................4

   III.   The District's Speech Codes Concerning Gender Identity ..............7

   IV.   Parents Defending Education and This Litigation ........................ 10

   V.    District Court Proceedings ................................................................. 13

Summary of Argument ............................................................................................... 16

Argument ......................................................................................................................... 17

   I.     PDE is likely to succeed on the merits. ........................................... 18

       A.    The Policies unconstitutionally compel speech. ................... 18

       B.    The Policies discriminate based on viewpoint. ..................... 23

       C.    The Policies prohibit speech based on content and cannot withstand *Tinker*'s demanding standard. ................................ 28

       D.    The Policies are overbroad. ...................................................... 33

   II.    The remaining preliminary-injunction criteria favor PDE. ........... 40

Conclusion ...................................................................................................................... 41

Certificate of Compliance ........................................................................................ 43

Certificate of Service ................................................................................................. 43

Addendum .........................................................................................................................a

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis,*
   143 S.Ct. 2298 (2023) ................................................................. 2, 6, 21, 23

*Ams. for Prosperity Found. v. Bonta (AFPF),*
   141 S.Ct. 2373 (2021) ................................................................. 33

*Barr v. Lafon,*
   538 F.3d 554 (6th Cir. 2008) ...................................................... passim

*Bays v. City of Fairborn,*
   668 F.3d 814 (6th Cir. 2012) ...................................................... 18

*Bethel Sch. Dist. No. 403 v. Fraser,*
   478 U.S. 675 (1986) ..................................................................... 3

*Bonnell v. Lorenzo,*
   241 F.3d 800 (6th Cir. 2001) ...................................................... 40

*Bostock v. Clayton Cnty.,*
   140 S.Ct. 1731 (2020) ................................................................. 5, 27

*Boy Scouts of America v. Dale,*
   530 U.S. 640 (2000) ..................................................................... 2, 32

*Brown v. Li,*
   308 F.3d 939 (9th Cir. 2002) ...................................................... 19

*C.N. v. Ridgewood Bd. of Educ.,*
   430 F.3d 159 (3d Cir. 2005) ........................................................ 19

*Castorina v. Madison Cnty. Sch. Bd.,*
   246 F.3d 536 (6th Cir. 2001) ...................................................... 28, 29, 30

*Dahl v. Bd. of Trustees of W. Mich. Univ.,*
   15 F.4th 728 (6th Cir. 2021) ....................................................... 41

*Dambrot v. Cent. Mich. Univ.,*
   55 F.3d 1177 (6th Cir. 1995) ...................................................... 25, 33, 37

*Davis v. Monroe Cnty. Bd. of Educ.,*
   526 U.S. 629 (1999) ..................................................................... 38

*DeAngelis v. El Paso Mun. Police Officers Ass'n,*
   51 F.3d 591 (5th Cir. 1995) ........................................................ 34

*Defoe ex rel. Defoe v. Spiva*,
  625 F.3d 324 (6th Cir. 2010) ...................................................... 25, 26, 29, 30

*DeJohn v. Temple Univ.*,
  537 F.3d 301 (3d Cir. 2008) ............................................................... 27, 35

*Doe 1 v. Marshall*,
  367 F. Supp. 3d 1310 (M.D. Ala. 2019) .................................................. 20

*FCC v. Pacifica Found.*,
  438 U.S. 726 (1978) ................................................................................ 34

*Fischer v. Thomas*,
  52 F.4th 303 (6th Cir. 2022) ........................................................... 17, 40

*Flaherty v. Keystone Oaks Sch. Dist.*,
  247 F. Supp. 2d 698 (W.D. Pa. 2003) ..................................................... 35

*Gooding v. Wilson*,
  405 U.S. 518 (1972) ................................................................................ 33

*Green v. Miss USA, LLC*,
  52 F.4th 773 (9th Cir. 2022) .................................................................. 22

*Hazelwood Sch. Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988) ....................................................................... 3, 19, 21

*Holloman ex rel. Holloman v. Harland*,
  370 F.3d 1252 (11th Cir. 2004) .............................................................. 24

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) ................................................................................ 20

*Iancu v. Brunetti*,
  139 S.Ct. 2294 (2019) ............................................................................. 24

*Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*,
  3 F.4th 887 (6th Cir. 2021) .................................................................... 24

*Janus v. AFSCME 31*,
  138 S.Ct. 2448 (2018) ............................................................................. 22

*Jones v. Caruso*,
  569 F.3d 258 (6th Cir. 2009) .................................................................. 41

*Kennedy v. Bremerton Sch. Dist.*,
  142 S.Ct. 2407 (2022) ............................................................................... 6

*Kutchinski v. Freeland Cmty. Sch. Dist.*,
  69 F.4th 350 (6th Cir. 2023) ........................................................ 3, 29, 33

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*,
   141 S.Ct. 2038 (2021) .................................................................passim

*Matal v. Tam*,
   582 U.S. 218 (2017) ............................................................... 25

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) ..........................................passim

*Minn. Voters All. v. Mansky*,
   138 S.Ct. 1876 (2018) ........................................................... 24

*Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*,
   984 F.3d 477 (6th Cir. 2020) .............................................. 40

*Morse v. Frederick*,
   551 U.S. 393 (2007) ................................................................3

*N.J. ex rel. Jacob v. Sonnabend*,
   37 F.4th 412 (7th Cir. 2022) ............................................... 29

*Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*,
   354 F.3d 249 (4th Cir. 2003) .............................................. 33

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*,
   969 F.3d 12 (1st Cir. 2020) ................................................ 29

*Obama for Am. v. Husted*,
   697 F.3d 423 (6th Cir. 2012) .............................................. 40

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) .........................................................25, 26

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) .............................................................. 28

*Roberts v. Neace*,
   958 F.3d 409 (6th Cir. 2020) .............................................. 40

*Rosenberger v. Rector and Visitors of UVA*,
   515 U.S. 819 (1995) .............................................................. 24

*Saxe v. State Coll. Area Sch. Dist.*,
   240 F.3d 200 (3d Cir. 2001) .......................................passim

*Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*,
   56 F.4th 400 (6th Cir. 2022) .............................................. 40

*Smith v. Mount Pleasant Pub. Schools*,
   285 F. Supp. 2d 987 (E.D. Mich. 2003)............................. 35

*Speech First, Inc. v. Cartwright,*
    32 F.4th 1110 (11th Cir. 2022) ....................................................... 24

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020) ..............................................................7

*Texas v. Johnson,*
    491 U.S. 397 (1989) ......................................................................... 23

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
    393 U.S. 503 (1969) ...................................................................passim

*United States v. Stevens,*
    559 U.S. 460 (2010) ......................................................................... 37

*United States v. United Foods, Inc.,*
    533 U.S. 405 (2001) ......................................................................... 22

*United States v. Varner,*
    948 F.3d 250 (5th Cir. 2020) ......................................................... 4, 5

*W.V. Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943) ..............................................................4, 16, 19

*Ward v. Polite,*
    667 F.3d 727 (6th Cir. 2012) ......................................... 18, 19, 21, 24

*Westfield High School L.I.F.E. Club v. City of Westfield,*
    249 F. Supp. 2d 98 (D. Mass. 2003) ............................................... 35

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................. 17

*Wooley v. Maynard,*
    430 U.S. 705 (1977) ......................................................................... 20

*Young v. Giles Cnty. Bd. of Educ.,*
    181 F. Supp. 3d 459 (M.D. Tenn. 2015) ........................................ 30

*Zamecnik v. Indian Prairie Sch. Dist. No. 204,*
    636 F.3d 874 (7th Cir. 2011) ............................................... 26, 31, 32

## Statutes

28 U.S.C. §1292 .......................................................................................1

28 U.S.C. §1331 .......................................................................................1

## Other Authorities

A. Scalia & B. Garner, Reading Law (2012) ...................................................... 38

A. Schlemon, *Problems with Preferred Pronouns*, Stand to Reason (June 6, 2023), perma.cc/U6UM-NFVR ....................................................................... 23

A. Shrier, *Standing Against Psychiatry's Crazes*, Wall St. J. (May 3, 2019), perma.cc/V3HV-TW5W ..................................................................... 27

J. Backholm, *Why I Don't Use Preferred Pronouns*, Family Research Council (May 21, 2021), perma.cc/AL3D-N42N .............................................................. 5

J. Clarke, *They, Them, and Theirs*, 132 Harv. L. Rev. 894 (2019) ......................... 4

*Pronouns – A How To Guide*, LGBTQ+ Resource Center, University of Wisconsin-Milwaukee, perma.cc/5H3D-L442 ......................................................... 26

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellant, Parents Defending Education ("PDE"), respectfully requests oral argument. On August 15, 2023, PDE filed an unopposed motion to expedite this appeal and schedule oral argument for this Court's December 2023 session. *See* CA6.Dkt.20. This Court granted the motion "insofar as that upon the completion of briefing, this appeal will be submitted to the court at the earliest practicable date that the court's schedule will permit." CA6.Dkt.24. The merits panel still must decide "when and whether oral argument will be conducted and whether to expedite the issuance of a decision." *Id.*

The Court should hold oral argument during its December 2023 session. The Supreme Court has "made clear that students do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the schoolhouse gate.'" *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 141 S.Ct. 2038, 2044 (2021). Yet the district court held that public schools can force students to use classmates' "preferred pronouns" and can punish students who use pronouns that correspond with biological sex. The District's policies unconstitutionally compel speech, discriminate based on viewpoint and content, and are overbroad. Because the district court improperly denied PDE's request for a preliminary injunction, the Court should expedite oral argument and reverse. *See* 6 Cir. R. 34(c)(2).

## STATEMENT OF JURISDICTION

The district court had jurisdiction because PDE alleges violations of the First and Fourteenth Amendments. 28 U.S.C. §1331. This Court has jurisdiction because PDE appeals from an order denying injunctive relief. §1292(a)(1). The district court entered that order on July 28, 2023, and PDE timely appealed two days later. *See* Op., R.28, PageID#810-50; Notice, R.29, PageID#851.

## STATEMENT OF THE ISSUES

The use of gender-specific pronouns is a "hot issue" that "has produced a passionate political and social debate" across the country. *Meriwether v. Hartop*, 992 F.3d 492, 508-09 (6th Cir. 2021). One side believes that gender is subjective and so people should use others' "preferred pronouns"; the other side believes that sex is immutable and so people should use pronouns that correspond with biological sex. *Id.* at 498. Like the general public, students have varying views on this important subject, and the Supreme Court has long recognized that students don't "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Yet the Olentangy Local School District has adopted policies that punish speech expressed by one side of the debate—the use of pronouns that are contrary to another student's identity. The district court upheld the Policies as consistent with the First Amendment and denied PDE's preliminary-injunction motion.

The issues presented in this appeal are:

1

1.      Whether the District's speech policies likely violate the First Amendment because they compel speech, discriminate based on viewpoint, prohibit speech based on content without evidence of a substantial disruption, or are overbroad.

2.      Whether, if PDE is likely to succeed on the merits, the remaining preliminary-injunction criteria favor issuing a preliminary injunction.

## STATEMENT OF THE CASE

## I.    The First Amendment and Public Schools

The framers designed the Free Speech Clause of the First Amendment to "protect the 'freedom to think as you will and to speak as you think.'" *303 Creative LLC v. Elenis*, 143 S.Ct. 2298, 2310 (2023) (quoting *Boy Scouts of America v. Dale*, 530 U.S. 640, 660-61 (2000)). They did so because "they saw the freedom of speech 'both as an end and as a means.'" *Id.* "An end because the freedom to think and speak is among our inalienable human rights," and "[a] means because the freedom of thought and speech is indispensable to the discovery and spread of political truth." *Id.* at 2310-11 (cleaned up). The First Amendment thus protects "an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply misguided, and likely to cause anguish or incalculable grief." *Id.* at 2312 (cleaned up). The government also "may not compel a person to speak its own preferred messages." *Id.*

Students, too, have First Amendment rights, and they do not "shed [them] at the schoolhouse gate." *Tinker*, 393 U.S. at 506. America's public schools are "the nurseries

of democracy," and "[o]ur representative democracy only works if we protect the 'marketplace of ideas.'" *Mahanoy*, 141 S.Ct. at 2046. Schools must "ensur[e] that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Id.*

Given these bedrock principles, the Supreme Court has recognized only four "specific categories of speech that schools may regulate in certain circumstances," *id.* at 2045:

(1) "indecent, offensively lewd, or vulgar speech uttered during a school assembly on school grounds," *Kutchinski v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 356 (6th Cir. 2023) (citing *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986));

(2) "speech during school or at a school-sponsored event that schools 'reasonably regard as promoting illegal drug use,'" *id.* at 356-57 (quoting *Morse v. Frederick*, 551 U.S. 393, 408 (2007));

(3) "'speech in school-sponsored expressive activities' if the schools' 'actions are reasonably related to legitimate pedagogical concerns,'" *id.* at 357 (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)); and

(4) "on-campus and some off-campus speech that 'materially disrupts classwork or involves substantial disorder or invasions of the rights of others,'" *id.* (quoting *Tinker*, 393 U.S. at 513).

Importantly, the fourth category requires schools to meet a "'demanding standard.'" *Id.* at 359 (quoting *Mahanoy*, 141 S.Ct. at 2047-48). To justify barring speech, "a school must 'show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'" *Id.* (quoting *Tinker*, 393 U.S. at 509). "Undifferentiated fear or apprehension is not enough to overcome the right to freedom of expression." *Id.* (cleaned up). Instead,

the school must "reasonably forecast" that the speech at issue will "'cause material and substantial disruption to schoolwork and school discipline.'" *Id.*

Moreover, even if a school's policies "pass muster under *Tinker*, they [may still] violate the First Amendment in some other fashion." Op., R.28, PageID#837. Regardless whether the speech is disruptive under *Tinker*, public schools cannot compel students "to utter what is not in [their] mind" simply because they are at school or in a classroom, *W.V. Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943); they cannot engage in "viewpoint discrimination," *Barr v. Lafon*, 538 F.3d 554, 571 (6th Cir. 2008); and they cannot draft overbroad policies that violate the First Amendment in a "substantial" number of applications, *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215-16 (3d Cir. 2001) (Alito, J.).

## II.  The Growing Use of Speech Codes to Punish Student Speech Regarding Gender Identity

Debates about biological sex and gender identity are raging across the country. While society has long referred to males and females by sex-specific pronouns (*e.g.*, "he," "his," or "she," "her"), many individuals—including students in secondary schools—now identify as transgender or "non-binary" and adopt other pronouns that correlate with their "gender identity" rather than their biological sex. *See, e.g., United States v. Varner*, 948 F.3d 250, 257 (5th Cir. 2020). Most transgender people "use gendered pronouns such as he and she," while others "use 'they/them' pronouns." J. Clarke, *They, Them, and Theirs*, 132 Harv. L. Rev. 894, 957 (2019). In addition, "[s]ome

transgender people may request even more unfamiliar pronouns, such as ze (pronounced 'zee') and hir (pronounced 'hear')." *Id.* According to transgender and non-binary advocates—and the district court—describing someone using pronouns or any other terms that are inconsistent with their gender identity is a form of "verbal bullying" that "sends a message of disrespect toward the listener" and attacks "their social standing" and "their place in society." Op., R.28, PageID#835 (citing various sources).

On the other hand, many others believe that sex is immutable and wish to use pronouns that align with longstanding views of biology and English usage. *See Meriwether*, 992 F.3d at 508-09; *Bostock v. Clayton Cnty.*, 140 S.Ct. 1731, 1782 (2020) (Alito, J., dissenting); *Varner*, 948 F.3d at 257. Many individuals on this side of the debate ground their positions in scientific, "religious," or "philosophical beliefs." *Meriwether*, 992 F.3d at 509. Accordingly, they believe that using pronouns that align with the listener's biological sex rather than gender identity "advanc[es] a viewpoint": that "'sex is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires.'" *Id.* Conversely, using a listener's preferred pronouns advances the opposite message: that "[p]eople can have a gender identity inconsistent with their sex at birth." *Id.* at 507. Thus, policies that require them to use pronouns that are inconsistent with biological sex compel them to communicate an idea they do not hold. *See, e.g.*, J. Backholm, *Why I Don't Use Preferred Pronouns*, Family Research Council (May 21, 2021), perma.cc/AL3D-N42N ("Pronouns contain a

5

statement of belief about the nature of reality…. How would you feel if you were asked to say 'Jesus is Lord' every time you saw someone?… That's how some of us feel.").

In sum, "the use of gender-specific titles and pronouns" is a "hot issue" that "has produced a passionate political social debate." *Meriwether*, 992 F.3d at 508-09. It "'concerns a struggle over the social control of language in a crucial debate about the nature and foundation, or indeed real existence, of the sexes.'" *Id.* at 508. The First Amendment gives both sides the freedom to promote their beliefs in the marketplace of ideas, without the government tipping the scales. "[L]earning how to tolerate speech … of all kinds is 'part of learning how to live in a pluralistic society,' a trait of character essential to 'a tolerant citizenry.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2430 (2022). Indeed, "tolerance, not coercion, is our Nation's answer. The First Amendment envisions the United States as a rich and complex place where all persons are free to think and speak as they wish, not as the government demands." *303 Creative*, 143 S.Ct. at 2322.

Yet there is a growing trend of schools picking one side of the debate over the other. Schools are increasingly adopting speech codes regarding gender identity to compel students to affirm beliefs they do not hold and that are incompatible with their deeply held convictions. Speech codes prohibit expression that would be constitutionally protected outside of school, punishing students for unpopular speech by labeling it "harassment," "bullying," "hate speech," or "incivility." FIRE Spotlight, R.7-1, PageID#254. These policies—imposing overbroad, content-based (and often viewpoint-based) restrictions on speech—are unconstitutional. *Id.*, PageID#254, 264; *Speech*

6

*First, Inc. v. Fenves*, 979 F.3d 319, 338-39 & n.17 (5th Cir. 2020) (collecting a "consistent line of cases that have uniformly found campus speech codes unconstitutionally over-broad or vague").

So-called "preferred pronouns policies" are an increasingly used speech code. Preferred-pronoun policies subject students to formal discipline for referring to other students according to the pronouns that are consistent with their biological sex rather than their gender identity. Under these types of policies, a student who uses "he" or "him" when referring to a biological male who identifies as a female will be punished for "misgendering" that student. *See, e.g.*, Pronoun Police, R.7-1, PageID#322-23. Other speech codes are written so broadly or vaguely that they effectively shut down all discussion or debate on transgender issues. *See, e.g.*, FIRE Spotlight, R.7-1, PageID#273.

## III.    The District's Speech Codes Concerning Gender Identity

Olentangy Local School District has adopted three speech codes that compel and punish disfavored speech about, among other things, gender identity.

***Policy 5517.*** On April 10, 2023, the District adopted a revised version of Policy 5517, which prohibits student speech the District considers to be "harassment." Policy 5517, R.7-1, PageID#121. The District defines "harassment" broadly to include disfavored speech about "gender identity." *Id.* Specifically, the policy prohibits three forms of expression that are relevant here:

> 1. Any "insulting" or "dehumanizing" speech directed against a student or employee that "has the effect of substantially interfering

with a student's educational performance, opportunities, or bene-
fits." *Id.*, PageID#123.

2. Any "unwanted and repeated" speech, including "insulting" or "dehuman-
izing" speech, that is "severe or pervasive enough" to:

   a. create a "hostile" or "offensive educational … environment";

   b. "cause discomfort or humiliation"; or

   c. "unreasonably interfere with the individual's school … performance
   or participation." *Id.*, PageID#122.

3. Any speech that "systematically and chronically inflict[s] … psychological
distress" on students when the speech is "based upon … characteristics that
are protected by Federal civil rights laws," including "gender identity." *Id.*

The District "vigorously enforce[s]" Policy 5517. *Id.*, PageID#121.

***Policy 5136.*** The District has also adopted Policy 5136, which prohibits students

from using personal electronic devices, including "cell phones" and "computers," to

express opinions that "in any way … might reasonably create in the mind of another

person an impression of being" "humiliated," "harassed," or "embarrassed." Policy

5136, R.7-1, PageID#134. Students also violate the policy when they use their electronic

devices to engage in speech that "can be construed as harassment or disparagement of

others" based on various categories, including "transgender identity." *Id.* This prohibi-

tion on speech applies while students are on and off campus. Op., R.28, PageID#815;

*see* Policy 5136, R.7-1, PageID#133-34. The policy emphasizes that "[v]iolation[s] of

these prohibitions shall result in disciplinary action." *Id.*

***The Code of Conduct.*** The Code of Conduct has two proscriptions that are rel-

evant here. First, the Code prohibits "discriminatory language," which is defined as

8

"verbal or written comments, jokes, and slurs that are derogatory towards an individual or group" based on, among other things, "transgender identity." Code of Conduct, R.7-1, PageID#150. Second, the Code prohibits "harassment," which is defined as "written, verbal, [or] electronic" speech that "a student has exhibited toward another particular student or students more than once," that causes "mental … harm," and that is "sufficiently severe, persistent or pervasive" that it creates an "intimidating" or "abusive" "educational environment for the other student(s)." *Id.*, PageID#157. Like Policy 5136, the Code prohibits speech that occurs on and off campus. *See id.*, PageID#149. Violations of the Code are "strictly prohibited and will not be tolerated." *Id.*, PageID#157; *id.*, PageID#136.

The Policies differ slightly, but all agree that they forbid "intentional misgendering." *See* Op., R.28, PageID#829. The District recently confirmed that it will enforce the Policies to punish misgendering and disfavored speech on gender identity. In February 2023, a parent wrote to the District asking whether their child "who believes in two biological genders male/female" would "be forced to use the pronouns that a transgender child identifies with or be subject to reprimand from the district if they refuse to do so." Philemond Email, R.7-2, PageID#357. Through its legal counsel, the District responded that the parent's child has an "obligation to comply with Board Policy and the code of conduct." *Id.*, PageID#356. Accordingly, any student who "purposefully refer[s] to another student by using gendered language they know is contrary to the other student's identity" would violate the District's policies. *Id.*

While the District punishes speech espousing the belief that biological sex is immutable, it promotes speech on the other side of the gender-identity debate. *See, e.g.*, Transgender Guidelines, R.7-1, PageID#195 (requiring staff to "use the name and pronoun requested by the student or parents that matches their gender identity"); GSA Announcement, R.7-1, PageID#214-15 (promoting the sale of "pronoun bracelets" to identify the student's pronouns); Parent Decl. B, R.7-4, PageID#372 ¶17 (discussing "International Pronoun Day" with list of "preferred pronoun" options written on a classroom's whiteboard); Parent Decl. D, R.7-6, PageID#386 ¶16 (teacher assigned survey asking students for their "preferred pronouns").

## IV.    Parents Defending Education and This Litigation

PDE is a nationwide, grassroots membership organization whose members include parents, students, and other concerned citizens. Neily Decl., R.7-2, PageID#345 ¶3. PDE's mission is to prevent—through advocacy, disclosure, and, if necessary, litigation—the politicization of K-12 education, including government attempts to coopt parental rights and to silence students who express opposing views. *Id.* PDE has members in the District who are harmed by the Policies, including Parents A-D and the children of Parents A, B, and D. *See id.*, PageID#346 ¶¶4-5.

The children of Parents A-D ("Students") attend District schools. *See* Parent A Decl., R.7-3, PageID#362 ¶¶4-5 (high school); Parent B Decl., R.7-4, PageID#369 ¶¶4-5 (high school); Parent C Decl., R.7-5, PageID#377 ¶4 (middle and elementary school); Parent D Decl., R.7-6, PageID#383 ¶¶4-5 (high school). Parents A-D and their

children believe that people are either male or female, biological sex is immutable, and sex does not change based on someone's internal feelings. *E.g.*, Parent A Decl., R.7-3, PageID#362-63 ¶¶6-8; Parent B Decl., R.7-4, PageID#370-71 ¶¶6-8, 11. The Students "kno[w] and routinely com[e] into contact with students that identify as transgender or nonbinary at school." *E.g.*, Parent D Decl., R.7-6, PageID#384 ¶9; Parent C Decl., R.7-5, PageID#378 ¶8. The Students have "no ill-will toward children or adults who identify as transgender or nonbinary," but they "d[o] not want to be forced to 'affirm' that a biologically female classmate is actually a male—or vice versa—or that a class-mate is 'nonbinary' and neither male nor female." Parent A Decl., R.7-3, PageID#363 ¶8; *see* Parent B Decl., R.7-4, PageID#370 ¶8; Parent C Decl., R.7-5, PageID#378 ¶7; Parent D Decl., R.7-6, PageID#384 ¶8. Doing so would contradict their deeply held beliefs. *Id.*

When issues involving gender identity arise in class or in school-sponsored ac-tivities, the Students "wan[t] to speak about these topics and wan[t] to repeatedly state their belief that biological sex is immutable." Parent A Decl., R.7-3, PageID#363 ¶10; *see* Parent B Decl., R.7-4, PageID#370 ¶10; Parent C Decl., R.7-5, PageID#378-79 ¶9; Parent D Decl., R.7-6, PageID#384-85 ¶10. In addition, the Students want "to use pronouns that are consistent with a classmate's biological sex, rather than the class-mate's 'preferred pronouns.'" Parent A Decl., R.7-3, PageID#363-64 ¶11; *see* Parent B Decl., R.7-4, PageID#371 ¶11; Parent C Decl., R.7-5, PageID#379 ¶10; Parent D Decl., R.7-6, PageID#385 ¶11. The Students want "to use the pronouns that are consistent

with [their] classmates' biological sex repeatedly and at all times, including inside and outside the classroom, in the classmates' presence, and when referring to the classmates outside their presence." Parent A Decl., R.7-3, PageID#363-64 ¶11; *see* Parent B Decl., R.7-4, PageID#371 ¶11; Parent C Decl., R.7-5, PageID#378-79 ¶¶9-10; Parent D Decl., R.7-6, PageID#385 ¶11. The Students also want to "communicate their beliefs about controversial topics, including gender identity, on a regular basis and to send materials about those topics through [their] personal phone, computer, and on social media." Parent A Decl., R.7-3, PageID#364 ¶12; Parent B Decl., R.7-4, PageID#371 ¶12; Parent D Decl., R.7-6, PageID#385 ¶12. The Students want "to discuss these topics with other students and the Olentangy community both on and off campus, including during off-campus activities with no connection to any school-related activity." *Id.*

But under the Policies, the Students can be punished for a wide range of speech concerning gender identity, including using the "wrong" pronouns, disagreeing with other students' assertions about whether they are male or female, stating that a biological male who identifies as female should not be allowed to compete in women's sports, or expressing discomfort about sharing bathrooms with teachers or students of the opposite sex. Parent B Decl., R.7-4, PageID#373 ¶21; *see* Parent A Decl., R.7-3, PageID#365 ¶18; Parent C Decl., R.7-5, PageID#380 ¶15; Parent D Decl., R.7-6, PageID#387 ¶21. The Parents and Students are aware of communications from the District's counsel stating that purposely misgendering a student violates school policies.

12

*See* Parent A Decl., R.7-3, PageID#365 ¶16; Parent B Decl., R.7-4, PageID#372 ¶18; Parent C Decl., R.7-5, PageID#379 ¶13; Parent D Decl., R.7-6, PageID#386 ¶18.

Because of the Policies, the Students remain silent in school environments or try to avoid using sex-specific pronouns altogether. *See* Parent A Decl., R.7-3, PageID#364 ¶¶13-14; Parent B Decl., R.7-4, PageID#371-72 ¶¶13-14; Parent C Decl., R.7-5, PageID#379 ¶10; Parent D Decl., R.7-6, PageID#385-86 ¶¶13-14. The Students self-censor because they "fea[r] that expressing their belief that sex is immutable—by using biologically accurate pronouns or otherwise explaining their views—will cause [them] to be punished for violating school policies." Parent A Decl., R.7-3, PageID#364 ¶13; *see* Parent B Decl., R.7-4, PageID#371 ¶13; Parent C Decl., R.7-5, PageID#379 ¶10-11; Parent D Decl., R.7-6, PageID#385 ¶13. For example, the Students "refrai[n] from using pronouns that correlate with classmates' biological sex and avoi[d] any conversation involving sex and gender because of the District's policies." Parent A Decl., R.7-3, PageID#364 ¶14; *e.g.*, Parent B Decl., R.7-4, PageID#371-72 ¶14; Parent C Decl., R.7-5, PageID#379 ¶10; Parent D Decl., R.7-6, PageID#385-86 ¶14.

## V.   District Court Proceedings

On May 11, 2023, PDE sued the District and its officials, alleging that the District's policies (Policy 5517, Policy 5136, and the Code of Conduct) violate the First Amendment by impermissibly compelling speech, regulating speech based on viewpoint and content, and imposing overbroad restrictions on speech. Complaint, R.1, PageID#1-55. PDE sued on behalf of its members, including Parents A-D and their

13

children who attend schools in the District. *Id.*, PageID#6 ¶15. The same day, PDE moved for a preliminary injunction seeking to enjoin the defendants from enforcing the Policies.

In response to PDE's motion, the District argued that PDE lacked standing and that the Policies survived First Amendment scrutiny because intentional misgendering is a form of "harassment." *See* PI-Opp., R.13, PageID#427-36. Importantly, in support of its speech restrictions, the District submitted only a single exhibit—the District's email concerning intentional misgendering that PDE had already submitted with its motion. *Compare* Philemond Email, R.13-1, PageID#443-45, *with* Ex. S, R.7-2, PageID#354-57. The District submitted no evidence or declarations attempting to show that the Policies were necessary to prevent material and substantial disruption to schoolwork or school discipline. Nor did the District present evidence at the preliminary-injunction hearing, which was held on July 24. Op., R.28, PageID#811.

On July 28, the district court denied PDE's motion. *Id.*, PageID#810-50. The court first held that PDE had standing to challenge the Policies. PDE could bring a pre-enforcement challenge because "the children of Parents A-D wish to engage in speech that the Free Speech Clause arguably protects," since "misgendering students will be considered … discriminatory speech in violation of the Policies"; there was a credible threat of enforcement because the District had promised to "'vigorously enforce'" the Policies; and the District had never "den[ied]" that the Policies "'chil[l] speech.'" *Id.*, PageID#821.

14

But the district court held that PDE was unlikely to succeed on the merits of its claims. To begin, the court believed that the Policies could be upheld under *Tinker*. According to the court, using pronouns "contrary to an individual's preferences" is "deeply harmful" because it "evinces disrespect for the individual," "plays into stereotypes," "lacks basis in scientific reality," and "'inflict[s] measurable psychological and physiological harms.'" *Id.*, PageID#836. Intentional misgendering thus always "has the effect of creating a hostile environment for transgender students … and thereby causes a substantial disruption" under *Tinker*. *Id.* In reaching this conclusion, the district court relied entirely on evidence that was never put forth by the District, including law-review and journal articles, newspaper stories, and examples from other pending cases. *Id.*, PageID#832-36; *see* PI-Opp., R.13, PageID#427-36.

The district court recognized that even if the Policies "pass muster under *Tinker*, they [may still] violate the First Amendment in some other fashion," such as by "compel[ling] speech," "restrict[ing] speech based on viewpoint," and being "overbroad." *Id.*, PageID#837. But the court rejected these arguments too. The court agreed that the Policies compelled students to use certain pronouns, but it found this compelled speech constitutional because the District had a "legitimate pedagogical concern" in "maintain[ing] a safe and civil learning environment." *Id.*, PageID#839, 841. The court concluded that the Policies were viewpoint neutral because they "appl[y] equally to individuals on either side of a given debate" by "apply[ing] with equal force to students who identify as transgender as to those who identify as cisgender, to those who seek to

denigrate students on account of their transgender identity[,] and to those who seek to harass students who believe that gender at birth is immutable." *Id.*, PageID#841-43. And it concluded the Policies were not overbroad because PDE had not presented evidence that the District would "interpret or enforce the Policies" to prohibit "genuine efforts to discuss issues of gender identity or to express beliefs on the topic." *Id.*, PageID#844.

Finally, the district court recognized that the remaining preliminary-injunction factors would favor PDE if it were likely to succeed on the merits because "the loss of First Amendment freedoms, for even minimal periods of time, amounts to irreparable injury," and "it is always in the public interest to prevent violation of a party's constitutional rights." *Id.*, PageID#848 (cleaned up). But because PDE had failed to show a likelihood of success on the merits, the court concluded that PDE could not satisfy the remaining factors. *Id.*

## SUMMARY OF ARGUMENT

The district court violated bedrock principles of free-speech law. It held that the District can compel students to express certain beliefs about sex and gender identity "to maintain a safe and civil learning environment," Op., R.28, PageID#839, even though the Supreme Court has held that schools cannot force "students to declare a belief" and that there are no "circumstances which permit an exception" to this rule, *Barnette*, 319 U.S. at 631, 642. It held that the Policies don't discriminate based on viewpoint, despite this Court's holding that the use of pronouns "advance[s] a *viewpoint* on

16

gender identity." *Meriwether*, 992 F.3d at 509 (emphasis added). It held that the Policies survived the demanding *Tinker* standard, even though the District provided no evidence that its speech codes were necessary to prevent substantial disruption. And it found no problem with the Policies' loosely worded bans on protected speech, despite a consistent line of cases finding similar speech codes to be overbroad.

The district court should have granted PDE's preliminary-injunction motion. The Policies compel speech, discriminate based on viewpoint, prohibit speech based on content without evidence of a substantial disruption, and are overbroad. And because the Policies likely violate the First Amendment rights of PDE's members, the remaining preliminary-injunction factors are readily satisfied. This Court should enter a preliminary injunction itself, or, at a minimum, reverse and remand with instructions for the district court to grant that relief.

## ARGUMENT

PDE is entitled to a preliminary injunction if it shows four things: (1) it is "likely to succeed on the merits"; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities" favors a preliminary injunction; and (4) "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[I]n First Amendment cases, only one question generally matters to the outcome: Have the plaintiffs shown a likelihood of success on the merits of their First Amendment claim?" *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022). "[T]he standard of review for a district court decision regarding a preliminary injunction with

First Amendment implications is de novo." *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012) (cleaned up). Because all four factors favor PDE, the Court should reverse and issue a preliminary injunction.

## I.    PDE is likely to succeed on the merits.

The Policies violate the First Amendment for at least four reasons. *First*, the Policies compel speech outside the narrow exception for school-sponsored activities (like writing a paper or reciting the Gettysburg Address) by forcing students to use others' "preferred" pronouns. *Second*, the Policies discriminate based on viewpoint because they restrict speech on one side of the debate (those who believe that pronouns should correspond to biological sex) while allowing the other side of the debate (those who believe pronouns should correspond with gender identity) to speak freely. *Third*, the Policies discriminate based on content and the District provided no evidence to survive *Tinker*'s demanding standard. *Fourth*, the Policies are overbroad because they violate the First Amendment in a substantial number of applications.

### A.    The Policies unconstitutionally compel speech.

The First Amendment "prohibits the most aggressive form of viewpoint discrimination—compelling an individual 'to utter what is not in [her] mind' and indeed what she might find deeply offensive—and the Court has enforced that prohibition, too, in the public school setting." *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of

18

opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. For example, in the Supreme Court's landmark decision in *Barnette*, the Court held that a school could not compel a student to say the Pledge of Allegiance in class. *Id.* Even strong government interests—like promoting "national unity," "patriotism," and "national security" during World War II—could not justify compelling a student "to utter what is not in his mind." *Id.* at 634, 640-41.

Courts have recognized, of course, that schools must be allowed to compel speech when implementing a "legitimate school curriculum." *Ward*, 667 F.3d at 733. A student may "be forced to speak or write on a particular topic even though the student might prefer a different topic." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 187 (3d Cir. 2005). For example, "a junior high school English teacher may fail a student who opts to express her thoughts about a once-endangered species, say a platypus, in an essay about *A Tale of Two Cities*." *Ward*, 667 F.3d at 733. A history teacher "may demand a paper defending Prohibition." *Brown v. Li*, 308 F.3d 939, 953 (9th Cir. 2002). And "[i]n a math class, … the teacher can insist that students talk about math, not some other subject." *Mahanoy*, 141 S.Ct. at 2050 (Alito, J., concurring).

But this exception is strictly limited. It applies only to "'student speech in school-sponsored expressive activities'" where the school's actions are "'reasonably related to legitimate pedagogical concerns.'" *Ward*, 667 F.3d at 733 (quoting *Hazelwood*, 484 U.S. at 273); *see also, e.g.*, *Saxe*, 240 F.3d at 213-14 ("*Hazelwood*'s permissive 'legitimate pedagogical concern' test governs *only* when a student's school-sponsored speech could

19

reasonably be viewed as speech of the school itself." (emphasis added)). This limitation makes sense. If the exception were broader, a school could "forc[e] individual expression" just because it "happen[s] to occur in a school," *Ward*, 667 F.3d at 734; *see also Saxe*, 240 F.3d at 216, and would "wield alarming power to compel ideological conformity," *Meriwether*, 992 F.3d at 506.

Here, the Policies prohibit a student from "purposefully referring to another student by using gendered language they know is contrary to the other student's identity." Philemond Email, R.7-2, PageID#356. Although framed as a prohibition on speech, the district court correctly recognized that the Policies "compel speech" and that it didn't matter that the Policies do not literally command students to speak. Op., R.28, PageID#841. Using pronouns is "required by the English language," and "the use of pronouns in daily conversation is ever-present." *Id.*, PageID#843; *see Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (driving is "a virtual necessity for most Americans," and so requiring a license plate message is compelled speech, even though no law requires individuals to drive); *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1325 (M.D. Ala. 2019) (same). And even if students alter their speech to avoid using pronouns (*e.g.*, "George went to George's locker to get the book that George borrowed from Sarah"), the Policies still "compel the speaker to alter the message by [making it] more acceptable to others." *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 581 (1995). But "[n]o government … may affect a speaker's message by forcing her to accommodate other views; no government may alter the expressive content of her

message; and no government may interfere with her desired message." *303 Creative*, 143 S.Ct. at 2318 (cleaned up).

Despite recognizing that the Policies compel speech, the district court upheld them because "requiring the use of preferred pronouns promotes 'legitimate pedagogical concerns,' without 'compelling the speaker's affirmative belief.'" Op., R.28, PageID#841. But that isn't the proper standard for assessing compelled speech in public schools. As explained, schools cannot compel speech outside "school-sponsored expressive activities." *Ward*, 667 F.3d at 733. Here, as the district court correctly recognized, the Policies "reach speech that … is not school-sponsored." Op., R.28, PageID#826. School-sponsored expressive activities occur only "as part of the school curriculum" and are "supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Hazelwood*, 484 U.S. at 270-71; *see Saxe*, 240 F.3d at 214 ("[S]chool 'sponsorship' of student speech is not lightly to be presumed."). But the Policies apply inside and outside of the classroom and regardless whether a teacher is present.

Nor are the Policies' commands "'reasonably related to legitimate pedagogical concerns'" in any event. *Ward*, 667 F.3d at 733. The "less the speech has to do with the curriculum and school-sponsored activities, the less likely any suppression will further a 'legitimate pedagogical concern.'" *Id.* at 734. The Policies' command to use certain pronouns is simply the District imposing its own views about what is "respect[ful]."

Op., R.28, PageID#839. Public schools "do not have a license to act as classroom thought police." *Meriwether*, 992 F.3d at 507.

The district court found the compelled use of pronouns to be nothing more than a "mechanical exercise" that doesn't "implicat[e] personal beliefs on gender identity." Op., R.28, PageID#840. As an initial matter, the supposed "'value'" of the speech at issue doesn't affect whether that speech is compelled. *United States v. United Foods, Inc.*, 533 U.S. 405, 411 (2001) (government unconstitutionally compelled speech even though the speech involved "minor debates about whether a branded mushroom is better than just any mushroom"). But even if it did, the district court's conclusion is squarely foreclosed by *Meriwether*. Using pronouns is not a "ministerial" exercise. *Meriwether*, 992 F.3d at 507. Far from it. Pronouns reflect a "conviction that one's sex cannot be changed, a topic which has been in the news on many occasions and has become an issue of contentious political debate." *Id.* at 508 (cleaned up). Using pronouns thus "*[i]s* the message …. Pronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Id.*; *see Green v. Miss USA, LLC*, 52 F.4th 773, 785 n.12 (9th Cir. 2022) (same); *Janus v. AFSCME 31*, 138 S.Ct. 2448, 2476 (2018) (explaining that "sexual orientation and gender identity" are "sensitive political topics … [that] are undoubtedly matters of profound value and concern to the public"). Though the district court downplayed the significance of the compelled speech, pronoun usage is profoundly important to the Students and others. *See, e.g.*, Parent A Decl., R.7-3, PageID#363 ¶8; Parent B Decl., R.7-4, PageID#370 ¶8; Parent C Decl., R.7-5,

PageID#378 ¶7; Parent D Decl., R.7-6, PageID#384 ¶8.; *see also, e.g.*, A. Schlemon, *Problems with Preferred Pronouns*, Stand to Reason (June 6, 2023), perma.cc/U6UM-NFVR ("Complying with a transgender person's request might seem like a minor change in your behavior, but it's not. They're not merely asking you to speak different words. You're being asked to abandon *your* worldview position on this topic and adopt *their* worldview.").

In the end, it's clear that the district court upheld the compelled use of certain pronouns because it (like the school) strongly disagrees with the Students' speech. The court believed that using the "wrong" pronouns "sends a message of disrespect," "plays into stereotypes," and "lacks basis in scientific reality." *See, e.g.*, Op., R.28, PageID#836. But that isn't any government's decision to make. "The First Amendment envisions the United States as a rich and complex place where all persons are free to think and speak as they wish, not as the government demands." *303 Creative*, 143 S.Ct. at 2322. Just as in *Meriwether*, the Policies here "violat[e] [students'] First Amendment rights by compelling [their] speech or silence." 992 F.3d at 503.

### B. The Policies discriminate based on viewpoint.

If there is a "bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). At all times, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the

restriction." *Rosenberger v. Rector and Visitors of UVA*, 515 U.S. 819, 829 (1995). View-point discrimination is thus always prohibited. *Minn. Voters All. v. Mansky*, 138 S.Ct. 1876, 1885 (2018); *Iancu v. Brunetti*, 139 S.Ct. 2294, 2302 (2019); *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893 (6th Cir. 2021).

The First Amendment's prohibition on viewpoint discrimination applies no dif-ferently "in the public school … setting." *Ward*, 667 F.3d at 733 (citing *Rosenberger*, 515 U.S. at 828). Thus, even if a school's regulation is "consistent with … the *Tinker* stand-ard," it will still be unconstitutional if it fails "*Rosenberger*'s prohibition on viewpoint discrimination." *Barr*, 538 F.3d at 571; *e.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022) ("[E]ven if [the university] could (per *Tinker*) restrict harassing speech that disrupts the school's functions, it couldn't do so, as it has here, based on the viewpoint of that speech."); *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1280 (11th Cir. 2004) ("[T]his fundamental prohibition against viewpoint-based discrimina-tion extends to public schoolchildren.").

Here, the Policies unquestionably impose a viewpoint-based restriction. The Pol-icies prohibit a student from "purposefully referring to another student by using gen-dered language they know is contrary to the other student's identity." Philemond Email, R.7-2, PageID#356. As *Meriwether* makes clear, using pronouns that correspond to bio-logical sex "communicate[s] a messag[e] [that] [p]eople can[not] have a gender identity inconsistent with their sex at birth." 992 F.3d at 507-08. "Never before have titles and pronouns been scrutinized as closely as they are today for their power to validate—or

invalidate—someone's perceived sex or gender identity." *Id.* at 509. When students decline to use preferred pronouns, they "t[ake] a side in that debate" and "advanc[e] a *viewpoint* on gender identity." *Id.* (emphasis added).

The district court believed that the Policies were viewpoint neutral because they "prohibit all derogatory speech that targets individuals on the basis of gender identity," and thus "appl[y] equally to individuals on either side of a given debate." Op., R.28, PageID#842 (citing *Barr*, 538 F.3d 554; *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324 (6th Cir. 2010)). But "[g]iving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017). By prohibiting opinions about biological sex that the District disfavors, the Policies impose "'viewpoint-discriminatory restrictions.'" *Saxe*, 240 F.3d at 206; *see Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1185 (6th Cir. 1995).

True, this Court has found that schools' prohibitions on displaying the Confederate flag were viewpoint neutral. *Barr*, 538 F.3d 554; *Defoe*, 625 F.3d 324. But those policies banned "all symbols which 'caus[e] disruption to the educational process,' regardless of whether the disruption arises because of a student's racial animus, or for another reason entirely." *Barr*, 538 F.3d at 572; *Defoe*, 625 F.3d at 336-37 (similar). There was "no indication that the school[s] permit[ted] 'one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules.'" *Barr*, 538 F.3d at 572 (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992)). This Court made clear that "'schools may not impose a viewpoint specific ban on some racially divisive symbols and not others.'" *Defoe*, 625 F.3d at 336 (cleaned up).

25

But the District did here precisely what those cases prohibit. Which pronouns to use "is a hot issue" that "'concerns a struggle over the social control of language in a crucial debate about the nature and foundation, or indeed real existence, of the sexes.'" *Meriwether*, 992 F.3d at 508-09. One side believes that everyone should use preferred pronouns and that ignoring their wishes is harmful to the listener. *See, e.g.*, *Pronouns – A How To Guide*, LGBTQ+ Resource Center, University of Wisconsin-Milwaukee, perma.cc/5H3D-L442 ("When someone is referred to with the wrong pronoun, it can make them feel disrespected, invalidated, dismissed, alienated, or dysphoric (often all of the above)."). The other side believes that people are either male or female and that using pronouns that are contrary to someone's biological sex conflicts with science, the English language, and, often, religious faith. *See, e.g.*, *Meriwether*, 992 F.3d at 498-99, 508-09; Parent D Decl., R.7-6, PageID#383-84 ¶¶6-7 ("I have raised my children to believe that 'people are either male or female,' and that someone cannot change from one to the other simply because they feel that way."). But instead of allowing both sides to speak and letting the best idea win, the District chose to "impose a viewpoint specific ban on some … divisive [pronouns] and not others." *Defoe*, 625 F.3d at 336 (cleaned up). The government cannot license one side to speak freely while muzzling the other. *See R.A.V.*, 505 U.S. at 392; *see also Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 876 (7th Cir. 2011) ("[A] school that permits advocacy of the rights of homosexual students cannot be allowed to stifle criticism of homosexuality.").

Consider the next school that adopts the opposite policy concerning pronouns. "[B]y [the district court's] logic," a school could "*prohibit* [students] from addressing [other] students by their preferred gender pronouns—no matter [their] own views." *Meriwether*, 992 F.3d at 506. The school might point to "pedagogical concern[s]," Op., R.28, PageID#839, because the use of "they/them" pronouns to refer to a singular individual is "grammatically incorrect," *see, e.g.*, *Bostock*, 140 S.Ct. at 1782 (Alito, J., dissenting) ("Under established English usage, two sets of sex-specific singular personal pronouns are used to refer to someone in the third person (he, him, and his for males; she, her, and hers for females)."). The school might conclude that preferred pronouns "lack basis in scientific reality," Op., R.28, PageID#836, because sex is immutable and no one can transition from one sex to another, *see DeJohn v. Temple Univ.*, 537 F.3d 301, 318 n.20 (3d Cir. 2008) ("The concept of gender is … rooted in science and means sex—male or female—based on biology (chromosomes, genitalia)."). And the school might conclude that using preferred pronouns "'inflict[s] measurable psychological and physiological harm'" on transgender students, Op., R.28, PageID#836, because schools "ought to … help the [students] change behavior" rather than "accept [their] self-diagnosis of gender dysphoria and the corresponding behavior," A. Shrier, *Standing Against Psychiatry's Crazes*, Wall St. J. (May 3, 2019), perma.cc/V3HV-TW5W.

But such a policy would rightly be struck down as an unconstitutional viewpoint-based restriction on student speech, and so too here. Students have a First Amendment right to join either side of the debate. The District "does not have the authority to

enforce a viewpoint-specific ban on [one set of pronouns] and not others." *Castorina v. Madison Cnty. Sch. Bd.*, 246 F.3d 536, 544 (6th Cir. 2001). By prohibiting "disrespect[ful]" pronouns, Op., R.28, PageID#836, the Policies "strik[e] at the heart of moral and political discourse—the lifeblood of constitutional self government (and democratic education) and the core concern of the First Amendment." *Saxe*, 240 F.3d at 210. That the "wrong" pronouns "may offend is not cause for [the speech's] prohibition, but rather the reason for its protection." *Id.*

### C.   The Policies prohibit speech based on content and cannot withstand *Tinker*'s demanding standard.

Under the First Amendment, the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). In most circumstances, content-based regulations are "presumptively unconstitutional" and must withstand strict scrutiny. *Id.* As the district court recognized, the Policies are "certainly content-based restrictions," Op., R.28, PageID#842, as they "target speech based on its communicative content," *Reed*, 576 U.S. at 163. And the District has never argued (and the district court did not hold) that the Policies can withstand strict scrutiny.

The district court nevertheless found the Policies constitutional under *Tinker*, a decision that allows schools to restrict certain content-based speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Tinker*, 393 U.S. at 513. According to the district court, the "intentional misgendering

28

of students" has "the effect of creating a hostile environment for transgender students on account of their gender identity and thereby causes a substantial disruption" under *Tinker*. Op., R.28, PageID#836. This reasoning fails.

To begin, the district court improperly relieved the District of its burden. "Substantial disruption is a 'demanding standard,'" *Kutchinski*, 69 F.4th at 359 (quoting *Mahanoy*, 141 S.Ct. at 2047-48), and *Tinker* "places the burden of justifying student-speech restrictions squarely on school officials," *N.J. ex rel. Jacob v. Sonnabend*, 37 F.4th 412, 426 (7th Cir. 2022); *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 25 (1st Cir. 2020) (same). Schools cannot restrict speech based on "'a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'" *Kutchinski*, 69 F.4th at 359. *Tinker* "requires a specific and significant fear of disruption, not just some remote apprehension of disturbance." *Saxe*, 240 F.3d at 211. The school thus must "reasonably forecast" that the banned speech will "result in substantial disruption of, or material interference with, the school environment." *Defoe*, 625 F.3d at 336; *see Tinker*, 393 U.S. at 511 (banning a black armband was unconstitutional because the school lacked "evidence that it [was] necessary to avoid material and substantial interference with schoolwork or discipline").

This Court has repeatedly enforced this high bar. In *Castorina*, this Court found a ban on Confederate flags unconstitutional under *Tinker* because the school had banned speech "without any showing of disruption." 246 F.3d at 542. By contrast, in *Barr*, the Court permitted a school to ban clothing with Confederate flags because the

29

school provided *evidence* that "racial tension [was] high and serious racially motivated incidents, such as physical altercations or threats of violence, ha[d] occurred." 538 F.3d at 568; *see also id.* at 566-67 (noting that "the record … contains evidence of racial violence, threats, and tensions"). Similarly, in *Defoe*, this Court upheld a similar restriction only because "[t]he record contains uncontested evidence of racial violence, threats, and tensions" at the specific schools. 625 F.3d at 334.

Here, the District made no attempt to carry its high burden. Before the district court, the District submitted a single exhibit—an email from the District's counsel stating that the Policies prohibit intentional misgendering. Philemond Email, R.7-2, PageID#354-57. The District provided no declarations, exhibits, or evidence of any kind even attempting to show that the Policies were necessary to prevent substantial disruption. *See* PI-Opp., R.13, PageID#423-42. That is why the district court was forced to rely on its own research, including newspaper stories, law-review articles, and examples from other pending cases. *See* Op., R.28, PageID#832-36. Given this non-existent record, the district court should have "conclude[d] that the [District] had little basis for anticipating disruption caused by" students using unwanted pronouns. *Barr*, 538 F.3d at 565; *Castorina*, 246 F.3d at 542; *see also Young v. Giles Cnty. Bd. of Educ.*, 181 F. Supp. 3d 459, 464 (M.D. Tenn. 2015) (enjoining school speech restrictions because the school made no "showing whatsoever regarding their stated fear of the speech disrupting the school environment").

In any event, the district court's extra-record evidence is woefully insufficient to punish speech. Pointing to law-review articles and other studies, the district court concluded that refusing to use preferred pronouns will "inflic[t] measurable psychological and physiological harms" on the listener. Op., R.28, PageID#836. But these theories are precisely what this Court *rejected* in *Meriwether*. Schools cannot adopt a categorical rule that the use of pronouns will "inhibi[t] [other students'] education or ability to succeed in the classroom." 992 F.3d at 511; *see also Saxe*, 240 F.3d at 209 ("Such a categorical rule [against harassment] is without precedent in the decisions of the Supreme Court or this Court, and it belies the very real tension between anti-harassment laws and the Constitution's guarantee of freedom of speech."). There is no "generalized 'hurt feelings' defense to a high school's violation of the First Amendment rights of its students." *Zamecnik*, 636 F.3d at 877. Without record evidence of disruption, "the school's actions mandate orthodoxy, not anti-discrimination, and ignore the fact that tolerance is a two-way street." *Meriwether*, 992 F.3d at 511 (cleaned up).

This is not to downplay or dismiss the difficult situations that transgender students face at school. But the district court conflated these struggles with the speech that the Students want to express. The Students don't want to commit "'violence and verbal and physical abuse,'" carry out "severe bullying and harassment," "'attack … the basic social standing and reputation of [transgender students as] a group of people,'" or impose a "'crude form of physical intimidation.'" Op., R.28, PageID#832-35. To the contrary, the Students have "no ill will against [transgender] students" and will be

31

"respectful to others." Parent A Decl., R.7-3, PageID#363 ¶8; *see* Parent B Decl., R.7-4, PageID#370 ¶8; Parent C Decl., R.7-5, PageID#378 ¶7; Parent D Decl., R.7-6, PageID#384 ¶8. They merely "wish to use pronouns that are consistent with a classmate's biological sex." Parent A Decl., R.7-3, PageID#363-64 ¶11; *see* Parent B Decl., R.7-4, PageID#371 ¶11; Parent C Decl., R.7-5, PageID#379 ¶10; Parent D Decl., R.7-6, PageID#385 ¶11. None of the district court's articles prove that this type of speech will cause substantial disruption warranting the suppression of their speech. *See* Op., R.28, PageID#832-36; *cf. Zamecnik*, 636 F.3d at 878 ("[T]here is no doubt that the slogan ['Be Happy, Not Gay'] is disparaging.... [But] it is not the kind of speech that would materially and substantially interfere with school activities." (citation omitted)).

The district court believed that using pronouns that are not "preferred" by the student "evinces disrespect for the individual," "plays into stereotypes," and "lacks basis in scientific reality." Op., R.28, PageID#836. But "the premise that gender identity is an idea 'embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view.'" *Meriwether*, 992 F.3d at 510 (quoting *Boy Scouts*, 530 U.S. at 660). "Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance." *Tinker*, 393 U.S. at 508. "But our Constitution says we must take this risk, and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this

relatively permissive, often disputatious, society." *Id.* at 508-09 (citation omitted). Because the Policies cannot withstand *Tinker*, they are also an unconstitutional content-based restriction of speech.

### D.    The Policies are overbroad.

"In the First Amendment context," courts recognize a special kind of facial challenge based on overbreadth. *Ams. for Prosperity Found. v. Bonta (AFPF)*, 141 S.Ct. 2373, 2387 (2021). Namely, a regulation is facially invalid if "'a substantial number of its applications are unconstitutional, judged in relation to the [policy's] plainly legitimate sweep.'" *Id.* The key question is whether the regulation is "so broad as to 'chill' the exercise of free speech and expression." *Dambrot*, 55 F.3d at 1182. The "risk of a chilling effect" is enough "because First Amendment freedoms need breathing space to survive." *AFPF*, 141 S.Ct. at 2389 (cleaned up). The overbreadth doctrine requires regulations to be drafted narrowly so they are not "susceptible of application to protected expression." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972).

The overbreadth doctrine applies no differently in the school context. If a school policy is unconstitutional in a "substantial" number of applications, then the policy is overbroad. *See, e.g.*, *Saxe*, 240 F.3d at 215-16. Put differently, if the school policy compels or prohibits speech outside the four narrow categories of speech that a school may regulate, *see Kutchinski*, 69 F.4th at 356-57, then the policy is overbroad, *see Saxe*, 240 F.3d at 214-17; *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 U.S. 249, 259-60 (4th Cir. 2003) (policy forbidding students from wearing shirts that depicted weapons

was overbroad because there was no evidence the policy was necessary to prevent substantial disruption or invasion of rights of others).

As explained above, the Policies are unconstitutional in a substantial number of applications. The Policies compel speech outside the narrow exception for school-sponsored activities by forcing students to use others' "preferred" pronouns. The Policies discriminate based on viewpoint because they restrict speech by one side of the debate (those who believe pronouns must correlate with biological sex) while allowing the other side of the debate to speak freely. And the Policies discriminate based on content because they prohibit certain "gendered language," Philemond Email, R.7-2, PageID#357, without any evidence of substantial disruption under *Tinker*. These defects alone render the Policies overbroad. *See Saxe*, 240 F.3d at 216-17.

But the Policies prohibit even more expressions than pronouns. They prohibit speech that, among other things, is "insulting," "humiliat[ing]," "dehumanizing," "derogatory," and "unwanted." Policy 5517, R.7-1, PageID#122; Policy 5136, R.7-1, PageID#134; Code of Conduct, R.7-1, PageID#150. These types of restrictions unquestionably impose "'content-based'" and "'viewpoint-discriminatory'" restrictions on speech. *Saxe*, 240 F.3d at 206 (quoting *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596-97 (5th Cir. 1995)). The Supreme Court "has held time and again, both within and outside the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it." *Saxe*, 240 F.3d at 215 (listing cases); *e.g.*, *FCC v. Pacifica Found.*, 438 U.S. 726, 745 (1978) ("[T]he

fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection.").

The district court concluded that the Policies were constitutional because they prohibit discriminatory "harassment." Op., R.28, PageID#829-31. But "there is no 'harassment exception' to the First Amendment's Free Speech Clause." *DeJohn*, 537 F.3d at 316. Indeed, a consistent line of cases has found school harassment policies to be unconstitutionally overbroad. *See, e.g.*, *Saxe*, 240 F.3d at 215-16 (high-school speech policy punishing "harassment" was overbroad because it "prohibit[ed] a substantial amount of non-vulgar, non-sponsored student speech"); *Flaherty v. Keystone Oaks Sch. Dist.*, 247 F. Supp. 2d 698, 701-04 (W.D. Pa. 2003) (speech policy prohibiting "abusive," "inappropriate," and "offen[sive]" language was overbroad); *Smith v. Mount Pleasant Pub. Schools*, 285 F. Supp. 2d 987, 990 (E.D. Mich. 2003) (speech policy prohibiting "verbal assault" was overbroad because it allowed "curtailment of speech that questions the wisdom or judgment of school administrators and their policies, or challenges the viewpoints of [other] students"); *Westfield High School L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 123-24 (D. Mass. 2003) (school policy allowing only "responsible" speech was likely unconstitutional). While "non-expressive, physically harassing *conduct* is entirely outside the ambit of the free speech clause," there is "no question that the free speech clause protects a wide variety of speech that listeners may consider deeply

35

offensive, including statements that impugn another's race or national origin or [gender identity]." *Saxe*, 240 F.3d at 206.

The District's "[l]oosely worded anti-harassment" policies are similarly overbroad because they could "conceivably be applied to cover any speech about some enumerated personal characteristics the content of which offends someone." *Id.* at 207, 217. They "sweep in … simple acts of teasing and name-calling"—on top of political, religious, and philosophical speech. *Id.* at 211, 216. For example, "disagreeing with another student's assertion about whether they are male or female," Parent D Decl. ¶21, R.7-6, PageID#802—*e.g.*, "he is not a female"—could no doubt be considered "derogatory towards" the other student's "transgender identity," Code of Conduct, R.7-1, PageID#150. Likewise, asserting "that a biological male who identifies as female should not be allowed to compete in women's sports," or "expressing discomfort about sharing bathrooms with teachers or students of the opposite biological sex," in the presence of students who identify as transgender or non-binary, *see* Parent D Decl. ¶21, R.7-6, PageID#80, could easily be viewed as "derogatory towards [a] … *group*" based on "transgender ideology," Code of Conduct, R.7-1, PageID#150 (emphasis added). And sending similar messages through the Students' cellphones or posting similar ideas on social media "*can be construed as* harassment or disparagement *of others* based upon … transgender identity." Policy 5136, R.7-1, PageID#134 (emphases added). These unbounded policies are not sufficiently tailored to *Tinker*'s demanding standard, rendering them overbroad.

The district court believed that these types of expressions wouldn't violate the Policies because PDE "presented no evidence suggesting that the School District will interpret or enforce the Policies so broadly." Op., R.28, PageID#844. But what matters is "the text of the policy." *Dambrot*, 55 F.3d at 1183. This Court cannot "save an un-constitutional [policy] by accepting the representations of the [District's] counsel that the [policy] [will] be enforced in a particular way." *Id.*; *see United States v. Stevens*, 559 U.S. 460, 480 (2010) ("[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*."). Because the "broad scope of the [Policies'] language presents a 'realistic danger' the [District] could compromise the protection afforded by the First Amendment," the Policies are overbroad. *Dambrot*, 55 F.3d at 1183.

The district court concluded that the Policies nonetheless toed the line because they prohibit only "discriminatory speech that rises to a certain severity level, such as speech that causes a reasonable threat of harm or interferes with student performance." Op., R.28, PageID#844. But the Policies are not "readily susceptible to such a con-struction." *Stevens*, 559 U.S. at 481 (cleaned up). The Code of Conduct prohibits mere "discriminatory language," which is defined as "verbal or written comments" that are "derogatory towards an individual or group based on," among other things, "transgender identity." Code of Conduct, R.7-1, PageID#150. And Policy 5136 pro-hibits speech via a cellphone that "might reasonably create in the mind of another

person an impression of being" "humiliated," "harassed," "embarrassed," or "intimi-dated." Policy 5136, R.7-1, PageID#134.[1] There is no severity requirement in either of these policies.

True, certain provisions within the Policies contain "severity" language. *See* Policy 5517, R.7-1, PageID#121-22 ("severe or pervasive"); Code of Conduct, R.7-1, PageID#157 ("severe, persistent or pervasive"). But those requirements are not imposed throughout the Policies, and, even where they are, the Policies are still overbroad. For example, Policy 5517 prohibits speech "severe enough to … cause discomfort." Policy 5517, R.7-1, PageID#537. The Policies also reach far further than the "harass-ment" standard endorsed by the Supreme Court. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999). In *Davis*, the Supreme Court adopted a narrow definition of ac-tionable "harassment" under Title IX, holding that the harassment must be "so severe, pervasive, *and* objectively offensive that it *denies* its victims the equal access to educa-tion." *Id.* at 652 (emphases added). By imposing this stringent definition, *Davis* ensures that schools regulate harassing *conduct*, not *speech*. But the Policies prohibit speech that is merely "severe *or* pervasive" and "severe, persistent *or* pervasive," Policy 5517, R.7-1, PageID#121-22 (emphasis added); Code of Conduct, R.7-1, PageID#157 (emphasis

---

[1] The district court interpreted this provision as an unenforceable "broad intro-ductory statement" because of the examples of violations given later in the policy. Op., R.28, PageID#845 n.4. But the "general/specific" canon applies only when "there is a *conflict* between a general provision and a specific provision." A. Scalia & B. Garner, Reading Law 183 (2012) (emphasis added). None exists here. Indeed, the District below never denied that this provision is enforceable.

added). That means the Policies punish a *single* instance of unwanted speech. And while the Supreme Court asks whether harassment "*denies* its victims the equal access to education," *Davis*, 526 U.S. at 652 (emphasis added), the District asks only whether the speech "cause[s] discomfort or humiliation" or creates an "intimidating" "educational environment," Policy 5517, R.7-1, PageID#121-22; Code of Conduct, R.7-1, PageID#157. The District is thus claiming far more power to punish speech than the Supreme Court allows.

Finally, the Code of Conduct and Policy 5136 are overbroad for another reason: They do not limit their reach to speech made on schoolgrounds or during a school-sponsored activity. The Code of Conduct applies to any speech "that occurs off school district property" that is "connected to activities or incidents that have occurred on school district property." Code of Conduct, R.7-1, PageID#149. Policy 5136 similarly applies to both "on- and off-campus" speech. Op., R.28, PageID#814; Policy 5136, R.7-1, PageID#133-34. But the District's ability to punish speech made off school-grounds is extremely limited. *See Mahanoy*, 141 S.Ct. at 2046. "When it comes to political or religious speech that occurs outside school or a school program or activity, the school will have a heavy burden to justify intervention." *Id.*; *see, e.g.*, *id.* at 2042-43 (holding that a public high school student's use of "vulgar language and gestures criticizing both the school and the school's cheerleading team" on social media and off schoolgrounds was constitutionally protected). For the same reasons the policies are overbroad as to speech

occurring *on* school grounds, the two policies are especially overbroad because they prohibit speech occurring *off* school grounds. *See Saxe*, 240 F.3d at 216 n.11.[2]

## II. The remaining preliminary-injunction criteria favor PDE.

Because PDE is likely to prevail on its First Amendment claims, the other preliminary-injunction criteria are automatically satisfied. *See, e.g., Fischer*, 52 F.4th at 307; *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 482 (6th Cir. 2020); *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) ("Preliminary injunctions in constitutional cases often turn on likelihood of success on the merits, usually making it unnecessary to dwell on the remaining three factors.").

***Irreparable Harm:*** The district court agreed with PDE that, "[w]ere [it] likely to succeed on the merits, this factor would favor PDE." Op., R.28, PageID#848. Rightly so: "[I]f it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). Without a preliminary injunction, PDE's members will be deprived of their First Amendment rights and suffer irreparable harm. *See, e.g., Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 408 (6th Cir. 2022); *Jones v. Caruso*, 569 F.3d 258, 277 (6th

---

[2] Contra the district court, the policies aren't limited to off-campus speech "targeting particular individuals." *Mahanoy*, 141 S.Ct. at 2045. For example, a student using the wrong pronouns would violate the ban on "discriminatory language" or "disparagement of others" regardless whether the student at issue heard the speech. *See* Code of Conduct, R.7-1, PageID#150; Policy 5136, R.7-1, Page#134.

Cir. 2009) ("the Supreme Court has long held that 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury'" (alteration omitted) (collecting cases)).

**Balance of Harms and Public Interest:** The district court agreed with PDE that these two criteria "'merge'" and "turn on whether PDE is likely to succeed." Op., R.28, PageID#848. Because "[p]roper application of the Constitution … serves the public interest," it is "always in the public interest to prevent the violation of a party's constitutional rights." *Dahl v. Bd. of Trustees of W. Mich. Univ.*, 15 F.4th 728, 736 (6th Cir. 2021) (cleaned up). These factors thus strongly favor a preliminary injunction.

## CONCLUSION

The Court should reverse the district court and enter a preliminary injunction.

Dated: September 25, 2023                    Respectfully submitted,

                                             */s/ J. Michael Connolly*

Emmett E. Robinson                           J. Michael Connolly
Trial Attorney                               Taylor A.R. Meehan
ROBINSON LAW FIRM LLC                        Cameron T. Norris
6600 Lorain Ave. #731                        James F. Hasson
Cleveland, OH 44102                          Thomas S. Vaseliou
Telephone: (216) 505-6900                    CONSOVOY MCCARTHY PLLC
Facsimile: (216) 649-0508                    1600 Wilson Blvd., Ste. 700
erobinson@robinsonlegal.org                  Arlington, VA 22201
                                             (703) 243-9423
                                             mike@consovoymccarthy.com
                                             taylor@consovoymccarthy.com
                                             cam@consovoymccarthy.com
                                             james@consovoymccarthy.com
                                             tvaseliou@consovoymccarthy.com


*Counsel for Appellant*

**CERTIFICATE OF COMPLIANCE**

This brief complies with Rule 32(a)(7)(B) because it contains 10,444 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it was prepared using Microsoft Word in 14-point Garamond font.

*/s/ J. Michael Connolly*
Counsel for Appellant
Dated: September 25, 2023

**CERTIFICATE OF SERVICE**

I filed this brief via ECF, which will email everyone requiring notice.

*/s/ J. Michael Connolly*
Counsel for Appellant
Dated: September 25, 2023

**Designation of Relevant Documents**

| Record Entry | Description | Page ID # |
|---|---|---|
| 1 | Complaint | 1-55 |
| 7 | PDE's Motion for a Preliminary Injunction and Brief in Support | 88-115 |
| 7-1 | Declaration of Thomas S. Vaseliou with Exhibits A-R | 116-344 |
| 7-2 | Declaration of Nicole Neily with Exhibits S-T | 345-61 |
| 7-3 | Declaration of Parent A | 362-68 |
| 7-4 | Declaration of Parent B | 369-76 |
| 7-5 | Declaration of Parent C | 377-82 |
| 7-6 | Declaration of Parent D | 383-89 |
| 13 | Olentangy's Opposition to PDE's Preliminary Injunction Motion | 423-42 |
| 13-1 | Olentangy's Exhibit A: Email Exchange with Philemond | 443-45 |
| 15 | PDE's Reply in Support of Preliminary Injunction Motion | 450-71 |
| 28 | District Court's Opinion and Order Denying Preliminary Injunction Motion | 810-50 |
| 29 | PDE's Notice of Appeal | 851-52 |