No. 23-3630

# In the United States Court of Appeals
## for the Sixth Circuit

PARENTS DEFENDING EDUCATION, *Plaintiff-Appellant*

v.

OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION;
MARK T. RAIFF, In his official capacity as Superintendent of Olentangy Local
School District; PETER STERN, In his official capacity as Olentangy's Assistant
Director of Equity and Inclusion; RANDY WRIGHT, In his official capacity as
Olentangy's Chief of Administrative Services; KEVIN DABERKOW, In his
official capacity as a member of the Olentangy Board of Education; BRANDON
LESTER, In his official capacity as a member of the Olentangy Board of
Education; KEVIN O'BRIEN, In his official capacity as a member of the
Olentangy Board of Education; LIBBY WALLICK, In her official capacity as a
member of the Olentangy Board of Education; LAKESHA WYSE, In her official
capacity as a member of the Olentangy Board of Education, *Defendants-Appellees*

**On Appeal from the United States District Court
for the Southern District of Ohio at Columbus
Case No. 2:23-cv-01595
Hon. Algenon L. Marbley, U.S. District Court Chief District Judge**

**BRIEF OF INSTITUTE FOR FAITH AND FAMILY AS *AMICUS CURIAE*
SUPPORTING PLAINTIFFS-APPELLANTS AND REVERSAL**

Deborah J. Dewart
Attorney at Law
111 Magnolia Lane
Hubert, NC 28539
lawyerdeborah@outlook.com
(910) 326-4554

*Attorney for Amicus Curiae
Institute for Faith and Family*

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-3630      Case Name: PDE v. Olentangy Local School District

Name of counsel: Deborah J. Dewart

Pursuant to 6th Cir. R. 26.1, Institute for Faith and Family ("IFFNC")

*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No

## CERTIFICATE OF SERVICE

I certify that on September 29, 2023 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Deborah J. Dewart

Deborah J. Dewart

Attorney at Law

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................. i

TABLE OF AUTHORITIES ..................................................... iii

IDENTITY AND INTEREST OF *AMICUS CURIAE* ........................... 1

INTRODUCTION AND SUMMARY ..................................... 1

ARGUMENT ......................................................................... 3

I.    THE POLICIES VIOLATE THE FIRST AMENDMENT
BY COMPELLING SPEECH ....................................... 3

II.   COMPELLED SPEECH AND VIEWPOINT DISCRIMINATION ARE
UNIQUELY PERNICIOUS FREE SPEECH VIOLATIONS ...................... 4

     A.    The Policies present a paradigmatic example of compelled
speech that is anathema to the First Amendment................................. 7

     B.    The Policies transgress liberties of religion
and conscience....................................................................... 8

     C.    The Policies exemplify the blatant viewpoint
discrimination characteristic of tyrannical government....................... 9

     D.    Viewpoint-based compelled speech stifles debate and attacks the
dignity of those who disagree with the prevailing state orthodoxy ... 12

     E.    The prohibition of viewpoint discrimination is now firmly entrenched
in Supreme Court precedent as a necessary component of the Free
Speech Clause..................................................................... 15

III.   THERE IS NO LEGITIMATE PEDAGOGICAL PURPOSE FOR THE
SCHOOL DISTRICT'S POLICIES ............................................ 19

     A.  Transgender ideology is a matter of intense public concern................... 20

B. The School District has no "legitimate pedagogical purpose" in suppressing a student's viewpoint about "gender identity" by compelling expression of a view the student does not hold ...................................... 21

C. Schools can affirm the dignity of every student without sacrificing the constitutional liberties of other students................................................... 26

CONCLUSION ...................................................................................... 28

CERTIFICATE OF COMPLIANCE...................................................... 29

CERTIFICATE OF SERVICE .............................................................. 30

# TABLE OF AUTHORITIES

## Cases

*Abrams v. United States*,
    250 U.S. 616 (1919)........................................................................... 15

*Ashcroft v. Free Speech Coal.*,
    535 U.S. 234 (2002)........................................................................... 10

*Axson-Flynn v. Johnson*,
    356 F.3d 1277 (10th Cir. 2004) .................................................. 22, 23

*Benton v. Maryland*,
    395 U.S. 784 (1969)............................................................................. 6

*Bethel Sch. Dist. No. 403 v. Fraser*,
    478 U.S. 675 (1986)................................................................. 2, 3, 20

*Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico*,
    457 U.S. 853 (1982)........................................................................... 19

*Boy Scouts of Am. v. Dale*,
    530 U.S. 640 (2000)..................................................................... 5, 23

*Brinsdon v. McAllen Indep. Sch. Dist.*,
    863 F.3d 338 (5th Cir. 2017) ............................................................ 21

*Brown v. Li*,
    308 F.3d 939 (9th Cir. 2002) ............................................................ 21

*Capitol Square Review & Advisory Bd. v. Pinette*,
    515 U.S. 753 (1995)............................................................................. 8

*Carey v. Brown*,
    447 U.S. 455 (1980)........................................................................... 17

*Cohen v. California*,
    403 U.S. 15 (1971)............................................................................. 16

*Coles ex rel. Coles v. Cleveland Bd. of Educ.*,
171 F.3d 369 (6th Cir. 1999) ............................................................... 27

*Curry v. Sch. Dist. of Saginaw*,
452 F.Supp.2d 723 (E.D. Mich. 2006) ................................................ 22

*Doe v. Cong. of the United States*,
891 F.3d 578 (6th Cir. 2018) ............................................................... 12

*Doe v. University of Michigan*,
721 F.Supp.852 (E.D. Mich. 1989) ..................................................... 23

*Fleming v. Jefferson County Sch. Dist. R-1*,
298 F.3d 918 (10th Cir. 2002) ............................................................. 22

*Girouard v. United States*,
328 U.S. 61 (1946).................................................................................. 9

*Good News Club v. Milford Central School*,
533 U.S. 98 (2001)............................................................................... 18

*Hansen v. Ann Arbor Pub. Schs*,
293 F. Supp. 2d 780 (E.D. Mich. 2003) ............................................... 2

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988)....................................................... 3, 20, 22, 23

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
515 U.S. 557 (1995)............................................ 10, 11, 14, 15, 18, 26

*Iancu v. Brunetti.*
139 S. Ct. 2294 (2019).................................................................. 12, 19

*Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*,
138 S. Ct. 2448 (2018)................................................................ 7, 13, 20

*Johanns v. Livestock Mktg. Ass'n*,
544 U.S. 550 (2005)............................................................................. 12

*Keyishian v. Bd. of Regents*,
   385 U.S. 589 (1967)................................................................ 20, 27

*Kutchinski ex rel. H.K. v. Freeland Cmty. Sch. Dist.*,
   69 F.4th 350 (6th Cir. 2023) ............................................... 3

*Lamb's Chapel v. Center Moriches Union Free School District*,
   508 U.S. 384 (1993)................................................................ 18

*Lee v. Weisman*,
   505 U.S. 577 (1992)................................................................ 9, 27

*Matal v. Tam*,
   137 S. Ct. 1744 (2017)...................................... 4, 5, 16, 19

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) .................................... 21, 27

*Morse v. Frederick*,
   551 U.S. 393 (2007)................................................................ 3, 20

*National Institute of Family & Life Advocates v. Becerra* (*NIFLA*),
   138 S. Ct. 2361 (2018)............................... 4, 9, 10, 13, 18

*Pacific Gas & Electric Co.* v. *Public Utilities Comm'n of Cal.*,
   475 U.S. 1 (1986).......................................... 10, 17, 25

*Palko v. Connecticut*,
   302 U.S. 319 (1937)................................................................ 6

*Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*,
   2023 U.S. Dist. LEXIS 131707 ("*PDE v. OLSDBE*") .......... 1, 3, 5, 8, 20, 24, 26

*Perry Education Ass'n v. Perry Local Educators' Ass'n*,
   460 U.S. 37 (1983)................................................................ 16

*Police Department of Chicago v. Mosley*,
   408 U.S. 92 (1972)................................................................ 16

*Poling v. Murphy*,
    872 F.2d 757 (6th Cir. 1989) ............................................................. 24

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ................................................................. 17, 18

*Reed v. Town of Gilbert*,
    135 S. Ct. 2215 (2015) ...................................................................... 19

*Regents of University of California v. Bakke*,
    438 U.S. 265 (1978) ......................................................................... 22

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ....................................................................... 5, 6

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ........................................................... 12, 13, 18

*Saxe v. State Coll. Area Sch. Dist.*,
    240 F.3d 200 (3rd Cir. 2001) ...................................... 4, 24, 26

*Schneiderman v. United States*,
    320 U.S. 118 (1943) ......................................................................... 6

*Settle v. Dickson County Sch. Bd.*,
    53 F.3d 152 (6th Cir. 1995) ......................................................... 21

*Shelton v. Tucker*,
    364 U.S. 479 (1960) ................................................................... 7, 20

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957) ....................................................................... 24

*Texas v. Johnson*,
    491 U.S. 397 (1989) ............................................................... 17, 21

*Thomas v. Collins*,
    323 U.S. 516 (1945) ....................................................................... 14

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
   393 U.S. 503 (1969) ................................................................ 2, 19, 24

*Turner Broadcasting Systems, Inc. v. FCC,*
   512 U. S. 622 (1994) ....................................................................... 12

*United States v. Schwimmer*,
   279 U.S. 644 (1929) .......................................................................... 5

*Ward v. Polite*,
   667 F.3d 727 (6th Cir. 2012) ........................................................... 23

*West Virginia State Board of Education v. Barnette*,
   319 U.S. 624 (1943)................................. 3, 4, 6, 7, 10, 11, 13, 15, 16, 18, 25, 27

*Wooley v. Maynard*,
   430 U.S. 705 (1977)........................................... 4, 6, 7, 11, 12, 18, 25

## State Constitutions

Oh. Const. art. I, § 7 ....................................................................... 9

## Other Authorities

Lackland H. Bloom, Jr., *The Rise of the Viewpoint-Discrimination Principle*,
   72 SMU L. Rev. F. 20 (2019) ........................................ 15, 16, 17, 19

Robert Bolt, *A Man For All Seasons*: *A Play in Two Acts*
   (1st ed., Vintage Int'l 1990) (1962) .................................................... 3

Richard F. Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly
   Through the Lens of Telescope Media*,
   99 Neb. L. Rev. 58 (2020) ...................................... 6, 7, 9, 10, 11, 12, 13, 14, 15

Richard F. Duncan, *Article: Defense Against the Dark Arts:
   Justice Jackson, Justice Kennedy, and the No-Compelled Speech Doctrine*,
   32 Regent U. L. Rev. 265 (2019-2020) ................................. 3, 4, 7, 8, 10, 13, 18

Robert P. George, Facebook (Aug. 2, 2017),
   https://www.facebook.com/ RobertPGeorge/posts/10155417655377906 .......... 8

Erica Goldberg, *"Good Orthodoxy" and the Legacy of Barnette*,
    13 FIU L. Rev. 639 (2019) .................................................................... 10, 14, 27

Paul Horwitz, *A Close Reading of Barnette, in Honor of Vincent Blasi*,
    13 FIU L. Rev. 689 (2019) .......................................................................... 10, 13

George Orwell, "1984" (Penguin Group 1977) (1949) ............................................ 9

# IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

As *amicus curiae*, the Institute for Faith and Family ("IFFNC") urges this Court to reverse the District Court's ruling.

The Institute for Faith and Family is a North Carolina nonprofit organization that exists to preserve and promote faith, family, and freedom through public policies that protect constitutional liberties, including speech and religion. See https://iffnc.com.

# INTRODUCTION AND SUMMARY

Transgender ideology is invading American public schools at an alarming rate. In addition to the massive intrusion on parental rights, the Olentangy School District Policies at issue in this case threaten First Amendment rights by demanding that all students use a child's preferred pronouns. Failure to comply is branded as "misgendering," i.e., "the use of pronouns differing from those preferred by transgender students." *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 2023 U.S. Dist. LEXIS 131707, *37 ("*PDE v. OLSDBE*"). The very word "misgendering" implicitly assumes the student's "preferred" gender is correct, regardless of biological reality. But in defiance of that reality, "misgendering" is

---

[1] This brief is submitted with a Motion to file. *Amicus curiae* certifies that no counsel for a party authored this brief in whole or in part and no person or entity, other than *amicus*, its members, or its counsel, has made a monetary contribution to its preparation or submission.

condemned as "discriminatory" (*id.* at 3, 50), "derogatory" (*id.* at 29), "verbal bullying" (*id.* at 39), "harassing" (*id.* at 50) and allegedly creates a "hostile environment" for transgender students causing "substantial disruption" (*id.* at 40). But "no matter how well-intentioned the stated objective, once schools get into the business of actively promoting one political or religious viewpoint over another, there is no end to the mischief that can be done in the name of good intentions." *Hansen v. Ann Arbor Pub. Schs*, 293 F. Supp. 2d 780, 803 (E.D. Mich. 2003). Such "mischief" pervades these Policies.

Pronouns are an integral part of everyday speech based on objective biological reality and implicitly coupled with the belief that each person is created immutably male or female. This aspect of speech touches a matter of intense public concern and debate. Not everyone accepts culturally popular "gender identity" concepts or believes that a person can transition from one sex to the other. The First Amendment safeguards the right to speak according to one's own beliefs on these matters, even in public schools. Students can respect the dignity of others without sacrificing their own rights to thought, conscience, and speech.

The Policies' combination of speech and viewpoint compulsion is a formula for tyranny that cannot be salvaged by appealing to cases that allow restrictions of student speech under limited circumstances. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S.

675, 685 (1986) (sexually explicit speech); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) (school-sponsored expression); *Morse v. Frederick*, 551 U.S. 393, 409 (2007) (speech promoting illegal drug use); *Kutchinski ex rel. H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 356-57 (6th Cir. 2023). Public school students do not sacrifice their constitutional rights as a condition of attending public school.

## ARGUMENT

### I. THE POLICIES VIOLATE THE FIRST AMENDMENT BY COMPELLING SPEECH.

There is hardly a more "dramatic example of authoritarian government and compelled speech" than when King Henry commanded Sir Thomas More to sign a statement blessing the King's divorce and remarriage. Richard F. Duncan, *Article: Defense Against the Dark Arts: Justice Jackson, Justice Kennedy, and the No-Compelled Speech Doctrine*, 32 Regent U. L. Rev. 265, 292 (2019-2020), citing Robert Bolt, *A Man For All Seasons*: *A Play in Two Acts* (1st ed., Vintage Int'l 1990) (1962). Thomas More, a faithful Catholic, could not sign.

Five centuries later, the Olentangy School District has created a conundrum that is no less momentous than Thomas More's predicament. The School District purportedly created its Policies to "maintain an education and work environment that is free from all forms of unlawful harassment." *PDE v. OLSDBE*, *2. But the Policies are riddled with viewpoint-based compelled speech. As in *Barnette*, there is

3

"probably no deeper division" than a conflict provoked by the choice of "what doctrine . . . public educational officials shall compel youth to unite in embracing." Duncan, *Defense Against the Dark Arts*, 32 Regent U. L. Rev. at 292, citing *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 641 (1943). There are deep divisions over what public schools should teach, particularly about sexuality and other contentious matters. These divisions dramatically impact speech.

Compelled speech is anathema to the First Amendment, particularly where government mandates conformity to its preferred viewpoint. *Barnette, Wooley, NIFLA* and other "eloquent and powerful opinions" stand as "landmarks of liberty and strong shields against an authoritarian government's tyrannical attempts to coerce ideological orthodoxy." Duncan, *Defense Against the Dark Arts*, 32 Regent U. L. Rev. at 266; *Barnette*, 319 U.S. 624; *Wooley v. Maynard*, 430 U.S. 705 (1977); *National Institute of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361 (2018). Even "[h]arassing or discriminatory speech," however evil and/or offensive, "may be used to communicate ideas or emotions that nevertheless implicate First Amendment protections." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 209 (3rd Cir. 2001).

## II.  COMPELLED SPEECH AND VIEWPOINT DISCRIMINATION ARE UNIQUELY PERNICIOUS FREE SPEECH VIOLATIONS.

The "proudest boast" of America's free speech jurisprudence is that we safeguard "the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 137

4

S. Ct. 1744, 1764 (2017) (plurality opinion) (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)). Gender identity may be "embraced and advocated by increasing numbers of people," but that is "all the more reason to protect the First Amendment rights of those who wish to voice a different view." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000). Our law also protects the right to remain silent—to *not* express viewpoints a speaker hates. Compelled expression is even worse than compelled silence, although both are constitutionally impermissible, because compelled speech affirmatively associates the speaker with a viewpoint he does not hold. Even the District Court admits that "[s]tudents do not enjoy a right to be free from mere offense or from the exchange of ideas," explaining that "[t]he former would be too broad, the latter contrary to the goals of education." *PDE v. OLSDBE*, *37.

The Policies "[m]andate[] speech" many students "would not otherwise make" and "exact[] a penalty" (school discipline) for refusal to comply. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). The Policies demand that students make assertions they know are false, such as using *male* pronouns for a biological *female* or *female* pronouns for a biological male—all based on the command of a gender-confused child. This mandate is obviously based on *content*. Worse yet, it is viewpoint-based because it requires students to endorse transgender ideology regardless of conscience or faith.

"When the law strikes at free speech it hits human dignity . . . *when the law compels a person to say that which he believes to be untrue, the blade cuts deeper* because it requires the person to be untrue to himself, perhaps even untrue to God." Richard F. Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly Through the Lens of Telescope Media*, 99 Neb. L. Rev. 58, 59 (2020) (emphasis added). The Policies combine the worst of two worlds—compelled speech and viewpoint discrimination.

Freedom of thought is the "indispensable condition" of "nearly every other form of freedom." *Palko v. Connecticut*, 302 U.S. 319, 326-27 (1937)), *overruled on other grounds by Benton v. Maryland*, 395 U.S. 784 (1969). The freedom of thought that undergirds the First Amendment merits "unqualified attachment." *Schneiderman v. United States*, 320 U.S. 118, 144 (1943). The distinction between compelled speech and compelled silence is "without constitutional significance." *Riley*, 487 U.S. at 796. These two are "complementary components" of the "individual freedom of mind." *Wooley*, 430 U.S. at 714; *Barnette*, 319 U.S. at 637. Together they guard "both the right to speak freely and the right to refrain from speaking at all." *Wooley*, 430 U.S. at 714; *Barnette*, 319 U.S. at 633-634; *id.,* at 645 (Murphy, J., concurring). A system that protects the right to promote ideological causes "must also guarantee the concomitant right to decline to foster such

concepts." *Wooley*, 430 U.S. at 714; Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 63.

The Policies force school children to become "instrument[s] for fostering . . . an ideological point of view" that many find "morally objectionable." *Wooley*, 430 U.S. at 714-715. A government edict that commands "involuntary affirmation" demands "even more immediate and urgent grounds than a law demanding silence." *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2464 (2018), citing *Barnette*, 319 U.S. at 633 (internal quotation marks omitted). Even a legitimate and substantial government or pedagogical purpose "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Wooley*, 430 U.S. at 716-717, citing *Shelton v. Tucker,* 364 U.S. 479, 488 (1960). The Policies cannot jump this hurdle.

### A. The Policies present a paradigmatic example of compelled speech that is anathema to the First Amendment.

Compelled speech "invades the private space of one's mind and beliefs." Richard F. Duncan, *Defense Against the Dark Arts*, 32 Regent U. L. Rev. at 275. While "ordinary authoritarians" merely demand silence, prohibiting people from saying what they believe is true, "[t]otalitarians insist on forcing people to say things

they know or believe to be untrue." *Id.*, quoting Robert P. George.[2] The Policies assume a totalitarian mode by demanding that students adopt a distorted view of reality that aligns with whatever "gender identity" any child demands. Many cannot in good conscience comply.

**B.** **The Policies transgress liberties of religion and conscience.**

In addition to speech, the Policies threaten to encroach on religious liberty and conscience by "requir[ing] the students to affirm the idea that gender is fluid, contrary to their deeply-held religious beliefs." *PDE v. OLSDBE*, at *3. Religious speech is not only "as fully protected . . . as secular private expression," but historically, "government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) (internal citations omitted). Convictions about sexuality are inextricably intertwined with religion and conscience, as many faith traditions have strong teachings about sexual morality, marriage, and the distinction between male and female. Compelled speech—that a boy is a girl or a girl is a boy—tramples deeply held religious beliefs and attacks conscience.

---

[2] Robert P. George, Facebook (Aug. 2, 2017), Professor of Jurisprudence at Princeton, https://www.facebook.com/ RobertPGeorge/posts/10155417655377906.

Like most other states, Ohio expressly defines religious liberty in terms of conscience. "All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience." Oh. Const. art. I, § 7. The victory for freedom of thought recorded in the Bill of Rights recognizes that in the domain of conscience there is a moral power higher than the State. *Girouard v. United States,* 328 U.S. 61, 68 (1946). Courts have an affirmative "duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people." *Lee v. Weisman*, 505 U.S. 577, 592 (1992). The Policies assault liberty of thought and conscience, compelling students "to contradict [their] most deeply held beliefs, beliefs grounded in basic philosophical, ethical, or religious precepts"—by affirming the lie that a biological female is a male (or that a male is a female). *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring); *see* Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 65-66.

C. **The Policies exemplify the blatant viewpoint discrimination characteristic of tyrannical government.**

"The possibility of enforcing not only complete obedience to the will of the State, but *complete uniformity of opinion* on all subjects, now existed for the first time." George Orwell, "1984" 206 (Penguin Group 1977) (1949) (emphasis added).

Viewpoint discrimination ushers in an Orwellian system that destroys liberty of thought. As Justice Kennedy cautioned, "The right to think is the beginning of freedom, and speech must be protected from the government because speech is the

beginning of thought." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002); *see* Duncan, *Defense Against the Dark Arts*, 32 Regent U. L. Rev. at 265. The Policies imperil these liberties.

"[T]he history of authoritarian government . . . shows how relentless authoritarian regimes are in their attempts to stifle free speech." *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring). There is "no such thing as good orthodoxy" under a Constitution that safeguards thought, speech, conscience, and religion, even when the government pursues seemingly benign purposes like national allegiance (*Barnette*), equality, or tolerance. Erica Goldberg, *"Good Orthodoxy" and the Legacy of Barnette*, 13 FIU L. Rev. 639, 643 (2019). "Even commendable public values can furnish the spark for the dynamic that Jackson insists leads to the 'unanimity of the graveyard.'" Paul Horwitz, *A Close Reading of Barnette, in Honor of Vincent Blasi*, 13 FIU L. Rev. 689, 723 (2019).

Every speaker must decide "what to say and what to leave unsaid." *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 575 (1995), quoting *Pacific Gas & Electric Co.* v. *Public Utilities Comm'n of Cal.,* 475 U.S. 1, 11 (1986) (plurality opinion). An individual's "intellectual autonomy" is the freedom to say what that person believes is true and refrain from saying what is false. Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 85. A speaker's choice "not to propound a particular point of view" is simply "beyond

the government's power to control," regardless of the speaker's reasons for remaining silent. *Hurley*, 515 U.S. at 575. There is "no more certain antithesis" to free speech than a government mandate imposed to produce "orthodox expression." *Id*. at 579. Such a restriction "grates on the First Amendment." *Id*. "Only a tyrannical [School District] . . . requires [a student] to say that which he believes is not true," e.g., that "two plus two make five." *Id*. Here, the Policies coerce students to make false statements about the sex of other students.

The Supreme Court has *never* upheld a viewpoint-based mandate compelling "an unwilling speaker to express a message that takes a particular ideological position on a particular subject." Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 78. But that is precisely what the Policies require, darkening the "fixed star in our constitutional constellation" that forbids any government official, "high or petty," from prescribing "what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. Regardless of how acceptable transgender ideology is in the current culture, the School District's interest in disseminating that ideology "cannot outweigh [a student's] First Amendment right to avoid becoming the courier for such message." *Wooley*, 430 U.S. at 717. *Barnette* and *Wooley* solidify the principle that government lacks the "power to compel a person to speak, compose, create, or disseminate a message on

any matter of political, ideological, religious, or public concern." Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 63-64. The Policies are even more intrusive than in *Wooley*, where the state did not "require an individual to speak any words, affirm any beliefs, or create or compose any expressive message," but rather to serve as a "mobile billboard" for an ideological message obviously attributable to the state. *Id.* at 63. Even *Wooley*'s passive display violated the First Amendment because it "usurp[ed] speaker autonomy." *Id.* at 76. The key is whether private speakers "are closely linked with the expression in a way that makes them appear to endorse the government message." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 565 n.8 (2005) (citation and internal quotation mark omitted) (upholding compelled beef advertising subsidies); *see Doe v. Cong. of the United States*, 891 F.3d 578, 593 (6th Cir. 2018) (atheists unsuccessfully challenged inscription of "In God We Trust" on currency, because it did not attribute the message to them).

### D. Viewpoint-based compelled speech stifles debate and attacks the dignity of those who disagree with the prevailing state orthodoxy.

Viewpoint discrimination is "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). It creates a "substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). This is "poison to a free society." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (Alito, J., concurring).

Citizens who hold competing views on public issues may use the political process to enact legislation consistent with their views, but under *Barnette*, the government may not "insist that the victory of one side, of one creed or value, be memorialized by compelling the defeated side to literally give voice to its submission." Duncan, *Defense Against the Dark Arts*, 32 Regent U. L. Rev. at 278, quoting Horwitz, *A Close Reading of* Barnette, 13 FIU L. REV. at 723. "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning." *Janus*, 138 S. Ct. at 2464. These Policies demean students who hold conscientious objection to transgender ideology.

The government may not regulate speech "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. The Policies represent "a paradigmatic example of the serious threat presented when government seeks to impose its own message in the place of individual speech, thought, and expression." *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring). The inherent viewpoint-based compulsion to speak seeks not only to control content (pronouns) but also promote an ideology unacceptable to many. Such coerced compliance attacks dignity. "Freedom of thought, belief, and speech are fundamental to the dignity of the human person." Duncan, *Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 59.

The Policies contravene "[t]he very purpose of the First Amendment . . . to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion." *Thomas v. Collins,* 323 U.S. 516, 545 (1945) (Jackson, J., concurring). This is dangerous to a free society where the government must respect a wide range of diverse viewpoints. The government itself may adopt a viewpoint but may never "interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579.

Through its Policies, the School District attempts to enhance the dignity of some students by compelling other students to regurgitate the state's preferred message. This purpose is "insufficient to override First Amendment concerns." Goldberg, *"Good Orthodoxy"*, 13 FIU L. Rev. at 664. Even when it is appropriate to regulate harmful discriminatory conduct, the School District may not require some of its young students to "communicate a message of tolerance that affirms the dignity of others." *Id*. Dignity is an interest "so amorphous as to invite viewpoint-based discrimination, antithetical to our viewpoint-neutral free speech regime, by courts and legislatures." *Id*. at 665.

As *Hurley* teaches, the state must guard against "conflation of message with messenger" because "a speaker's objection to speaking or disseminating a particular ideological message is at the core of the no-compelled-speech doctrine." Duncan,

*Seeing the No-Compelled-Speech Doctrine Clearly*, 99 Neb. L. Rev. at 64. The trial judge in *Hurley* erroneously reasoned that the parade organizer's rejection of a group's *message* was tantamount to "discrimination on the basis of the innate *personhood* of the group's members." *Id.* (emphasis added). The First Amendment guards a speaker's autonomy to "discriminate" by favoring viewpoints he wishes to express and rejecting other viewpoints. *Id.* Rejecting a *message* is not tantamount to rejecting a *person* who prefers that message. Similarly, rejecting transgender ideology is not tantamount to rejecting a gender-confused *person*.

**E.    The prohibition of viewpoint discrimination is firmly entrenched in Supreme Court precedent as a necessary component of the Free Speech Clause.**

A century ago, the Supreme Court affirmed a conviction under the Espionage Act, which criminalized publication of "disloyal, scurrilous and abusive language" about the United States when the country was at war. *Abrams v. United States*, 250 U.S. 616, 624 (1919). If that case came before the Court today, no doubt "the statute itself would be invalidated as patent viewpoint discrimination." Lackland H. Bloom, Jr., *The Rise of the Viewpoint-Discrimination Principle*, 72 SMU L. Rev. F. 20, 21 (2019). A few years after *Abrams*, the Court shifted gears in *Barnette*, "a forerunner of the more recent viewpoint-discrimination principle." *Id. Barnette*'s often-quoted "fixed star" passage was informed by "the fear of government manipulation of the marketplace of ideas." *Id.* Justice Kennedy echoed the thought: "The danger of

viewpoint discrimination is that the government is attempting to remove certain ideas or perspectives from a broader debate. . . . To permit viewpoint discrimination . . . is to permit Government censorship." *Matal*, 137 S. Ct. at 1767-1768 (Kennedy, J., concurring). Justice Kennedy's comments "explain why viewpoint discrimination is particularly inconsistent with free speech values." Bloom, *The Rise of the Viewpoint-Discrimination Principle*, 72 SMU L. Rev. F. at 36.

Since *Barnette*, courts have further refined the concept of viewpoint discrimination. In *Cohen v. California*, Justice Harlan warned that "governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views." 403 U.S. 15, 26 (1971); *see* Bloom, *The Rise of the Viewpoint-Discrimination Principle*, 72 SMU L. Rev. F. at 22. A year later the Court affirmed that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content" and "must afford all points of view an equal opportunity to be heard." *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95-96 (1972).

Further development occurred in the 1980's. Both the majority and dissent in *Perry Education Ass'n v. Perry Local Educators' Ass'n* agreed that viewpoint discrimination is impermissible, with the dissent explaining that such discrimination "is censorship in its purest form and government regulation that discriminates among viewpoints threatens the continued vitality of 'free speech.'" 460 U.S. 37, 62 (1983)

16

(Brennan, J., dissenting). In *Pacific Gas & Electric*, the Court struck down a viewpoint-based regulation based on coerced association with the views of other speakers. 475 U.S. at 20-21 (plurality opinion). Later the Court affirmed the "bedrock principle underlying the First Amendment . . . that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Justice Scalia authored a key decision in the early 1990's striking down a Minnesota ordinance that criminalized placing a symbol on private property that "arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 380 (1992) (burning cross). The Supreme Court considered "the anti-viewpoint-discrimination principle . . . so important to free speech jurisprudence that it applied even to speech that was otherwise excluded from First Amendment protection." Bloom, *The Rise of the Viewpoint-Discrimination Principle*, 72 SMU L. Rev. F. at 25, citing *R.A.V.*, 505 U.S. at 384-385. The ruling defined viewpoint discrimination as "hostility—or favoritism—towards the underlying message expressed" (*R.A.V.*, 505 U.S. at 385 (citing *Carey v. Brown*, 447 U.S. 455 (1980)), effectively placing the principle "at the very heart of serious free speech protection." Bloom, *The Rise of the Viewpoint-Discrimination Principle*, 72 SMU L. Rev. F. at 25. As Justice Scalia observed, the

government may not "license one side of a debate to fight free style, while requiring the other to follow Marquis of Queensberry rules." *R.A.V.*, 505 U.S. at 392.

During this same time frame, the Supreme Court held that the government may not discriminate against speech solely because of its religious perspective. *See, e.g., Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 394 (1993) (policy for use of school premises could not exclude film series based on its religious perspective); *Rosenberger*, 515 U.S. at 829 (invalidating university regulation that prohibited reimbursement of expenses to student newspaper that "primarily promotes or manifests a particular belief in or about a deity or an ultimate reality"); *Good News Club v. Milford Central School*, 533 U.S. 98, 112 (2001) (striking down regulation that discriminated against religious speech).

Government speech mandates often implicate viewpoint discrimination by either compelling a speaker to express the government's viewpoint (*Wooley*, *NIFLA*) (transgender ideology in this case) or a third party's viewpoint (*Hurley*) (student's unilateral declaration of gender identity). Duncan, *Defense Against the Dark Arts*, 32 Regent U. L. Rev. at 283. After *Hurley*, "the constitutional ideal of intellectual autonomy for speakers, artists, and parade organizers, which originated in *Barnette*, now had the support of a unanimous Supreme Court." *Id.* at 282; *Hurley*, 515 U.S. 557. Even when the government's motives are innocent, there is a residual danger of censorship in facially content-based statutes because "future government officials

may one day wield such statutes to suppress disfavored speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 167 (2015).

In recent years, *Matal* "is the Court's most important decision in the anti-viewpoint-discrimination line of cases." Bloom, *The Rise of the Viewpoint-Discrimination Principle*, 72 SMU L. Rev. F. at 29. As this case illustrates, "[g]iving offense [to a transgender student] is a viewpoint." *Matal*, 137 S. Ct. at 1763. The School District may not escape the charge of viewpoint discrimination "by tying censorship to the reaction of [the student's] audience." *Id*. at 1766. Shortly after *Matal*, the Court struck down a provision forbidding "immoral or scandalous" trademarks because the ban "disfavors certain ideas." *Iancu v. Brunetti*, 139 S. Ct. at 2297. The Court's approach "indicated that governmental viewpoint discrimination is a per se violation of the First Amendment." Bloom, *The Rise of the Viewpoint-Discrimination Principle*, 72 SMU L. Rev. F. at 33.

## III. THERE IS NO LEGITIMATE PEDAGOGICAL PURPOSE FOR THE SCHOOL DISTRICT'S POLICIES.

Public schools are not "enclaves of totalitarianism" and "students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate." *Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico*, 457 U.S. 853, 877 (1982) (Blackmun, J., concurring), quoting *Tinker*, 393 U.S. at 511. Students do not "shed their constitutional rights . . . at the schoolhouse gate" (*Tinker*, 393 U.S. at 506) and "cannot be punished merely for expressing their personal views

on the school premises" (*Hazelwood*, 484 U.S. at 266). The Policies do not fall within the narrowly crafted exceptions in *Fraser*, *Morse*, or any other exception.

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton*, 364 U.S. at 487. Even if there were a legitimate purpose for the Policies, it "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Id.* at 488. The First Amendment facilitates the free flow of information and ideas. "The Nation's future depends upon leaders trained through wide exposure" to a "robust exchange of ideas" that "discovers truth out of a multitude of tongues" rather than "authoritative selection." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). The School District insists that students "still have an opportunity to express their social, political, and religious views" (*PDE v. OLSDBE,* at \*38), but that reassurance rings hollow. The use of sex-specific pronouns implicitly associates the speaker with the belief that those pronouns accurately reflect reality.

## A.     Transgender ideology is a matter of intense public concern.

Speech on matters of public concern merits heightened protection. There is hardly a more contentious "matter of public concern" than gender identity, "a controversial [and] sensitive political topic[] . . . of profound value and concern to the public." *Janus*, 138 S. Ct. at 2476 (cleaned up). The Policies "use pronouns to communicate a message" many students believe is false—that "[p]eople can have a

gender identity inconsistent with their sex at birth." *Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021). "Pronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Id.* at 508. It is not the business of *any* government official in *any* position to coerce *any* person's chosen perspective on this—including, or perhaps especially—young schoolchildren.

**B.    The School District has no "legitimate pedagogical purpose" in suppressing a student's viewpoint about "gender identity" by compelling expression of a view the student does not hold.**

It is neither "legitimate" or "pedagogical" to forcibly alter a student's speech about the sex of other students. That speech merits constitutional protection no matter how profoundly school officials (or even society generally) might find their position "offensive or disagreeable." *Texas v. Johnson*, 491 U.S. at 414.

**Curriculum.** Students do not have free reign to alter a school assignment and receive credit. *Settle v. Dickson County Sch. Bd.*, 53 F.3d 152 (6th Cir. 1995) (Batchelder, J., concurring) (research paper). But the Policies do not regulate "academic assignments" that educators may require. *Brown v. Li*, 308 F.3d 939, 949 (9th Cir. 2002). In a case where students were required to recite the Mexican pledge of allegiance as part of a Spanish class, the purpose was not "to foster Mexican nationalism" but merely to engage in an educational exercise to assist with learning a foreign language. *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 349 (5th Cir. 2017).

Even where "educational discretion" is present, however, courts must discern whether it has been used as a pretext to punish a student based on some impermissible factor. *Regents of University of California v. Bakke,* 438 U.S. 265 (1978) (improper use of racial factors in medical school admissions); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1293 (10th Cir. 2004) (Mormon acting student may be required to follow the script, but school officials' statements suggested hostility to her faith). On the other hand, elementary school officials violated a student's free speech rights by rejecting his candy cane project merely because the product incorporated a religious message. *Curry v. Sch. Dist. of Saginaw*, 452 F.Supp.2d 723, 736 (E.D. Mich. 2006).

**School-sponsored expression**. Faculty can "exercis[e] editorial control over the style and content of student speech in school sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273. *Hazelwood* seems to sandwich a "school-sponsored speech" category in between government and private speech. *Fleming v. Jefferson County Sch. Dist. R1*, 298 F.3d 918, 923 (10th Cir. 2002) (community project decorating tiles that would become a permanent part of a school reopening after the Columbine shooting). "School-sponsored speech" encompasses expressive activity that "the public might reasonably perceive to bear the imprimatur of the school." *Hazelwood*, 484 U.S. at 271. "School-sponsored speech" may also occur "in a

classroom setting as part of a school's curriculum." *Axson-Flynn v. Johnson*, 356 F.3d at 1289. It is "designed to impart particular knowledge or skills to student participants and audiences." *Hazelwood*, 484 U.S. at 271. A teacher might encourage critical thinking by requiring students to write papers from a particular viewpoint. These *educational* purposes are poles apart from the demand that students set aside both reality and personal convictions to speak messages they know are false. *Hazelwood* does not grant schools unbridled discretion to compel such speech.

The School District adopts one side of the contentious transgender debate and shuts down further inquiry, demanding compliance with its preferred side. But the Constitution protects unpopular minority viewpoints. *Dale,* 530 U.S. at 660; *Ward v. Polite*, 667 F.3d 727, 735 (6th Cir. 2012) ("[t]olerance is a two-way street") (overruling university's expulsion of counseling student for her religious refusal to endorse same-same relationship); *Doe v. University of Michigan*, 721 F.Supp.852, 863 (E.D. Mich. 1989) (University could not establish an anti-discrimination policy that effectively prohibited certain speech because it disagreed with the message, nor could it "proscribe speech simply because it was found to be offensive, even gravely so, by large numbers of people"). This is particularly true in a changing social environment—"the fact that an idea may be embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view." *Dale,* 530 U.S. at 660. Even elementary

schools may not prohibit speech based on "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. "Mere unorthodoxy or dissent from the prevailing mores is not to be condemned. The absence of such voices would be a symptom of grave illness in our society." *Sweezy v. New Hampshire*, 354 U.S. 234, 251 (1957).

**Substantial disruption.** "The primary function of a public school is to educate its students; conduct that substantially interferes with the mission is, almost by definition, disruptive to the school environment." *PDE v. OLSDBE*, at *26, quoting *Saxe*, 240 F.3d at 217. Concerns about disruption would be reasonable if limited to physical acts or harm rather than sweeping in pure speech. But the District Court reasons that "[i]ntentional misgendering"—pure speech—"has the effect of creating a hostile environment for transgender students on account of their gender identity and thereby causes a substantial disruption." *PDE v. OLSDBE*, at *40. The court describes the pronoun mandate as a means "to maintain a safe and civil learning environment, which has long been considered a legitimate pedagogical concern." *Id.* at *44, citing *Poling v. Murphy*, 872 F.2d 757, 758, 762 (6th Cir. 1989). But preserving a "safe and civil" environment does not necessitate coercing young students use pronouns that falsely describe another child's biological sex—and thereby substantially disrupting those students' fundamental First Amendment freedoms.

Schools are not a haven where educators can ignore the First Amendment with impunity. Public schools cannot invade the protected liberties of their students. "[C]ensorship or suppression of expression of opinion is tolerated by our Constitution only when the expression presents a clear and present danger of action of a kind the State is empowered to prevent and punish." *Barnette*, 319 U.S. at 633 (allowing students to quietly forego the compulsory flag salute presented no "clear and present danger"). To affirm the District Court's ruling, this Circuit would be "required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind." *Id*. at 634. Such compulsion "invades the sphere of intellect and spirit" which the First Amendment "reserve[s] from all official control." *Id.* at 642.

The Policies compel students to either dishonestly affirm a belief they do not hold or alter their beliefs under state compulsion. Both alternatives gut the First Amendment. Students face compulsion to implicitly declare a belief, not merely academic instruction or exposure to beliefs that differ from their own. Decades of precedent drive the conclusion that the School District cannot compel students to affirm a belief that collides with reality and their own convictions. *Wooley*, 430 U.S. at 715 ("The First Amendment protects the right of individuals . . . to refuse to foster . . . an idea they find morally objectionable."); *Pacific Gas & Electric*, 475 U.S. at 16 ([I]f "the government  [were] freely able to compel . . . speakers to propound

political messages with which they disagree, . . . protection [of a speaker's freedom] would be empty, for the government could require speakers to affirm in one breath that which they deny in the next."); *Hurley,* 515 U.S. at 575 ("[T]he choice of a speaker not to propound a particular point of view . . . is presumed to lie beyond the government's power to control.")

### C. Schools can affirm the dignity of every student without sacrificing the constitutional liberties of other students.

The District Court condemns "using pronouns contrary to an individual's preferences intentionally (or repeatedly)" because it "evinces disrespect for the individual," "plays into stereotypes," "lacks basis in scientific reality," and is "deeply harmful." *PDE v. OLSDBE*, at *40. But as *Saxe* explained, "[b]y prohibiting disparaging speech directed at a person's 'values,' the Policy strikes at the heart of moral and political discourse—the lifeblood of constitutional self-government (and democratic education) and the core concern of the First Amendment." 240 F.3d at 210. The fact "that speech about 'values' may offend is not cause for its prohibition, but rather the reason for its protection." *Ibid*. Deeply held convictions about sexuality implicate an individual's values and dignity. The School District's Policies attack the values and dignity of students who are courageous enough to resist attempts to dictate their beliefs and speech about sexuality. "No court or legislature has ever suggested that unwelcome speech directed at another's 'values' may be prohibited under the rubric of anti-discrimination." *Ibid*.

Important as it is to "affirm[] the equal dignity of every student" and to create the best environment for learning, "students need to tolerate views that upset them, or even disturb them to their core, *especially from other students*." Goldberg, *"Good Orthodoxy"*, 13 FIU L. Rev. at 666 (emphasis added). Students must learn to endure speech that is offensive or even false as "part of learning how to live in a pluralistic society, a society which insists upon open discourse towards the end of a tolerant citizenry." *Lee v. Weisman*, 505 U.S. at 590. Indeed, students attending required classes are exposed to "ideas they find distasteful or immoral or absurd or all of these." *Id*. at 591. Transgender students are not exempt but must learn to tolerate the views of those who disagree with them.

Public schools have a role in "educat[ing] youth in the values of a democratic, pluralistic society." *Coles ex rel. Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 378 (6th Cir. 1999). Rigorous protection of constitutional liberties is essential to preparing young persons for citizenship, so that we do not "strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Barnette*, 319 U.S. at 637. Our Nation's deep commitment to "safeguarding academic freedom" is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Meriwether*, 992 F.3d at 504-505, 509, quoting *Keyishian*, 385 U.S. at 603.

## CONCLUSION

*Amicus curiae* urges the Court to reverse the District Court ruling.

Dated:  September 29, 2023                              Respectfully submitted,

/s/Deborah J. Dewart
Deborah J. Dewart
Attorney at Law
111 Magnolia Lane
Hubert, NC 28539
lawyerdeborah@outlook.com
(910) 326-4554

*Attorney for Amicus Curiae*
*Institute for Faith and Family*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,482 words, excluding the parts of this brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

DATED: September 29, 2023

/s/Deborah J. Dewart
Deborah J. Dewart

*Attorney for Amicus Curiae*
*Institute for Faith and Family*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on September 29, 2023. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED: September 29, 2023          /s/Deborah J. Dewart
                                  Deborah J. Dewart

                                  *Attorney for Amicus Curiae*
                                  *Institute for Faith and Family*