## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

PARENTS DEFENDING EDUCATION,

Plaintiff – Appellant,

v.

OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, ET AL.,

Defendants – Appellees.

On Appeal from the United States District Court
for the Southern District of Ohio

# BRIEF OF AMICI CURIAE
# SOUTHEASTERN LEGAL FOUNDATION AND
# MOUNTAIN STATES LEGAL FOUNDATION IN SUPPORT OF
# PLAINTIFF-APPELLANT AND REVERSAL

William E. Trachman
James L. Kerwin
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
(303) 292-2021
wtrachman@mslegal.org
jkerwin@mslegal.org

Celia Howard O'Leary
Benjamin Isgur
   *Counsel of Record*
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Rd., Ste. 104
Roswell, GA 30075
(770) 977-2131
coleary@southeasternlegal.org
bisgur@southeasternlegal.org

October 2, 2023

*Counsel for Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Amicus Southeastern Legal Foundation is a Georgia nonprofit corporation, and Amicus Mountain States Legal Foundation is a Colorado nonprofit corporation. Neither amicus has any parent companies, subsidiaries, or affiliates. Neither amicus issues shares to the public, and no publicly traded corporation owns 10% or more of its stock.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ..................................... i

TABLE OF AUTHORITIES .................................................. iii

IDENTITY OF AMICI CURIAE ............................................. 1

SUMMARY OF ARGUMENT ............................................... 2

ARGUMENT ..................................................................... 7

I.     Public school students retain their First Amendment rights subject only to limited, essential restrictions. ........................................... 7

II.     The government may never compel speech on matters of serious social or political concern............................................. 12

     A.     The district court correctly found that the Policies compel speech. .................................................................... 12

     B.     Public schools' limited special status does not permit them to compel speech on matters of serious social and political concern. ................................................................. 13

CONCLUSION..................................................................... 17

# TABLE OF AUTHORITIES

**CASES**                                                               **PAGE(S)**

*303 Creative, LLC v. Elenis*,
143 S. Ct. 2298 (2023) ............................................................... 11, 12, 15, 16

*Barr v. Lafon*,
538 F.3d 554 (6th Cir. 2008) ............................................................... 11

*Defoe ex rel. Defoe v. Spiva*,
625 F.3d 324 (6th Cir. 2010) ............................................................... 11

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) ............................................................... 12

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
138 S. Ct. 2448 (2018) ............................................................... 13

*Kutchinski ex rel. H.K. v. Freeland Cmty. Sch. Dist.*,
69 F.4th 350 (6th Cir. 2023) ............................................................... 8

*Mahanoy Area Sch. Dist. v. B.L. by & through Levy*,
141 S. Ct. 2038 (2021) ............................................................... 2, 7, 8, 11

*Matal v. Tam*,
582 U.S. 218 (2017) ............................................................... 11

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021) ............................................................... 6, 12, 13, 16

*Minn. Voters All. v. Mansky*,
138 S. Ct. 1876 (2018) ............................................................... 11

*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*,
2023 U.S. App. LEXIS 25859 (8th Cir. Sept. 29, 2023) ...................... 9

*Telescope Media Grp. v. Lucero*,
936 F.3d 740 (8th Cir. 2019) ............................................................... 10

*Terminiello v. Chicago*,
337 U.S. 1 (1949) ............................................................... 6

*Texas v. Johnson*,
  491 U.S. 397 (1989) ...................................................................... 6

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969) ..............................................8, 6, 7, 8, 11

*United States v. Varner*,
  948 F.3d 250 (5th Cir. 2020) ...................................................... 16

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ..............................................5, 12, 14, 15

*Wallace v. Jaffree*,
  472 U.S. 38 (1985) .................................................................... 15

*Wooley v. Maynard*,
  430 U.S. 705 (1976) ............................................................. 12, 13

## **Rules**

Fed. R. App. P. 26.1 ...................................................................... i

Fed. R. App. P. 29(a)(3) ................................................................ 1

Fed. R. App. P. 29(a)(4)(E) ........................................................... 1

Fed. R. App. P. 32(a)(5) ................................................................ 18

Fed. R. App. P. 32(a)(6) ................................................................ 18

Fed. R. App. P. 32(a)(7)(B) ........................................................... 18

Fed. R. App. P. 32(f) ..................................................................... 18

## **Other Authorities**

Kristina Howansky et al., *Him, Her, Them, or Neither: Misgendering and Degendering of Transgender Individuals*, 13 PSYCHOLOGY AND SEXUALITY 1026, 1027 (2022) ................................................................ 13

Ezra Marcus, *A Guide to Neopronouns*,
  N.Y. Times (Sept. 18, 2022) ...................................................... 16

**IDENTITY OF AMICI CURIAE[1]**

Southeastern Legal Foundation (SLF), founded in 1976, is a national, nonprofit legal organization dedicated to defending liberty and Rebuilding the American Republic. This case concerns SLF because it has an abiding interest in the protection of our constitutional freedoms and civil liberties. This is especially true when the government suppresses free speech on public issues in our nation's schools. SLF educates and advocates on behalf of parents and students across the country and is committed to defending their freedom of speech.

Mountain States Legal Foundation (MSLF) is a nonprofit public interest law firm organized under the laws of the State of Colorado. MSLF is dedicated to bringing before the courts issues that are vital to the defense and preservation of individual liberties: the right to speak freely, the right to equal protection of the laws, and the need for limited and ethical government. Since its creation in 1977, MSLF attorneys have been active in litigation regarding the proper interpretation and application of statutory, regulatory, and constitutional provisions.

---

[1] No counsel for a party has authored this brief in whole or in part, and no person other than Amici, their members, and their counsel has made a monetary contribution to the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). Because Defendants-Appellees did not consent to the filing of this brief, Amici have filed a Motion for Leave to File along with this brief. *See* Fed. R. App. P. 29(a)(3).

## **SUMMARY OF ARGUMENT**

More than fifty years ago, the Supreme Court explained that public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). What the Court now calls *Tinker*'s "demanding standard" is what schools must meet before restricting student speech to prevent disruption. *Mahanoy Area Sch. Dist. v. B.L. by & through Levy*, 141 S. Ct. 2038, 2048 (2021). Before a school can suppress dissenting views, it bears the heavy burden of showing that it is motivated by "something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* (quoting *Tinker*, 393 U.S. at 509).

The Olentangy Local School District Board of Education's (District) three challenged policies—all of which the District has acknowledged would be violated by a refusal to use a student's "preferred pronouns"—cannot meet this standard. *See* Appellant's Br. at 9. All three policies suppress dissenting views and compel preferred views merely to avoid discomfort. Policy 5517 prohibits "harassment," which the District broadly defines to include any "insulting" or "dehumanizing" speech that "has the effect of substantially interfering with a student's educational performance." Policy 5517, R.7-1, PageID#121–23. This requires students to walk on the thinnest of eggshells. Even a single instance of accidentally offending another

student can lead to discipline if the offended student reacts strongly enough. The second challenged policy, the Code of Conduct, prohibits "discriminatory language," including "jokes" that are "derogatory towards an individual or group based on" membership in one or more classes. Code of Conduct, R.7-1, PageID#150. It is difficult to imagine a plainer case of prohibiting speech to avoid "discomfort and unpleasantness" than prohibitions on off-color jokes. No one can seriously doubt that the First Amendment protects the right of students to engage each other in jovial banter about, for example, a provocative comedian. The opposite result would mean every student constantly fearing discipline for their speech, with school administrators having unfettered discretion to discipline any student that they wanted.

The third challenged policy, Policy 5136, sweeps furthest, gathering swaths of on- and off-campus speech. It permits the District to punish even the most innocuous speech based merely on the hypothetical perception of others. It prohibits using electronic devices "in any way that *might reasonably* create in the mind of another person *an impression* of being threatened, humiliated, harassed, embarrassed, or intimidated." Policy 5136, R.7-1, PageID#134 (emphases added). It also bars using devices to send any material "that *can be construed* as harassment or disparagement of others based upon their [membership in various classes, including] political beliefs." *Id.* (emphasis added). Among many other problems, Policy 5136

3

does not give students clear notice of what exactly is prohibited. No student can know what "might reasonably create" "an impression of being humiliated [or] embarrassed" "in the mind of another person."

Indeed, Policy 5136 prohibits a broad swath of speech that reaches all the way from singing the songs from the Broadway musical *Book of Mormon*, to sharing a meme about a political candidate's unfitness for office, to telling a joke about the difficulties of navigating romantic relationships that might appear in a 90s-era sitcom. And while those innocuous topics are clearly off-limits, the broad language of Policy 5136 places a wide range of speech in question and subjects students to the arbitrary disciplinary decisions of the District. All the District must do to punish speech under Policy 5136 is imagine a hypothetical person who would be embarrassed by the message. As Parents Defending Education's brief demonstrates, the Policies possess many constitutional infirmities. *See* Appellant's Br. at 18–40. They compel speech. *Id.* at 18–23. They discriminate based on viewpoint. *Id.* at 23–28. They fail to satisfy *Tinker*'s demanding standard. *Id.* at 28–33. And they are overbroad. *Id.* at 33–40.

The district court erred by mischaracterizing the Policies. In doing so, it turned the free speech protections of the First Amendment on their head. Rather than analyzing the Policies as written, it focused on outlier situations that might be constitutionally suppressed under *Tinker* and *Mahanoy*. It discussed extreme

4

instances of repeated, severe, and incessant bullying in the community. *See, e.g.*, Op., R.28, PageID#833. It cited an unrelated pending case before it in which a student was repeatedly bullied and then physically assaulted. *Id.* And it discussed the concept of a "hostile environment," eventually making a finding that the effect of the Policies was only to prevent hostile environments, threats of physical harm, and substantial disruptions. *Id.* at PageID#836–37. No party questions the fact that those specific situations are serious issues in the District. But the District could either use other policies designed to address those extreme and specific situations or modify the Policies to ensure that they are not violated by ordinary speech. The Plaintiffs are not before this Court because they intend to bully, threaten, or assault people. They are before this Court because they want to speak their consciences on an issue of the day.

In its compelled speech analysis, the district court merged two unrelated situations and emerged with the proposition that the prohibition against compelling speech "does not extend with full force within the schoolhouse gate." *Id.* at 29. To reach this conclusion, it cited cases that arose in the context of compelling students to do their schoolwork. *Id.* That is classic conduct, far removed from the kind of First Amendment speech at issue. Marking "3 + 3 = 7" as wrong on a test is nothing like requiring students to express personal affirmation of matters of serious social or political opinion. *Cf. W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943).

Finally, the district court brushed past this Court's precedent and held that the Policies are viewpoint-neutral, reasoning that "pronouns . . . cannot be construed as affirming the speaker's agreement with the classmate's beliefs on gender identity." *Compare* Op., R.28, PageID#843, *with Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) ("Pronouns can and do convey a powerful message implicating a sensitive topic of public concern.").

Beyond these myriad problems, the three challenged policies restrict and compel speech for exactly the reasons that *Tinker* held (and *Mahanoy* recently reaffirmed) impermissible: the District's "undifferentiated fear or apprehension of disturbance." *Tinker*, 393 U.S. at 506. Such unsubstantiated fear "is not enough to overcome the right to freedom of expression." *Id.* After all, "[a]ny departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance." *Id.*; *see also Texas v. Johnson*, 491 U.S. 397, 408–09 (1989 ("[A] principal 'function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.'" (quoting *Terminiello v. Chicago¸* 337 U.S. 1, 4 (1949))).

The First Amendment does not allow the government to compel one person to use another's preferred pronouns. Far too often, governmental entities, schools in particular, misperceive their role in the contentious topics of the day. One of the foundations of our society is that citizens, not the government, decide for themselves what is true and correct. "Our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." *Tinker*, 393 U.S. at 506. To protect this essential component of the First Amendment and American society, the district court must be reversed.

## ARGUMENT

### I. Public school students retain their First Amendment rights subject only to limited, essential restrictions.

The right to freely speak one's mind conferred by the First Amendment applies fully to everyone regardless of age. Children are no exception. Schools may only restrict speech when their core purpose—pedagogy—*requires* that the government do so. *See Mahanoy*, 141 S. Ct. at 2047–48. The restrictions contained in the Policies are not required to fulfill the purpose of the school. They are thus impermissible.

Schools may only restrict student speech when that speech fits into one of four narrow categories: lewdness, illegal drug use, school-sponsored activities, or

material disruptions. *See Kutchinski ex rel. H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 356–57 (6th Cir. 2023); Op., R.28, PageID#826. The district court correctly found that the speech at issue did not fall into the first three categories. Op., R.28, PageID#826. But it determined, despite the sweeping prohibitions that the Policies embrace, that the Policies punished only speech that "materially disrupts classwork or involves substantial disorder or invasions of the rights of others," and therefore survived constitutional scrutiny. *Id.* To reach this conclusion, the district court misapplied the *Tinker* standard.

When examining a school's claim that a policy is necessary to prevent material disruptions, the Supreme Court has focused its inquiry on the actual classroom. *See Mahanoy*, 141 S. Ct. at 2047–48. School-sponsored extracurriculars are a secondary point of interest. *Id.* In *Mahanoy*, a student who was rejected from the varsity cheerleading squad posted a vulgar message on social media, visible to hundreds of fellow students. *Id.* at 2048. The message was offensive and upset members of the school community. *Id.* But the Court noted that even though "discussion of the matter took . . . 5 to 10 minutes of an Algebra class 'for just a couple of days,'" and members of the cheerleading squad were upset by the message, it did not meet "*Tinker*'s demanding standard." *Id.* at 2047–48.

*Tinker* itself also provides a close analogy. There, students wore black armbands to protest the Vietnam War. *Tinker*, 393 U.S. at 504. The school,

concerned with the disruptive potential of protest on such a serious and sensitive national topic, sent the students home unless they removed their armbands. *Id.* The Court held that this was impermissible because the school needed substantially more reason for preventing student speech on an important topic than just an "undifferentiated fear or apprehension of disturbance." *Id.* at 506. The District's behavior here is no different. It fears that dissent on this topic will cause some mild disturbance but has no specific fear it can identify. *See* Appellant's Br. at 23 (noting District's failure to present any specific feared disruption). That "is not enough to overcome the right to freedom of expression." *Id.*

Here, the district court reframed the Policies as only preventing certain conduct (bullying and creating hostile environments) to find that they satisfied *Tinker*. Op., R. 28, PageID#822–23. But the Policies punish *speech*, not conduct. And they punish many forms of speech that fall far short of bullying or creating a hostile environment. *See* Policy 5517, R.7-1, PageID#123 ("Harassment means any [speech] that . . . has the effect of substantially interfering with a student's educational performance . . . ."). Nor can the district court sidestep First Amendment scrutiny by simply reframing speech (using preferred pronouns) as conduct (bullying). *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 2023 U.S. App. LEXIS 25859, at *16 (8th Cir. Sept. 29, 2023) ("A school district cannot avoid the strictures of the First Amendment simply by defining certain speech as 'bullying' or

'harassment.'"); *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019) ("Speech is not conduct just because the government says it is.").

Imagine a kindergarten student who, upon meeting a biologically male student who prefers the pronoun "they," uses the pronoun "he" when offhandedly referring to the student. Or imagine an overheard cafeteria conversation between two students agreeing among themselves that, based on what they have learned in Biology and English classes, "he" is the proper word for someone who is biologically male. In either case, imagine that the student who prefers "they" becomes upset and reports the speakers to administrators. Policy 5517, as the school has interpreted it, permits the school to discipline for "harassment" the students who used "he" in those scenarios. The school also reads the Code of Conduct policy as permitting it to punish the students who used "he." *See* R.7-1, PageID#157. Imagine that these statements instead took place in a private text message conversation between parent and child or between two students. The school believes that Policy 5136 permits it to punish the students for that private conversation—even if the student who prefers "they" never found out about the statements. *See* R.7-1, PageID#134 (prohibiting communications with electronic devices that "might reasonably create" an impression of being humiliated or could "be reasonably construed" as humiliating and containing no requirement of any level of harm or disruption).

In each of these situations, the school's interest in restricting student speech falls well short of "*Tinker*'s demanding standard." *Mahanoy*, 141 S. Ct. at 2047–48. A communication that "might reasonably create" an impression of being humiliated, *see* Policy 5136, R.7-1, PageID#134, falls beneath the degree of disruption present in *Mahanoy*—a communication that actually *did* disrupt a class for 10 minutes for several days and which was characterized as upsetting various members of the school community. *Id.*[2]

As the Supreme Court has made clear for centuries, and reiterated often, the government does not get to decide for the people what is right or true. The District here cannot require that students abandon their beliefs by forcing them to contradict those beliefs through speech. The Plaintiffs desire merely the freedom to "speak [their] mind[s] regardless of whether the government considers [their] speech sensible and well intentioned or deeply misguided . . . ." *303 Creative, LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023) (internal citations and quotations omitted). That freedom is guaranteed to them because "the government may not compel a person

---

[2] Alternatively, the Policies are also impermissible under a viewpoint discrimination framework. *See Matal v. Tam*, 582 U.S. 218, 243 (2017). The Supreme Court has spoken directly and without compromise: "Giving offense is a viewpoint." *Id.* The force of the Policies is to prevent students from merely giving offense. The Policies are, therefore, viewpoint-discriminatory. And viewpoint discrimination is flatly prohibited. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). Public schools are no exception to this rule. *See, e.g.*, *Barr v. Lafon*, 538 F.3d 554, 571 (6th Cir. 2008); *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 336 (6th Cir. 2010).

to speak its own preferred messages." *Id.* (citing *Tinker*, 393 U.S. at 505–06). "Whether the First Amendment to the Constitution will permit officials to [compel speech] does not depend upon whether as a voluntary exercise we would think it to be good, bad or merely innocuous." *Barnette*, 319 U.S. at 634. To hold otherwise would crash the one "fixed star in our constitutional constellation" down to earth. *Id.* That is impermissible. The district court should be reversed.

## II. The government may never compel speech on matters of serious social or political concern.

The government violates the First Amendment any time it "tries" to "compel affirmance of a belief with which the speaker disagrees[.]" *Meriwether*, 992 F.3d at 503 (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995)); *accord Barnette*, 319 U.S. at 642; *303 Creative*, 143 S. Ct. at 2312. "[W]here the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest *cannot outweigh* an individual's First Amendment right to avoid becoming the courier for such message." *Wooley v. Maynard*, 430 U.S. 705, 717 (1976) (emphasis added). This remains true in the public school context, even for ideas as foundational to our country as the Pledge of Allegiance. *Barnette*, 319 U.S. at 634.

### A. The district court correctly found that the Policies compel speech.

As the district court found (and the District all but admitted), the effect of the Policies is to compel student speech. Op., R.28, PageID#837. The Policies do this

by providing students with two permissible choices: speak the District's preferred message, or remain silent on the question and engage in verbal acrobatics to speak without using pronouns.[3] A policy that compels students to speak the District's preferred message, or compels students to remain silent, is equally violative of the First Amendment. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018) ("We have held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" (quoting *Wooley*, 430 U.S. at 714)).

### B. Public schools' limited special status does not permit them to compel speech on matters of serious social and political concern.

First Amendment interests are especially strong where speech "relates to core religious and philosophical beliefs." *Meriwether*, 992 F.3d at 509. "Pronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Id.* at 508. The speech "concerns a struggle over the social control of language in a

---

[3] To be clear, many individuals argue that even this neutral-seeming choice—not using any pronouns at all—is both offensive and itself discriminatory: "Abstention from pronoun use represents a specific form of misgendering known as degendering and has been conceptualised as discriminatory when employed in descriptions of transgender but not cisgender individuals." Kristina Howansky et al., *Him, Her, Them, or Neither: Misgendering and Degendering of Transgender Individuals*, 13 PSYCHOLOGY AND SEXUALITY 1026, 1027 (2022). Not only does this highlight the problem with banning so-called offensive or insulting speech because such standards will constantly change, but it also paves the way for the District to move from enforcing quiet self-censorship—which is *already* unconstitutional—to requiring students to verbally use and affirm classmates' pronouns.

crucial debate about the nature and foundation, or indeed real existence, of the sexes." *Id.* When it comes to debate over pronouns, the mode of address used for a person is not merely a formality; the "mode of address [*is*] the message." *Id.* And the school context does not change the rule. *See Barnette*, 319 U.S. at 634.

*Barnette* is the paradigmatic example of a school attempting to compel speech. *Id.* West Virginia tried to compel public school students to salute the flag and recite the Pledge of Allegiance. *Id.* at 633. This, the Court said, "requires affirmation of a belief and an attitude of mind." *Id.* And crucially, it did not matter whether it required "that pupils forego any contrary convictions of their own and become unwilling converts to the prescribed ceremony or whether it will be acceptable if they simulate assent by words without belief and by a gesture barren of meaning." *Id.* In either case, unconstitutional compulsion would be present.

To reach this conclusion, the Court did not evaluate whether other students in the classroom might be offended by the decision of some students not to recite the Pledge. It did not look for students who might be particularly sensitive to offense—perhaps because their family members were veterans or sacrificed their lives in war—and weigh that fact to help decide whether the school might be able to compel students to recite the Pledge. The rule of law is simple: the school may not compel students to recite the Pledge, "because the opinions of men, depending only on the evidence contemplated by their own minds, cannot follow the dictates of other men."

*See Wallace v. Jaffree*, 472 U.S. 38, 53 n.38 (1985) (internal citation omitted). The district court misapplied this fundamental component of the First Amendment.

According to the district court, "nothing in the Policies prohibits a student who has a firmly-held belief that sex and gender are binary and set in stone from expressing that belief while also using a transgender classmate's preferred pronouns."[4] Op., R.28, PageID#843. But even if this were the case, it would not cure the constitutional defects of the Policies. The district court's suggestion to the contrary defies a long and continuous line of Supreme Court jurisprudence. More than fifty years ago, it did not matter whether the school required "that pupils forego any contrary convictions of their own and become unwilling converts" or merely "simulate assent by words without belief." *Barnette*, 319 U.S. at 633. And in the Supreme Court's recent decision in *303 Creative*, it did not "matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech

---

[4] With due respect to the district court, Amici disagree with this conclusion. Indeed, the school believes all three policies permit it to punish a student who says, "I will call you 'she' only because the school requires me to, but it is my firm internal belief that you are male." *See* Policy 5517, R.7-1, PageID#123; Code of Conduct, R.7-1, PageID#150; Policy 5136, R.7-1, PageID#134. Similarly, the school believes all three policies permit it to punish a student who says to a transgender swimmer, "I believe in my heart that transgender athletes should compete in sports against students of their biological sex." *See* Policy 5517, R.7-1, PageID#123; Code of Conduct, R.7-1, PageID#150; Policy 5136, R.7-1, PageID#134.

that he would prefer not to include." 143 S. Ct. at 2312. "Either way, unconstitutional compulsion is present." *Id.*

The district court's analysis also conflicts with Sixth Circuit precedent. As the district court put it, "Pronouns, in such a case, cannot be construed as affirming the speaker's agreement with the classmate's beliefs on gender identity, given that the speaker has already plainly expressed her disagreement." R. Doc 28, at 34. But following *Meriwether*, this cannot be the answer. 992 F.3d at 508. Compelling the use of a pronoun that does not match someone's biological sex forces the speaker to affirm agreement with the idea that an incongruence between biological sex and gender identity is possible.[5] And this Court has already explained just that. *See id.*

The district court's suggestions that government can "force an individual to include other ideas with his own speech that he would prefer not to include," *303 Creative*, 143 S. Ct. at 2312, and that pronouns cannot be construed as expressing a message despite that in this context "the mode of address [*is*] the message,"

---

[5] Depending on the requested pronouns, it might also require the speaker to affirm the idea that humans can be something other than male or female. *See United States v. Varner*, 948 F.3d 250, 256–58 (5th Cir. 2020) (discussing the problem of judicially compelling pronouns and refusing to engage the judiciary in the "quixotic undertaking" of deciding whether each pronoun neologism—for example, "fae/faer/faerself"—may be similarly compelled). For instance, an individual's decision to use "neopronouns" could require a speaker's affirmation that an individual is not merely neither male nor female, but a vampire or a gender represented by a paw emoji. Ezra Marcus, *A Guide to Neopronouns*, N.Y. TIMES (Sept. 18, 2022), bit.ly/nytneopronouns.

16

*Meriwether*, 992 F.3d at 508, are both contrary to established law. The district court should be reversed.

## CONCLUSION

For all these reasons, and those stated by Plaintiff-Appellant in its brief, Amici ask this Court to reverse the district court and enter a preliminary injunction.

Respectfully submitted,

William E. Trachman
James L. Kerwin
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
(303) 292-2021
wtrachman@mslegal.org
jkerwin@mslegal.org

Celia Howard O'Leary
Benjamin Isgur
   *Counsel of Record*
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Rd., Ste. 104
Roswell, GA 30075
(770) 977-2131
coleary@southeasternlegal.org
bisgur@southeasternlegal.org

October 2, 2023

*Counsel for Amici Curiae*

17

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,684 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using Word 2016 and uses a proportionally spaced typeface, Times New Roman, in 14-point type.

/s/    Benjamin Isgur

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was electronically filed on October 2, 2023, with the Clerk of the Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter, who are registered with the CM/ECF system.

/s/     Benjamin Isgur