No. 23-3630

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

PARENTS DEFENDING EDUCATION,
*Plaintiff-Appellant*,

v.

OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, ET AL.,
*Defendants-Appellees*.

On Appeal from the Judgment of the United States
District Court for the Southern District of Ohio
(Dist. Ct. No. 2:23-cv-01595-ALM-KAJ)

**BRIEF OF *AMICI CURIAE* STATES OF SOUTH CAROLINA, OHIO, ALABAMA, GEORGIA, IDAHO, INDIANA, IOWA, KENTUCKY, LOUISIANA, MISSISSIPPI, MISSOURI, MONTANA, NEBRASKA, NORTH DAKOTA, TEXAS, UTAH, AND VIRGINIA SUPPORTING PLAINTIFF-APPELLANT AND REVERSAL**

ALAN WILSON
*Attorney General*
Robert Cook
*Solicitor General*
J. Emory Smith, Jr.
*Deputy Solicitor General*
Thomas T. Hydrick
*Asst. Dep. Solicitor General*
Joseph D. Spate
*Asst. Dep. Solicitor General*
Counsel of Record
STATE OF SOUTH CAROLINA
OFFICE OF THE ATTORNEY GENERAL
1000 Assembly St.
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

DAVE YOST
*Attorney General*
Mathura J. Sridharan
*Deputy Solicitor General*
Nicholas A. Cordova
*Deputy Solicitor General*
STATE OF OHIO OFFICE OF THE ATTORNEY GENERAL
30 E. Broad St., 17th Floor
Columbus, OH 43215
(614) 728-7511
mathura.sridharan@OhioAGO.gov

*Attorneys for Amici Curiae*

October 2, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

STATEMENT OF *AMICUS* INTEREST AND SUMMARY OF ARGUMENT.....1

ARGUMENT .................................................................................................2

    A. The Policies Compel Speech Because Students Cannot Avoid Using Pronouns in a School Setting..................................................................3

    B. The Policies Compel Students to Affirm a Particular Belief on Gender Identity and Do Not Advance Legitimate Pedagogical Interests ...............4

        a. *The Policies Force Students to Affirm Beliefs They Do Not Hold* ........5

        b. *A Mere Rational Relation to Learning Does Not Justify Compelling Students to Express Views Contrary to Their Deeply Held Beliefs* ......7

CONCLUSION ...............................................................................................12

ADDITIONAL COUNSEL .............................................................................13

CERTIFICATE OF COMPLIANCE ..............................................................14

CERTIFICATE OF SERVICE ........................................................................15

## TABLE OF AUTHORITIES

**Cases** Page(s)

*Barr v. Lafon*,
  538 F.3d 554 (6th Cir. 2008) ................................................................................ 9

*Dambrot v. Cent. Michigan Univ.*,
  55 F.3d 1177 (6th Cir. 1995) ............................................................................ 6, 7

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, Council 31,
  138 S. Ct. 2448 (2018) ........................................................................................ 2

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*,
  141 S. Ct. 2038 (2021) .................................................................................... 7, 9

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ................................................................... 1, 5, 6, 7

*Minersville School District v. Gobitis*,
  310 U.S. 586, (1940) ........................................................................................... 8

*New Doe Child #1 v. Cong. of U.S.*,
  891 F.3d 578 (6th Cir. 2018) .............................................................................. 2

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*,
  969 F.3d 12 (1st Cir. 2020) ........................................................................... 8, 10

*Nuxoll ex rel. Nuxoll v. Indian Prairie School District No. 204*,
  523 F.3d 668 (7th Cir. 2008) ......................................................................  10, 11

*Saxe v. State College Area School District*,
  240 F.3d ....................................................................................................... 10, 11

*Slotterback v. Interboro Sch. Dist.*,
  766 F.Supp. 280 ................................................................................................ 11

*Sonnabend*,
  37 F.4th ......................................................................................................... 8, 11

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969) ............................................................................................ 7

*W. Virginia State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ................................................................................... 2, 3, 8

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
  576 U.S. 200 (2015) ............................................................................................ 2

*Wooley v. Maynard*,
  430 U.S. 705 (1977) ........................................................................................ 3, 4

*Zamecnik v. Indian Prairie Sch. Dist. No. 204*,
  636 F.3d 874 (7th Cir. 2011) ............................................................................ 11

**Statutes**

Ohio Rev. Code § 3321.01(A)(1) ................................................................................4

**Rules**

Fed. R. App. P. 29(a)(2)..........................................................................................14
Federal Rule of Appellate Procedure 29(a)(5)........................................................14

**STATEMENT OF *AMICUS* INTEREST AND SUMMARY OF ARGUMENT**

"[T]itles and pronouns carry a message." *Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021). Some believe that people can have a gender identity inconsistent with their sex at birth. Using preferred pronouns expresses this view. Others disagree. They hold a more traditional view of sex and gender, under which to use pronouns inconsistent with someone's biological sex is to speak a lie.

Olentangy Local School District Board of Education ("Board") took the first of these views. And it undertook to eradicate any opposing view by forcing students—including those who disagree—to use their peers' preferred pronouns. Specifically, the Board adopted three policies purportedly prohibiting "harassment" on the basis of protected characteristics including "transgender identity" ("Policies"). Order, R.28, PageID#815–16. By the Board's own admission, these policies punish students that "fail[] to address a student by [his or her] preferred pronouns," among other things. *Id*., PageID#810. Ultimately, these Policies put students that disagree with the Board's views on gender identity to an unconstitutional Hobson's choice: conform or be punished.

The Policies unconstitutionally compel students to speak the Board's views on gender. The Policies thus contravene a "fixed star in our constitutional constellation": "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess

1

by word or act their faith therein." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The Supreme Court recognized that fixed star in another case involving forced student speech. There, a school sought to compel students to salute the American flag. The First Amendment barred it from doing so. Just as the First Amendment in the 1940s barred schools from compelling a symbolic pledge of patriotic allegiance, the First Amendment today bars schools from compelling pledges to modern views of gender. South Carolina, Ohio, and the other *Amici* states submit this brief to urge the Court to say so.

## ARGUMENT

The First Amendment does not allow school board officials to coerce students into expressing messages on social issues inconsistent with the students' values. *Barnette*, 319 U.S. at 642. To the contrary, "the First Amendment stringently limits a State's authority to compel a private party to express a view with which the private party disagrees." *New Doe Child #1 v. Cong. of U.S.*, 891 F.3d 578, 593 (6th Cir. 2018) (quoting *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 219 (2015)). This is because "freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, Council 31, 138 S. Ct. 2448, 2463 (2018) (internal citation omitted). These protections extend to students in public schools: the First

2

Amendment bars public schools from compelling students to express opinions with which they disagree. *Barnette*, 319 U.S. at 642.

It follows from all this that the students will likely prevail in the First Amendment challenge to the Policies.

### A. The Policies Compel Speech Because Students Cannot Avoid Using Pronouns in a School Setting.

As a preliminary matter, the Polices do indeed compel speech, because the students have no choice but to use pronouns at school. To understand why, it is worth a brief digression to discuss *Wooley v. Maynard*, 430 U.S. 705 (1977). In that case, Jehovah's Witnesses challenged New Hampshire statutes requiring noncommercial motor vehicles to bear license plates embossed with the state motto, "Live Free or Die." The Supreme Court held that the statutes violated the appellants' First Amendment rights. *Id*. Of special relevance here, the Court reasoned that the required display of the state motto on the appellants' license plates unconstitutionally compelled them to express the message of the state motto. True, objectors might in theory simply refrain from owning an automobile. But driving is "a virtual necessity for most Americans . . . ." *Id*. at 715. Thus, to compel display the State's logo "[a]s a condition to driving an automobile," "in effect require[d]" citizens of the Granite State "use their private property as a 'mobile billboard' for the State's ideological message." *Id*.

3

Similar reasoning applies here. No one contests that the Policies compel students to refer to certain students using sex-specific pronouns that do not correspond to the referent's sex at birth. And for most students zoned to attend Olentangy schools, compliance is "a virtual necessity." *Id*. Ohio law compels school attendance. Ohio Rev. Code § 3321.01(A)(1). And, as even the District Court recognized, "student[s] in a school hallway" must "use[] pronouns because it is required by the English language when . . . greeting classmates, exchanging pleasantries, and joking with friends." Order, R.28, PageID#843. Thus, the Policies "in effect require" Students to use their peers' preferred pronouns. *Wooley*, 430 U.S. at 715.

### B. The Policies Compel Students to Affirm a Particular Belief on Gender Identity and Do Not Advance Legitimate Pedagogical Interests.

The District Court upheld the Polices, notwithstanding the fact that they compel speech, because it thought the Policies promoted the "legitimate pedagogical concern," of "maintain[ing] a safe and civil learning environment," Order, R.28, PageID#839, 841, and did so without "compel[ling] the speaker's affirmative belief," *id*., PageID#838 (citation omitted). Every aspect of that analysis is wrong. The policies *do* compel students to use language that affirms beliefs contrary to their convictions and beliefs. And such compulsory speech cannot be upheld based on the pedagogical goal the District Court cited.

4

*a. The Policies Force Students to Affirm Beliefs They Do Not Hold.*

The Policies require students to affirm the Board's preferred beliefs about gender. A gender-specific pronoun necessarily conveys the message that the addressee's gender corresponds to the pronoun. Why else would the Board care so deeply about controlling pronoun usage if it were not for the fact that pronoun usage forces the student to acknowledge that the pronoun's referent is of the corresponding gender? Correspondingly, forcing students to affirm a belief that the addressee is of a gender different from his or her sex at birth is the exact sort of compelled speech the First Amendment prohibits. Since the Policies require this of students, they compel students to express beliefs they do not actually hold. The Polices thus compel speech, plain and simple.

This conclusion is consistent with, and likely compelled by, this Court's decision in *Meriwether v. Hartop*. In that case, this Court held that a public college's policy requiring faculty to refer to students by pronouns corresponding to their self-asserted gender identity likely violated the First Amendment. *Meriwether v. Hartop*, 992 F.3d at 502. In *Meriwether*, a professor at a public college challenged the college's policy requiring faculty to refer to students by pronouns reflected by their self-asserted gender identity. *Id.* The district court dismissed his complaint, explaining that he had failed to state a colorable First Amendment claim. This Court reversed, holding that the professor plausibly alleged that the policy violated his First

5

Amendment rights "by compelling his speech or silence and casting a pall of orthodoxy over the classroom." *Id.* at 503. In doing so, this Court confirmed that a person's use of pronouns expresses a view on gender identity: "Through his continued refusal to address [a transgender woman] as a woman, [Professor Meriwether] advanced a viewpoint on gender identity." *Id.* at 509 (citing *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1189 (6th Cir. 1995)). The professor's pronoun usage "reflected his conviction that one's sex cannot be changed, a topic which has been in the news on many occasions and 'has become an issue of contentious political . . . debate.'" *Id.* at 508 (emphasis original).

Just so here. By using a transgender student's preferred pronouns, a fellow student is not expressing, "I acknowledge that you *think* your gender is X." That a transgender student believes they are transgender is obvious. No one doubts that a transgender student self-identifies with a particular gender, so simply reminding a transgender student of their own belief cannot be the Policies' purpose. Instead, by using a transgender student's preferred pronouns, a fellow student is expressing the message, "I accept that your gender *is* X." That is an affirmation of the transgender student's worldview, and compelling that affirmation is the Policies' true, impermissible, purpose.

To contest this obvious point, the District Court suggested that students' pronoun use, unlike that of professors in classrooms, "seems more like a mechanical

exercise than the expression of substantive content." Order, R.28, PageID#840 (citation omitted). The District Court suggested that "a student walking down a middle school hallway uses pronouns not to wade into the gender identity debate or to express a personal belief about gender identity . . . ." *Id*. But the District Court reveals its own disbelief of that assertion in holding that conventional pronoun usage conveys gender-identity based hostility that creates a "hostile environment," amounts to "verbal bullying," and causes physical harm. *Id*, PageID#835–36. If conventional pronoun usage is so powerful, it is only because pronouns inherently express a position in "the gender identity debate" and "express a personal belief about gender identity." As this Court has held, pronouns are *not* a type of "non-ideological ministerial task [that] would not be protected by the First Amendment;" instead, "titles and pronouns carry a message." *Meriwether*, 992 F.3d at 507.

  b. *A Mere Rational Relation to Learning Does Not Justify Compelling Students to Express Views Contrary to Their Deeply Held Beliefs.*

The District Court tried to avoid this conclusion by asserting that the Policies are reasonably calculated to "maintain a safe and civil learning environment." Order, R.28, PageID#839, 841. This misguided proposition, even if true, is insufficient to save the Policies from invalidation. True enough, "schools have a special interest in regulating speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'" *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2045 (2021) (quoting *Tinker v. Des*

7

*Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969)). But that principle from *Tinker* cannot be extended to *compel* speech adhering to views—especially views that implicate issues of deep personal significance and public debate—as a condition for attending school at all. Otherwise, the compulsory flag salute in *Barnette* would have been permitted because the educators reasonably believed the salute would inculcate a sense of national unity in furtherance of students' civics education, or to avoid causing disruptive offense to especially patriotic students. *See Minersville School District v. Gobitis*, 310 U.S. 586, (1940). What was true in *Barnette* is true here: fostering a functional educational environment does not "depend on compelling little children to participate in a ceremony which ends in nothing for them but a fear of spiritual condemnation. If . . . their fears are groundless, time and reason are the proper antidotes for their errors." *Barnette*, 319 U.S. at 644 (1943) (Black and Douglas, JJ., concurring).

In any event, "*Tinker* places the burden of justifying student-speech restrictions squarely on school officials." *Sonnabend*, 37 F.4th at 426 (citing *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 25 (1st Cir. 2020)). The School Board has failed to satisfy this burden.

Consider first the "material disruption" requirement. The District Court opined that "a hostile environment created by discriminatory speech is enough to cause a substantial disruption on its own." Order, R.28, PageID#831. A "hostile

environment," the District Court reasoned, is "more than just teasing and name calling" and is "created by comments, slurs, and jokes rooted in an individual's identity and in their personal characteristics, like their race, ethnicity, gender, sexual orientation, or religious or political beliefs." *Id.* But the traditional use of pronouns bears no resemblance to the material disruption of classwork envisioned by the courts. *See e.g.*, *Mahanoy*, 141 S. Ct. at 2050 (2021) (Alito, J., concurring) ("In a math class, for example, the teacher can insist that students talk about math, not some other subject. In addition, when a teacher asks a question, the teacher must have the authority to insist that the student respond to that question and not some other question, and a teacher must also have the authority to speak without interruption and to demand that students refrain from interrupting one another. Practical necessity likewise dictates that teachers and school administrators have related authority with respect to other in-school activities like auditorium programs attended by a large audience.") (internal citations omitted); *see also Barr v. Lafon*, 538 F.3d 554, 577 (6th Cir. 2008) (upholding a school policy prohibiting students from displaying the Confederate flag due to the reasonable forecast that it would substantially and materially disrupt the school environment in light of a history of racial tensions). As then-Judge Alito once wrote for the Third Circuit, schools that wish to ban speech to avoid a "hostile environment" must establish "a realistic threat of substantial disruption"—an "undifferentiated fear or apprehension of

9

disturbance" is "not enough to justify a restriction on student speech." *Saxe v. State College Area School District*, 240 F.3d at 217 (internal citations omitted). The Board's "hostile environment" policy in this case, and the District Court's decision upholding it, rests not on a demonstrated or realistic threat of substantial disruption, but rather on an undifferentiated fear that there may be a disturbance if students are not forced to affirm their acceptance of foundational principles with which they disagree.

As for "substantial disorder," the District Court simply opined that "discriminatory speech that arises to the level of creating a hostile environment can have severely negative effects on students' attendance and performance in school and their physical and psychological wellbeing—in other words, on the orderly operation of the school and its mission." Order, R.28, PageID#833. The court cited *Nuxoll ex rel. Nuxoll v. Indian Prairie School District No.* 204, 523 F.3d 668, 674 (7th Cir. 2008), for the proposition that a school can forbid speech if there is reason to think it will lead to a decline in students' test scores, an upsurge in truancy, or other symptoms of substantial disruption. *Id.* at 24-25 (citing *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. No. 204*, 523 F.3d 668, 674 (7th Cir. 2008)). The District Court failed to mention, however, that *Nuxoll* determined the First Amendment *protected* a student's wearing a "Be Happy, Not Gay" t-shirt, because "it is highly speculative that allowing the plaintiff to wear a T-shirt that says 'Be Happy, Not

Gay' would have even a slight tendency to provoke [incidents of harassment of homosexual students], or for that matter to poison the educational atmosphere." *Nuxoll*, 523 F.3d at 676. Indeed, speech expressing pointed disagreement with an LGBTQ+ lifestyle was permitted as not likely to cause substantial disorder. Simply using grammar in a traditional manner—in the way it has been used for millennia, and is used throughout the country still today—is not likely to do so here, either. (Especially because the school has substantial leeway to prohibit teasing or targeting of transgender students—it simply cannot compel other students to voice agreement with those students' views of gender.)

As for "invasions of the rights of others," "it is certainly not enough that the speech is merely offensive to some listener." *Saxe*, 240 F.3d at 217. Indeed, "at least one court has opined that [the 'interference with the rights of others' language] covers only independently tortious speech like libel, slander or intentional infliction of emotional distress." *Id.* (citing *Slotterback v. Interboro Sch. Dist.*, 766 F.Supp. 280, 289 n. 8 (E.D. Pa. 1991)). Simply put, "there's no 'generalized "hurt feelings" defense to a high school's violation of the First Amendment rights of its students' . . . ." *N.J. by Jacob v. Sonnabend*, 37 F.4th 412, 426 (7th Cir. 2022) (quoting *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 877 (7th Cir. 2011)).

Thus, even assuming school officials can rely on *Tinker* to compel speech, rather than to restrict it, the Board has not done enough to justify the Policies.

## CONCLUSION

Because the challenged policies compel student speech in violation of the First Amendment, the District Court erred in denying the Appellant a preliminary injunction. This Court should reverse.

Respectfully submitted,

s/Joseph D. Spate
Alan Wilson
*Attorney General*
Robert Cook
*Solicitor General*
J. Emory Smith, Jr.
*Deputy Solicitor General*
Thomas T. Hydrick
*Asst. Dep. Solicitor General*
Joseph D. Spate
*Asst. Dep. Solicitor General*
STATE OF SOUTH CAROLINA
OFFICE OF THE ATTORNEY GENERAL
1000 Assembly St.
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

Dave Yost
*Attorney General*
Mathura J. Sridharan
*Deputy Solicitor General*
Nicholas A. Cordova
*Deputy Solicitor General*
STATE OF OHIO OFFICE OF THE ATTORNEY GENERAL
30 E. Broad St., 17th Floor
Columbus, OH 43215
(614) 728-7511
mathura.sridharan@OhioAGO.gov

# ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General of Alabama

CHRISTOPHER M. CARR
Attorney General of Georgia

RAÚL LABRADOR
Attorney General of Idaho

THEODORE E. ROKITA
Attorney General of Indiana

BRENNA BIRD
Attorney General of Iowa

DANIEL CAMERON
Attorney General of Kentucky

JEFF LANDRY
Attorney General of Louisiana

LYNN FITCH
Attorney General of Mississippi

ANDREW BAILEY
Attorney General of Missouri

AUSTIN KNUDSEN
Attorney General of Montana

MICHAEL T. HILGERS
Attorney General of Nebraska

DREW WRIGLEY
Attorney General of North Dakota

KEN PAXTON
Attorney General of Texas

SEAN REYES
Attorney General of Utah

JASON MIYARES
ATTORNEY GENERAL OF VIRGINIA

13

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 2701 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman font) using Microsoft Word (the same program used to calculate the word count).

The Amici States are authorized to file this brief without the consent of the parties or the leave of the Court. Fed. R. App. P. 29(a)(2).

s/Joseph D. Spate<br>Joseph D. Spate

October 2, 2023

**CERTIFICATE OF SERVICE**

I certify that on October 2, 2023, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. I certify that the foregoing document is being served on this day to all counsel of record registered to receive a Notice of Electronic Filing generated by CM/ECF.

s/Joseph D. Spate<br>
Joseph D. Spate

October 2, 2023