Case No. 23-3630

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

_____

## PARENTS DEFENDING EDUCATION

*Plaintiff-Appellant,*

v.

## OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, et al.,

*Defendants-Appellees*


On Appeal from the United States District Court for the
Southern District of Ohio
Eastern Division, No. 2:23-cv-01595


_____

## BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION AND AMERICAN CIVIL LIBERTIES UNION OF OHIO IN PARTIAL SUPPORT OF PLAINTIFF-APPELLANT PARENTS DEFENDING EDUCATION

_____

David J. Carey
AMERICAN CIVIL LIBERTIES UNION OF
  OHIO FOUNDATION
1108 City Park Avenue, Suite 203
Columbus, OH 43206
Tel: (614) 586-1972
dcarey@acluohio.org

Amy R. Gilbert
Freda J. Levenson

Vera Eidelman
Ben Wizner
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street
New York, NY 10004
Tel.: (212) 549-2500
veidelman@aclu.org
bwizner@aclu.org

AMERICAN CIVIL LIBERTIES UNION OF
  OHIO FOUNDATION
4506 Chester Ave.
Cleveland, OH 44103
Tel: (614) 586-1972
agilbert@acluohio.org
flevenson@acluohio.org

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................... i

TABLE OF AUTHORITIES............................................................................ ii

STATEMENT OF INTEREST.........................................................................v

INTRODUCTION ........................................................................................1

ARGUMENT ..............................................................................................6

I.     Young People Have First Amendment Rights .................................6

II.    The District Court Failed to Apply Appropriate Standards for PDE's
       Viewpoint and Content Discrimination and Compelled Speech Claims ..........8

       A.    The District Court Erred Where It Failed to Apply
             the Governing *Tinker* Standard to In-School Speech...........................8

       B.    The District Court Erroneously Engaged in a
             Compelled-Speech Analysis in the Absence of Compulsion .............11

III.   The District Court Wrongly Upheld the Discriminatory Language
       and PCD Policies' Restrictions on In-School Speech Under *Tinker*...............12

       A.    The District Court Erroneously Presumed That Prohibited
             Speech Based on Some Personal Characteristic Is Always
             Substantially Disruptive ...............................................................13

       B.    *Tinker* Does Not Condone Students Misgendering their
             Classmates as a General Matter, But It Also Does Not
             Deem Such Speech Unprotected Under All Circumstances ..............18

IV.    Applying *Mahanoy* and Its Progeny, the PCD Policy Also
       Unconstitutionally Restricts Speech Outside of School ................................19

       A.    Courts Must Be Skeptical of a School's Efforts
             to Regulate  Off-Campus Speech. .....................................................19

       B.    The PCD Policy's regulation of off-campus
             speech is unconstitutional...............................................................22

CONCLUSION ...........................................................................................24

CERTIFICATE OF COMPLIANCE .................................................................26

CERTIFICATE OF SERVICE ........................................................................27

## TABLE OF AUTHORITIES

**Cases**

*Am. Amusement Mach. Ass'n v. Kendrick*,
  244 F.3d 572 (7th Cir. 2001)..................................................................7

*Ashcroft v. ACLU*,
  535 U.S. 564 (2002) ...........................................................................6

*Axson-Flynn v. Johnson*,
  356 F.3d 1277 (10th Cir. 2004)..............................................................11

*Barr v. Lafon*,
  538 F.3d 554 (6th Cir. 2008)............................................................9, 18

*Bethel Sch. Dist. No. 403 v. Fraser*,
  478 U.S. 675 (1986) ...............................................................iv, 9, 13, 20

*Bible Believers v. Wayne County, Mich.*,
  805 F.3d 228 (6th Cir. 2015)............................................................. iv

*Brown v. Entm't Merchants Ass'n*,
  564 U.S. 786 (2011)........................................................................7, 20

*C.N. v. Ridgewood Bd. of Educ.*,
  430 F.3d 159 (3d Cir. 2005)..................................................................11

*Castorina ex rel. Rewt v. Madison Cnty. Sch. Bd.*,
  246 F.3d 536 (2001)..............................................................................16

*Cohen v. California*,
  403 U.S. 15 (1971) ...............................................................................7

*Defoe ex rel. Defoe v. Spiva*,
  625 F.3d 324 (6th Cir. 2010)................................................................16

*Hazelwood Sch. Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988) ...............................................................iv, 9, 10, 20

*Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*,
  3 F.4th 887 (6th Cir. 2021) ...................................................................3

*Kutchinski as next friend to H.K. v. Freeland Community School District*,
69 F.4th 350 (6th Cir. 2023) ........................................................... *passim*

*Mahanoy Area Sch. Dist. v. B.L. by and through Levy*,
141 S.Ct. 2038 (2021) .................................................................. *passim*

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021)..............................................................11

*Morse v. Frederick*,
551 U.S. 393 (2007) ..................................................................iv, 20

*N.A.A.C.P. v. Button*,
371 U.S. 415 (1963) ...........................................................................6

*N.J. by Jacob v. Sonnabend*,
37 F.4th 412 (7th Cir. 2022) ...................................................... 16, 18

*Novak v. City of Parma*,
33 F.4th 296 (6th Cir. 2022) .......................................................iv, 16

*Ohio Citizen Action v. City of Englewood*,
671 F.3d 564 (6th Cir. 2011) ........................................................ iv

*Parents Def. Educ. v. Linn Mar Cmty. Sch. Dist.*,
No. 22-2927 (8th Cir. Sept. 29, 2023) ................................................19

*Reno v. American Civil Liberties Union*,
521 U.S. 844 (1997) ...........................................................................7

*Saxe v. State Coll. Area Sch. Dist.*,
240 F.3d 200 (3d Cir. 2001)........................................................ 13, 17

*Speet v. Schuette*,
726 F.3d 867 (6th Cir. 2013)..............................................................3

*Sypniewski v. Warren Hills Regional Bd. of Educ.*,
307 F.3d 243 (3d Cir. 2002)........................................... 14, 15, 16, 18

*Texas v. Johnson*,
491 U.S. 397 (1989) ...........................................................................6

iii

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
   393 U.S. 503 (1969) ................................................................... *passim*

*United States v. Stevens*,
   559 U.S. 460 (2010) ............................................................................6

*W. Virginia State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ............................................................................8

*Wilkins v. Daniels*,
   744 F.3d 409 (6th Cir. 2014).............................................................11

*Wood v. Eubanks*,
   25 F.4th 414 (6th Cir. 2022) ............................................................. iv

**Other Authorities**

U.S. Dep't of Ed., Off. for Civ. Rts.,
   *Dear Colleague* (Oct. 26, 2010),
      https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html .........23

U.S. Dep't of Ed., Off. for Civ. Rts.,
   *First Amendment: Dear Colleague* (July 28, 2003),
      https://www2.ed.gov/about/offices/list/ocr/firstamend.html ..............................23

## STATEMENT OF INTEREST[1]

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan, non-profit organization dedicated to defending the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws. The ACLU of Ohio is an affiliate of the ACLU.

The ACLU and its affiliates have been at the forefront of numerous state and federal cases addressing freedom of speech, including in this Court. *See, e.g.*, *Wood v. Eubanks*, 25 F.4th 414 (6th Cir. 2022); *Novak v. City of Parma*, 33 F.4th 296 (6th Cir. 2022); *Bible Believers v. Wayne County, Mich.*, 805 F.3d 228 (6th Cir. 2015); *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564 (6th Cir. 2011).

On student speech specifically, the ACLU and its affiliates have litigated several cases that define the First Amendment landscape, including two with central relevance here: *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), and *Mahanoy Area Sch. Dist. v. B.L. by and through Levy*, 141 S.Ct. 2038 (2021). *See also, e.g.*, *Morse v. Frederick*, 551 U.S. 393 (2007); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986).

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* certify that no person or entity, other than amici curiae, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part.

As organizations committed to protecting the freedom of speech, including the right of young people to express themselves free of government restriction—both within and outside of the school environment—the ACLU and ACLU of Ohio have a strong interest in the proper resolution of this case.

## **INTRODUCTION**

The First Amendment protects young people's freedom of speech, both inside and outside of the school environment. Youth and inexperience are not justifications for the government to suppress student expression. Quite the opposite: In service of their dual role as both custodians of students' development and as the "nurseries of democracy," schools bear a special duty to foster the free exchange of ideas—including and especially unpopular ones, "for popular ideas have less need for protection." *Mahanoy Areas Sch. Dist. v. B.L. by and through Levy*, 141 S.Ct. 2038, 2046 (2021). That is true during school hours and in school-sponsored programs, and applies with even more force outside of the school environment.

Of course, public schools are tasked with ensuring that all students have an opportunity to learn, but that task is entirely compatible with free expression. When students encounter ideas from others that they find challenging or even offensive, the appropriate role of the school generally is not to shield them by way of selective suppression. Its role is to teach students how to engage in discourse, a skill they will need in adult society: how to engage with, adapt to, reject, or seek to change views with which they disagree. When words spoken in a school-supervised environment create a hostile environment, or cause material and substantial disruption, a school can regulate them consistent with the First Amendment. Outside of the school environment, public schools have even less of a defensible interest in suppressing

young people's speech. To do so would bar some student ideas from *ever* finding expression, would intrude on the realm of parents, and would further stifle the airing of unpopular views. *See id.* at 2046.

In examining two of the policies at issue in this case—a provision of the Code of Conduct that prohibits a broadly-defined category of "discriminatory" language ("Discriminatory Language Policy"), and a personal communication device ("PCD") policy that prohibits disruptive, embarrassing, or humiliating speech, as well as speech that could be understood to disparage others on the basis of a listed characteristic, including political beliefs, both on and off campus—the district court ignored this First Amendment framework and, as a result, erred on several independent fronts.

As an initial matter, the district court improperly focused its analysis on the question of whether a school may constitutionally prohibit students from intentionally misgendering classmates in a way that creates a hostile environment for transgender students. To be sure, the answer to that question is yes; intentional misgendering may well rise to the level of such severe or pervasive harassment that it creates a hostile environment and may be regulable on that basis. But the district court failed to recognize that this is a facial challenge—not an as-applied one. Even though the Discriminatory Language and PCD Policies effectively prohibit intentional misgendering, they also prohibit much more. In assessing their

constitutionality, the operative question is not whether the First Amendment would allow a hypothetical ban focused solely on intentional misgendering that creates a hostile educational environmental, but whether the actual text of the two policies at issue unconstitutionally restricts speech as a whole. *See generally Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893 (6th Cir. 2021) ("For [a] facial challenge, we look to the Policy's text and determine whether it unconstitutionally burdens speech."). Sustaining a First Amendment facial challenge is appropriate where there is a risk that the statute would chill a substantial amount of protected speech. *See Speet v. Schuette*, 726 F.3d 867, 878 (6th Cir. 2013).

That is the case here. The Discriminatory Language Policy cannot withstand First Amendment review under the standard for in-school student speech set by *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), and the PCD Policy fails appropriate scrutiny under both *Tinker* and *Mahanoy*, which governs regulation of speech outside of the school environment.

This is not to say that all speech that could be covered by the two policies is protected from discipline. Where speech rises to the level of substantially disrupting the school's educational function, it may be restricted in the same fashion as any other substantially disruptive expression. And where it is so severe or pervasive as to create a hostile environment, it may also be subject to regulation.  But if it does not, a school may not proscribe it.

3

The district court's rulings to the contrary rely on several misapplications of the law. *First*, as to Parents Defending Education's (PDE) claim that any policies that prohibit intentional misgendering in school are tantamount to viewpoint or content discrimination, the district court erred by failing to apply the controlling standard set by *Tinker*. Instead, it applied an inappropriately lenient "reasonableness" test.

*Second*, the lower court engaged in a misguided—and unnecessary—analysis of PDE's compelled speech claim, which alleged that the School District's policies compelled students to use other students' preferred pronouns. In fact, the School District granted students an accommodation to "avoid using pronouns where doing so would be contrary to [their] religious beliefs," thus preventing them from being compelled to speak any particular message at all. *See* Opinion & Order Denying Preliminary Injunction ("Opinion"), R. 28, Page ID # 817.

*Third*, where the court below did apply *Tinker*, it applied it incorrectly as to both the Discriminatory Language Policy and the PCD Policy. The former reaches any "verbal or written comments, jokes, and slurs that are derogatory towards an individual or group" based on a listed identity characteristic. The latter reaches speech that "create[s] in the mind of another person an impression of being . . . humiliated [or] embarrassed," is merely "disruptive," or "that can be construed as . . . disparagement of others based upon their . . . political beliefs[.]" The district court

improperly construed both policies to be far narrower than their text provides. It then created and applied a novel rule that *any* speech that is derogatory on the basis of an identity characteristic automatically constitutes a "substantial disruption" to the school's educational function. It applied that rule categorically, without regard to context, specific actual or reasonably-forecast effects, severity, or pervasiveness.

That line of reasoning circumvents *Tinker*'s substantial disruption requirement by effectively assuming it away for a considerable swathe of speech. In practice, the district court's rule would mean that nearly *any* joke or passing remark invoking some identity characteristic—including one that is unlikely to cause offense, or one that is not heard or spread widely—would be automatically forbidden. Students would find themselves understandably reluctant to offer any number of opinions—whether about men, girls, elderly people, kids, atheists, or, under the PCD policy, Democrats or Republicans—lest they be deemed "derogatory towards . . . a [group][.]"

*Fourth*, the district court erred in upholding the PCD Policy even though that policy's prohibitions reach outside of the school environment, thereby failing to observe the Supreme Court's caution in *Mahanoy* that student speech restrictions outside of school must be undertaken with the utmost precision.

The ruling below should be reversed in part, at a minimum as to the School District's Discriminatory Language and PCD Policies.[2] The First Amendment does not grant PDE or its members a general free pass to intentionally misgender their transgender classmates, and they should not be granted any injunction to that effect—but nor can the First Amendment countenance the far-reaching overbreadth of these two policies, which prohibit far more than speech that creates a hostile environment or substantial disruption.

## ARGUMENT

### I.   Young People Have First Amendment Rights

"As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (cleaned up)). The "government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *see also N.A.A.C.P. v. Button*, 371 U.S. 415, 432, 438 (1963) (explaining that freedom of speech is among the most jealously guarded constitutional guarantees, necessitating "[p]recision of regulation"). Rather, the First Amendment is designed to "put[ ] the decision as to

---

[2] Amici curiae take no position on any other aspects of PDE's claims in this case, other than stated in this Brief.

what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." *Cohen v. California*, 403 U.S. 15, 24 (1971).

This right "is powerful medicine in a society as diverse and populous as ours," *id.*, and it applies "[e]ven where the protection of children is the object." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 804–05 (2011) (invalidating regulation of violent video games for minors); *see also Reno v. American Civil Liberties Union*, 521 U.S. 844, 874 (1997) (invalidating statute prohibiting indecent communications available to minors online).

"[M]inors are entitled to a significant measure of First Amendment protection," with regard to both what they can hear and what they can say. *Mahanoy*, 141 S. Ct. at 2044. This is important for their development, for "it is obvious" that young people "are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble." *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001). Indeed, the fact that a speaker is young is reason not for the diminution of their rights, but for their "scrupulous protection . . . if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes."

7

*W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) As *Mahanoy* reaffirmed, these principles apply with special force when it comes to schools—which, as "the nurseries of democracy," "have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" 141 S. Ct. at 2046.

## II.    The District Court Failed to Apply Appropriate Standards for PDE's Viewpoint and Content Discrimination and Compelled Speech Claims

### A.    The District Court Erred Where It Failed to Apply the Governing *Tinker* Standard to In-School Speech

Any analysis of restrictions on student speech begins with the axiom that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate[.]" *Tinker*, 393 U.S. at 506; *see also, e.g.*, *Mahanoy*, 141 S.Ct. at 2045. Schools may therefore proscribe and control student speech only within "fundamental constitutional safeguards." *Tinker*, 393 U.S. at 507. Students may "express [their] opinions, even on controversial subjects" and even where those opinions are offensive, so long as their expression does not cause—or is not reasonably forecast to cause—"substantial disruption of or material interference with school activities," or infringe the rights of others. *Id.* at 513–14; *see also* *Mahanoy*, 141 S.Ct. at 2045 (describing school's "special interest in regulating speech that 'materially disrupts classwork or involves substantial disorder'").

*Tinker*'s limits apply to nearly all restrictions on student speech during times when the students are under school supervision—during "the classroom hours," as well as when students are "in the cafeteria, or on the playing field, or on the campus during the authorized hours." *Tinker*, 393 U.S. at 512–13; *see also Barr v. Lafon*, 538 F.3d 554, 563–64 (6th Cir. 2008) (explaining that *Tinker* applies to all student speech that is not covered by *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 680 (1986) (school may prohibit vulgar language at mandatory assembly) or *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) (school may reasonably regulate school-sponsored student speech)).

The district court erred by failing to properly apply *Tinker* to the Discriminatory Language and PCD Policies' regulation of in-school speech, and in some instances, by failing to apply *Tinker* at all. Specifically, in examining PDE's First Amendment claims for viewpoint or content discrimination, the district court stated that the restrictions "must … be viewed against the backdrop of *Tinker*," but then proceeded to apply what it described as "the more lenient 'reasonableness' standard[.]" Opinion, R. 28, Page ID # 841. But *Tinker* did not announce or apply a "reasonableness" standard.

In fact, a freestanding "reasonableness" standard has no grounding in precedent for a general student speech restriction; *Tinker* requires substantial disruption. The district court pointed to *Kutchinski as next friend to H.K. v. Freeland*

9

*Community School District*, but the cited language stands only for the proposition that under *Tinker*, a school may act where the substantial disruption (the operative standard) is "reasonably forecast." 69 F.4th 350, 359 (6th Cir. 2023). *Kutchinski* does not authorize a more lenient form of review than *Tinker* itself.

The district court may also have conflated *Tinker* with the standard from *Hazelwood*, which requires only a rational relationship to a legitimate pedagogical interest. But *Hazelwood* applies only to speech that is sponsored by the school. *See Hazelwood*, 484 U.S. at 270–71. That is not the subject of the Discriminatory Language and PCD Policies. *Tinker* is more protective of student speech than *Hazelwood*, and for good reason. Under *Hazelwood*, a reviewing court effectively asks whether the First Amendment requires a school "affirmatively to promote particular student speech." *Id.* By contrast, *Tinker* pertains to "educators' ability to silence a student's personal expression that merely happens to occur on the school premises." *Id.* The latter category of speech is far broader, and far more important to protect during a formative time in young people's lives. *See Mahanoy*, 141 S.Ct. at 2045. Under the district court's rationale, a school could ban students from discussing anything from electoral politics to religion to taste in music, so long as the ban is merely "reasonable." Whatever its origin, the district court's lower "reasonableness" test is incorrect and potentially dangerous as a gauge for the Discriminatory Language and PCD Policies.

B.    <u>The District Court Erroneously Engaged in a Compelled-Speech
Analysis in the Absence of Compulsion</u>

The district court's analysis of whether the Discriminatory Language and PCD Policies unconstitutionally compel student speech was also misplaced and largely unnecessary, because the policies do not compel speech at all. The court reached the correct conclusion—that PDE's compelled speech claim fails—but for the wrong reasons.

The First Amendment right against compelled speech is violated "only in the context of actual compulsion." *Wilkins v. Daniels*, 744 F.3d 409, 415 (6th Cir. 2014) (quoting *C.N. v. Ridgewood Bd. of Educ.,* 430 F.3d 159, 189 (3d Cir. 2005)). Where there are options other than "speaking," mere unwillingness to conform to those options does not imply actual compulsion. *See id.* at 416 ("The Act imposes a choice on appellants, even though it is not a choice they welcome."). Here, the School provided an accommodation to students to "avoid using pronouns where doing so would be contrary to [their] religious beliefs." Opinion, R. 28, Page ID # 817. Contrast that with, for example, *Meriwether v. Hartop*, 992 F.3d 492, 513–14 (6th Cir. 2021), where the plaintiff sought and was ultimately denied just such an accommodation. Had it been granted, his speech would not have been compelled. *See id.*; *see also Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir. 2004) (compulsion existed where the school forced a student to "say words she finds

11

offensive" without providing an alternative). That the students chose not to accept the accommodation offered here does not render the policies compulsory.

## III.   **The District Court Wrongly Upheld the Discriminatory Language and PCD Policies' Restrictions on In-School Speech Under *Tinker***

The School District's policy against "discriminatory" language defines that term very broadly, to include any "verbal or written comments, jokes, and slurs that are derogatory towards an individual or group based on one or more of the following characteristics: race, color, national origin, sex (including sexual orientation and transgender identity), disability, age, religion, ancestry, or genetic information." Opinion, R. 28, Page ID # 815. The PCD Policy additionally prohibits students from using a personal communications device to transmit any "disruptive," "embarrass[ing]" or "humiliat[ing]" speech, as well as speech that "can be construed as . . . disparagement of others" based upon the same characteristics listed above, except with "political beliefs" swapped in for "genetic information." *Id.* at ## 814–815.

The Discriminatory Language Policy literally bars any joke that rests on a generalization about any of the groups in question, and the PCD Policy effectively does the same. Under the former, jokes about men, boys, girls, Catholics, or British nationals would all be forbidden. It would bar a joke that began, "a priest, a rabbi, and an imam walked into a restaurant"—almost no matter how it ended. And the

PCD Policy would go even further, reaching any joke about, or criticism of, socialists, communists, fascists, or anarchists.

In assessing these policies' constitutionality as to in-school speech, the district court invoked *Tinker*, but rested much of its analysis on the incorrect supposition that every single instance of prohibited speech "that is based on some personal characteristic" would necessarily create a substantial disruption. Opinion, R. 28, Page ID # 828. That is unsupportable under either *Tinker* or the language of the two policies themselves.

A.  <u>The District Court Erroneously Presumed That Prohibited Speech Based on Some Personal Characteristic Is Always Substantially Disruptive</u>

Under *Tinker*, a school must "reasonably believe that speech will cause actual, material disruption before prohibiting it." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 216–17 (3d Cir. 2001) (Alito, J.); *see also Tinker*, 393 U.S. at 509 (striking prohibition on speech "where there is no finding and no showing that engaging in the forbidden expression would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school'").[3] To restrict

---

[3] The district court's conclusion that affected students are "in effect, a captive audience" also understates the scope of the two policies. Opinion R. 28, Page ID # 833. The Supreme Court has only entertained that logic in *Fraser*, a case about a student's presentation at a mandatory assembly. *See Fraser*, 478 U.S. at 677. In contrast, the Discriminatory Language Policy applies to *any* derogatory comments made during the school day, and the PCD Policy additionally applies off campus.

student expression, there must be a demonstrable connection between the restricted speech and an actual or reasonably-forecast substantial disruption, grounded in objective and specific facts rather than wholesale presumption. *See Kutchinski,* 69 F.4th at 359-60; *Sypniewski v. Warren Hills Regional Bd. of Educ*., 307 F.3d 243, 262–63 (3d Cir. 2002) (holding unconstitutional a school's racial harassment policy that "proscribes 'name calling,' 'racial prejudice,' and 'ill will,' independent of any possible disruption").

But here, rather than requiring any finding or reasonable forecast of substantial disruption, the district court's ruling expressly authorizes the School District to rest on supposition. It does so with a pair of blanket presumptions that effectively circumvent *Tinker*: first, that "speech that directly targets individual students on account of their identity" *necessarily* and *categorically* creates a hostile environment; and second, that "a hostile environment created by discriminatory speech is enough to cause a substantial disruption on its own." Opinion, R. 28, Page ID # 831, # 834. Under these presumptions, every single instance of discriminatory or disparaging speech based on a listed personal characteristic would *by definition* be enough to create a substantial disruption under *Tinker*—regardless of the speech's context, the relationship between speakers, or the severity or pervasiveness of the

---

Applying a "captive audience" rationale to that full universe of speech is both factually unfounded and far too restrictive of free inquiry.

statements. This presumes away *Tinker*'s substantial disruption requirement—or, read another way, "employ[s] an interpretation that read[s] a disruption requirement into the polic[ies] . . . by adding a requirement not found anywhere in the text[.]"[4] *Sypniewski*, 307 F.3d at 262–63.

In justifying this leap, the district court relied heavily on two distinctions: one between "civil" discussion and "disrespectful" discussion; and another between speech about people in general and speech targeted towards individual students. *See* Opinion, R. 28, Page ID ## 834–837. It reasoned that disrespectful, targeted speech could be presumed to create a substantial disruption in all cases, and found that the Discriminatory Language and PCD policies did no more than prohibit such speech. *Id.* at ## 836–837.

But that approach understates the plain scope of the two policies, which reach *both* general and targeted speech, and *both* civil and disrespectful comments. The Discriminatory Language Policy proscribes comments that are derogatory "towards an individual or group," and the PCD Policy prohibits the "disparagement of others."

---

[4] By contrast, for example, the "Hazing, Harassment, Intimidation, Bullying, and Sexual Harassment" Policy, which Plaintiff also challenges and on which Amici take no position, is limited to behavior that actually "causes mental or physical harm to the other student(s) and is sufficiently severe, persistent or pervasive that it creates an intimidating, threatening or abusive educational environment for the other student(s)." Opinion, R. 28, Page ID # 815. That does not presume that certain comments necessarily create a substantial disruption or hostile environment; it requires that such an effect actually occur for the policy to apply.

Opinion, R. 28, Page ID ## 815–816. Both reach comments made in the abstract. In addition, the Discriminatory Language Policy reaches not just "slurs," but also "jokes," which surely should not be presumed to *always* create a hostile environment. *See* Opinion, R. 28, Page ID # 815; *but see Novak v. City of Parma*, 932 F.3d 421, 427 (6th Cir. 2019) (describing "[o]ur nation's long-held First Amendment protection for parody"). The district court's read of the two policies as reaching only targeted harassment simply cannot be reconciled with those policies' text, and that constitutes error in its own right. *See Sypniewski*, 307 F.3d at 263.

Moreover, the district court reached too far in holding that disrespectful discussion is inherently unprotected or substantially disruptive under *Tinker*. A student's speech can be disrespectful without being so severely or pervasively so that it creates a hostile educational environment or otherwise disrupts the school. Whether speech does have that effect will, of course, depend on the context, but the expression must do more than merely give or risk offense. *Compare Castorina ex rel. Rewt v. Madison Cnty. Sch. Bd.*, 246 F.3d 536, 541 (2001) (finding students' decision to wear t-shirts depicting the Confederate flag "did not disrupt school activity or cause unrest during the school day") *with Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 334 (6th Cir. 2010) (justifying a school district's ban on the displays of the Confederate flag based on uncontested evidence of racial violence, threats, and tensions in the schools); *see also N.J. by Jacob v. Sonnabend*, 37 F.4th 412, 425–

26 (7th Cir. 2022) ("[T]here's no generalized 'hurt feelings' defense to a high school's violation of the First Amendment rights of its students[.]") (internal citations omitted).

There are any number of scenarios where language might be "derogatory" or disrespectful but poses no actual threat of a hostile environment or substantial disruption. Such language would nonetheless be prohibited by these two policies. Students could be punished for grousing in the hallway about a teacher who is "too old" to understand them. *See* Opinion, R. 28, Page ID # 815 ("derogatory … based on … age"). Two students using off-color language to privately joke about an ethnic, racial, religious, or ancestral group to which they both belong could be reprimanded, even if no offense was intended or taken. A student who denounced Russian aggression against Ukraine in imprecise terms could be found to have derogated a "group" based on "national origin."

Absent the district court's unauthorized and ungrounded efforts to limit them, the two policies "could conceivably be applied to cover any speech about some enumerated personal characteristics the content of which offends someone." *Saxe*, 240 F.3d. at 217. They cannot withstand *Tinker*, and risk chilling a great deal of substantive—even if inelegant—discourse that is a critical part of adolescent growth.

B.    *Tinker* Does Not Condone Students Misgendering their Classmates as a General Matter, But It Also Does Not Deem Such Speech Unprotected Under All Circumstances

The fact that these two policies are facially unconstitutional does not imply that PDE or its members are broadly entitled to intentionally misgender their classmates. The school can plainly prohibit such speech where it creates a hostile environment or a substantial disruption. *See Sypniewski*, 307 F.3d at 264 ("Students cannot hide behind the First Amendment to protect their 'right' to abuse and intimidate other students at school").

A student's intentional misgendering of a classmate often—perhaps *usually*—will obstruct that classmate's ability to learn and/or disrupt the functioning of the school, thereby invoking school discipline that would not violate the First Amendment. *See, e.g., Barr*, 538 F.3d at 557–58, 560, 566–67 (upholding a school's Confederate flag ban based on the school's history of racially motivated fights and threats, and an increase of absenteeism prior to the ban); *Sonnabend*, 37 F.4th at 425–26 (recognizing that schools may regulate speech where necessary to ensure an environment that is "conducive to learning"). There is nothing about intentional misgendering that is inherently *less* disruptive to an educational environment than other forms of speech that may descend to abuse. To the extent that it seeks any sort of exemption from appropriately tailored school rules against disruptive bullying or harassment that gives rise to a hostile environment, PDE should not be entitled to

18

one. Such speech can be punished wherever it meets the standards established for disruptive speech or speech that creates a hostile environment. But at the same time, the district court erred in presuming that this entire category of speech is *always* disruptive or *always* creates a hostile environment, regardless of context. *Cf. Parents Def. Educ. v. Linn Mar Cmty. Sch. Dist.*, No. 22-2927, at *17 (8th Cir. Sept. 29, 2023) (Kelly, J. concurring) (recognizing school's responsibility to prohibit misgendering that creates a hostile school environment, but facially invalidating policy that "is insufficiently tailored to its effort to achieve this goal").

## IV.    Applying *Mahanoy* and Its Progeny, the PCD Policy Also Unconstitutionally Restricts Speech Outside of School

The district court was also wrong to conclude that the PCD Policy comports with the First Amendment, for the additional reason that it reaches protected speech outside of the school environment.

### A.    Courts Must Be Skeptical of a School's Efforts to Regulate Off-Campus Speech.

As the Supreme Court held in *Mahanoy*, and this Court recognized in *Kutchinski*, because "off-campus regulations, coupled with on-campus regulations, cover 'all the speech a student utters during the full 24-hour day,'" courts must "be more skeptical of a school's efforts to regulate off-campus speech." *Kutchinski*, 69 F.4th at 357 (quoting *Mahanoy*, 141 S. Ct. at 2046). When it comes to off-campus

speech, the First Amendment's full protections presumptively apply. *See Mahanoy*, 141 S.Ct. at 2046.[5]

A school's significant interests may overcome that presumption, but "three features of off-campus speech" suggest that they will do so only rarely. *Kutchinski*, 69 F.4th at 357 (quoting *Mahanoy*, 141 S. Ct. at 2046). First, "off-campus speech will normally fall within the zone of parental, rather than school-related, responsibility." *Id.* (quoting *Mahanoy*, 141 S. Ct. at 2046). Second, allowing punishment for off-campus speech is a draconian measure that "may mean the student cannot engage in [certain] kind[s] of speech at all." *Id.* (quoting *Mahanoy*, 141 S. Ct. at 2046). This is particularly true for speech that is critical of the status quo—speech that, though potentially "disruptive," may prove essential. *Cf. Brown*, 564 U.S. at 795, n.3 (discussing importance of protecting minors' right to attend rallies in support of their own rights). Third, and relatedly, allowing schools to

---

[5] While *Mahanoy* was the first case to apply this distinction to online speech, the same on/off-campus thread runs through the Supreme Court's student speech cases. The Supreme Court has consistently held that "schools may regulate some speech in the school '*even though the government could not censor similar speech outside the school.*'" *Morse v. Frederick*, 551 U.S. 393, 406 (2007) (quoting *Hazelwood*, 484 U.S. 260 at 266 (emphasis added). *See also Fraser*, 478 U.S. at 677 (upholding a suspension for a lewd speech delivered at a mandatory assembly, but noting that the student delivering "the same speech in a public forum outside the school context . . . would have been protected."); *Hazelwood*, 484 U.S. at 266–67 (upholding regulation on a school newspaper produced under the school's supervision, but noting that the government would not have the same ability to control young people's speech in "streets, parks, and other traditional public forums.").

regulate off-campus speech would fail to serve the school's own interest in "protecting a student's unpopular expression." *Kutchinski*, 69 F.4th at 357 (quoting *Mahanoy*, 141 S. Ct. at 2046). Such protection is necessary to prepare young people for, and allow them to contribute to, "American democracy[, which] works only if we protect the 'marketplace of ideas.'" *Id*. (quoting *Mahanoy*, 141 S.Ct. at 2046).

Thus, as this Court has held, "[s]chools generally cannot regulate 'speech that is not expressly and specifically directed at the school, school administrators, teachers, or fellow students and that addresses matters of public concern[.]'" *Id*. (quoting *Mahanoy*, 141 S.Ct. at 2055) (Alito, J., concurring). But where off-campus speech "involves serious or severe harassment of . . . teachers [or] . . . student[s]," a school can "regulate the speech and discipline [the speaker] so long as . . . the speech substantially disrupted classwork (or [school administrators] reasonably believed [it would])." *Id.* at 358.

Thus, under *Mahanoy* and *Kutchinski*, a school may regulate off-campus speech that falls "outside the First Amendment's ordinary protection." *Mahanoy*, 141 S.Ct. at 2046. If it does not meet that description, the court must consider whether the speech falls within the limited universe of off-campus speech that schools can nevertheless proscribe, which includes "serious or severe harassment." *Kutchinski*, 69 F.4th at 357–58. If yes, the speech must also have "substantially

disrupted classwork," or have been reasonably expected to; if no, the school's regulation or discipline is unconstitutional. *Id.*

B.    The PCD Policy's regulation of off-campus speech is unconstitutional.

As noted above, the PCD Policy violates *Tinker*'s standard for in-school speech. Its application outside of school is even more troubling under *Mahanoy*. The district court erroneously held that off-campus speech falls within a school's purview if it is "about the school, its students and teachers, and their actions during the times when the school is responsible for the student," Opinion, R. 28, Page ID # 846 (internal citation omitted), ignoring the reality that such topics make up much of a young person's life and, therefore, the "public issues" they will seek—and have a right—to debate. *See Mahanoy*, 141 S. Ct. at 2046–47 (concluding that although "criticism[ ] of the team, the team's coaches, and the school" was "hurtful" and constituted "criticism of the rules of a community of which B.L. forms a part," and was important not to stifle for that reason) (internal citations omitted).

Following the decision-tree established by *Mahanoy* and *Kutchinski*, the PCD Policy is also unconstitutional because of its overly broad regulation of off-campus speech. The regulated speech plainly does not fall "outside the First Amendment's ordinary protection," which reaches hurtful, humiliating remarks, as well as disparagement of others. *See, e.g., Mahanoy*, 141 S.Ct. at 2046. Nor, for two reasons, does the regulated speech fall within the limited universe of off-campus speech that

schools can nevertheless proscribe. *See Kutchinski*, 69 F.4th at 357–58. First, the policy's prohibition on "disruptive" speech or speech that "might reasonably create . . . an impression of being . . . embarrassed" is not good enough. That is an even lower bar than the "substantially disruptive" standard that applies in schools, and which must additionally be satisfied if off-campus speech falls within a proscribable category. *See* Section II *supra*; *see also Kutchinski*, 69 F.4th at 359 ("Substantial disruption is a 'demanding standard'" requiring forecast of "material and substantial disruption to schoolwork and school discipline) (internal citations omitted).

Second, the prohibition reaches far beyond "serious or severe harassment." *Kutchinski*, 69 F.4th at 358. To be sure, some speech that embarrasses or disparages another could rise to the level of serious or severe harassment—if, for example, it "limit[ed] or den[ied] a student's ability to participate in or benefit from an educational program[.]"[6]  But plenty of embarrassing or disparaging speech falls short of this high bar.  As written, the PCD Policy's ban on "disparagement of others based upon their . . . political beliefs" reaches, for example, one student criticizing another via text message for their views on gun control or gender-affirming care. Indeed, the disparagement need not even apply to any particular student to be

---

[6] U.S. Dep't of Ed., Off. for Civ. Rts., *First Amendment: Dear Colleague* (July 28, 2003), https://www2.ed.gov/about/offices/list/ocr/firstamend.html; *See also* U.S. Dep't of Ed., Off. for Civ. Rts., *Dear Colleague* (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html.

prohibited. If a student used a personal computer to email a letter to the editor of her local newspaper, stating that abortion is a basic human right and that attempts to ban it are founded in misogyny and racism, the administration could punish her under the PCD policy. And the ban on "embarrass[ing]" or "humiliat[ing]" another would easily reach speech "blowing the whistle on serious misconduct," something the First Amendment "obvious[ly]" would not allow. *Mahanoy*, 141 S. Ct. at 2058 (Alito, J., concurring).

Thus, not only does the PCD Policy unconstitutionally regulate in-school speech, it also unconstitutionally regulates protected speech off campus, leaving young people fearful of retribution for ever expressing their views.

## **CONCLUSION**

For the foregoing reasons, the ACLU and ACLU of Ohio urge this Court to reverse the district court's decision in part. At minimum, the School District's Discriminatory Language and PCD Policies are unconstitutional under the First Amendment.

Respectfully submitted,

<u>/s/ David J. Carey</u>

David J. Carey
AMERICAN CIVIL LIBERTIES UNION OF
   OHIO FOUNDATION
1108 City Park Avenue, Suite 203
Columbus, OH 43206
Tel: (614) 586-1972
dcarey@acluohio.org

Amy R. Gilbert
Freda J. Levenson
AMERICAN CIVIL LIBERTIES UNION OF
   OHIO FOUNDATION
4506 Chester Ave.
Cleveland, OH 44103
Tel: (614) 586-1972
agilbert@acluohio.org
flevenson@acluohio.org

*Counsel for Amici Curiae*

Dated: October 2, 2023

Vera Eidelman
Ben Wizner
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
125 Broad Street
New York, NY 10004
Tel.: (212) 549-2500
veidelman@aclu.org
bwizner@aclu.org

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this Brief of Amici Curiae complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because, excluding parts of the document exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1) it contains 6,445 words.

I further certify this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface with 14-point Times New Roman font in Microsoft Word.

Dated: October 2, 2023          By:    /s/ David J. Carey
                                       David J. Carey

                                       *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2023, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

/s/ David J. Carey
David J. Carey

*Counsel for Amici Curiae*