No. 23-3630

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

PARENTS DEFENDING EDUCATION,

*Plaintiff-Appellant,*

v.

OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Ohio
Case No. 2:23-cv-01595-ALM-KAJ

## Brief of Alliance Defending Freedom as Amicus Curiae in Support of Appellant and for Reversal

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street NW
Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@adflegal.org

TYSON C. LANGHOFER
MATHEW W. HOFFMANN
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
(571) 707-4655
tlanghofer@adflegal.org
mhoffmann@adflegal.org

*Attorneys for Amicus Curiae*

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-3630      Case Name: Parents Defending Educ. v. Olentangy

Name of counsel: Mathew W. Hoffmann

Pursuant to 6th Cir. R. 26.1, Alliance Defending Freedom
                                                            *Name of Party*
makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on _____ October 2, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Mathew W. Hoffmann

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

Corporate Disclosure Statement..................................................................i

Table of Authorities........................................................................ iii

Identity and Interest of Amicus Curiae.....................................................1

Introduction .................................................................................2

Background....................................................................................4

I. The district court permitted Olentangy Local School District to compel students to speak pronouns inconsistent with sex. ........4

II. ADF's educator-clients believe that sex is immutable and have faced discipline for refusing to speak the opposite message by using pronouns inconsistent with sex. .........................7

    A. Dr. Nicholas Meriwether .........................................8

    B. Vivian Geraghty...................................................11

    C. Tanner Cross, Monica Gill, and Kimberly Wright ...............12

    D. Pam Ricard.........................................................13

Argument.....................................................................................15

I. Declining to use feeling-based pronouns conveys a message, which the district court recognized by substituting its own message for the speaker's. ...........................................15

II. Forced pronoun usage requires affirming an orthodoxy and doesn't qualify as curricular speech................................19

III. Students and educators can't avoid using pronouns altogether. .....................................................................22

Conclusion ..................................................................................23

Rule 32(g)(1) Certificate of Compliance.................................................25

Certificate of Service ......................................................................26

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis,*
143 S. Ct. 2298 (2023) ............................................................ 1, 17

*Cohen v. California,*
403 U.S. 15 (1971) ...................................................................... 17

*Hazelwood School District v. Kuhlmeier,*
484 U.S. 260 (1988) .................................................................... 21

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
515 U.S. 557 (1995) .................................................................... 17

*Janus v. American Federation of State, County, & Municipal
Employees, Council 31,*
138 S. Ct. 2448 (2018) ............................................................ 3, 21

*Loudoun County School Board v. Cross,*
2021 WL 9276274 (Va. Aug. 30, 2021).................................... 13

*Mahanoy Area School District v. B.L.,*
141 S. Ct. 2038 (2021) ............................................................... 23

*Meriwether v. Hartop,*
992 F.3d 492 (6th Cir. 2021) .......................... 1, 8, 9, 10, 16, 21, 22

*Perlot v. Green,*
609 F. Supp. 3d 1106 (D. Idaho 2022)........................................ 1

*Ricard v. USD 475 Geary County School Board,*
2022 WL 1471372 (D. Kan. May 9, 2022) .................................. 1

*Riley v. National Federation of the Blind of North Carolina, Inc.,*
487 U.S. 781 (1988) .................................................................... 22

*Taking Offense v. State,*
281 Cal. Rptr. 3d 298 (Cal. App. 2021) .................................... 18

*Uzuegbunam v. Preczewski,*
141 S. Ct. 792 (2021) .........................................................................1

*Ward v. Polite,*
667 F.3d 727 (6th Cir. 2012) .................................................. 21, 22

*West Virginia State Board of Education v. Barnette,*
319 U.S. 624 (1943) ......................................................... 19, 20, 24

*Wood v. Arnold,*
915 F.3d 308 (4th Cir. 2019) ........................................................22

*Wooley v. Maynard,*
430 U.S. 705 (1977) ....................................................................23

## Other Authorities

Alliance Defending Freedom, *Kansas public school pays $95K after suspending teacher for refusing to deceive parents* (Aug. 31, 2022) ...................................................................................15

Alliance Defending Freedom, *Victory: Shawnee State agrees professors can't be forced to speak contrary to their beliefs* (Apr. 14, 2022) ............................................................................10

**IDENTITY AND INTEREST OF AMICUS CURIAE[1]**

Alliance Defending Freedom (ADF) is a not-for-profit, public interest legal organization protecting religious freedom, free speech, the sanctity of life, parental rights, and marriage and family. ADF regularly defends students, adults, and organizations in cases before this Court and the Supreme Court involving the right to free speech. *E.g.*, *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021); *303 Creative LLC v. Elenis*, 143 S. Ct. 2298 (2023); *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021). ADF's free-speech advocacy includes protecting students, teachers, and professors from overbroad harassment policies that both squelch and compel speech. *E.g.*, *Perlot v. Green*, 609 F. Supp. 3d 1106 (D. Idaho 2022).

In particular, ADF has defended clients, like Dr. Nicholas Meriwether, Vivian Geraghty, Tanner Cross, Monica Gill, Kimberly Wright, and Pam Ricard, targeted by government policies that force them to use pronouns inconsistent with sex. *E.g.*, *Meriwether*, 992 F.3d at 501; *Ricard v. USD 475 Geary Cnty. Sch. Bd.*, 2022 WL 1471372 (D. Kan. May 9, 2022). For these educators, declining to use pronouns inconsistent with

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than amicus and its counsel made any monetary contribution intended to fund the preparation or submission of this brief. Counsel for defendants-appellees withheld consent to the filing of this brief.

sex conveys their deepest convictions on the nature of males and females; it communicates their belief that sex is immutable.

But here the district court denied that pronouns convey a message in most—if not all—cases and allowed the school district to compel students to speak pronouns inconsistent with sex. ADF therefore has a strong interest in presenting the views of its clients on (1) how pronoun usage conveys a message; and (2) how damaging compelling them to speak the opposite message is.

## INTRODUCTION

When faced with a request to use feeling-based pronouns, the choice of what pronouns to use communicates a message on a fundamental issue of human nature. "He" conveys that the person referred to is a male, while "she" denotes a female. For educators like Dr. Nicholas Meriwether, Vivian Geraghty, Tanner Cross, Monica Gill, Kimberly Wright, and Pam Ricard, the choice of pronouns communicates their belief that sex is immutable. Referring to a female as "he" conveys that a person's sex depends not on objective biology but instead on a person's subjective feeling about what it means to be stereotypically male or female.

School and university policies that compel the use of pronouns inconsistent with sex compel students and educators to speak contrary to their deeply held beliefs. Forced affirmation does "additional damage"

over forced silence. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018). Compelled use of pronouns inconsistent with sex "coerce[s]" educators like Dr. Meriwether and Ms. Geraghty and the students in this case into "betraying their convictions." *Id.* It forces them to engage in "social transition"—affirmation of a gender identity inconsistent with sex—which they believe is a lie and will harm students. Each of these educators has faced discipline, including reprimands, suspension, and forced resignation, all for not abiding by policies that require using feeling-based pronouns rather than sex-reflective pronouns.

The district court here substituted its own idea of the message pronouns communicate for the only perspective that matters—that of the educator or student who speaks his or her beliefs.[2] The court below opined that everyday pronoun usage does not "express a personal belief about gender identity" but merely "greet[s] and acknowledg[es]." Order Denying Preliminary Injunction ("Order"), R.28, Page ID# 840. But the district court allowed the school district to compel speaking pronouns inconsistent with sex because the school district viewed those pronouns as curricular speech that would "creat[e] an environment in which each

---

[2] The district court made a number of rulings inconsistent with First Amendment law, but this brief addresses only the compelled speech holding.

individual feels respected, acknowledged, and heard by their classmates," *i.e.*, communicate that message. Order, R.28, Page ID#839.

The district court's logic exemplifies the dangers of compelled speech. The First Amendment protects each individual's right to express his *own* message, not a message the government mandates. Requiring feeling-based pronouns that conflict with sex-reflective pronouns forces educators and students to affirm a set of beliefs not their own—that sex is mutable and dependent on a person's subjective perception of self and how it feels to be male or female. Pronouns are not curricular speech. They don't bear the imprimatur of the school or involve curriculum. And pronouns are ubiquitous. Educators and students can't avoid using them, so policies that prohibit using pronouns consistent with sex compel speaking pronouns inconsistent with sex.

Accordingly, this Court should reverse and enter a preliminary injunction on at least the compelled speech claim or remand with instructions to do so.

## BACKGROUND

**I.   The district court permitted Olentangy Local School District to compel students to speak pronouns inconsistent with sex.**

Olentangy Local School District admittedly compels speech. Order, R.28, Page ID# 837. Its policies "require students to use the preferred

4

pronouns of other students"—no matter whether those pronouns reflect the students' sex. *Id.*

Parents A, B, C, and D each have children attending schools in the school district who "believe that biological sex is immutable." V. Compl., R.1, Page ID# 22, 26, 31, 35. These parents have taught their children to show respect to all but also to tell the truth, even when it's unpopular. V. Compl., R.1, Page ID# 22, 26, 31, 35. And those students believe the truth to be "that people are either male or female and that a child cannot 'transition' from one sex to another." V. Compl., R.1, Page ID# 22, 26–27, 31, 35. The students thus "wish to use pronouns that are consistent with a classmate's biological sex, rather than the classmate's 'preferred pronouns.'" V. Compl., R.1, Page ID# 22, 27, 32, 36. But the school district's policies "force[ ]" them to "affirm" a contradictory belief through the use of "preferred pronouns"—"that a biologically female classmate is actually a male—or vice versa—or that a classmate is 'nonbinary' and neither male nor female." V. Compl., R.1, Page ID# 22, 26–27, 31, 35.

Parents Defending Education, on behalf of its members Parents A–D, sued the school district. *See* V. Compl., R.1, Page ID# 1. It moved for a preliminary injunction against the district's policies, arguing, among other things, that they unconstitutionally compelled students' speech. Mot. for Prelim. Inj., R.7, Page ID# 94.

The district court rejected the compelled speech argument. Order, R.28, Page ID# 841. It reasoned that in primary schools, the compelled

speech analysis "focuses on the rationale behind the policy." Order, R.28, Page ID# 838. It drew the distinction between impermissible "attempts to promote social values or goals" and permissible compelling of "student speech in school-sponsored expressive activities" that "are reasonably related to legitimate pedagogical concerns." Order, R.28, Page ID# 838–39. Requiring "preferred gender pronouns," according to the district court, "may simply reflect a school's desire" to have "a safe and civil learning environment." Order, R.28, Page ID# 839.

The district court ruled that requiring "preferred pronouns" would foster "an environment in which each individual feels respected, acknowledged, and heard by their classmates." *Id.* Despite that Parents A–D's children do not feel comfortable in an environment compelling such important speech, the district court held that the district's policies "allow[ ] all students to feel comfortable participating in discussion and sharing their perspectives—and thus promote[ ] learning." *Id.*

The district court then limited this Court's decision in *Meriwether* to its facts. Under the district court's reasoning, Dr. Meriwether had the right not to violate his conscience by using pronouns inconsistent with sex because he used pronouns to address students *in a political philosophy class* in which issues of gender identity often arose. Order, R.28, Page ID# 840. The Olentangy students did not have the same freedom because pronoun usage "in everyday situations," *i.e.*, outside philosophy class, "is not so inherently fraught." *Id.* Those pronouns don't

6

convey a message, the district court assumed, because "a student walking down a middle school hallway uses pronouns not to wade into the gender identity debate or to express a personal belief about gender identity, but simply to carry out the standard back-and-forth ritual of greeting and acknowledging friends." *Id.* And that required usage does not compel a message, but merely acknowledges "others' right to choose a path for themselves—not agreement with the[ir] choices, or with their underlying beliefs." *Id.*

## II. ADF's educator-clients believe that sex is immutable and have faced discipline for refusing to speak the opposite message by using pronouns inconsistent with sex.

Dr. Nicholas Meriwether, Vivian Geraghty, Tanner Cross, Monica Gill, Kimberly Wright, and Pam Ricard are practicing Christian educators who believe that God creates each person with immutable sex as male or female and that rejection of one's biological sex is a rejection of the image of God within that person. As Christians, they believe they cannot affirm as true those ideas and concepts that they believe are not true. And they strive to treat every person with dignity, love, and care because they believe all people are created in the image of God. That's what makes them good educators.

These educators believe that what pronouns they use conveys an important message. They have seen an increase in students asking to be addressed by different names consistent with new asserted gender

identities and by pronouns that are inconsistent with their sex. Those requests are part of "social transition." As Ms. Geraghty understands it, social transition includes the use of a new name and pronouns to "validate" students' asserted gender identities inconsistent with their sex. V. Compl. ¶ 52, *Geraghty v. Jackson Local Sch. Dist. Bd. of Educ.*, No. 5:22-cv-02237 (N.D. Ohio Dec. 12, 2022). Social transition is an "active intervention" that can have a "significant effect[ ]" on a student's "psychological functioning." *Id.* ¶ 52. It can start children—who have limited ability to assess long term consequences and who frequently suffer from past trauma or other mental health issues—on the road to irreversible medical interventions, such as puberty blockers and genital-mutilating surgery. *Id.* ¶¶ 53–55. Participating in that social transition thus communicates a message—that what makes a child a boy or a girl is that child's personal sense of being a boy or girl rather than the child's sex. *Id.* ¶ 59. And it also forces the speaker to advocate for something she believes harms children. *Id.* ¶ 60.

These educators have also all faced discipline for seeking to preserve their freedom from uttering a message that contradicts their deeply held beliefs. Their stories show the additional damage inflicted by compelled speech in this context.

### A.    Dr. Nicholas Meriwether

For nearly three decades, Dr. Meriwether has served as philosophy professor at Shawnee State University. *Meriwether*, 992 F.3d at 498. Dr.

Meriwether is a campus "fixture." *Id*. He designed a bachelor's degree program in Philosophy and Religion, taught "countless students in classes ranging from Ethics to the History of Christian Thought," and was a member of the faculty senate. *Id*. When teaching political philosophy, Dr. Meriwether employs the Socratic method and addresses students either by "Mr." or "Ms." *Id*. at 499. He finds that the formal address helps students "view the academic enterprise as a serious, weighty endeavor and fosters an atmosphere of seriousness and mutual respect." *Id*. (cleaned up).

On the first day of his 2018 political philosophy class, Dr. Meriwether answered a student's question with "Yes, sir." *Id*. After class, that male student, "Doe," approached Dr. Meriwether and "demanded" he "refer to [Doe] as a woman." *Id*. Dr. Meriwether responded that "his sincerely held religious beliefs prevented him from communicating messages about gender identity that he believes are false." *Id*. Doe then became "hostile" and "promised that Meriwether would be fired if he did not give in to Doe's demands." *Id*.

The next day, Dr. Meriwether's dean "advised" him to "eliminate all sex-based references from his expression"—no "Mr." or "Ms." and no "he" or "she." *Id*. Dr. Meriwether objected "that eliminating pronouns altogether was next to impossible, especially when teaching." *Id*. So the dean accepted the proposed compromise of retaining sex-based references

to students, while using only Doe's name. *Id.* But after Doe protested, the dean required Dr. Meriwether to address Doe as a woman. *Id.* at 500.

Searching for any possible compromise, Dr. Meriwether wondered if it would be acceptable if he used requested pronouns in class but inserted a "disclaimer in his syllabus noting that he was doing so under compulsion and setting forth his personal and religious beliefs about gender identity" *Id.* (cleaned up). The University rejected that compromise as well. *Id.*

At the same time, the University's Title IX office opened an investigation into Dr. Meriwether. *Id.* It found he had discriminated based on gender identity and created a hostile environment because Doe "perceive[d] them self as a female," and because Dr. Meriwether "'refuse[d] to recognize' that identity by using female pronouns." *Id.* at 501. The university reprimanded Dr. Meriwether and required him to either sacrifice his beliefs by referring to Doe as a female or suffering "further corrective actions," *id.*, forcing Dr. Meriwether to file suit. This Court held Dr. Meriwether stated a First Amendment claim, *id.* at 518, and he later favorably settled his case, preserving his freedom from compelled speech.[3]

---

[3] Alliance Defending Freedom, *Victory: Shawnee State agrees professors can't be forced to speak contrary to their beliefs* (Apr. 14, 2022), https://perma.cc/B9HZ-NRJH.

**B.    Vivian Geraghty**

For two years, Vivian Geraghty taught her English class in Jackson Local School District, Ohio, consistent with her religious beliefs. V. Compl. ¶¶ 37–38, *Geraghty v. Jackson Local Sch. Dist. Bd. of Educ.*, No. 5:22-cv-02237 (N.D. Ohio Dec. 12, 2022). She had never received any kind of complaint about her performance or disciplinary action. *Id.* ¶ 38. That all changed when two students requested Ms. Geraghty address them by "names associated with their new gender identities" with one student requesting to be addressed by "pronouns inconsistent with the student's sex." *Id.* ¶ 66.

Ms. Geraghty went to her principal to seek a solution that would allow her to continue to teach without violating her religious and speech rights, for example, by refraining from using pronouns inconsistent with the student's sex and by addressing the student by last name. *Id.* ¶¶ 65, 68. Less than an hour later, the principal, now joined by his supervisor, inquired into Ms. Geraghty's religious beliefs and told her that "she would be required to put her beliefs aside as a public servant." *Id.* ¶¶ 70–73. The officials threatened that refusing to participate in social transition would amount to "insubordination." *Id.* ¶ 75. Ms. Geraghty held her ground, and the officials forced her to resign. *Id.* ¶¶ 78–83. Her case is ongoing.

## C.    Tanner Cross, Monica Gill, and Kimberly Wright

Tanner Cross, Monica Gill, and Kimberly Wright have all served as educators for at least 15 years. Am. V. Compl. ¶¶ 45, 52, 57, *Cross v. Loudoun Cnty. Sch. Bd.*, No. CL21-3254 (Va. Cir. Sept. 9, 2021). They are all integral parts of their school district, Loudoun County Public Schools, Virginia. As Mr. Cross's vice principal relayed, "[S]tudents look forward to going to P.E. each week," which is "due to the hard work" of Mr. Cross. *Id.* ¶ 50. Ms. Gill's evaluators praised her for "provid[ing] a very safe environment in which students can express their opinions and engage in debates." *Id.* ¶ 56. And her dean described Ms. Wright as a "lighthouse of positivity in a time of extreme negativity" and "a shining example of what it means to be a professional educator." *Id.* ¶ 60.

But in May 2021, the school district took up a proposed policy that would force teachers to address students by requested pronouns— whatever they may be. *Id.* ¶¶ 61, 66. The proposed policy would require educators to "use the name and pronoun that correspond to [a 'gender-expansive or transgender' student's] consistently asserted gender identity." *Id.* ¶ 66. But it did not define "gender-expansive" or "consistently asserted." *Id.* ¶¶ 64, 67–68. Notably, the school district *invited* school employees to comment on the proposal. *Id.* ¶ 2.

During the public comment portion of a board meeting debating the policy, Mr. Cross accepted that invitation and offered his view "out of love for those who suffer with gender dysphoria." *Id.* ¶ 97. He warned that the

proposed policy "will damage children" and cited examples of detransitioners who used medical interventions to appear as the opposite sex but "felt led astray" by those procedures and attempted to revert to their natal sex. *Id.* Mr. Cross said he would "never lie" to his students and could "not affirm that a biological boy can be a girl and vice versa." *Id.* Less than 48 hours later, officials placed Mr. Cross on leave for his public comments. *Id.* ¶¶ 105–08.

Mr. Cross filed suit against the district's retaliation, and the court, as affirmed by the Virginia Supreme Court, ordered him preliminarily reinstated. *See Loudoun Cnty. Sch. Bd. v. Cross*, 2021 WL 9276274, at *1 (Va. Aug. 30, 2021). Yet, the district did not heed Mr. Cross's advice. It adopted the policy, forcing Mr. Cross, Ms. Gill, and Ms. Wright to challenge it on speech and religious freedom grounds. *See* Am. V. Compl. ¶ 122. Their case is ongoing.

## D. Pam Ricard

Ms. Ricard taught in her school district for almost two decades. V. Compl. ¶ 94, *Ricard v. USD 475 Geary Cnty. Schs. Sch. Bd. Members* (D. Kan. Mar. 7, 2022). Yet in 2021, her district suspended and reprimanded her for refusing to use a student's name based on a new asserted gender identity. *Id.* ¶¶ 132–34. The reprimand required Ms. Ricard to use "[p]referred names and pronouns." *Id.* ¶ 136.

A week after Ms. Ricard returned from her suspension, her principal sent her and other staff a "Diversity Training on Gender

13

Identity and Gender Expression" and a protocol regarding the "Use of Preferred Names and Pronouns." *Id.* ¶ 8. Those materials taught that "[s]ociety has historically utilized 'he/him' when identifying biological males and 'she/her' when identifying biological females." *Id.* But, today, "[i]ndividuals prefer to utilize pronouns that they identify with," which do "not have to agree with their biological assignment." *Id.* The materials also instructed employees "to utilize the pronouns an individual requests to be identified by" to prevent "discrimination and harassment" while "contribut[ing] to a culture of unity and inclusivity." *Id.*

Ms. Ricard requested a religious accommodation to avoid using "preferred pronouns or other gendered language when different from the student's . . . sex." *Id.* ¶ 150. But the district's board unanimously denied the request and doubled down. *Id.* ¶ 184. At the same meeting, it amended its policy to require teachers to use students' "preferred names and pronouns." *Id.* ¶ 186. Shortly thereafter, the district informed teachers of its practice of hiding information from parents: the district would not "communicate [changes in name and pronoun] information to parents." *Id.* ¶ 189. In March 2022, Ms. Ricard had two students in class requesting to be addressed by pronouns inconsistent with their sex. *Id.* ¶ 193. She filed suit to preserve her freedom to speak consistent with her

beliefs and, after a favorable ruling on her motion for preliminary injunction, settled her case successfully.[4]

## ARGUMENT

As the examples of ADF's educator-clients and the students here show, declining to use asserted pronouns communicates a speaker's deeply held beliefs. The district court recognized pronouns' communicative nature by substituting its own message—that use of asserted pronouns conveys to students a certain respect and acknowledgment—for that of the speaker. But the First Amendment does not allow either the school district or the district court to serve as the arbiter of truth on this or any other topic. Similarly, pronouns do not amount to curricular speech because they have nothing to do with the school district's own speech or its curriculum. Educators and students cannot avoid using pronouns, and the school district's policies here compel using pronouns inconsistent with sex. They cannot pass muster under the First Amendment.

**I. Declining to use feeling-based pronouns conveys a message, which the district court recognized by substituting its own message for the speaker's.**

In many situations, a speaker's choice of pronouns communicates a profound message. "He" conveys that the person addressed is a male.

---

[4] Alliance Defending Freedom, *Kansas public school pays $95K after suspending teacher for refusing to deceive parents* (Aug. 31, 2022), https://perma.cc/J3E9-BUJ2.

"She" expresses the idea that the subject is a female. For those—like ADF's educator-clients—who believe sex is immutable, declining to use pronouns inconsistent with sex communicates that belief. As this Court recognizes, using pronouns consistent with sex, when asked to use other pronouns, "manifest[s] [the] belief that sex is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires." *Meriwether*, 992 F.3d at 509 (cleaned up).

Those who seek to compel the use of pronouns inconsistent with sex also understand that those pronouns communicate a message. Using a student's asserted pronouns comes as part of "social transition" to "validate" the student's gender identity as a reflection of that student's feelings. V. Compl. ¶ 52, *Geraghty*, No. 5:22-cv-02237 (N.D. Ohio Dec. 12, 2022). Thus, using "he" to refer to a female who identifies as a male communicates that the student is defined by the student's feeling of being what the student stereotypically believes a male is like. Those pronouns convey that students "can have a gender identity inconsistent with their sex at birth." *Meriwether*, 992 F.3d at 507; *see also id.* at 501 (university punished Dr. Meriwether because he refused to recognize Doe's asserted female identity by using female pronouns).

Those pronouns don't lose their meaning in the context of everyday usage, *i.e.*, "in the mechanical exercise of greeting classmates, exchanging pleasantries, and joking with friends." *Contra* Order, R.28,

Page ID# 843. Indeed, pronouns do much of their communicative work in the humdrum of everyday conversation. Using pronouns inconsistent with sex in otherwise nondescript contexts affirms a student's social transition. It is an active intervention in recognizing the student as adopting a gender identity inconsistent with her sex.

The district court's assumption that in many cases pronouns do not have any message impermissibly substitutes its assumptions for the message of the speaker. In addition, that assumption reveals that those pronouns do, in fact, communicate. The First Amendment "put[s] the decision as to what views shall be voiced" where it should be—"into the hands of each of us." *Cohen v. California*, 403 U.S. 15, 24 (1971); *see also 303 Creative LLC*, 143 S. Ct. at 2312 ("[T]he First Amendment protects an individual's right to speak his mind."). It protects speech others may not agree with because "one man's vulgarity is another's lyric." *Cohen*, 403 U.S. at 25. And it even "unquestionably" protects speech from which many cannot decipher a message at all: the "painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995). "[N]o other approach would comport with the premise of individual dignity and choice upon which our political system rests." *Cohen*, 403 U.S. at 24.

In assuming use of asserted pronouns *didn't* communicate a message, the district court ignored the undisputed evidence of what the

speakers, the children of Parents A–D, expressed. The record reveals those students—like ADF's educator-clients—cannot use pronouns inconsistent with sex because such speech will "'affirm' that a biologically female classmate is actually a male—or vice versa." V. Compl., R.1, Page ID# 22, 26–27, 31, 35. The district court's contrary assumption contravenes the First Amendment's basic premise: that individuals—not the government—control what message they speak and how.

The district court's reasoning as to why school districts should be able to compel pronouns belies any argument that they do not convey a message. According to that court, pronouns inconsistent with sex create "an environment" of "respect[ ]" and "acknowledg[ment]." Order, R.28, Page ID# 839. Those pronouns make students more "comfortable" in "sharing their perspectives." *Id.* In other words, pronouns inconsistent with sex convey the message that students can assert and live out a gender identity inconsistent with sex. And the lower court even recognized that the school district would succeed in compelling its preferred message: pronouns inconsistent with sex allow students to be "heard by their classmates." *Id.*; *see also Taking Offense v. State*, 281 Cal. Rptr. 3d 298, 313 (Cal. App. 2021) ("[T]he Legislature understood the importance of pronouns' content and, thereby, their *meaning*, . . . to the point that it passed a law criminalizing misgendering.").

But forcing students like Plaintiffs' children to speak about sex in a manner that they consider a lie is the exact opposite of respect and

acknowledgment. The school district's policy disrespects these students and communicates that these' students views are wrong and misguided. In promoting its own message, the school district censored students who do not share the school district's views. The Constitution strictly prohibits that.

**II.  Forced pronoun usage requires affirming an orthodoxy and doesn't qualify as curricular speech.**

The district court's holding on the assumed message-neutrality of pronouns doomed its curricular speech analysis. The court drew the distinction between compelled speech in school that promotes "social values or goals" and student curricular speech. Order, R.28, Page ID# 838–39. It thought use of feeling-based pronouns didn't implicate the former and so applied the more forgiving standard of the latter. But use of pronouns inconsistent with sex conveys a message. *Supra* Part I. And that message promotes the school district's social goal of "social transition" and recognizing asserted gender identities. *See* Order, R.28, Page ID# 849.

Compelling use of feeling-based pronouns thus "prescribe[s] what shall be orthodox" in school. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The school district requires students to "confess by word" their "faith" in its orthodoxy by affirming that one can be male, female, or neither without regard to one's sex. *See id.* That happens *each* time a student uses a pronoun inconsistent with another's sex. But

compelling adherence to a certain worldview violates a "fixed star in our constitutional constellation." *Id.* Indeed, the "freedom to differ is not limited to things that do not matter much." *Id.* That's not freedom at all. True freedom allows us "to differ as to things that touch the heart of the existing order." *Id.*

Even if students remain free in general to discuss their views on gender identity, their speech remains compelled by the school district's policies. The district court thought that compelled speech had no application to the everyday usage of pronouns because students—while forced to use pronouns they otherwise would not—could still retain their "belief while also using a transgender classmate's preferred pronouns." Order, R.28, Page ID# 843. But in that situation speech remains compelled. The students in *Barnette* could still maintain their beliefs while pledging to and saluting the flag, but that did not make the compulsion constitutional. The Supreme Court did not differentiate between "pupils forego[ing] any contrary convictions of their own and becom[ing] unwilling converts to the prescribed ceremony" or those merely "simulat[ing] assent by words without belief and by a gesture barren of meaning." 319 U.S. at 633. Either way, the policy "force[d] citizens to confess by word or act" their adherence to the school board's orthodoxy—regardless of whether they believed that orthodoxy. *Id.* at 642. Compelled pronoun policies force students "to endorse ideas they

find objectionable," even if their endorsement is hollow. *See Janus*, 138 S. Ct. at 2464.

Feeling-based pronouns also don't meet the threshold requirement of curricular speech. Courts have recognized that school officials may have greater control over speech that "members of the public might reasonably perceive to bear the imprimatur of the school," *i.e.*, curricular speech. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988). But pronouns don't have that imprimatur, so schools cannot compel their use based on "legitimate pedagogical concerns." *See id.* at 273. Everyday pronoun use does not involve "school-sponsored publications," "theatrical productions," or classroom assignments. *Id.* at 271; *Ward v. Polite*, 667 F.3d 727, 734 (6th Cir. 2012). Pronoun usage thus cannot "fairly be characterized as part of the school curriculum." *Hazelwood*, 484 U.S. at 271. "To be concrete," pronouns fall under *Barnette*, which "involved forced individual expression that happened to occur in a school" and not *Hazelwood*, which "involved restricted student expression through the school's newspaper." *See Ward*, 667 F.3d at 734. A contrary holding would grant school districts "alarming power to compel ideological conformity." *Meriwether*, 992 F.3d at 506.

Educators can "assure that participants learn whatever lessons the activity is designed to teach." *Ward*, 667 F.3d at 733 (quoting *Hazelwood*, 484 U.S. at 271). So "a junior high school English teacher may fail a student who opts to express her thoughts about a once-endangered

species, say a platypus, in an essay about *A Tale of Two Cities.*" *Id.* A school can require students to "read, discuss, and think" about Islam, for example, and further require students "to identify the tenets of Islam." *Wood v. Arnold*, 915 F.3d 308, 317 (4th Cir. 2019). But it cannot force students "to profess or accept the tenets of Islam" or "engage in any devotional practice related to Islam." *Id.* at 319. By mandating pronoun usage, the school district has far exceeded the bounds of educational goals to demand that students profess the idea that sex depends on a person's feeling rather than biological reality. That, the First Amendment does not allow.

## III. Students and educators can't avoid using pronouns altogether.

School district policies requiring the use of asserted pronouns—like the ones here—do not escape the compelled speech analysis because their terms may not literally require speaking those pronouns. School districts cannot put students and educators to the "Hobson's Choice" of choosing whether to remain silent or to speak the government's message. *Meriwether*, 992 F.3d at 517. Freedom of speech "necessarily compris[es] the decision of both what to say and what *not* to say." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797 (1988).

As the district court recognized, students and teachers can't avoid pronouns: their use "in daily conversation is ever-present." Order, R.28, Page ID# 843. Using pronouns is "a virtual necessity for most

Americans," just like driving a car. *See Wooley v. Maynard*, 430 U.S. 705, 715 (1977). In *Wooley*, the Supreme Court held that New Hampshire could not compel its residents to display the state motto "Live Free or Die" on their license plates. *Id.* at 717. Residents could choose not to drive and thus avoid speaking the state's message. But that didn't factor into the Supreme Court's analysis. New Hampshire "condition[ed] . . . driving" on becoming "a mobile billboard for the State's ideological message." *Id.* at 715 (cleaned up).

In other words, the state law still compelled speech. It "force[d] an individual, as part of his daily life—indeed constantly while his automobile is in public view—to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Id.* That impermissibly "invades the sphere" the First Amendment protects. *Id.* The same goes for compelled pronoun policies.

## CONCLUSION

Our "public schools are the nurseries of democracy" that must preserve the "marketplace of ideas" for our "representative democracy" to work. *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2046 (2021). But compelled speech transforms that marketplace into a monopoly by making the government the sole issuer of acceptable ideas. It "transcends constitutional limitations on [government] power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to

our Constitution to reserve from all official control." *Barnette*, 319 U.S. at 642. Policies like the ones here force educators and students alike to betray their convictions. This Court should reverse and enter a preliminary injunction on at least the compelled speech claim or remand with instructions to do so.

Dated: October 2, 2023

Respectfully submitted,

*/s/ Mathew W. Hoffmann*

| | |
|---|---|
| JOHN J. BURSCH | TYSON C. LANGHOFER |
| ALLIANCE DEFENDING FREEDOM | MATHEW W. HOFFMANN |
| 440 First Street NW | ALLIANCE DEFENDING FREEDOM |
| Suite 600 | 44180 Riverside Parkway |
| Washington, DC 20001 | Lansdowne, VA 20176 |
| (616) 450-4235 | (571) 707-4655 |
| jbursch@adflegal.org | tlanghofer@adflegal.org |
| | mhoffmann@adflegal.org |

*Attorneys for Amicus Curiae*

# RULE 32(G)(1) CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because it contains 5,393 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and 6th Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.


Dated: October 2, 2023

/s/ *Mathew W. Hoffmann*
Mathew W. Hoffmann
*Attorney for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Mathew W. Hoffmann*
Mathew W. Hoffmann
*Attorney for Amicus Curiae*