No. 23-3630

# In the United States Court of Appeals for the Sixth Circuit

PARENTS DEFENDING EDUCATION,
*Plaintiff-Appellant*,

v.

OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, ET AL.,
*Defendants-Appellees*.

On Appeal from the U.S. District Court for the Southern District of Ohio,
No. 2:23-cv-01595 (Hon. Algenon Marbley)

## BRIEF OF *AMICI CURIAE* JEWISH COALITION FOR RELIGIOUS LIBERTY, COALITION FOR JEWISH VALUES, AMERICAN HINDU COALITION, AND ISLAM AND RELIGIOUS FREEDOM ACTION TEAM IN SUPPORT OF APPELLANT AND REVERSAL

Sue Ghosh Stricklett
American Hindu Coalition
42618 Trade West Drive
Sterling, VA 20166
(301) 785-1041
sueghosh@stricklettgroup.com

*Counsel for American Hindu Coalition*

David J. Hacker
Justin Butterfield
Holly M. Randall
First Liberty Institute
2001 West Plano Parkway, Ste 1600
Plano, TX 75075
dhacker@firstliberty.org
jbutterfield@firstliberty.org
hrandall@firstliberty.org

Kayla A. Toney
  *Counsel of Record*
First Liberty Institute
1331 Pennsylvania Ave. NW, Ste 1410
Washington, DC 20004
(202) 918-1554
ktoney@firstliberty.org

*Counsel for Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 29(a)(4)(A), and 6th Cir. R. 26.1, there is no parent corporation or publicly held corporation that owns 10% or more of stock of any *amici curiae* described below.

/s/ *Kayla A. Toney*

Kayla A. Toney
  *Counsel of Record*
First Liberty Institute
1331 Pennsylvania Ave. NW, Suite 1410
Washington, DC 20004
(202) 918-1554
ktoney@firstliberty.org

October 2, 2023

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .............................................................................. iii

INTERESTS OF *AMICI CURIAE* ..................................................................1

INTRODUCTION ...........................................................................................3

ARGUMENT ...................................................................................................5

I.     The District's Policy violates the Free Speech and Free Exercise Clauses by compelling students to use pronouns that conflict with biology and their religious beliefs ..................................................................................5

    A.    The First Amendment provides students double protection for speech motivated by sincerely held religious beliefs………………………...5

    B.    By mandating the use of preferred names and pronouns, the District takes sides in an ideological debate and marginalizes religious students ……………………………………………………………………………..10

II.    The District's Policy substantially burdens the sincerely held religious beliefs of many different faith groups, including Jewish Americans, Hindu Americans, and Muslim Americans....................................................13

    A.    Traditional Jewish Beliefs about Sex and Gender ..............................15

    B.    Hindu Beliefs about Sex and Gender ....................................................17

    C.    Muslim Beliefs about Sex and Gender...................................................19

III.    The District's Policy will disproportionately impact families from minority faith backgrounds .........................................................................23

    A.    Minority faiths are most likely to be misunderstood and targeted by hostile government officials ...............................................................23

    B.    Families from minority faith backgrounds often lack educational alternatives.................................................................................................26

CONCLUSION .................................................................................................28

# TABLE OF AUTHORITIES

**Cases**

*A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*,
  611 F.3d 248 (5th Cir. 2010) ...........................................................................23

*Agudath Israel of Am. v. Cuomo*,
  983 F.3d 620 (2d Cir. 2020) ....................................................................... 23, 24

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
  No. 22-15827, 2023 WL 5946036 (9th Cir. Sept. 13, 2023)……………..…..8, 9

*Fulton v. City of Philadelphia*,
  141 S. Ct. 1868 (2021)………………………………………………………...8

*Ginsburg v. State of New York*,
  390 U.S. 629 (1968)……………………………………………………....12,13

  *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (20015, 6

*Gonzales v. Mathis Indep. Sch. Dist.*,
  No. 2:18-cv-43, 2018 WL 6804595 (S.D. Tex. Dec. 27, 2018)...........................23

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972)………………………………………………….…………10

*Healy v. James*,
  408 U.S. 169 (1972)…..………………………………………………………..7

*Holt v. Hobbs*,
  574 U.S. 352 (2015) ..........................................................................................22

*Islamic Soc'y of Basking Ridge v. Township of Bernards*,
  226 F. Supp. 3d 320 (D.N.J. 2016)....................................................................... 23

*Kennedy v. Bremerton School District*,
  142 S. Ct. 2407 (2022).........................................................................................3, 5

*L.W. by and through Williams v. Skrmetti, et al*,
  No. 23-5600; 23-5609, 2023 WL 6321588 (6th Cir. Sept. 28, 2023).....10, 11, 12

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*,
  141 S. Ct. 2038 (2021).....................................................................27

*Mirabelli v. Olson*,
  No. 3:23-cv-00768, 2023 WL 5976992 (S.D. Cal. 2023)………………………26

*Morse v. Frederick*,
  551 U.S. 393 (2007) ............................................................... 25, 26

*Parents Defending Education v. Linn Mar Cmty. Sch. Dist.*,
  No. 22-2927, 2023 WL 6330394 (8th Cir. Sept. 29, 2023)…………......…..…3, 9

*Parents Defending Education v. Olentangy Local Sch. Dist. Bd. of Educ.*,
  No. 2:23-cv-01595, 2023 WL 4848509 (S.D. Ohio July 28, 2023)…...…….*passim*

*Parents for Educational & Religious Liberty in Schools v. Lester Young Jr.*,
  Index No. 907655-22 (N.Y. Sup. Ct. filed Oct. 9, 2022)...................................27

*Settle v. Dickson Cnty. Sch. Bd.*,
  53 F.3d 152, 155 (6th Cir. 1995)……………………………………...…….7

*Tatel v. Mt. Lebanon School District*,
  No. CV 22-837, 2022 WL 15523185 (W.D. Pa. Oct. 27, 2022)........................26

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
  309 F.3d 144 (3d Cir. 2002) .............................................................24

*Terminiello v. City of Chicago*,
  337 U.S. 1 (1949)………………………………………...……………7

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,
  450 U.S. 707 (1981) .......................................................... 15, 22, 23

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969)………………………………………………....6, 9

*Ward v. Polite*,
667 F.3d 727 (6th Cir. 2012)……………………………………………..7, 8, 9

*West Virginia Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ...................................................................................6, 7

*303 Creative v. Elenis*,
43 S. Ct. 2298 (2023)………………………………………………… 6, 8, 9

**Other Authorities**

Marwan Ibrahim Al-Kaysi, Morals and Manners in Islam: A Guide to
Islamic Adab (1986) ...............................................................................20

*Aum School*, Aum Educational Society of America (2022) ......................................27

Jordana Birnbaum, *Shomer Negiah, the Prohibition on Touching*, My Jewish
Learning…………………………………………………………………...16

Catholic Catechism, No. 2333 ........................................................... 13

Catholic Catechism, No. 2361 ........................................................... 14

*Dharma Sastra*, Vol. 6 Manu Sanskrit ............................................................ 17, 18

Dr. Sikiru Gbena Eniola, *An Islamic Perspective of Sex and Sexuality: A Lesson
for Contemporary Muslims*, 12 IOSR Journal of Humanities and Social
Science 2 (May-Jun. 2013)...............................................................14

Fatwa No. 88708, "Sisters object to barrier between them and men in the
mosque," *Islamweb.net* (Sept. 29, 2004)............................................20

First Liberty Institute, *Public Comment on Section 1557 NPRM* (Oct. 3, 2022)... 14

"Gender and Sexuality," *Religion Library: Hinduism*, Patheos...........................18

*Genesis* 1:27 ............................................................ 13, 15

Ahmad Ibn Hajar al-Asqalani, *Fath al-Bari bi Sharh Sahih al-Bukhari,* Beirut: Dar al-Ma`rifah (1980)……………………………………………………...22

*Issues in Jewish Ethics: Homosexuality*, Jewish Virtual Library……………..14

Maimonides, Mishne Torah, Hilkhot Talmud Torah.............................................. 15

*Male, Female, or Other: Ruling of a Transgender Post Sex Change Procedures*, American Fiqh Academy (May 2, 2017).......................................................22

*Marriage in Islam*, Why Islam? Facts About Islam (March 5, 2015) ........ 14, 19, 20

Orthodox Church of America, *"In the Beginning…" Healing our Misconceptions* ...................................................................................................... 13

*Raising Children as Good Hindus*, Hinduism Today (Apr. 1, 2021) ....................18

Chaim Rapoport, *Judaism and Homosexuality: An Alternate Rabbinic View*, 13 Hakirah, the Flatbush Journal of Jewish Law and Thought 29 .........15

Yehuda Shurpin, *Why Are Women Exempt From Certain Mitzvahs?*, Chabad.org......................................................................................... 16, 17

*Surah Al-Hujurat* 49:13 .........................................................................................19

*Surah An-Nisa* 4:1 ................................................................................................. 19

*Surah Nur* 24:31...................................................................................................20

The Church of Jesus Christ of Latter-Day Saints, *Chastity, Chaste*...................... 14

Asma Uddin, When Islam Is Not A Religion: Inside America's Fight For Religious Freedom (2019) ..........................................................................23

*Women and Mitzvot*, Aish (May 23, 2013) ...................................................... 16, 17

*Women are the Twin Halves of Men*, Observer News Service, (March 9, 2017) ...................................................................................................... 14, 21

Christopher Yuan, *Gender Identity and Sexual Orientation,* THE GOSPEL COALITION........................................................................................13

Rabbi Avi Zakutinsky, *Dancing at a Wedding*.......................................................16

Ani Amelia Zainuddin, et al, *The Islamic Perspectives of Gender-Related Issues in the Management of Patients with Disorders of Sex Development*, NATIONAL LIBRARY OF MEDICINE (April 21, 2016)................................................. 19, 20, 21

# INTERESTS OF *AMICI CURIAE*[1]

*The Jewish Coalition for Religious Liberty* is a cross-denominational organization of Jewish rabbis, lawyers, and professionals who are committed to defending religious liberty. As members of a minority faith that adheres to practices that many in the majority may not know or understand, the Jewish Coalition for Religious Liberty has an interest in ensuring that government actors are prohibited from evaluating the validity of religious objectors' sincerely held beliefs. The Jewish Coalition for Religious Liberty is also interested in ensuring that parents' and students' First Amendment free exercise rights are protected.

*The American Hindu Coalition (AHC)* is an apolitical national advocacy organization representing Hindus, Buddhists, Jains, Sikhs, and related members of minority religions that frequently face discrimination and misunderstanding in the public school system, as their religious practices and beliefs are unfamiliar to mainstream America. The AHC membership, comprised of parent activists, have advocated for a parent-partnered public school education in various local and state-wide school boards, including Fairfax County, Virginia, New York City, and San Francisco.

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than *Amici* or their counsel—contributed money that was intended to fund preparing or submitting the brief. Appellants consented to the filing of this brief; appellees did not consent.

AHC joins this brief in support of Plaintiff-Appellant, Parents Defending Education, in defense of religious parents and children against discriminatory practices in public school education that are prohibited by the Fourteenth Amendment, as construed by the Supreme Court. AHC further endeavors to protect students' and parents' First Amendment rights to freely exercise their religion and their fundamental rights not to be compelled to act contrary to their sincerely held religious beliefs.

***The Coalition for Jewish Values (CJV***) is the largest Rabbinic Public Policy organization in the United States. CJV articulates and advances public policy positions based upon traditional Jewish thought, through education, mobilization, and advocacy, including *amicus curiae* briefs in defense of equality and freedom for religious institutions and individuals. Representing over 2,500 traditional Orthodox rabbis, CJV has an interest in protecting religious liberty and practice, including the ability of parents to raise their children according to their sincerely held beliefs.

***The Islam and Religious Freedom Action Team (IRF)*** of the Religious Freedom Institute amplifies Muslim voices on religious freedom, seeks a deeper understanding of the support for religious freedom inside the teachings of Islam, and protects the religious freedom of Muslims. To this end, the IRF engages in research, education, and advocacy on core issues including freedom from coercion in religion and equal citizenship for people of diverse faiths. The IRF explores and supports

2

religious freedom by translating resources by Muslims about religious freedom, by fostering inclusion of Muslims in religious freedom work both where Muslims are a majority and where they are a minority, and by partnering with the Institute's other teams in advocacy. The IRF has an interest in protecting the ability of parents to raise their children according to their sincerely held religious beliefs.

**INTRODUCTION**

As the Supreme Court recently recognized in *Kennedy v. Bremerton School District*, suppressing religious expression in public schools "would undermine a long constitutional tradition under which learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'" 142 S. Ct. 2407, 2431 (2022) (citation omitted). Yet the Olentangy Local School District's speech code ignores that warning and suppresses religious expression. Days ago, the Eighth Circuit enjoined a very similar policy in Linn Mar, Iowa, finding that its regulation on student speech likely violated the First Amendment. *Parents Defending Education v. Linn Mar Community School District*, No. 22-2927 2023 WL 6330394 (8th Cir. Sept. 29, 2023). This Court should do the same.

Under the District's speech code, a Muslim student who wears a hijab and follows the Quran's teachings on gender will be singled out for discipline if she voices an objection to sharing a restroom with a biological male in violation of her religious beliefs. Jewish students learning Torah commandments and principles at

3

home will be compelled to use classmates' preferred pronouns in violation of their religious beliefs about sex and gender, or else face discipline for "harassment." And Hindu families, who have no viable choice but to send their children to public school, will face additional pressure as their children are not able to express their beliefs at school but are instead required to affirm concepts about sex and gender that directly conflict with their beliefs. For Parents A-D, their children, and families in districts around the country adopting policies similar to Olentangy's, such concerns are neither speculative nor hypothetical. But the courts can protect these students' and parents' concerns by vigorously enforcing their First Amendment rights.

The First Amendment provides robust protection for religious exercise, which includes students' ability to speak or refrain from speaking in accordance with their sincere religious beliefs, and parents' ability to raise their children in accordance with their sincere religious beliefs. *Amici* urge the Court to uphold free exercise and free speech rights and consider the impact of Olentangy's speech code on religious families, particularly families from minority faith backgrounds.

**ARGUMENT**

I. **The District's Policy violates the Free Speech and Free Exercise Clauses by compelling students to use pronouns that conflict with biology and their religious beliefs.**

A. **The First Amendment provides students double protection for speech motivated by sincerely held religious beliefs.**

Parents Defending Education argues that the First Amendment prevents schools from compelling students to affirm beliefs with which they disagree, Appellant Br. at 27–32, that the District's Policy discriminates based on content and viewpoint, *id.* at 32–42, and that it is unconstitutionally overbroad, *id.* at 42–49. *Amici* believe that Parents Defending Education has an additional claim under the Free Exercise Clause, which provides further protection for religious expression and robustly protects parents' freedom to raise their children in accordance with their sincere religious beliefs.

The First Amendment extends "double protection" to speech that is motivated by sincere religious beliefs. *Kennedy*, 142 S. Ct. at 2431. In *Kennedy*, the Court upheld Coach Kennedy's First Amendment right to say a brief post-game prayer on the 50-yard line, holding that "[b]oth the Free Exercise and Free Speech Clauses of the First Amendment protect expressions like Mr. Kennedy's." *Id*. at 2416. The Court rejected the "'modified heckler's veto, in which . . . religious activity can be proscribed' based on 'perceptions' or 'discomfort.'" *Id.* at 2427 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001)).The Supreme Court recently

5

applied a similar free speech principle to the context of religious beliefs about sexuality in *303 Creative v. Elenis*, finding that Colorado violated the Free Speech Clause of the First Amendment by compelling a Christian web designer to create wedding websites for same-sex couples that affirm concepts about marriage contrary to her sincere religious beliefs. *See* 143 S. Ct. 2298 (2023). Drawing on a long tradition of jurisprudence including *West Virginia v. Barnette*, *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, and *Boy Scouts of America v. Dale*, the Court held that "the First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply 'misguided,' and likely to cause 'anguish' or 'incalculable grief.'" *Id.* at 2312 (internal citations omitted). And the Court made clear that that "the government may not compel a person to speak its own preferred messages." *Id.* (citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505-06 (1969)).

These bedrock protections for speech, including religious speech, extend to students in a wide variety of contexts. In *Tinker v. Des Moines*, the Supreme Court rejected school officials' concern about quelling potential disturbance as an excuse for banning students' expression protesting the Vietnam War. 393 U.S. at 508. The Court found that "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right of freedom of expression . . . Any word spoken,

in class, in the lunchroom, or on the campus that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk." *Id.* (citing *Terminiello v. City of Chicago,* 337 U.S. 1 (1949)). Likewise, in *Healy v. James*, the Court found that unsubstantiated fear of "disruption" was not a valid reason for denying official recognition to a local student chapter of Students for a Democratic Society. 408 U.S. 169, 189–90 (1972).

This Court upheld similar principles in *Ward v. Polite*: "The free-speech guarantee also generally prohibits the most aggressive form of viewpoint discrimination—compelling an individual 'to utter what is not in [her] mind' and indeed what she might find deeply offensive—and the Court has enforced that prohibition, too, in the public school setting." 667 F.3d 727, 733 (6th Cir. 2012) (quoting *West Virginia Bd. of Educ. v. Barnette,* 319 U.S. 624, 634) (1943)). Here, the district court improperly cited *Ward* only in reference to "legitimate pedagogical concerns," 2023 WL 4848509, at *14, ignoring the main thrust of the case: "that the First Amendment does not permit educators to invoke curriculum 'as a pretext for punishing [a] student for her . . . religion," and that "discriminating against the religious views of a student is not a legitimate end of a public school*." Ward*, 667 F.3d at 734 (quoting *Settle v. Dickson Cnty. Sch. Bd*., 53 F.3d 152, 155 (6th Cir. 1995)); *see id*. ("Surely, for example, the ban on discrimination against clients based on their religion . . . does not require a Muslim counselor to tell a Jewish client that

his religious beliefs are correct if the conversation takes a turn in that direction . . . .

Tolerance is a two-way street. Otherwise, the rule mandates orthodoxy, not anti-discrimination.")

Last month, the en banc Ninth Circuit protected religious student speech in *Fellowship of Christian Athletes v. San Jose Unified School District*, holding that the school district violated Christian students' free exercise, free speech, and free association rights when it derecognized their student ministry club because of their religious beliefs about sex and gender. The court determined:

> Anti-discrimination laws and policies serve undeniably admirable goals, but when those goals collide with the protections of the Constitution, they must yield—no matter how well-intentioned. *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2315 (2023) . . . . We do not in any way minimize the ostracism that LGBTQ+ students may face because of certain religious views, but the First Amendment's Free Exercise Clause guarantees protection of those religious viewpoints even if they may not be found by many to "be acceptable, logical, consistent, or comprehensible."

No. 22-15827, 2023 WL 5946036, at *23 (9th Cir. Sept. 13, 2023) (quoting

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021)).

The District's speech code—and the district court opinion—flout these important constitutional principles. The District requires discipline for students based on the content and viewpoint of their speech, defining the use of anything other than preferred names and pronouns as speech that is "insulting," "humiliating," "dehumanizing," "derogatory," and "unwanted." ECF No. 1 at 43, ¶ 164. Given that

compelling an adult to speak messages that violate her religious beliefs about sexuality violates the Free Speech Clause, as in *303 Creative*, how much more when those compelled are minor students in the coercive atmosphere of school administrators who control their grades, records, and college admissions chances. *See also Fellowship of Christian Athletes*, 2023 WL 5946036, at \*20 n.11 ("the power dynamic of the student-teacher relationship is not lost upon us"). As *Tinker* and *Ward* require, this Court should hold that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506.

Just last week, the Eighth Circuit applied these important principles when it enjoined a school policy in Linn Mar, Iowa, which is very similar to Olentangy's policies at issue in this case. *Parents Defending Education*, 2023 WL 6330394, at \*6. The Court held that the school district's regulation on student speech likely violated the First Amendment. Specifically, the policy was impermissibly vague because it required discipline if a student refused "to respect a student's gender identity," without clarifying what that meant. *Id.* at \*5. Thus, "[a] student thus cannot know whether he is violating the policy when he expresses discomfort about sharing a bathroom with someone who is transgender, argues that biological sex is immutable during a debate in social studies class, or expresses an opinion about the participation of transgender students on single-sex athletic teams." *Id.* at \*6. Further,

"District officials are left to determine on an 'ad hoc and subjective basis' what speech is 'disrespectful' and subject to discipline, and what speech is acceptable." *Id*. (citing *Grayned v. City of Rockford*, 408 I.S. 104, 109 (1972)). Olentangy's speech code raise all the same concerns, yet is even more likely to violate the First Amendment because school officials have clearly stated that they will discipline any student who "purposefully refer[s] to another student by using gendered language they know is contrary to the other student's identity." Appellant Br. at 18. Thus, not only is the speech code impermissibly vague, but it discriminates based on content and viewpoint in a way that violates the First Amendment.

**B. By mandating the use of preferred names and pronouns, the District takes sides in an ideological debate and marginalizes religious students.**

The district court excused the District's speech code by downplaying its significance, arguing that "the use of pronouns when talking to others in everyday situations is not so inherently fraught," and merely indicates "respect for others' right to choose a path for themselves." *Parents Defending Education*, 2023 WL 4848509, at *15. Not so. Far from a "mechanical exercise," *id.* at *16, the use of names and pronouns that conflict with biological sex has profound moral and medical significance. As this Court just recognized in *L.W. by and through Williams v. Skrmetti, et al*, No. 23-5600; 23-5609, 2023 WL 6321588, at *5, 19 (6th Cir. Sept. 28, 2023), issues of gender transition are a "vexing and novel topic of medical

debate," and "several European nations, including the ones who paved the way for early drug-related and surgical treatments, have since limited these medical interventions for minors." Judge White's dissent acknowledged that using a preferred name and pronouns is an important step in "social transition," which precedes medical transition for minors. *Id.* at *24 (White, J., dissenting).

By taking sides (and assuming medical expertise) in an area fraught with moral and medical uncertainty, the District is ostracizing religious students who believe that sex is biological and unchanging. The District purports to "creat[e] an environment in which each individual feels respected, acknowledged, and heard by their classmates." *Parents Defending Education*, 2023 WL 4848509, at *15. Yet its speech code has the opposite effect. Far from an innocent academic or curricular decision, the District's speech code is an "attempt[] to promote social values or goals through compelled speech," which Supreme Court precedent prohibits (as the district court acknowledged). *Id.* at *14.

Instead of correcting this error, the district court doubled down, taking the controversial position that "it is not so simple to define 'biological sex' as just male or female," and that "the full scope of discrimination on the basis of 'sex' must encompass discrimination on the basis of all the biological markers that comprise an individual's 'biological sex'—including *inter alia* their organs, their chromosomes, their hormones, and their gender identity." *Id*. at *7. The district court's dicta went

11

even further to opine that *Bostock v. Clayton County* applies beyond Title VII to Title IX.[2] *Id.* While harmful and misleading, this dicta confirms that the District— and the lower court—are not acting neutrally with regard to issues of sex and gender but are in fact choosing a side in a political and ideological debate of significant consequences. The court described LGBTQ students as a "captive audience," failing to recognize that religious students are a "captive audience" too.[3] *Id.* at \*12 (citation omitted). And the reason they lack the "full capacity for individual choice which is the presupposition of First Amendment guarantees" is that the District removed that choice. *Id.* (quoting *Ginsburg v. State of New York*, 390 U.S. 629, 650 (1968) (Stewart, J., concurring)). Its mandate: use pronouns that conflict with biology, or don't speak at all. That choice violates the Constitution.

---

[2] This Court just rejected this line of reasoning in *L.W. by and through Williams*, 2023 WL 6321588, at \*16, finding that *Bostock* applies to Title VII only, not equal protection claims by advocates of gender transitions for minors. This Court also cited *Meriwether* for the principle that Title VII analysis does not apply to Title IX.

[3] Since concerns about student bullying and harassment are significant, it is important to note here that Plaintiffs here "bear no ill will toward children or adults who identify as transgender or nonbinary." ECF No. 1 at 22, ¶ 73. Indeed, the District's policies from previous years already addressed situations where LGBTQ students—or any students—experience bullying. What infringes on constitutional rights is the District's decision that the use of birth names and biological pronouns *per se* violates its policies, even if they are used respectfully by students with sincere religious beliefs. That discriminates based on content and viewpoint, and that violates the First Amendment.

**II.** **The District's Policy substantially burdens the sincerely held religious beliefs of many different faith groups, including Jewish Americans, Hindu Americans, and Muslim Americans.**

Religions from diverse cultures and geographic regions assert—as they have for millennia—that sex is an objective, binary category that cannot be changed by self-perception or medical intervention.[4] Millions of Christians hold to this belief. Catholic teaching makes clear that "[e]veryone, man and woman, should acknowledge and accept his sexual identity" and that "[p]hysical, moral, and spiritual difference and complementarity are oriented toward the goods of marriage and the flourishing of family life."[5] The Orthodox Church of America teaches that "our sexuality begins with our creation," and "[t]he Bible says 'Male and female He created them' (Gen. 1:27)."[6] Within the Protestant tradition, most denominations believe the Bible's teaching that God created humans male and female in His image, and that this reality cannot be changed based on perceived gender identity, including but not limited to the Anglican Church, Assemblies of God, the Church of God in

---

[4] *See, e.g.,* Christopher Yuan, *Gender Identity and Sexual Orientation,* THE GOSPEL COALITION, https://www.thegospelcoalition.org/essay/gender-identity-and-sexual-orientation/.

[5] Catholic Catechism, No. 2333, https://www.usccb.org/sites/default/files/flipbooks/catechism/562/#zoom=z.

[6] Orthodox Church of America, *"In the Beginning…" Healing our Misconceptions,* https://www.oca.org/the-hub/two-become-one/session-2-in-the-beginning-.-.-.-healing-our-misconceptions (quoting *Genesis* 1:27).

Christ, the Lutheran Church, the Presbyterian Church in America, and Southern Baptists.[7]

But this religious belief is not just the province of traditional trinitarian Christianity. Sacred texts that define beliefs on marriage, sexuality, chastity, and sex as binary (male and female) include not only the Catholic Catechism[8] and the Bible, but also the Quran,[9] Hadith,[10] the Torah,[11] and the Book of Mormon.[12] The First Amendment provides robust protection for religious believers who adhere to these faiths, as well as for individuals who do not participate in a specific religious

---

[7] For a complete list of sources, *see* First Liberty Institute, *Public Comment on Section 1557 NPRM* (Oct. 3, 2022), at 4-9, https://perma.cc/97NU-VCMZ (detailing religious beliefs of 20 faith groups on sex and gender).

[8] Catholic Catechism, No. 2361, https://www.usccb.org/sites/default/files/flipbooks/catechism/569/#zoom=z.

[9] *Marriage in Islam*, Why Islam? Facts About Islam (March 5, 2015), https://www.whyislam.org/social-issues/marriage-in-islam/; *Women are the Twin Halves of Men*, Observer News Service, (March 9, 2017), https://kashmirobserver.net/2017/03/09/women-are-the-twin-halves-of-men/.

[10] Dr. Sikiru Gbena Eniola, *An Islamic Perspective of Sex and Sexuality: A Lesson for Contemporary Muslims*, 12 IOSR JOURNAL OF HUMANITIES AND SOCIAL SCIENCE 2 (May-Jun. 2013), at 2028, https://www.iosrjournals.org/iosr-jhss/papers/Vol12-issue2/C01222028.pdf

[11] *Issues in Jewish Ethics: Homosexuality*, JEWISH VIRTUAL LIBRARY, https://www.jewishvirtuallibrary.org/homosexuality-in-judaism.

[12] The Church of Jesus Christ of Latter-Day Saints, *Chastity, Chaste,* https://www.churchofjesuschrist.org/study/scriptures/tg/chastity?lang=eng.

tradition but who hold sincere religious beliefs about the body, sexuality, marriage, and gender.[13]

## A. Traditional Jewish Beliefs about Sex and Gender

For millions of Jewish Americans who follow traditional *halachic* teaching that is rooted in Jewish law dating back three millennia, the Torah is very clear about the divine creation of human beings as distinctly male and female.[14] "[W]e have to strive to 'maintain sexual purity' on a universal level and it is 'our obligation . . . to incorporate the Holiness Code into our everyday civic and communal life.'"[15] Observant Jews are careful to follow the timeless prescriptions of the Torah and Talmud and to respect their specific commands regarding sexual purity and holiness.

Differences between the biological sexes, in accordance with divine creation, also are fundamental to the structure and pattern of Jewish religious worship. For example, traditional Jewish synagogues provide a physical and visible separation between men and women during prayers, and affectionately touching a nonrelative

---

[13] *See Thomas* v. *Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714 (1981).

[14] *Genesis* 1:27.

[15] Chaim Rapoport, *Judaism and Homosexuality: An Alternate Rabbinic View*, 13 HAKIRAH, THE FLATBUSH JOURNAL OF JEWISH LAW AND THOUGHT 29, 30 (citing Sanhedrin 58a (expounding on *Genesis* 2:24) and Maimonides, Mishneh Torah, Hilkhot Melakhim 9:5), https://hakirah.org/Vol13Rapoport.pdf, at 32.

member of the opposite sex is prohibited.[16] Many extend these practices to weddings and other occasions.[17] Also, while men and women are equally obligated to obey the negative commandments (such as do not murder and do not steal), women are exempt from many positive time-bound commandments.[18] This is based on the belief that God created men and women with different biological roles and abilities, and that "[a]s the primary creators and nurturers of human life, women more closely resemble God than men do."[19] Thus, only men are obligated to pray at specific times each day, to blow the shofar on Rosh Hashanah, and to live in the ceremonial booth on Sukkot.[20] Women are allowed, but not required, to complete these practices. One potential explanation for this difference is that women are not required to observe such commandments because doing so might interfere with family responsibilities, and "raising children is considered one of the most elevated forms of service to God, crucial to the continuation of His nation and His Torah."[21] Only men may wear the

---

[16] Jordana Birnbaum, *Shomer Negiah, the Prohibition on Touching*, My Jewish Learning, https://rb.gy/0tlj3.

[17] Rabbi Avi Zakutinsky, *Dancing at a Wedding*, https://outorah.org/p/27278/.

[18] *Women and Mitzvot*, AISH (May 23, 2013), https://aish.com/women-mitzvot/.

[19] *Id.*

[20] *Id.*

[21] Yehuda Shurpin, *Why Are Women Exempt From Certain Mitzvahs?*, Chabad.org, https://www.chabad.org/library/article_cdo/aid/4407982/jewish/Why-Are-Women-Exempt-From-Certain-Mitzvahs.htm.

ceremonial garments of *tzitzit* and *tefillin.*[22] All morning prayer services contain specific blessings for men and women.[23]

All of these practices are based on biological, chromosomal sex; the Torah does not recognize the possibility of changing the sex or gender with which a person was created. "This distinction between women and men is also reflected in the role parents have in determining the identity of their child. The essence of Jewishness is determined by the mother, whereas the particulars of Jewishness, such as tribal identity, are determined by the father."[24]

The distinctions between men and women also factor into eligibility to perform communal roles such as counting for a prayer quorum or leading prayers. If members of the Jewish community could change their sex or gender at will, this would not only disrupt their own religious practice, as the core obligations for men and women are not subject to change, but it would also disrupt the religious life of the community.

### B. Hindu Beliefs about Sex and Gender

Hindu scripture, culture, and values emphasize marriage and child-rearing as essential to *Dharma* (religious or moral duties). Both the marriage vow and the

---

[22] *Women and Mitzvot*, *supra* note 18.

[23] *Id.*

[24] Shurpin, *supra* note 21.

institution of marriage, which is heterosexual only, are defined and sanctioned by divine authority.[25] Hindu teaching makes clear that men and women have distinct identities and roles, and that sexual activity belongs within the confines of heterosexual marriage. It is only within marriage that sexual behavior aligns with *dharma* or righteous living.[26]

Producing offspring and rearing children are considered sacred duties essential to marriage, with distinct roles for the mother and the father. For example, the Hindu medical text, *Āyurveda*, describes a mother's vital role in her child's development, both physical and psychological. As such, Hindus believe that a parent's rights and responsibilities in child-rearing are sacred and must be protected against government infringement. For Hindus, child-rearing is a parent's highest righteous (*Dharmic*) duty. "Parents are indeed the first guru . . . [t]he child's deepest impressions come from what the parents do and say."[27] Hindu legal texts (*Dharmaśāstras*) dating back two millennia provide detailed instructions regarding

---

[25] *See, e.g., Dharma Sastra*, Vol. 6 Manu Sanskrit, Chapter III, pp. 80-93, https://archive.org/details/dharmasastra-with-english-translation-mn-dutt-6-vols-20-smritis/Dharma%20Sastra%20Vol%206%20Manu%20Sanskrit/page/80/mode/2up.

[26] "Gender and Sexuality," *Religion Library: Hinduism*, Patheos, https://www.patheos.com/library/hinduism/ethics-morality-community/gender-and-sexuality.

[27] *Raising Children as Good Hindus*, Hinduism Today (Apr. 1, 2021), https://www.hinduismtoday.com/magazine/apr-may-jun-2021/raising-children-as-good-hindus/.

the rights and responsibilities of both parents in child-rearing and the importance of child welfare in society. Thus, parental instructions on a *Dharmic* life, without government interference, are essential to a child's education.

### C. Muslim Beliefs about Sex and Gender

In the Muslim faith, both sacred writings and specific teachings make clear that men and women are two distinct biological sexes with important differences and relationships toward one another. The Quran makes this clear: "O Mankind! We created you all from a male and a female, and made you into nations and tribes so that you may know one another. Verily the noblest of you in the sight of God is the most God-fearing of you."[28] The Quran also teaches that "all human beings, whether male or female, are descended from Adam and Eve."[29] Both Shi'ah and Sunni Muslims hold to the words of the Prophet Mohammad (pbuh) who has stated that "men and women are twin halves of each other' (Bukhari)."[30] Muslims' belief that sex is binary, fixed, and immutable is closely linked to the creation narrative and "brings home the fact that men and women are created from a single source.

---

[28] *Surah Al-Hujurat* 49:13.

[29] *Surah An-Nisa* 4:1; *see also* Ani Amelia Zainuddin, et al, *The Islamic Perspectives of Gender-Related Issues in the Management of Patients with Disorders of Sex Development*, NATIONAL LIBRARY OF MEDICINE (April 21, 2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5272885/.

[30] *Marriage in Islam*, *supra* note 9.

Furthermore, by using the analogy of twin half, the Prophet (pbuh) has underlined the reciprocal and interdependent nature of men and women's relationships."[31]

Because the identities of biological men and women are unique and divinely created, this belief has important implications for religious worship, marriage, and discussions about gender identity. "Men and women in Islam have different roles, responsibilities, and accountabilities, as they differ in anatomy, physiology, and psychology."[32] As a matter of religious obedience, Muslims must observe decency (*ihtisham*), which prevents a Muslim female from sharing a restroom with the opposite biological sex, modesty (*hijab*), which includes behavior as well as dress, and seclusion (*khalwa*), which means a man and woman who are unrelated and unmarried cannot be alone together in an enclosed space.[33] In religious worship, men and women sit in separate areas of the mosque to reduce distractions and to protect modesty; this is a "way of preventing men and women from seeing each other and a way of increasing attention to prayer."[34] The obligation to go to Friday prayers

---

[31] *Marriage in Islam*, *supra* note 9.

[32] Zainuddin, *supra* note 29.

[33] *See, e.g.*, *Surah Nur* 24:31 (describing concept of *hijab*); MARWAN IBRAHIM AL-KAYSI, MORALS AND MANNERS IN ISLAM: A GUIDE TO ISLAMIC ADAB 60-61 (1986) (describing restroom obligations).

[34] Fatwa No. 88708, "Sisters object to barrier between them and men in the mosque," *Islamweb.net* (Sept. 29, 2004), https://www.islamweb.net/en/fatwa/88708/sisters-object-to-barrier-between-them-and-men-in-the-mosque.

applies to men but not women, and traditionally the prayer of a woman is more rewarded if she prays at home rather than at the mosque.[35] This belief does not demean women but instead recognizes the traditional complementary spheres of keeping a home and making a living in a more public way.[36] Thus, Muslims' belief in the distinct biological sexes is not only rooted in their sacred teachings but goes to the very core of their religious exercise.

Islamic teaching does recognize the rare occurrence of "*khuntha*" or "intersex" biology, when a child is born with sexual ambiguity because of opposite sex organs. Surgery is typically only allowed for *khuntha* individuals when medical doctors determine that it would allow the person to be designated as a certain sex, in order to be able to perform his or her duties as a Muslim.[37] For example, "[t]here are fatwas from different Islamic countries which give rulings regarding sex change surgery or gender reconstruction surgery . . . [t]hese fatwas generally agree that gender reconstruction surgery for the [*khuntha*] is permissible in Islam" but "totally prohibited" in other cases.[38] Islamic teaching does not recognize alternate gender identities, because even when someone changes his or her outer appearance or

---

[35] Zainuddin, *supra* note 29.

[36] *Women are the Twin Halves of Men*, *supra* note 9.

[37] Zainuddin, *supra* note 29.

[38] *Id.*

receives hormones or surgery, there is no fundamental change in biology at the cellular level and thus "the rulings of that [biological] sex continue to apply."[39]

Because Islam affirms the reality of sexual dimorphism of the human species, it forbids imitation of the opposite sex. A seminal classical work of Islamic jurisprudence summarizes the view of scholars: "It is unanimously forbidden for men and women to deliberately imitate one another."[40] This means that the District's rule requiring students, through the use of pronouns, to describe males as females or females as males, puts the Muslim student in the position of having to choose between obedience to God and obedience to the state.

Thus, the District's speech code interferes with the religious exercise of a wide variety of faith traditions who hold sincere beliefs about sex and gender, by requiring students to affirm concepts that violate their sincerely held beliefs and conflict with their parents' instruction at home.[41] The District's speech code subjects minor

---

[39] *Male, Female, or Other: Ruling of a Transgender Post Sex Change Procedures*, AMERICAN FIQH ACADEMY (May 2, 2017), http://fiqhacademy.com/res03/.

[40] Ahmad Ibn Hajar al-Asqalani, *Fath al-Bari bi Sharh Sahih al-Bukhari*, Beirut: Dar al-Ma`rifah (1980). Vol. 9, p. 336, https://shamela.ws/book/1673/5425.

[41] While there is substantial common ground among these faith traditions (and many others) on religious beliefs about sex and gender, there may be internal disagreement over whether or how religious adherents should use names or pronouns that conflict with biological sex. Some may be willing to use preferred pronouns as a matter of courtesy, while others find it deeply offensive. No matter: "[T]he guarantee of the Free Exercise Clause, is "not limited to beliefs which are shared by all of the members of a religious sect." *Holt v. Hobbs*, 574 U.S. 352, 362 (quoting *Thomas*,

students to discipline if they decline or express ideas that differ from its ideological orthodoxy. This violates the constitutional rights of religious students, especially those from minority faith backgrounds who are more likely to experience discrimination.

### III. The District's Policy will disproportionately impact families from minority faith backgrounds.

#### A. Minority faiths are most likely to be misunderstood and targeted by hostile government officials.

Government officials are more likely to misunderstand minority faiths because their beliefs and practices are unfamiliar, and public-school administrators are no exception. *See, e.g., A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 260–61 (5th Cir. 2010) (school officials questioned Native American student's belief in "keep[ing his] hair long and in braids as a tenet of [his] sincere religious beliefs"); *Gonzales v. Mathis Indep. Sch. Dist.*, No. 2:18-cv-43, 2018 WL 6804595, at *4 (S.D. Tex. Dec. 27, 2018) (school officials mistakenly argued that students' traditional religious promesa (promise) was not "religious" or "an established tenet of their Catholic faith").

---

450 U.S. at 715–16). What the Constitution requires is that individuals are free to decide whether and how to speak according to their consciences—not compelled by the government under threat of punishment.

As an unwelcome minority in many American communities, Muslims are especially likely to face hostility from government officials who do not afford them the same presumption of good faith that other religious groups may enjoy. *See, e.g.,* ASMA UDDIN, WHEN ISLAM IS NOT A RELIGION: INSIDE AMERICA'S FIGHT FOR RELIGIOUS FREEDOM 116–117 (2019); *see also Islamic Soc'y of Basking Ridge v. Twp. of Bernards*, 226 F. Supp. 3d 320, 327–28 (D.N.J. 2016) (documenting destruction of property, government hostility, and false accusations regarding Islamic beliefs and practices following proposal to build local Mosque).

Anti-Semitism continues to be a problem, especially toward Orthodox Jews who adhere to traditional Torah values and practices. *See, e.g., Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 627 (2d Cir. 2020) (striking down governor's order targeting "a predominately ultra-orthodox cluster" based on his claim that the State was "having issues in the Orthodox Jewish community in New York, where because of their religious practices . . . we're seeing a spread [of COVID-19]"); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 153 (3d Cir. 2002) (striking down ordinance enacted out of "fear" that "Orthodox Jews [would] move to Tenafly" and "take over").

Given these realities, children growing up in minority religious traditions face the greatest pressure to conform to the values and beliefs endorsed by school administrators. The students involved in this lawsuit are already facing such

pressure. For example, the children of Parents A, B, C, and D believe that "people are either male or female and that a child cannot 'transition' from one sex to another," ECF No. 1 at 24, 26, 31, 35, ¶¶ 73, 93, 114, 131, but they "self-censor," *id.* at ¶ 78, "remain silent in classroom environments," *id.* at ¶ 117, or "tell the teachers what they want to hear," *id* at ¶ 79, 99, 117, 137, because they "fear[] that expressing their belief that sex is immutable—by using biologically accurate pronouns or otherwise explaining their views—will cause [them] to be punished for violating school policies," *id.* at ¶ 78. Parents A, B, and C have expressed that they have "watched their child steadily lose self-confidence over the course of the 2022-23 school year because of the District's speech policies," ECF No. 1 at 25, 30, 34, ¶ 87, 109, 125, and for the children of Parent D, "being disciplined for stating their fundamental beliefs will inflict mental and psychological harm on Parent D's children by forcing them to 'choose' between expressing the beliefs they have been taught at home and following the instructions of teachers and other Olentangy authority figures," ECF No. 1 at 38, ¶ 145. The identities of these students are anonymous to protect their safety. But a Muslim student wearing a hijab or a Jewish student wearing a yarmulke will experience additional pressure because their very appearance demonstrates sincere religious beliefs that will attract the ire of school administrators enforcing the District's speech code.

For all these reasons, the speech code violates the Free Exercise Clause in a way that will disproportionately harm families from minority faith backgrounds.

### B. Families from minority faith backgrounds often lack educational alternatives.

As many courts have recognized, parental rights do not evaporate when parents send their children to public school. *Morse v. Frederick*, 551 U.S. 393, 424 (2007) (Alito, J., concurring) ("It is a dangerous fiction to pretend that parents simply delegate their authority—including their authority to determine what their children may say and hear—to public school authorities."). Indeed, such an approach would "be fundamentally unfair to parents who in reality do not have that choice." *Tatel v. Mt. Lebanon Sch. Dist,* 637 F.Supp.3d 295, 324-25 (W.D. Pa. 2022). As Justice Alito observed, "[m]ost parents, realistically, have no choice but to send their children to a public school and little ability to influence what occurs in the school." *Morse*, 551 U.S. at 424. And "[c]onstitutional rights should not be analyzed in a way that benefits only socially and economically advantaged persons," that is, parents who can afford private school or homeschooling on a single income. *Tatel*, 637 F.Supp.3d at 325. As the court in *Mirabelli v. Olson* recognized, "[s]ome parents who do not want such barriers may have the wherewithal to place their children in private schools or homeschool, or to move to a different public school district. Families in middle or lower socio-economic circumstances have no such options." No. 3:23-cv-00768, 2023 WL 5976992, at *18 (S.D. Cal. 2023). The District's speech code has caused

26

the parents in this lawsuit to question whether they are subjecting their children "to these harms from the District's policies by not withdrawing [their] child from Olentangy, even though [their] family cannot afford the financial strain that would impose." ECF No. 1 at 26, 30, 34, 39, ¶ 88, 110, 126, 148.

Even for the fraction of parents who could afford private school, members of minority faiths have very few options that would not cause confusion or conflict with their beliefs. A Muslim family may choose Catholic school over public school in order to avoid speech codes like the District's, but that would cause a different conflict as the student would learn one faith at home and another faith at school. Many Jewish parents, especially the most Orthodox, do choose to send their children to religious schools, but large geographical areas lack Jewish day schools altogether, or the schools are under attack by hostile governments for allegedly not complying with local regulations.[42] And "[a]lthough the Hindu-American community has developed numerous institutions over the past decades, an absence of educational institutions still persists."[43]

---

[42] *See, e.g., Matter of Parents for Educational & Religious Liberty in Schools v. Lester Young Jr.,* 190 N.Y.S.3d 816 (N.Y. Sup. Ct. Mar. 23, 2023) (dismissing Jewish parents' claim that New York's "substantial equivalent" compulsory attendance regulations violated their constitutional rights by targeting Orthodox Jewish day schools).

[43] *Aum School*, Aum Educational Society of America (2022), https://aum.school/.

As the Supreme Court recently observed , "America's public schools are the nurseries of democracy," which "only works if we protect the 'marketplace of ideas.'" *Mahanoy Area Sch. Dist. v. B. L. by & through Levy,* 141 S. Ct. 2038, 2046 (2021) Especially for members of minority faiths who are often misunderstood, "[t]hat protection must include the protection of unpopular ideas." *Id.* Here, families from a wide variety of religious, cultural, and political backgrounds are coming together to express deeply concerned opposition to the District's speech code. The Court should heed their concerns and take action to protect the constitutional rights of students and parents.

## CONCLUSION

For all these reasons, the Court should reverse the district court's ruling.

Dated: October 2, 2023

Respectfully submitted,

Sue Ghosh Stricklett
American Hindu Coalition
42618 Trade West Drive
Sterling, VA 20166
(301) 785-1041
sueghosh@stricklettgroup.com

*Counsel for American Hindu Coalition*

/s/ *Kayla A. Toney*
_____

Kayla A. Toney
  *Counsel of Record*
First Liberty Institute
1331 Pennsylvania Ave. NW, Suite 1410
Washington, DC 20004
(202) 918-1554
ktoney@firstliberty.org

David J. Hacker
Justin Butterfield
Holly M. Randall
First Liberty Institute
2001 West Plano Parkway, Ste 1600
Plano, TX 75075
(972) 941-4444
dhacker@firstliberty.org
jbutterfield@firstliberty.org
hrandall@firstliberty.org

*Counsel for Amici Curiae*

29

# CERTIFICATES OF COMPLIANCE

I, Kayla A. Toney, hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6460 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f);

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14.


October 2, 2023

/s/ *Kayla A. Toney*

Kayla A. Toney

**CERTIFICATE OF SERVICE**

I certify that on the date indicated below, I filed the foregoing document with the Clerk of the Court, using the CM/ECF system, which will automatically send notification and a copy of the brief to the counsel of record for the parties.

October 2, 2023

/s/ *Kayla A. Toney*

Kayla A. Toney