# In the United States Court of Appeals
# for the Sixth Circuit

PARENTS DEFENDING EDUCATION,

Plaintiff-Appellant,

v.

OLENTANGY LOCAL SCHOOL DISTRICT
BOARD OF EDUCATION, *et al.*,
Defendants-Appellees.

On Appeal from the United States District Court for the
Southern District Of Ohio, Eastern Division,
No. 2:23-cv-01595

## BRIEF *AMICUS CURIAE* OF
## THE NATIONAL LEGAL FOUNDATION
## IN SUPPORT OF PLAINTIFF-APPELLANT,
### *and supporting reversal*

Steven W. Fitschen
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

Counsel of Record for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

The *Amicus Curiae* has not issued shares to the public, and none have a parent company, subsidiary, or affiliate that has issued shares to the public. Thus, no publicly held company can own more than 10% of the stock of *Amicus Curiae*.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

INTERESTS OF *AMICUS CURIAE* ............................................... 1

SUMMARY OF THE ARGUMENT .................................................. 2

ARGUMENT ................................................................................... 3

    I.    The School District's Policies Violated the Free Exercise
        Rights of Students................................................................... 3

CONCLUSION ............................................................................ 13

# TABLE OF AUTHORITIES

## Cases

*303 Creative v. Elenis,* 143 S. Ct. 2298, ___ (2023)...................... 7, 11, 13

*Bible Believers v. Wayne Cnty.*, 805 F.3d. 228 (6th Cir. 2015) .......... 10-11

*Board of Education of Westside Community Schools v. Mergens,*
    496 U.S. 226 (1990)..............................................................................2

*Boy Scouts of Am. v. Dale*, 530 U. S. 640, 656 (2000) ............................... 7

*Hurley v. Irish-American Gay, Lesbian and Bisexual*
    *Group of Boston*, 515 U.S. 557 (1995) ........................................... 11

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423 (2022)............. 12

*Lee v. Weisman*, 505 U.S. 577 (1992) ...................................................... 13

*Matal v. Tam*, 582 U.S. 218 (2017) ......................................................... 12

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) .................... 8-11, 13

*Parents Defending Education v. LinnMar Community School*
    *Dist.*, No. 22-2927 (8th Cir., Sept. 29, 2023).................................. 13

*Snyder v. Phelps*, 562 U.S. 443 (2011) ...............................................11-12

*Terminiello vs. Chicago*, 337 U.S. 1 (1949) ............................................ 10

*Tinker v. Des Moines Ind. Community Sch. Dist.,*
    393 U.S. 503 (1969) .......................................................... 10, 12-13

*United States v. Seeger*, 380 U.S. 163 (1965)...........................................5

*Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012) .................................8-11, 13

*W. Va. State Bd. of Educ. vs. Barnette,*
    319 U.S. 624 (1943) ......................................................2, 6-8, 11-13


**Statutes**

Equal Access Act, 20 U.S.C. § 4071................................................................1


**Other Authorities**

Genesis 1:27 (NIV) .......................................................................................4

*In God's Image, Men and Women are Made for Love!,*
    U.S. Catholic Conf. Council of Bishops, Love and Sexuality
    (https://www.usccb.org/topics/natural-family-planning/
    love-and-sexuality) ..............................................................................5

*On Transgender Identity*, Southern Baptist Convention
    (https://www.sbc.net/resource-library/resolutions/
    on-transgender-identity/) ....................................................................5

*Statement on same-sex relationships and sexual identity*,
    Orthodox Church in America (https://www.oca.org/holy-
    synod/statements/holy-synod/holy-synod-issues-statement-on
    -same-sex-relationships-and-sexual-identity) .................................5

Qu'ran 75:36-39 ...........................................................................................4

# INTEREST OF *AMICUS CURIAE*[1]

The National Legal Foundation (NLF) is a public interest law firm dedicated to the defense of First Amendment liberties, including the freedoms of speech, assembly, and religion; and parental rights. The NLF and its donors and supporters, including those residing in Ohio, are vitally concerned with the outcome of this case because of its effect on religion-based parental rights.

Further, the issues involved in this case are an area of expertise for the NLF. Both through direct litigation and through amicus work, the NLF is involved in representing parents and public policy organizations that desire to ensure that parents maintain the full panoply of their rights in public schools. Similarly, the NLF has long been involved in protecting the rights of students in public schools, for example having successfully defended the constitutionality of the Equal Access Act, 20 U.S.C. § 4071, in

---

[1] No counsel for any party authored this brief in whole or in part. No person or entity other than *Amicus* and its counsel made a monetary contribution intended to fund the preparation or submission of this brief. Appellant has consented to the filing of this Brief. Appellees have not, and a motion for leave to file the Brief accompanies it.

*Board of Education of Westside Community Schools v. Mergens*, 496 U.S. 226 (1990).

## SUMMARY OF THE ARGUMENT

It is a bedrock principle under the Constitution that government entities, including local school boards, shall not pass any law or regulation that "prohibits the free exercise of religion." *W. Va. State Bd. of Educ. vs. Barnette,* 319 U.S. 624, 637 (1943). In this case, the Olentangy School District ("School District") violated the First Amendment's Free Exercise guarantee by compelling students to use preferred pronouns that do not align with others' biological sex ("Preferred Pronouns"), despite those students registering religious objections to such compulsion. Compl., R. 1, Page ID # 22-29 (¶¶73, 75, 76, 79, 83, 87, 93, 95, 96, 98, 99, 105). In a broad opinion, the District Court held that the "intentional misgendering of students" is itself sufficiently disruptive to constitute "verbal bullying" and, therefore, may lawfully be suppressed by the School District. Op., R. 28, Page ID # 836. In so holding, the District Court utterly ignored the students' sincere religious objections to using pronouns that are consistent with other students' biological sex ("Biological Pronouns"). This brief will

highlight the religious issues at stake, the legal standards that should apply, and the inescapable conclusion that the District Court should be reversed.

## ARGUMENT

## I.   The School District's Policies Violated the Free Exercise Rights of Students.

In three official policies, the School District issued rules that require students to use Preferred Pronouns in school and during other activities related to school (including, but not limited to, in the school building) even when they are inconsistent with Biological Pronouns ("Policy"). Compl., R. 1, Page ID #2-3 (¶¶3-6). The Policy requires students to adopt Preferred Pronouns, even if it violates the students' religious beliefs that sex is God-given and immutable. Compl., R. 1, Page ID # 18 (¶57). Parents Defending Education, whose members include both students and parents, including four groups of parents and students whose rights are at issue in this case, brought suit challenging these requirements. Student A and the two students who are the children of Parent B (collectively "Students") premised their challenges in part on the Policy's violation of their sincerely held religious beliefs. The Students claimed in this regard that their beliefs did not permit

them "to 'affirm' that a biologically female classmate is actually a male – or vice versa – or that a classmate is 'nonbinary' and neither male nor female."  Compl., R. 1, Page ID # 22 (¶73).  The Students also "wish to use pronouns consistent with a classmate's biological sex and to explain to their classmates why they believe that all human beings are created male or female by God."  Compl., R. 1, Page ID # 27 (¶96).  The Students bear no ill will towards transgender individuals or seek in any way to harm them.  Compl., R. 1, Page ID # 23 (¶77).  Instead, "they just want to express their deeply held views."  Compl., R. 1, Page ID # 27 (¶96)

Many religions hold that sex is fixed by God at fertilization, not "assigned" by a doctor or nurse at birth and, thus, is neither subjective nor changeable by the individual.  The Old Testament, which serves as a foundational holy text for both Jews and Christians, states, "God created man in his own image, in the image of God he created him; male and female he created them." Genesis 1:27 (NIV).  The Islamic Holy Scriptures similarly assert, "He made of him a pair, male and female." Qu'ran 75:36-39.  Not surprisingly, therefore, many religious groups

affirm that sex is biologically determined at birth and immutable.[2]

This, of course, has been religious doctrine for thousands of years, as well as the commonly held belief in our country until recently, and there is no dispute that the Students' religious views are sincerely held and consistent with those of many across Ohio and the country. In any event, it has long been held that a court may not inquire into the validity of a person's religious belief. *See United States v. Seeger*, 380 U.S. 163, 184 (1965).[3]

In developing and implementing the Policy, the School District explicitly recognized that Free Exercise principles might be violated, but required compliance anyway. On its website, the School District stated, "The district recognizes the First Amendment rights of students

---

[2] *See, e.g., In God's Image, Men and Women are Made for Love!*, U.S. Catholic Conf. Council of Bishops, Love and Sexuality (https://www.usccb.org/topics/natural-family-planning/love-and-sexuality); *On Transgender Identity*, Southern Baptist Convention (https://www.sbc.net/resource-library/resolutions/on-transgender-identity/); *Statement on same-sex relationships and sexual identity*, Orthodox Church in America (https://www.oca.org/holy-synod/statements/holy-synod/holy-synod-issues-statement-on-same-sex-relationships-and-sexual-identity).

[3] While your *Amicus* focuses on religious belief, that belief is also well grounded in biology, as each individual is sexed at fertilization and, no matter what outward or pharmaceutical interventions are later attempted, the person's sex remains immutable.

and community members to express their opinions and beliefs on controversial topics.  But while at school, students' expression cannot disrupt or attempt to disrupt the educational process . . . .  [T]he District prohibits bullying, harassment, intimidation and discrimination of students."  Compl., R. 1, Page ID # 19 (¶58).  The School District's lawyer also wrote, "While your children certainly maintain religious rights of freedom at school, those rights do not relieve them of the obligation to comply with Board Policy and the code of conduct."  Compl., R. 1, Page ID # 18 (¶57).

The straightforward question presented in this case is whether the government (here, a public school) can compel students to speak in a manner contrary to their sincere religious belief.  Supreme Court and Sixth Circuit precedents are consistent that the answer to that question is clearly "no."  The foundational Supreme Court case is *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 630 (1943), in which Jehovah's Witness students challenged a school policy requiring them to recite the pledge of allegiance, in violation of their religious beliefs.  The Court held that this compelled speech violated the Free Exercise clause. *Id.* at 642.  In so holding, the Court made clear that the Free Exercise

Clause allows for the expression of beliefs that the majority disagrees with or outright disdains—"whether the First Amendment to the Constitution will permit officials to order observance of ritual of this nature does not depend upon whether as a voluntary exercise we would think it to be good, bad or merely innocuous." *Id.* at 634; *see also 303 Creative v. Elenis,* 143 S. Ct. 2298, ___ (2023) *(slip op., at 14); Boy Scouts of Am. v. Dale*, 530 U. S. 640, 656 (2000).

In ruling against the Students, the District Court turns *Barnette* upside down, focusing on the alleged "verbal bullying" that the mere use of Biological Pronouns would present against those who wish to use Preferred Pronouns. Op., R. 28, Page ID # 835-836. The District Court did not cite, nor does the record show, any evidence of actual threats, name-calling, or intimidation by the Students. According to the District Court, merely using different pronouns has "the effect of creating a hostile environment" which provides justification for the School District to compel student speech contrary to their religious beliefs. Op., R. 28, Page ID # 836. *Barnette* clearly forecloses this stifling of religious belief—"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in

politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." 319 U.S. at 642.

This Court has applied *Barnette* in two recent cases with similar facts—*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), and *Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012)—and came to the conclusion that the principles of *Barnette* controlled. *Meriwether* involved a professor who had been disciplined by Shawnee State College for his refusal to adopt preferred pronouns. The professor stated that using pronouns that are different than those associated with the student's biological sex would violate his "core religious and philosophical beliefs." 992 F.3d at 509. Similarly to the School District here, Shawnee State claimed that "it has a compelling interest in stopping discrimination against transgender students." *Id.* at 510. The court disagreed and ruled in the professor's favor. It did so in part on Free Exercise grounds, stating Shawnee State had created a situation in which "Meriwether must adhere to the university's orthodoxy (or face punishment). This is coercion, at the very least of the indirect sort. And we know the Free Exercise Clause protects against both direct and indirect coercion." *Id.* at 517.

In *Ward,* Eastern Michigan University expelled a graduate student who refused, on religious grounds, to provide counseling services to a person who wanted to foster a same-sex relationship. 667 F.3d at 731-32. This Court held the expulsion to be improper on Free Exercise and Free Speech grounds. *Id.* In so doing, it outlined a limited right for schools to limit student speech so long as the suppression is premised on "legitimate pedagogical concerns." *Id.* at 733. These concerns are at their highest when the matter involves a curricular decision (for example, when assigning a student to write on a relevant topic in a history class). *Id.* Where, however, the speech is farther afield from curricular matters, only when a student causes "substantial disruption or material interference with school activities" is suppression authorized. *Id.* *Ward* specifically warned that a school must not "invoke curriculum as a pretext for punishing [a] student for her . . . religion." *Id.*

*Meriwether* and *Ward* compel a reversal of the District Court in this case. As in *Meriwether*, the Students refused to use Preferred Pronouns based upon their sincere religious beliefs. And, like *Meriwether,* there is no evidence in the record that any student caused

any disruption or acted in a hostile fashion towards any person. And, finally, the only way for a student to avoid sanction is to "adopt the orthodoxy" of the School District or "face punishment." *Meriwether*, 992 F.3d at 517.

As in *Ward,* there is no claimed linkage between the Policy and any curricular decisions (since, in fact, the Policy explicitly applied off school grounds on issues unrelated to pedagogical matters). Also, the District Court cited to no evidence of any disruption, name-calling, bullying or any other incitement by any student. As the Supreme Court made clear in *Tinker*, when it addressed another instance of student speech that contained no hint of disruption or incitement, "any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk." *Tinker v. Des Moines Ind. Community Sch. Dist.,* 393 U.S. 503, 506 (1969) (citing *Terminiello vs. Chicago*, 337 U.S. 1 (1949)). Instead, contrary to the teachings of *Tinker*, *Meriwether,* and *Ward*, the District Court stated that the mere usage of Biological Pronouns was enough to warrant suppression by the School District. *See also Bible Believers v.*

*Wayne Cnty.*, 805 F.3d 228, 244 (6th Cir. 2015) (finding that aggressive anti-Islamic messaging directed at Muslims did not constitute incitement).

Perhaps sensing the weakness of its position, the District Court did not address *Barnette's*, *Meriwether's*, *Ward's*, or *Bible Believers'* controlling Free Exercise Clause holdings, nor did it seek to explain why the Students should be required to speak contrary to the tenets of their religion.  Instead, the District Court blandly asserted that using Biological Pronouns constitute "verbal bullying" because it "sends a message of disrespect towards the listener; it is an attack on their social standing, their place in society."  Op., R. 28, Page ID # 835.  This mode of reasoning has been repeatedly rejected by the Supreme Court, most recently in *303 Creative,* where the Court stated that "the First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply 'misguided' . . . and likely to cause 'anguish' or 'incalculable grief.'"  *303 Creative v. Elenis*, 600 U.S. __, 143 S. Ct. 2298, 2312 (2023) (quoting *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 574 (1995), and *Snyder v.*

*Phelps*, 562 U.S. 443, 456 (2011)); *see also Matal v. Tam*, 582 U.S. 218 (2017).

This Court should reject the District Court's mistaken reasoning. Instead, it should heed the warnings of the Supreme Court in *Barnette*, which presented the same context that this case presents, i.e., the ability of schoolchildren to resist the prevailing orthodoxy of the day as pressed by the government:

> [The u]ltimate futility of such attempts to compel coherence is the lesson of every such effort from the Roman drive to stamp out Christianity as a disturber of its pagan unity, the Inquisition, as a means to religious and dynastic unity, the Siberian exiles as a means to Russian unity, down to the fast failing efforts of our present totalitarian enemies. Those who begin coercive elimination of dissent soon find themselves exterminating dissenters. Compulsory unification of opinion achieves only the unanimity of the graveyard.

319 U.S. at 641. As the Supreme Court has often reminded, schoolchildren do not shed their constitutional rights at the schoolhouse gate. *See Tinker*, 393 U.S. at 506; *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423 (2022) (quoting *Tinker*). The price of free speech, at school and elsewhere, includes that others may disagree. But the remedy is not suppression of that speech, but recognition that we live in

a free society that requires exposure to the ideas of others, including those rooted and confirmed by religious belief, with which we may disagree and which calls for our tolerance, not for governmental restrictions weighing in on the governmental-approved side of the issue. "The Constitution and the best of our traditions counsel mutual respect and tolerance, not censorship and suppression, for religious and nonreligious views alike." *See id.* at 2416; *see also Lee v. Weisman*, 505 U.S. 577, 589, 591-92 (1992).

Indeed, the point the district court failed to grasp was stated as an uncontroversial blackletter law proposition by the Eight Circuit just last Friday: "A school district cannot avoid the strictures of the First Amendment simply by defining certain speech as 'bullying' or 'harassment.'" *Parents Defending Education v. LinnMar Community School Dist.*, No. 22-2927 (8th Cir., Sept. 29, 2023) slip op. at *9.

## CONCLUSION

This Court should follow *Barnette, Meriwether, Ward*, *Kennedy*, *Tinker,* and *303 Creative*, recognize that the Students have plausibly alleged that their Free Exercise rights are abridged by the School District's Policy, reverse the District Court's Free Exercise holding, and

remand the case so that the Student members of Parents Defending Education may pursue their claims.

Respectfully submitted,
This 2nd day of October, 2023

s/Steven W. Fitschen
Steven W. Fitschen
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that, pursuant to Fed. R. App. P. 32(a)(5)(A) and 32(a)(7)(B)(i) and the corresponding local rules, the attached Brief *Amicus Curiae* has been produced using 14-point Times New Roman font which is proportionately spaced and contains 2,653 words, including footnotes and excluding those portions not required to be counted, as calculated by Microsoft Word 365.

s/Steven W. Fitschen
Steven W. Fitschen
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

DATED: October 2, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2023, the foregoing brief was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit through the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

<u>s/Steven W. Fitschen</u>
Steven W. Fitschen
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org