No. 23-3630

# United States Court of Appeals

## for the

# Sixth Circuit

PARENTS DEFENDING EDUCATION,

*Plaintiff-Appellant,*

v.

OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF
EDUCATION, *et al.*,

*Defendants-Appellees.*

On appeal from the United States District Court
for the Southern District of Ohio, Eastern Division,
Honorable Algernon L. Marbley, Presiding

**BRIEF OF *AMICI CURIAE***
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION**
**AND MANHATTAN INSTITUTE**
**IN SUPPORT OF PLAINTIFF AND REVERSAL**

ABIGAIL E. SMITH
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut St.
Suite 1250
Philadelphia, PA 19106

ILYA SHAPIRO
TIM ROSENBERGER
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017

RONALD G. LONDON*
ROBERT CORN-REVERE
JAMES JORDAN
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue, SE
Suite 340
Washington, DC 20003
(215) 717-3473
ronnie.london@thefire.org

*Counsel of Record

*Attorneys for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici* certifies that (1) *amici* do not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in either *amicus*.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .............................................ii

TABLE OF AUTHORITIES ....................................................................v

INTEREST OF *AMICI CURIAE* ...............................................................1

SUMMARY OF ARGUMENT .................................................................3

ARGUMENT .........................................................................................5

I.    Olentangy's Policies Infringe on First Amendment Rights Without any Countervailing Justification. .................5

    A.    Schools may not compel student speech. .......................6

    B.    Nothing in *Tinker* elevates the "rights of others" over a student's freedom of conscience. ....................................................................9

        1.    The invasion of the rights of others exception is extremely narrow. ...........................10

        2.    Invading the rights of others necessarily involves targeting specific individuals. ...........................................................13

        3.    Governments cannot compel speech at the expense of individual moral convictions. ...........................................................15

    C.    Olentangy's policies unconstitutionally compel speech. ...............................................................16

II.    The *Davis* Harassment Standard Does Not Justify Olentangy's Speech Regulations. ...........................................20

    A.    *Davis* establishes a high bar for verbal "harassment." ...............................................................21

B.    *Davis* allows schools to regulate conduct, not speech. ............................................................23

C.    The use of different pronouns, alone, does not rise to the level of regulable harassment under *Davis*. ...............................................26

CONCLUSION .........................................................27

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*303 Creative, LLC v. Elenis,*
  143 S. Ct. 2298 (2023) ..................................................... 4, 15

*A.V. v. City of St. Paul,*
  505 U.S. 377 (1992) .............................................................. 24

*Ambach v. Norwick,*
  441 U.S. 68 (1979) ................................................................. 8

*Biggs v. Bd. of Educ. of Cecil Cnty., Md.,*
  229 F. Supp. 2d 437 (D. Md. 2002) ...................................... 26

*Blackwell v. Issaquena Cnty. Bd. of Educ.,*
  363 F.2d 749 (5th Cir. 1966) ......................................... 11, 18

*Brandenburg v. Ohio,*
  395 U.S. 444 (1969) .............................................................. 24

*Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty., Ok.,*
  334 F.3d 928 (10th Cir. 2003) .............................................. 26

*Burnside v. Byars,*
  363 F.2d 744 (5th Cir. 1966) ...................................... 7, 11, 12

*Cantwell v. Connecticut,*
  310 U.S. 296 (1940) .............................................................. 24

*Cedar Falls Cmty. Sch. Dist.,*
  No. 20-CV-2098-CJW-MAR, 2022 WL 873612
  (N.D. Iowa Mar. 23, 2022) .................................................... 23

*Davis v. Monroe Cnty. Bd. of Educ.,*
  526 U.S. 629 (1999) ...................................................... passim

*DeAngelis v. El Paso Mun. Police Officers Ass'n,*
  51 F.3d 591 (5th Cir. 1995) .................................................. 24

*DeJohn v. Temple Univ.*,
    537 F.3d 301 (3d Cir. 2008).................................................25

*Doe v. Univ. of Mich.*,
    721 F. Supp. 852 (E.D. Mich. 1989) ................................20

*Dorey on behalf of J.D. v. Pueblo Sch. Dist. 60*,
    215 F. Supp. 3d 1082 (D. Colo. 2016)..............................26

*Estate of Lance v. Lewisville Indep. Sch. Dist.*,
    743 F.3d 982 (5th Cir. 2014) ............................................26

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*
    *Bd. of Educ.*, No. 22-15827, 2023 WL 5946036
    (9th Cir. Sept. 13, 2023) ..................................................16

*Fennel v. Marion Indep. Sch. Dist.*,
    804 F.3d 398 (5th Cir. 2015) ............................................26

*Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*,
    315 F.3d 817 (7th Cir. 2003) ............................................22

*Glowacki ex rel. D.K.G. v. Howell Pub. Sch. Dist.*,
    No. 2:11-CV-15481, 2013 WL 3148272
    (E.D. Mich. June 19, 2013)..............................................14

*Green v. Jacksonville State Univ.*,
    No. 1:16-CV-1047-VEH, 2017 WL 2443491
    (N.D. Ala. June 6, 2017)...................................................26

*Holloman ex rel. Holloman v. Harland*,
    370 F.3d 1252 (11th Cir. 2004) ..........................................9

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*,
    515 U.S. 557 (1995) ............................................................8

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
    138 S. Ct. 2448 (2018) .......................................................7

*Kuhlmeier v. Hazelwood Sch. Dist.*,
    795 F.2d 1368 (8th Cir. 1986) ..........................................13

*Mahanoy Area School District v. B.L.*,
  141 S. Ct. 2038 (2021) .............................................................. 3, 13, 18

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
  138 S. Ct. 1719 (2018) ..................................................................... 19

*McCauley v. Univ. of the V.I.*,
  618 F.3d 232 (3d Cir. 2010) .............................................................. 25

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ............................................................ 19

*Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.*,
  969 F.3d 12 (1st Cir. 2020) ............................................................... 14

*Olmstead v. United States*,
  277 U.S. 438 (1928) ............................................................................ 8

*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*,
  No. 22-2927, 2023 WL 6330394 (8th Cir. Sept. 29, 2023) ................... 10

*Parents Defending Educ. v. Olentangy Loc. Sch. Dist.*
  *Bd. of Educ.*, No. 2:23-CV-01595, 2023 WL 4848509,
  (S.D. Ohio July 28, 2023) ........................................................... passim

*Ricketts v. Wake Cnty. Pub. Sch. Sys.*,
  No. 5:21-CV-49-FL, 2022 WL 19710 (E.D.N.C. Jan. 3, 2022) ............. 26

*S.B. ex rel. A.L. v. Bd. of Educ. of Hartford Cnty.*,
  819 F.3d 69 (4th Cir. 2016) ............................................................... 26

*S.S. v. E. Ky. Univ.*,
  532 F.3d 445 (6th Cir. 2008) ............................................................ 26

*Saxe v. State Coll. Area Sch. Dist.*,
  240 F.3d 200 (3d Cir. 2001) ................................................... 12, 19, 24

*Settle v. Dickson Cnty. Sch. Bd.*,
  53 F.3d 152 (6th Cir. 1995) ............................................................... 17

*Slotterback v. Interboro Sch. Dist.*,
  766 F. Supp. 280 (E.D. Pa. 1991) ...................................................... 13

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ............................................................. 24

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020) .............................................. 26

*Stafford v. George Washington Univ.*,
    No. 18-cv-2789 (CRC), 2019 WL 2373332
    (D.D.C. June 5, 2019) ......................................................... 26

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) ...................................................... passim

*UWM Post v. Bd. of Regents of Univ. of Wis.*,
    774 F. Supp. 1163 (E.D. Wis. 1991) ................................... 20

*W. Va. Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ...................................................... passim

*Ward v. Polite*,
    667 F.3d 727 (6th Cir. 2012) .............................................. 17

## INTEREST OF *AMICI CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan, nonprofit organization dedicated to defending the individual rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended individual rights through public advocacy, strategic litigation, and participation as *amicus curiae* in cases that implicate expressive rights under the First Amendment. *See, e.g.*, Brief for FIRE, NCAC, and Comic Book Legal Defense Fund as Amici Curiae Supp. Resps., *Mahanoy Area Sch. Dist.* v. *B.L.*, 141 S. Ct. 2038 (2021) Brief for FIRE as Amicus Curiae in Supp. Pl.-Appellant and Partial Reversal, *Cunningham v. Blackwell*, 41 F.4th 530 (6th Cir. 2022); Brief for FIRE as Amicus Curiae in Supp. of Neither Affirmance Nor Reversal, *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021). FIRE has a direct interest in this case because of its advocacy on behalf of K-12 students punished by their schools for First Amendment-protected expression. *See, e.g.*, First Am. Complaint, *I.P. v.*

---

[1] No counsel for a party authored this brief in whole or in part. Further, no person, other than *amici*, their members, or their counsel contributed money intended to fund preparing or submitting this brief.

*Tullahoma City Schs.*, Case No. 4:23-cv-26, Dkt. No. 36 (E.D. Tenn. Sept. 21, 2023).

The Manhattan Institute (MI) is a nonprofit policy research foundation that works to keep America and its great cities prosperous, safe, and free. MI develops and disseminates ideas that foster individual freedom and economic choice across multiple dimensions. To that end, it produces scholarship and files briefs opposing regulations that violate constitutionally protected liberties, including in the marketplace of ideas.

The Supreme Court's landmark ruling in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506 (1969), established that neither students nor teachers "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Although the Court recognized limited exceptions to this broad ruling "in light of the special characteristics of the school environment," *id.*, too often those exceptions are treated as if they were the rule. That is the case here. *Amici* file this brief to explain that *Tinker*'s limited exceptions cannot override the even more fundamental rule established in *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 642 (1943): that "no official, high or petty, can prescribe what shall be orthodox in politics,

nationalism, religion, or other matters of opinion, or force citizens to confess by word or act their faith therein."

## SUMMARY OF ARGUMENT

Just two terms ago, the Supreme Court reaffirmed *Tinker's* baseline rule that that "students do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the schoolhouse gate.'" *Mahanoy Area School District v. B.L.*, 141 S. Ct. 2038, 2044 (2021) (quoting *Tinker*, 393 U.S. at 506). In *Tinker*, the Court held that student speech is presumptively protected *unless* it falls into two narrow categories: It either substantially disrupts the school environment or it invades the rights of other students at school. *Id.* at 513. But over the years, many courts have run *Tinker* in reverse. They assume student speech can be restricted unless a student plaintiff can convince the court it is *not* disruptive or invasive of others' rights. Such an approach gets the First Amendment backwards.

That is what happened here. Olentangy School District seeks, through a web of interconnected anti-harassment policies, to compel all students to use another student's chosen pronouns. Students are required to do so even if they have religious, moral, or philosophical

3

objections to doing so, as do the student members of plaintiff organization Parents Defending Education. The district court held that compelling students to speak particular pronouns was permissible in order to promote speech that "evinces []respect for the individual" and to "maintain a safe and civil learning environment." *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 2:23-CV-01595, 2023 WL 4848509, at *13, 15 (S.D. Ohio July 28, 2023) (*PDE*).

However, the discomfort or personal offense of one student does not meet *Tinker's* "invasion of the rights of others" exception, 393 U.S. at 513, and, in any event, cannot justify forcing another student to violate his own conscience "by word or act." *Barnette*, 319 U.S. at 642. The Supreme Court just last summer reaffirmed that "the government may not compel a person to speak its own preferred messages." *303 Creative, LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023) (citing *Tinker*, 393 U.S. at 505–06). This foundational rule applies even when the government seeks to prevent discrimination because such efforts, while well-intentioned, are not "immune from the demands of the Constitution." *Id.* at 2315.

Despite these controlling precedents, the district court held that a government interest in minimizing harassment justified compelling

student speech. This ruling contradicts not just *Tinker* and *Barnette*, but adopts a standard for "harassment" contrary to the rule set forth by the Supreme Court in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999). The district court incorrectly dismissed *Davis* as merely setting a Title IX liability standard, ignoring precedent applying *Davis* as the necessary standard given the significant First Amendment concerns presented by prohibitions on student speech.

If the district court's ruling is allowed to stand, students at Olentangy will learn the wrong lesson: If your speech is unpopular, the government may not only silence you, but force you to act as its mouthpiece, conscience be damned. This Court should reverse.

## ARGUMENT

### I. Olentangy's Policies Infringe on First Amendment Rights Without any Countervailing Justification.

Eighty years ago, the Supreme Court confirmed that "[i]f there is any fixed star in our constitutional constellation" it is that the government cannot compel schoolchildren to speak words they do not believe. *Barnette*, 319 U.S. at 642. *Barnette* involved the Pledge of Allegiance, but as the Court observed at the time, "[i]f there are any circumstances which permit an exception, they do not now occur to us."

*Id.* A quarter century later, *Tinker* further expanded protections for student speech, and while it articulated certain limited exceptions, none override the rule set forth in *Barnette* which bars any official control over "the sphere of intellect and spirit." *Id*. Accordingly, since *Barnette*, *no* Supreme Court case has authorized government authority to compel student speech.

### A.    Schools may not compel student speech.

The Supreme Court has never permitted schools to compel students to speak contrary to their beliefs, whether in *Tinker* or elsewhere. In *Tinker*, the Court held that "state-operated schools may not be enclaves of totalitarianism." *Tinker*, 393 U.S. at 511. As such, even though the First Amendment applies somewhat differently "in light of the special characteristics of the school environment," *id.* at 506, the government can regulate student speech only if it falls into either of two narrow categories. First, schools can regulate speech that invades "the rights of other students to be secure and to be let alone." *Id*. at 508. Second, schools may regulate speech that would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Id*. at 508–09 (internal quotation marks omitted). Under either

category, however, the Court held that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 508.

Neither of those exceptions permits schools to compel speech contrary to a student's personal belief. To the contrary, the *Tinker* Court held that students "may not be confined to the expression of those sentiments that are officially approved," *id.* at 511, and that school administrators "cannot suppress 'expressions of feelings with which they do not wish to contend.'" *Id.* (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)). Suppressing a student's voicing of a personal view on pronouns and mandating him to voice a state-approved view are two sides of the same coin, and neither are constitutional under *Tinker*.

As the Supreme Court recently observed, compelling speech causes unique First Amendment harms, because when "speech is compelled, . . . individuals are coerced into betraying their convictions." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018). "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning . . . ." *Id.* For that reason, the Speech Clause "has no more certain antithesis" than forcing a

government message. *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 579 (1995) (citing *Barnette*, 319 U.S. at 642).

Compelled speech in the school context is particularly obnoxious. The Supreme Court made this point forcefully when it rejected the "compulsion of students to declare a belief" in *Barnette*. 319 U.S. at 631. The Court held forcing students to "forego any contrary convictions of their own" by participating in a mandatory flag salute and thus becoming "unwilling converts to the prescribed ceremony" violated the First Amendment's most basic tenets. *Id.* at 633.

The school environment is especially important because "[o]ur Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example." *Olmstead v. United States*, 277 U.S. 438, 485 (1928). Public schools are vital institutions in preparing individuals for participation as citizens and to preserve the values of our democracy. *Ambach v. Norwick*, 441 U.S. 68, 76 (1979). "That [schools] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important

principles of our government as mere platitudes." *Barnette*, 319 U.S. at 637.

While *Barnette* involved a student that objected to reciting the Pledge of Allegiance on religious grounds, the Court was careful to note that the restriction on school-compelled speech did not "turn on one's possession of particular religious views or the sincerity with which they are held." *Id.* at 634. Rather, the "many citizens who do not share . . . religious views," *Id.*, likewise retain the First Amendment right not to be compelled "to utter what is not in [their] mind[s]." *Id. See, e.g.*, *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1269 (11th Cir. 2004) (holding *Barnette* "clearly established" that all students have the right "to be free from compelled speech" under the First Amendment). So whether an Olentangy student's personal belief on pronoun usage is rooted in faith, science, or philosophy, that student's right not to be compelled by the government to violate that belief is protected by the First Amendment.

## B. Nothing in *Tinker* elevates the "rights of others" over a student's freedom of conscience.

Compelling students to use preferred pronouns to avoid invading "the rights of others" prong as the district court did here is a dangerous

and unconstitutional expansion of that exception. The court first noted that the "scope" of how much student speech can be regulated under that exception is unclear, then held that "verbal bullying" can be punished under *Tinker* which it defined expansively to include "using pronouns contrary to an individual's preferences intentionally (or repeatedly)." *PDE*, 2023 WL 4848509, at *9, *13.

This is incorrect. *Tinker* has never before been interpreted to permit compelled speech, but even if it had been, recent Supreme Court decisions make clear that Tinker's exception regarding "the rights of others" does *not* override the individual's First Amendment right to speak in ways that align with his own conscience.[2]

### 1. The invasion of the rights of others exception is extremely narrow.

*Tinker* contemplated "invasion of the rights of others" as requiring far more extreme facts than merely students using particular pronouns in an untargeted manner in the hallway. *Tinker* defined what it meant

---

[2] The Eighth Circuit recently reaffirmed this in another case filed by Parents Defending Education. *See Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, No. 22-2927, 2023 WL 6330394, at *4 (8th Cir. Sept. 29, 2023) ("A school district cannot avoid the strictures of the First Amendment simply by defining certain speech as 'bullying' or 'harassment.'").

by invading, or "colliding with the rights of others," in express reference to two Fifth Circuit cases: *Blackwell v. Issaquena County Board of Education*, 363 F.2d 749 (5th Cir. 1966), and *Burnside v. Byars*, 363 F.2d 744 (5th Cir. 1966). *See Tinker*, 393 U.S. at 513 (citing *Burnside*, 363 F.2d at 749, and *Blackwell*, 363 F.2d at 749). Those two cases, decided on the same date, both involved segregated schools that banned their students from wearing "freedom buttons." *Blackwell*, 363 F.2d at 752; *Burnside*, 363 F.2d at 747. In *Burnside*, the Fifth Circuit held the school must allow the buttons to be worn because there was no evidence that the students "caus[ed] a commotion or disrupt[ed] classes." *Id.* at 748.

But the same court held that the *Blackwell* school did *not* violate the First Amendment by banning the buttons, because the students who wore them caused serious disruption and collided with the rights of other students by physically intimidating them and forcing them, against their will, to speak a political message. For example, some button-wearing students "accosted other students by pinning the buttons on them even though they did not ask for one. One of the students tried to put a button on a younger child who began crying." *Id.* at 751. Later, students "tr[ied] to pin [buttons] on anyone walking in the hall," including "other students

who did not wish to participate." *Id.* at 752, 753. So the school could prohibit student speech that resulted in such extreme "collision with the rights of others." *Id.* at 754.

Later courts have affirmed the view that invading the rights of others requires something far more serious than "that the speech is merely offensive to some listener." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001) (Alito, J.). In *Saxe*, for example, the Third Circuit held that an anti-harassment policy violated the First Amendment when it prohibited a student from expressing his belief that "homosexuality is a sin" in school. *Id.* at 203. The court held that for an anti-harassment policy to pass muster under the First Amendment, it must require some "threshold showing of severity or pervasiveness"; otherwise, "it could conceivably be applied to cover any speech about some enumerated personal characteristics the content of which offends someone." *Id.* at 217. *Saxe* also noted that some courts had held the invasion of the rights of others exception reaches "only independently tortious speech like libel, slander or intentional infliction of emotional distress." *Id.* (citing *Slotterback v. Interboro Sch. Dist.*, 766 F. Supp. 280,

289 n.8 (E.D. Pa. 1991), and *Kuhlmeier v. Hazelwood Sch. Dist.*, 795 F.2d 1368, 1375 (8th Cir. 1986), *rev'd on other grounds*, 484 U.S. 260 (1988)).

### 2. Invading the rights of others necessarily involves targeting specific individuals.

Several courts have held that a student's speech must specifically target another student or teacher to invade the rights of others under *Tinker*. For example, in *Mahanoy Area School District*, the Supreme Court's most recent case to address this issue, the Court listed types of invasive speech that *might* be regulated as including "serious or severe bullying or harassment *targeting particular individuals*" and "threats *aimed at* teachers or other students." *Mahanoy*, 141 S. Ct. at 2045 (emphases added). The Court contrasted that regulable behavior with the speech of the plaintiff cheerleader, who posted on Snapchat "Fuck school fuck softball fuck cheer fuck everything." *Id.* at 2043. Although her speech was distressing to some of her classmates, the school could not punish her because it did not "*target* any member of the school community with vulgar or abusive language." *Id.* at 2047 (emphasis added).

Other courts agree. The First Circuit has held a school can only punish student speech if it reasonably determined "that the student

speech *targeted* a specific student," and that there was a causal "link between [the student's] protected speech and the harm [the targeted student] suffered." *Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 29, 31 (1st Cir. 2020) (emphasis added). Similarly, a district court in this circuit held that a student saying "I don't believe in gays" did not invade the rights of others under *Tinker* because it did not "threaten[], name[], or target[] a particular individual." *Glowacki ex rel. D.K.G. v. Howell Pub. Sch. Dist.*, No. 2:11-CV-15481, 2013 WL 3148272, at *8 (E.D. Mich. June 19, 2013). The court opined that invading the rights of others would require "some sort of threat or direct confrontation" that was absent. *Id.* Because the student's comment "did not identify particular students for attack but simply expressed a general opinion— albeit one that some may have found offensive—on the topic of homosexuality," the court held that this statement "did not impinge upon the rights of other students." *Id.* The court in *Glowacki* held that such untargeted speech is not regulable even when spoken in the classroom; here, Parents Defending Education's student members seek to make even more general statements *outside* the classroom, in the hallway.

14

### 3.    Governments cannot compel speech at the expense of individual moral convictions.

The state lacks *any* authority to compel an individual to speak contrary to his own conscience to achieve its ends, no matter how laudable. *Barnette*, 319 U.S. at 642 (the Constitution protects "the sphere of intellect and spirit" against "all official control"). This foundational principle controls this case. The Supreme Court reaffirmed this principle just last term. In *303 Creative,* 143 S. Ct. at 2312, the Supreme Court held that the state could not compel a website designer to "create websites celebrating marriages she does not endorse" even if doing so furthered the government's interest in nondiscrimination. *Id.* at 2309.

Citing *Tinker*, the Court noted that "[g]enerally, . . . the government may not compel a person to speak its own preferred messages." *Id.* at 2312 (citing *Tinker*, 393 U.S. at 505–06). The Court held that this was particularly true when the compelled speech ran counter to the speaker's own views, even if it would further the government's interest in nondiscrimination: "The First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply misguided, and likely to cause anguish or incalculable grief." *Id.* (cleaned up)

The en banc Ninth Circuit recently applied this principle in the school context, holding that an anti-discrimination policy could not be used to exclude a Christian school club from official recognition. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, No. 22-15827, 2023 WL 5946036, at 23 (9th Cir. Sept. 13, 2023). The court noted that "[a]nti-discrimination laws and policies serve undeniably admirable goals, but when those goals collide with the protections of the Constitution, they must yield—no matter how well-intentioned." *Id.* The same calculus governs this case.

### C.  Olentangy's policies unconstitutionally compel speech.

Olentangy's policies compel speech on pronouns in violation of students' beliefs, and thus reach far beyond what the Supreme Court authorized in *Tinker*. The district court here stated that in the K-12 context the question "is not whether the Policies compel speech, but whether they do so for an impermissible reason." *PDE*, 2023 WL 4848509, at *14. That gets the framework backward. Under *Barnette* and *Tinker*, the starting principle is that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker*, 393 U.S. at 506, and that the "compulsion of students to declare a belief"

16

violates the First Amendment. *Barnette*. 319 U.S. at 631. Thus, this court must take a narrow view to what exceptions are allowed to this general framework, particularly when it comes to compelled speech, rather than assume all regulation is permissible absent a particularly bad reason.

The district court next erred in stating that compelling students to use pronouns against their beliefs was merely a "pedagogical concern," no different than insisting students in a math class talk about math. *PDE*, 2023 WL 4848509, at *14, 15. But pedagogical concerns allow teachers to compel student speech only when implementing "legitimate curricular objectives"—for example, "a junior high school English teacher may fail a student who opts to express her thoughts about a once-endangered species, say a platypus, in an essay about *A Tale of Two Cities*." *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012) (citing *Settle v. Dickson Cnty. Sch. Bd.*, 53 F.3d 152, 155 (6th Cir. 1995)). No such pedagogical concern or legitimate curricular objective is served by compelling students to speak against their consciences outside of the classroom in a way that does not target their classmates or disrupt the operation of their schools.

The district court also erred in reasoning that a student's general use of particular pronouns in his day-to-day speech invades the rights of others under *Tinker*. It is undisputed that the student speech Parents Defending Education seeks to protect is the general, untargeted use of pronouns consistent with students' "religious or scientific beliefs that biological sex is immutable and that individuals cannot transition from one sex to another." *PDE*, 2023 WL 4848509, at *4. That is a far cry from the "serious or severe bullying or harassment targeting particular individuals" envisioned by the Supreme Court in *Mahanoy*, 141 S. Ct. at 2045, and it is the exact opposite situation envisioned by the Fifth Circuit (later relied upon by the Supreme Court in *Tinker*) in *Blackwell*. After all, in *Blackwell*, the students invaded the rights of other students by *compelling them to speak*. *See Blackwell*, 363 F.2d at 753, 754. In this case, the district court argued it would invade the rights of others *not* to compel students to speak. That argument defies logic and has no basis in *Blackwell* or *Tinker*.

Finally, the district court's contention that a student choosing to use a certain pronoun does not "express a personal belief about gender identity" simply has no basis in law or fact. *PDE*, 2023 WL 4848509, at

*15. The last decade of American jurisprudence is replete with cases demonstrating that Americans have strongly held convictions about gender identity, homosexuality, and LGBT issues at large. *See, e.g.*, *Meriwether v. Hartop*, 992 F.3d 492, 499 (6th Cir. 2021) (professor declined to refer to a student as a female "because his sincerely held religious beliefs prevented him from communicating messages about gender identity that he believes are false"); *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018) ("[T]he religious and philosophical objections to gay marriage are protected views and in some instances protected forms of expression . . . ."); *Saxe*, 240 F.3d at 203 (student sincerely believed "that homosexuality is a sin").

And Parents Defending Education has repeatedly and consistently represented in this case that its members have "sincerely-held religious or scientific beliefs that biological sex is immutable and that individuals cannot transition from one sex to another." *PDE*, 2023 WL 4848509, at *4. By compelling Parents Defending Education's student members to speak against their convictions, Olentangy is requiring them to "affirm[] . . . a belief and an attitude of mind" they do not share. *Barnette*, 319 U.S.

19

at 633. That flatly violates *Barnette*, and *Tinker* provides no carveout. Olentangy's policies are unconstitutional.

## II. The *Davis* Harassment Standard Does Not Justify Olentangy's Speech Regulations.

Having established that schools cannot *compel* student speech in the name of preventing harassment, when and how *can* they regulate student harassment without running afoul of the First Amendment? Schools have dual legal and moral obligations to prevent discriminatory student-on-student conduct and abide by the First Amendment. This balance requires a clear standard for distinguishing discriminatory harassment from protected speech because of the school's "obligation to ensure equal educational opportunities for all of its students, . . . must not be at the expense of free speech." *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 868 (E.D. Mich. 1989); *see also UWM Post v. Bd. of Regents of Univ. of Wis.*, 774 F. Supp. 1163, 1181 (E.D. Wis. 1991).

The Supreme Court answered the question of when and how to balance these commitments in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), giving two guiding standards: First, to be punishable, harassment must rise to the level of conduct, not just speech. And second, student conduct must be "severe, pervasive, and

objectively offensive" before it can be punished as harassment. *Id.* at 650. For the past two decades, courts have used the *Davis* framework to balance protections for speech with schools' obligations to protect students from actionable harassment. Because Olentangy's policies fail to bridge the speech-conduct divide and burden pure speech, they fail the *Davis* test.

The district court below favored one side of the speech-harassment balance over the other, casting aside the need for the balance regulations and First Amendment obligations. By disregarding *Davis*, the court upset the careful balance between the need to protect students from actual harassment and the First Amendment's speech protections.

## A. *Davis* establishes a high bar for verbal "harassment."

*Davis* began with a straightforward question: Are local school boards liable under Title IX for peer-on-peer sexual harassment that occurs on campus? Writing for the Court, Justice O'Connor laid out the overall standard:

> We thus conclude that [Title IX] funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is *so severe, pervasive, and objectively offensive* that it can be said to deprive the victims

of access to the educational opportunities or benefits provided
by the school.

526 U.S. at 650 (emphasis added).

The requirement that harassment be "severe, pervasive, and
objectively offensive" resulted from a debate over First Amendment
implications between Justice O'Connor and the dissenting Justice
Kennedy. Justice Kennedy feared that a broad definition of harassment
would require schools to restrict speech and trample on the First
Amendment rights of their students. *Id.* at 681–83 (Kennedy, J.,
dissenting). Without First Amendment protections, schools would "label
even the most innocuous of childish conduct [] harassment." *Id.* at 681.

In response to these concerns, and recognizing that students in K-
12 education cannot be held to the expectations of adults, Justice
O'Connor expressly laid out the need for a standard that did not restrict
student speech, for "schools are unlike the adult workplace and []
children may regularly interact in a manner that would be unacceptable
among adults." *Id.* at 651; *accord, Gabrielle M. v. Park Forest-Chicago
Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003). To address
Justice Kennedy's concern about the interplay between harassment and
First Amendment protected conduct, the Court further affirmed that

22

mere "teasing"' and "offensive name[-calling]" were excluded from harassment. *Id.* at 652. Harassment is instead defined based on the "persistence and severity of the [students'] actions." *Id.*

*Davis* struck a balance. Just as students should be free from discriminatory harassment in order to learn and grow in schools, they do not "shed their constitutional rights to freedom of speech or expression" as a condition of entry. *Tinker*, 393 U.S. at 506. Schools thus cannot restrict a student's speech in the name of purging potential harassment from campus. Students are still learning how to interact with one another, and will "often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." *Id.* at 651–52. School policies must recognize that and balance the desire to eliminate harassing conduct with the need to protect student speech.

### B. *Davis* allows schools to regulate conduct, not speech.

This separation of conduct and speech is key, because speech, "without more, is insufficient to show actionable harassment." *Nissen v. Cedar Falls Cmty. Sch. Dist.*, No. 20-CV-2098-CJW-MAR, 2022 WL 873612, at *14 (N.D. Iowa Mar. 23, 2022). Conduct, on the other hand, is

regulable so long as there is only an "incidental burden[] on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Local schools tread too closely to the First Amendment line when they touch on pure, untargeted speech.

Then-Judge Alito explained this separation of speech and conduct in *Saxe*, writing that "physically harassing *conduct* is entirely outside the ambit of the free speech clause. But . . . the free speech clause protects a wide variety of speech that listeners may consider deeply offensive[.]" *Saxe*, 240 F.3d at 206 (emphasis in original) (citing *Brandenburg v. Ohio*, 395 U.S. 444 (1969) and *Cantwell v. Connecticut*, 310 U.S. 296 (1940)). Without this divide between speech and conduct, *Saxe* warns, school districts would regulate "'pure expression'" and "turna blind eye to the First Amendment implications." *Id.* (quoting *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596 (5th Cir. 1995)). This would allow schools to enforce content- and viewpoint-based regulations with impunity, in the name of preventing harassment. *Id.* And school administrations would duck "the most exacting First Amendment scrutiny." *Id.* at 207 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992)).

With the separation of conduct and speech established, *Davis* provides the required standard to balance those interests. Harassment codes that fail to track the *Davis* standard fall afoul of the First Amendment. *See, e.g.*, *McCauley v. Univ. of the V.I.*, 618 F.3d 232 (3d Cir. 2010) (upholding district court's invalidation of university harassment policy on First Amendment grounds); *DeJohn v. Temple Univ.*, 537 F.3d 301, 318 (3d Cir. 2008) (striking down sexual harassment policy reasoning that because the policy failed to require that speech in question "objectively" create a hostile environment, it provided "no shelter for core protected speech."). This understanding applies beyond the bounds of Title IX and into most areas where schools carry a legal and moral

obligation to prevent harassment, including race[3] and disability[4] discrimination.

## C.    The use of different pronouns, alone, does not rise to the level of regulable harassment under *Davis.*

The Olentangy pronoun policies directly regulate pure speech regardless of whether it is severe, pervasive, and objectively offensive. That fails *Davis* by default. Indeed, some courts have opined that pure speech, without more, likely can *never* suffice to show regulable harassment under *Davis. See, e.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 337 n.16 (5th Cir. 2020) *as revised* (Oct. 30, 2020) ("Whether *Davis*

---

[3] *See Fennel v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408–09 (5th Cir. 2015); *see also Green v. Jacksonville State Univ.*, No. 1:16-CV-1047-VEH, 2017 WL 2443491, at *13 (N.D. Ala. June 6, 2017) (finding it appropriate to utilize Title IX analysis on Title VI claim); *Stafford v. George Washington Univ.*, No. 18-cv-2789 (CRC), 2019 WL 2373332, at *11, *15 (D.D.C. June 5, 2019) (same); *Ricketts v. Wake Cnty. Pub. Sch. Sys.*, No. 5:21-CV-49-FL, 2022 WL 19710, at *5 (E.D.N.C. Jan. 3, 2022) (same); *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty., Ok.*, 334 F.3d 928, 934 (10th Cir. 2003) (remanding to District Court with instructions to apply *Davis* test to Title VI claim).

[4] *See S.S. v. E. Ky. Univ.*, 532 F.3d 445, 454–55 (6th Cir. 2008) (citing *Biggs v. Bd. of Educ. of Cecil Cnty., Md.*, 229 F. Supp. 2d 437, 445 (D. Md. 2002)); *Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 990, 995 (5th Cir. 2014) (collecting cases); *S.B. ex rel. A.L. v. Bd. of Educ. of Hartford Cnty.*, 819 F.3d 69, 74–75 (4th Cir. 2016); *Dorey on behalf of J.D. v. Pueblo Sch. Dist. 60*, 215 F. Supp. 3d 1082, 1088–89 (D. Colo. 2016).

may constitutionally support purely verbal harassment claims, much less speech-related proscriptions outside Title IX protected categories has not been decided by the Supreme Court or this court and seems self-evidently dubious."). This forecloses the regulation of "identity-based comments," regardless of whether they "cut to the core of who [students] are as individuals," *PDE*, 2023 WL 4848509, at *11. Because the *Davis* standard for harassment applies here, and because the Olentangy pronoun policies regulate pure speech, not conduct, they violate the First Amendment.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court and direct it to enjoin the challenged policies.

Dated: October 2, 2023

ABIGAIL E. SMITH
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut St.
Suite 1250
Philadelphia, PA 19106

ILYA SHAPIRO
TIM ROSENBERGER
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017

/s/ Ronald G. London

RONALD G. LONDON*
ROBERT CORN-REVERE
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Ave., SE
Suite 340
Washington, DC 20003
(215) 717-3473
Ronnie.london@thefire.org

*Counsel of Record*

**Certificate of Compliance With Type-Volume Limit**

1. This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f): this document contains 5,356 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.


Date: October 2, 2023            /s/ *Ronald G. London*
                                 COUNSEL OF RECORD
                                 FOUNDATION FOR INDIVIDUAL
                                   RIGHTS AND EXPRESSION

# CERTIFICATE OF SERVICE

The undersigned certifies that on October 2, 2023 an electronic copy of the Foundation for Individual Rights and Expression Brief of *Amicus Curiae* was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: October 2, 2023

/s/ Ronald G. London

RONALD G. LONDON*
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Ave., SE
Suite 340
Washington, DC 20003
(215) 717-3473


*Counsel of Record