# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **PARENTS DEFENDING EDUCATION** | : | |
| | : | **Case No. 23-3630** |
| **Plaintiff,** | | |
| | : | *On Appeal from S.D. Ohio Case No. 2:23-CV-01595* |
| **v.** | | |
| | : | |
| **OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, et al.** | : | |
| | : | |
| **Defendants.** | : | |

---

## BRIEF OF APPELLEES, OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, MARK T. RAIFF, RANDY WRIGHT, PETER STERN, KEVIN DABERKOW, BRANDON LESTER, KEVIN O'BRIEN, LIBBY WALLICK AND LAKESHA WYSE

---

*/s/ Bartholomew T. Freeze*

Bartholomew T. Freeze (0086980)
Genevieve M. Hoffman (0089281)
FREUND, FREEZE & ARNOLD
620 E. Broad St. Suite F
Columbus, OH 43215
Phone: (614) 827-7300
Fax: (614) 827-7303

*Counsel for Defendant-Appellants Olentangy Local School District Board of Education, Mark T. Raiff, Randy Wright, Peter Stern, Kevin Daberkow, Brandon Lester, Kevin O'Brien, Libby Wallick and LaKesha Wyse*

*and*

Jessica K. Philemond (0076761)
Sandra R. McIntosh (0077278)
Mitchell L. Stith (0096759)
SCOTT SCRIVEN LLP
250 E. Broad St., Suite 900
Columbus, OH 43215

*Co-Counsel for Defendant-Appellant Olentangy Local School District Board of Education*

## <u>CORPORATE DISCLOSURE</u>

Pursuant to 6th Cir. R. 26.1, Mark T. Raiff, Randy Wright, Peter Stern, Kevin Daberkow, Brandon Lester, Kevin O'Brien, Libby Wallick and LaKesha Wyse affirm they are not subsidiaries or affiliates of a publicly owned corporation and there is no publicly owned corporation that has a financial interest in the outcome of this appeal. Moreover, the Olentangy Local School District Board of Education, as a political subdivision of the State of Ohio is not required to make a disclosure.

**FREUND, FREEZE & ARNOLD**
**A Legal Professional Association**

# **TABLE OF CONTENTS**

Table of Authorities ...................................................................................iv

Statement in Support of Oral Argument .................................................vi

Statement of the Issues.................................................................................1

Statement of the Case...................................................................................1

Summary of the Argument...........................................................................6

Argument.........................................................................................................6

    I.     Standard of Review ........................................................8

    II.    PDE is Unlikely to Succeed on the Merits of its First Amendment Challenge.................................................................9

        A. PDE Fails to Establish Compelled Speech ......................................9

        B. The First Amendment is not Unbridled in Public Schools and *Tinker* is the Standard ..................................................................10

        C. The Policies are not Overbroad and are Appropriate for the K-12 Environment ................................................................17

        D. Appellant's Relied-Upon Authority is Outside the Realm of the K-12 Context and *Davis* does not Apply ......................................20

    III.   PDE Fails to Establish the Remaining Elements for a Preliminary Injunction...........................................................25

        A. PDE Cannot Show an Imminent, Irreparable Injury....................25

        B. The Balance of harms and Public Interest Elements Weigh Against Granting an Injunction ................................................27

Conclusion ...................................................................................................28

Certificate of Compliance .........................................................................30

Certificate of Service .................................................................................31

Addendum/Designation of Relevant District Court Documents ...........32

FREUND, FREEZE & ARNOLD
A Legal Professional Association

# TABLE OF AUTHORITIES

*Cases*

ACLU Fund of Michigan v. Livingston Cty., 796 F.3d 636 (6th Cir.2015) ............**8**

Bauchman v. W. High Sch., 132 F.3d 542 (10th Cir.1997) ....................................**10**

Bays v. City of Fairborn, 668 F.3d 814 (6th Cir. 2012) ............................................**8**

B.W.A. v. Farmington R-7 Sch. Dist., 554 F.3d 734 11(8th Cir.2009) .................**11**

Bethel Sch. Dist. No. 403 v. Fraser,
478 U.S. 675, 106 S. Ct. 3159, 92 L. Ed. 2d 549 (1986).........................................**10**

Broadrick v. Oklahoma, 413 U.S. 601, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973)...**17**

C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159 (3d Cir. 2005) ...............................**9**

C.R. v. Eugene Sch. Dist. 4J, 835 F.3d 1142 (9th Cir.2016)...................................**13**

Chen v. Albany Unified Sch. Dist., 56 F.4th 708 (9th Cir.2022)............................**13**

City of Houston, Texas v. Hill,
482 U.S. 451, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987).........................................**17**

D.T. v. Sumner Cty. Sch., 942 F.3d 324 (6th Cir.2019).........................................**26**

Davis v. Monroe Cty. Bd. of Edn.,
526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).............................**23, 24, 25**

Doe v. Boyertown Area Sch. Dist., 897 F.3d 518, 528 (3d Cir.2018) ...................**14**

Doe v. Marshall, 367 F. Supp. 3d 1310 (M.D.Ala.2019) ........................................**23**

Essroc Cement Corp. v. CPRIN, Inc., 593 F. Supp. 2d 962 (W.D. Mich. 2008)....**25**

Evans-Marshall v. Bd. of Edn. of the Tipp City Exempted Vill. Sch. Dist.,
624 F.3d 332 (6th Cir.2010) ...................................................................................**22**

Florey v. Sioux Falls Sch. Dist., 619 F.2d 1311 (8th Cir.1980)............................**10**

Glowacki v. Howell Pub. Sch. Dist.,
E.D.Mich. No. 2:11-cv-15481, 2013 U.S. Dist. LEXIS 85960, (June 19, 2013)......**6**

**FREUND, FREEZE & ARNOLD**
**A Legal Professional Association**

Globe Newspaper Co. v. Superior Court, 457 U.S. 596 (1982) ...............................**13**

Grove v. Mead Sch. Dist. No. 354, 753 F.2d 1528 (9th Cir. 1985) .......................**10**

Grutter v. Bollinger, 539 U.S. 306, 123 S. Ct. 2325, 156 L. Ed. 2d 304 (2003).....**21**

Hazelwood Sch. Dist. v. Kuhlmeier,
484 U.S. 260, 108 S. Ct. 562, 98 L. Ed. 2d 592 (1988)....................................**11, 11**

Kowalski v. Berkeley Cty. Sch., 652 F.3d 565 (4th Cir.2011)...............................**12**

Lavine v. Blaine Sch. Dist., 257 F.3d 981 (9th Cir.2001) .......................................**11**

Lowery v. Euverard, 497 F.3d 584 (6th Cir. 2007) ................................................**20**

Lucero v. Detroit Pub. Sch., 160 F. Supp. 2d 767 (E.D. Mich. 2001) ...................**26**

M.A.L. v. Kinsland, 543 F.3d 841 (6th Cir.2008)...................................................**11**

McNeilly v. Land, 684 F.3d 611 (6th Cir. 2012)......................................................**8**

Members of City Council v. Taxpayers for Vincent,
466 U.S. 789, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984).......................................**17**

Meriwether v. Hartop, 992 F.3d 492 (6th Cir.2021) .........................................**21, 22**

New York v. Ferber, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) .......**13**

Nken v. Holder, 556 U.S. 418, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009)...........**27**

Norris v. Cape Elizabeth Sch. Dist., 969 F.3d 12 (1st Cir.2020) ..........................**12**

O'Toole v. O'Connor, 802 F.3d 783 (6th Cir. 2015) ................................................**8**

Overstreet v. Lexington-Fayette Urban Cty. Govt., 305 F.3d 566 (6th Cir.2002)....**8**

Porter v. Ascension Parish Sch. Bd., 393 F.3d 608 (5th Cir.2004) .......................**12**

Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200 (3rd Cir. 2001).........................**12**

Sypniewski v. Warren Hills Regional Bd. of Edn., 307 F.3d 243 (3d Cir.2002)....**17**

Tinker v. Des Moines Indep. Community Sch. Dist.,
393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)...................**5, 11, 12, 14, 15, 16**

Tumblebus Inc. v. Cranmer, 399 F.3d 754 (6th Cir.2005) .....................................**27**

**FREUND, FREEZE & ARNOLD**
**A Legal Professional Association**

Tumminello v. Father Ryan High Sch., Inc.,
678 Fed. App'x 281 (6th Cir. 2017) ........................................................................**13**

Willey v. Sweetwater Cty. Sch. Dist. No. 1 Bd. of Trustees,
D.Wyo. No. 23-CV-069-SWS, 2023 U.S. Dist. LEXIS 113818 (June 30, 2023)...**22**

Wilkins v. Daniels, 744 F.3d 409 (6th Cir. 2014) .....................................................**9**


*Statutes*

Age Discrimination Act of 1975................................................................................**19**

Ohio Revised Code 3313.66 .....................................................................................**18**

Section 504 of the Rehabilitation Act of 1973 ........................................................**19**

Title VI of the Civil Rights Act of 1964...................................................................**19**

Title IX of the Education Amendments of 1972.........................................**19, 23, 24**


*Other Authorities*

Ohio St. Bd. of Ed. Model Policy ......................................................................**18, 19**

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellees do not object to the Court's prior decision to submit the appeal to the panel for oral argument following the completion of briefing.

**FREUND, FREEZE & ARNOLD**
**A Legal Professional Association**

## <u>STATEMENT OF ISSUES</u>

1.    Whether PDE is entitled to a preliminary injunction prohibiting enforcement of the District's anti-harassment policies on the basis of the First Amendment.

## <u>STATEMENT OF THE CASE</u>

This appeal arises out of the District Court's denial of the Plaintiff's request for a preliminary injunction to enjoin two policies of the Olentangy Local School District Board of Education (the "District"), which have been in effect for approximately a decade, that prohibit harassment of other students. Plaintiff, Parents Defending Education ("Plaintiff" or "PDE"), challenges the anti-harassment policies pursuant to the Free Speech Clause of the First Amendment.

Plaintiff is an organization that holds itself out to prevent politicization of K-12 education and purportedly brings this appeal on behalf of unidentified school-aged children of Parents A, B, C[1] and D. See <u>Complaint</u>, R. 1, PAGEID# 1-55. The pseudonymous students did not complete their own declarations; rather, their parents aver that the students want to openly discuss their views on gender identity and the immutability of sex but choose not to in the school environment. See <u>Declaration of Parents A, B, and D</u>, Rs. # 7-3, 7-4, 7-6, PAGEID# 362-76, 383-89. However, the parents and their children do not want the adverse view discussed in the school at

---

[1] Parent C's children are not members of PDE. <u>Declaration of Parent C</u>, R. 7-5, PAGEID# 377-82.

**FREUND, FREEZE & ARNOLD**
**A Legal Professional Association**

all, *e.g.*, that trans and nonbinary people exist. See <u>Complaint</u>, R. 1, PAGEID# 24 at ¶ 80 (Parent A voluntarily withdrew child from a class that had flags expressing the teacher's view on gender ideology); PAGEID# 28 at ¶ 101 (Parent B upset that a teacher gave a survey about pronouns that would permit trans and nonbinary students to be identified by preferred pronouns and cisgender students to be identified by their biological pronouns); ¶ 102 (Parent B upset that child was given a writing assignment that permitted the child to express their views on gender); PAGEID# 37 at ¶ 139 (Parent D upset that a teacher gave a survey about pronouns that would permit trans and nonbinary students to be identified by preferred pronouns and cisgender students to be identified by their biological pronouns). See also, <u>Declaration of Parent D</u>, R. 7-6, PAGEID# 386 at ¶ 19 (Parent D voluntarily withdrew child from Advanced Placement classes "in an attempt to minimize their exposure to gender identity"); <u>Declaration of Parent A</u>, R. 7-3, PAGEID# 363 at ¶ 6 (Parent A believes gender should only be discussed with families); <u>Declaration of Parent B</u>, R. 7-4, PAGEID# 370 at ¶ 6 (same for Parent B); <u>Declaration of Parent C</u>, R. 7-5, PAGEID# 378 at ¶ 5 (same for Parent C); <u>Declaration of Parent D</u>, R. 7-6, PAGEID# 384 at ¶ 6 (same for Parent D).

By way of selective quotations, PDE goes to great lengths to present a version of the District's policies that best fit their narrative. However, what the policies actually say, and what they actually prohibit, when read in full, falls firmly within

- 2 -

the authority granted to the District. Policy 5517 was adopted in 2011 to protect all its students from harassment. Declaration of Thomas Vaseliou, R. 7-1 at PAGEID# 121. Since 2013, the Policy has included transgender identity as a protected class since 2013—nearly the entire time that the pseudonymous high school students have been school-aged in the District. See Transcript of Preliminary Injunction Hearing, R. 33 at PAGEID# 902-903; see also, Declaration of Parents A, B, and D, R. 7-3, R. 7-4, R. 7-6, PAGEID# 362-76, 383-89. Pursuant to the Policy, students are prohibited from engaging in discriminatory harassment of other students and staff "based on race, color, national origin, sex (including sexual orientation and gender identity), disability, age (except as authorized by law), religion, ancestry, or genetic information (collectively, "Protected Classes") that are protected by Federal civil rights laws." For these purposes, the Policy defines "harassment" as:

> any threatening, insulting, or dehumanizing gesture, use of technology, or written, verbal or physical conduct directed against a student or school employee that:
>
> A. places a student or school employee in reasonable fear of harm to his/her person or damage to his/her property;
>
> B. has the effect of substantially interfering with a student's educational performance, opportunities, or benefits, or an employee's work performance; or
>
> C. has the effect of substantially disrupting the orderly operation of a school.

Declaration of Thomas Vaseliou, R. 7-1 at PAGEID# 121-23. On April 10, 2023, a technical correction ("T.C.") was made to Policy 5517, but it was not substantively

- 3 -

amended.

The District also maintains Policy 5136 which governs students' personal communication devices ("PCDs"), including tablets and smartphones. Declaration of Thomas Vaseliou, R. 7-1 at PAGEID# 133. Pursuant to Policy 5136, students are prohibited from using their PCD to harass (as previously defined) fellow students based on their transgender identity.

Finally, the District maintains a student Code of Conduct which contains provisions that, similar to the policies, proscribe discrimination and harassment based on transgender identity.

No pseudonymous student has been disciplined pursuant to the aforementioned policies. See Complaint, R. 1, PAGEID# 1-55. Moreover, District counsel confirmed that, although purposeful references contrary to another student's identity would violate District policies, students will not be disciplined for expressing their religious views. See Counsel Email Exchange, R. 13-1, PAGEID# 443-45. Therefore, students who have a religious belief that sex is immutable are free to openly discuss their views without fear of disciplinary action from the District. Id.

Despite the fact that the students have been subject to the above anti-harassment policies for a decade with neither real nor threatened discipline, Plaintiff filed the underlying request for *emergency* relief on the grounds that the

- 4 -

policies violate the students' First Amendment rights to freedom of speech. On July 24, 2023, the District Court heard the parties' arguments on Plaintiff's Motion for a Preliminary Injunction. On July 28, 2023, the District Court issued its Opinion and Order denying the Motion. Order Denying Preliminary Injunction, R. 28, PAGEID# 810-50. Therein, the Court held that Plaintiff failed to establish a substantial likelihood of success on its First Amendment claim for the reason that the District's policies complied with Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). The Court specifically found that speech that interferes with students' educational performance has been understood as a "substantial disruption" under Tinker. Moreover, the Court recognized the second, far less developed prong of Tinker—the invasion of the rights of other students. Order Denying Preliminary Injunction, R. 28, at PAGEID# 827. The District Court explicitly found that a hostile environment created by discriminatory speech is enough to cause a substantial disruption on its own. Of course, the District Court made sure to recognize that "[s]tudents do not enjoy a right to be free from mere offense or from the exchange of ideas." Id. at PAGEID# 834. However, "speech that directly targets individual students on account of their identity . . . must be separated from speech that discusses a political, social, or religious perspective in a non-derogatory manner." Id. at PAGEID# 25. Rather, targeted verbal bullying expresses more than a social viewpoint and, instead, creates a hostile environment.

- 5 -

The District Court held that intentional misgendering constitutes verbal bullying, but sincere questions and civil discussions about transgender issues as well as accidental misgendering are neither harassment nor derogatory. Id. at PAGEID# 836. Moreover, the speech that the pseudonymous students wish to engage in—as averred by their parents—consists of neutral, respectful, and generalized discussions of gender identity issues, and that the policies allow students to continue to engage in such discussions. Id. at PAGEID# 836-37.

The Court further held that Plaintiff failed to establish a substantial likelihood of success on the parents' Fourteenth Amendment claims—a decision which was not appealed.

## **SUMMARY OF THE ARGUMENT**

As explained by the Eastern District of Michigan in Glowacki v. Howell Pub. Sch. Dist., E.D.Mich. No. 2:11-cv-15481, 2013 U.S. Dist. LEXIS 85960, (June 19, 2013):

> This case highlights a tension that exists between public school anti-bullying policies and the First Amendment's guarantee of free speech. Far from being irreconcilable, however, this tension merely illustrates the well-established principle that public schools must endeavor to balance competing interests: **public schools must strive to provide a safe atmosphere conducive to learning for all students while fostering an environment that tolerates the expression of different viewpoints**, even if unpopular, so as to equip students with the tools necessary for participation in a democratic society. This delicate balancing act has led the Supreme Court of the United

- 6 -

States to recognize that while the First Amendment undoubtedly applies to students in public schools, **school officials have greater authority to regulate speech than government officials in other settings**.

Id. at *1-2 (emphases added).

The District recognizes its immense role in protecting this delicate balance—in celebrating and protecting its students' First Amendment rights while simultaneously protecting its students from the psychological harm of direct, targeted harassment and bullying. In doing so, the District does not elevate the rights of certain students over others. Rather, it has enacted policies that prohibit students from harassing one another. It has not enacted policies that suppress genuine, civil debate about matters of public concern. The unique nature of the K-12 context provides the District with latitude not afforded to other governmental officials. The District's use of anti-harassment and anti-bullying policies falls well within this ambit as the policies permit the expression of different viewpoints, even if unpopular, so long as that expression does not rise to the level of bullying or harassment as specifically defined by the policies. Preparing its students to participate in a democratic society does not require that the District permit students to bully or harass one another based on their viewpoints.

FREUND, FREEZE & ARNOLD
A Legal Professional Association

# **ARGUMENT**

## I.   **Standard of Review**

When considering a motion for a preliminary injunction, a district court must balance four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." Bays v. City of Fairborn, 668 F.3d 814, 818-819 (6th Cir. 2012).

When reviewing an order granting or denying a preliminary injunction in a First Amendment case, the appellate court "review[s] the District Court's legal rulings de novo (including its First Amendment conclusion), and its ultimate conclusion as to whether to grant the preliminary injunction for abuse of discretion." O'Toole v. O'Connor, 802 F.3d 783, 788 (6th Cir. 2015) (citations omitted). "[T]he party seeking a preliminary injunction bears the burden of justifying such relief." ACLU Fund of Michigan v. Livingston Cty., 796 F.3d 636, 642 (6th Cir.2015) (quoting McNeilly v. Land, 684 F.3d 611, 615 (6th Cir. 2012)). "A preliminary injunction is an **extraordinary remedy** which should be granted only if *the movant carries his or her burden* of proving that the circumstances clearly demand it." Overstreet v. Lexington-Fayette Urban Cty. Govt., 305 F.3d 566, 573 (6th Cir.2002) (emphases added).

FREUND, FREEZE & ARNOLD
A Legal Professional Association

II.     **PDE is Unlikely to Succeed on the Merits of its First Amendment Challenge.**

    **A. PDE Fails to Establish Compelled Speech.**

    "A 'general principle of compelled speech jurisprudence . . . is that a violation of the First Amendment right against compelled speech occurs only in the context of actual compulsion.'" <u>Wilkins v. Daniels</u>, 744 F.3d 409, 415 (6th Cir. 2014) (quoting <u>C.N. v. Ridgewood Bd. of Educ.</u>, 430 F.3d 159, 189 (3d Cir. 2005)).

    Here, PDE cannot establish the policies herein compel speech as there has been no actual compulsion. The policies do not prohibit students from engaging in civil discussions regarding their views on gender and related issues, or otherwise expressing their deeply held beliefs in a manner appropriate for a school setting. Despite this, the pseudonymous parents assert their children "wish to share their discomfort about using a restroom with people of the other biological sex [but] refrain from doing so . . . because they fear that expressing their beliefs that sex is immutable—or similar views—will cause them to violate District policies." <u>Declaration of Parent C</u>, R. 7-5, PAGEID# 378-79 at ¶ 9. However, the express language of the policies does not prohibit the civil exchange of ideas, or the expression of discomfort. Rather, the policies operate to prohibit students from engaging in direct harassment of other students on the basis of their gender identity. Moreover, none of the pseudonymous parents or students allege that any student has been disciplined for expressing their views regarding gender identity or expression,

- 9 -

or for unintentionally using incorrect pronouns when referring to another student. To the contrary, when one of the parent members of PDE expressed concerns about such a possibility, the District's general counsel confirmed that a student would not be forced to affirm a belief they did not hold, and offered the opportunity to seek an accommodation for the use of a student's preferred names and pronouns. Counsel Email Exchange, R. 13-1, PAGEID# 443-45. No accommodation was sought.

Accordingly, no students have been, and no students will be, coerced into speaking a message they do not agree with. Rather, the accommodation and affirmation that no punishment would follow takes any speech out of the realm of coercion and into the realm of choice. See Bauchman v. W. High Sch., 132 F.3d 542, 557 (10th Cir.1997) (the choice not to sing songs believed to infringe upon exercise of religious freedom with no adverse impact on academic record negates element of coercion) (citing Grove v. Mead Sch. Dist. No. 354, 753 F.2d 1528, 1533 (9th Cir. 1985); Florey v. Sioux Falls Sch. Dist., 619 F.2d 1311, 1318 (8th Cir.1980)). Therefore, PDE has failed to establish coercion or compulsion.

### B. The First Amendment is not Unbridled in Public Schools and *Tinker* is the Standard.

"The First Amendment guarantees wide freedom in matters of *adult* public discourse," but that does not mean that "the same latitude must be permitted to children in a public school." Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 682, 106 S. Ct. 3159, 92 L. Ed. 2d 549 (1986) (emphasis added). The Supreme Court has

FREUND, FREEZE & ARNOLD
A Legal Professional Association

made clear that "the First Amendment rights of students in the public schools 'are not automatically coextensive with the rights of adults in other settings,' and must be 'applied in light of the special characteristics of the school environment.'" Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266, 108 S. Ct. 562, 98 L. Ed. 2d 592 (1988) (citations omitted). A school, therefore, "need not tolerate student speech that is inconsistent with its basic educational mission." Lavine v. Blaine Sch. Dist., 257 F.3d 981, 988 (9th Cir.2001) (citing Hazelwood, 484 U.S. at 266).

Courts recognize that neither students nor teachers shed their constitutional rights to freedom of expression at the schoolhouse gate. Tinker, 393 U.S. at 506. Tinker was patently about viewpoint restrictions on speech, evident not only from the facts of the case (e.g., the silent armbands communicating the *viewpoint* of opposition to the war), but the Court's language itself: "In order for the State in the person of school officials to justify prohibition of *a particular expression of opinion*, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany *an unpopular viewpoint*." Id. at 509 (emphases added). The Sixth Circuit has likewise recognized this distinction, confirming that the higher Tinker standard applies *only* to content- and viewpoint-based restrictions and that a less demanding standard is applied to viewpoint-neutral regulations. M.A.L. v. Kinsland, 543 F.3d 841, 850 (6th Cir.2008); see also, B.W.A. v. Farmington R-7 Sch. Dist., 554 F.3d 734, 740 (8th

FREUND, FREEZE & ARNOLD
A Legal Professional Association

Cir.2009) ("viewpoint discrimination by school officials is not violative of the First Amendment if the Tinker standard requiring a reasonable forecast of substantial disruption or material interference is met."); <u>Porter v. Ascension Parish Sch. Bd.</u>, 393 F.3d 608, 615 (5th Cir.2004) (<u>Tinker</u> applies to school regulations directed at specific student viewpoints).

Thus, <u>Tinker</u> permits schools to restrict student speech *on the basis of viewpoint* in two broad sets of circumstances: (1) if the speech "might reasonably lead school authorities to forecast substantial disruption of or material interference with school activities," or (2) if the speech "interferes with the rights of other students to be secure and to be let alone." <u>Tinker</u>, 393 U.S. at 508, 514. The second prong has been less developed in case law, but it is nevertheless clear that speech that "is merely offensive to some listener" is not sufficient and does not fall within <u>Tinker's</u> scope. <u>Saxe v. State Coll. Area Sch. Dist.</u>, 240 F.3d 200, 217 (3rd Cir. 2001). On the other hand, "bullying *is* the type of conduct that implicates the governmental interest in protecting against the invasion of the rights of others." <u>Norris v. Cape Elizabeth Sch. Dist.</u>, 969 F.3d 12, 29 (1st Cir.2020) (emphasis added). "The language of <u>Tinker</u> supports the conclusion that public schools have a 'compelling interest' in regulating speech that interferes with or disrupts the work and discipline of the school, including discipline for student harassment and bullying." <u>Kowalski v. Berkeley Cty. Sch.</u>, 652 F.3d 565, 572 (4th Cir.2011).

**FREUND, FREEZE & ARNOLD**
**A Legal Professional Association**

Likewise, the Ninth Circuit has explicitly held that sexually harassing speech is not entitled to First Amendment protection, as it "implicates the rights of students to be secure. Such harassment is harmful because it positions the target as a sexual object rather than a person, threatening the individual's sense of physical, as well as emotional and psychological, security." C.R. v. Eugene Sch. Dist. 4J, 835 F.3d 1142, 1152 (9th Cir.2016). Students do not have a First Amendment right to "target" specific classmates in an elementary or high school setting "with vulgar or abusive language." Chen v. Albany Unified Sch. Dist., 56 F.4th 708, 717 (9th Cir.2022).

In the specific context of student discipline, this Court itself has found that suicide is a foreseeable consequence of bullying. Tumminello v. Father Ryan High Sch., Inc., 678 Fed. App'x 281, 288 (6th Cir. 2017) ("If a school is aware of a student being bullied but does nothing to prevent the bullying, it is reasonably foreseeable that the victim of the bullying might resort to self-harm, even suicide."). As a result, "it is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'" New York v. Ferber, 458 U.S. 747, 756-57, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (quoting Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 607 (1982)). This interest is further heightened when confronted with populations who have historically been the target of discrimination and harassment. To this end, the Third Circuit recently noted, "transgender students face extraordinary social, psychological, and medical

risks and the School District clearly had a compelling state interest in shielding them from discrimination. There can be no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity." <u>Doe v. Boyertown Area Sch. Dist.</u>, 897 F.3d 518, 528 (3d Cir.2018) (quotation omitted).

Here, even assuming that the policies prohibiting students from harassing others on the basis of transgender identity are content and viewpoint restrictions, they patently comply with the <u>Tinker</u> standard. Nothing in the subject policies prohibits students from having thoughtful, civil discussions on the topic of gender identity and gender expression. For example, there is a difference between a student's desire to express him or herself by wearing a t-shirt with the message "gender is immutable," compared to a student *directly* and *personally* harassing a transgender student for wanting to be referred to by a pronoun that doesn't correspond with their gender at birth. One is protected by the First Amendment in the K-12 setting and one is not; the policies at issue proscribe only the unprotected activity. The policies do not proscribe discussion on the fluidity of gender, nor could they. As specifically pled by PDE, teachers have discussed the issue of gender identity in school and offered pronoun surveys. A pronoun survey offered by the District is not adopting a point of view. That there are people in this country, including students in the District, that identify with a gender that does not correspond with their sex assigned at birth is a fact. That there are people in this country,

including students in the District, that want to be called by a different pronoun is a fact. The anonymous members' deeply held beliefs that this goes against their own religious or scientific beliefs does not negate these facts. Moreover, all students, including the anonymous members, are free to respond to discussions on gender identity in general to the effect that their religion teaches that gender is immutable. This is what the members assert they'd like to do and the policies at issue do not even arguably proscribe this conduct.[2]

This case is distinguishable from the cases upon which Plaintiff relies for numerous reasons. First, PDE overwhelmingly relies on cases outside of the K-12 context and on cases that implicate strict scrutiny. But Tinker is the standard, not strict scrutiny, because the Court recognized the unique environment of the school setting as distinctively different. The most analogous argument of this case to Tinker is a negative analogy regarding the pronoun bracelets decried by PDE. R. 1, ¶ 140. Therein, PDE expressly alleges that pronoun bracelets had been offered for sale and that the wearing of such bracelets expresses that a student is considered an "ally."

---

[2] Though the declarations do include contradictory contentions: the students allegedly want to openly discuss the issue while simultaneously stating that they do not believe gender identity should be discussed in school at all. See Declaration of Parent A, R. 7-3, ¶ 6 (Parent A believes gender should only be discussed with families); Declaration of Parent B, R. 7-4, ¶ 6 (same for Parent B); Declaration of Parent C, R. 7-5, ¶ 5 (same for Parent C); Declaration of Parent D, R. 7-6, ¶ 6 (same for Parent D); Id., ¶ 19 (parent D withdrew children from AP classes "in an attempt to minimize their exposure to gender identity in class").

FREUND, FREEZE & ARNOLD
A Legal Professional Association

Id. Notably, PDE does not allege that the *District* sold these bracelets or that the *District* suggests that students who don't wear them are "enemies." The bracelets are precisely the sort of speech governed by <u>Tinker</u>— a bracelet instead of an arm band. A student's desire to express their opinion regarding gender identity through a bracelet is protected by the First Amendment. The flip side of that coin is that the anonymous members here *have* exercised their own First Amendment rights, unencumbered by the District, to *not* wear the bracelets to express their own opinions. That other students might interpret that choice in a certain manner does not change the nature of the expressive conduct, unless it qualifies under one of the <u>Tinker</u> requirements (e.g., substantial disruption or interfering with the rights of others).

If instead of asking this Court to void the policies protecting students from *direct bullying and harassment*, the anonymous students had desired to wear arm bands or bracelets that communicated the message "gender is not fluid," their speech would be protected. To be sure, some students and teachers may find this view offensive. It is implied from the declarations that the anonymous students and parents found the pronoun bracelets to communicate a message that is likewise offensive to them, as it goes against their deeply held beliefs. Yet, PDE would not assert that students should not be permitted to wear the bracelets, which neither substantially disrupt the learning environment nor interfere with the rights of others.

- 16 -

Accordingly, it is evident that the District's policies plainly comply with the mandate of <u>Tinker</u>.

### C. The Policies are not Overbroad and are Appropriate for the K-12 Environment.

Unconstitutional overbreadth may occur where a regulation that is directed at activities that are not constitutionally protected is structured to prohibit protected activities as well. <u>City of Houston, Texas v. Hill</u>, 482 U.S. 451, 458, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987). Overbreadth creates "a likelihood that the statute's very existence will inhibit free expression" by "inhibiting the speech of third parties who are not before the Court." <u>Members of City Council v. Taxpayers for Vincent</u>, 466 U.S. 789, 800, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984). For overbreadth to render the policy unconstitutional, it must be "not only real but substantial in relation to the statute's plainly legitimate sweep." <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 615, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973). This precludes invalidating a rule merely because it is susceptible to a few impermissible applications; rather, the breadth of the challenged language must be shown to reach a *substantial* amount of constitutionally protected conduct. <u>City of Houston</u>, 482 U.S. at 459.

Moreover, <u>Sypniewski v. Warren Hills Regional Bd. of Edn.</u>, 307 F.3d 243, 259 (3d Cir.2002), explained:

> Because of the duties and responsibilities of the public elementary and secondary schools, the overbreadth doctrine warrants a more hesitant application in this

setting than in other contexts. There are important reasons for this. First, <u>Tinker</u> acknowledges what common sense tells us: a much broader "plainly legitimate" area of speech can be regulated at school than outside school. Speech that disrupts education, causes disorder, or inappropriately interferes with other students' rights may be proscribed or regulated. 393 U.S. at 513. Everyday school discipline does not depend on the necessity of a speech code. In the public school setting, the First Amendment protects the nondisruptive expression of ideas**. It does not erect a shield that handicaps the proper functioning of the public schools**.

(Emphasis added).

Here, the duties of the District in maintaining an environment for its students free from bullying and harassment are not only recognized in case law, but statutorily mandated at the state and federal level. Ohio Revised Code 3313.66 requires that boards of education adopt policies to prohibit bullying and harassment. Moreover, the Ohio State Board of Education ("State Board") is required to adopt a model anti-harassment and anti-bullying policy. Therein, the State Board explicitly states: "Ohio schools must provide physically safe and **emotionally secure** environments for all students and school personnel." See <u>Model Policy</u>[3] at § 1.1. The intent of implanting the anti-bullying and anti-harassment policies is to create a positive climate, which the State Board defines as "one that emphasizes and recognizes

---

[3] https://education.ohio.gov/getattachment/Topics/Other-Resources/School-Safety/Safe-and-Supportive-Learning-Administrators/Drive-Policy-and-Practice-with-Data/Model-Anti-Harassment-Anti-Intimidation-and-Anti-Bullying-Policy.pdf.aspx (last accessed Oct. 16, 2023).

FREUND, FREEZE & ARNOLD
A Legal Professional Association

positive behaviors, evokes nonviolence, cooperation, teamwork, understanding and **acceptance toward all students and staff** * * * ." Id. The State Board's model policy further defines "harassment" as "Any intentional written, verbal, graphic, or physical act that a student or group of students exhibited toward other particular student more than once and the behavior both: Causes mental or physical harm to the other student; and is sufficiently severe, persistent or pervasive that it creates an intimidating, threatening or abusive educational environment for the other student." Id. at § 3.1. The Model Policy further provides that harassment, intimidation, or bullying also consists of electronically transmitted acts via the internet and cell phones. Id. The Model Policy likewise advises districts that "[s]chool personnel should intervene promptly whenever they observe student conduct that has the purpose or effect of ridiculing, humiliating, or intimidating another student/school personnel, even if such conduct does not meet the formal definition of 'harassment, intimidation or bullying." Id. at § 7.1.

At the federal level, discrimination on the basis of race, color, and national origin is prohibited by Title VI of the Civil Rights Act of 1964; sex/gender discrimination is prohibited by Title IX of the Education Amendments of 1972; discrimination on the basis of disability is prohibited by Section 504 of the Rehabilitation Act of 1973; and age discrimination is prohibited by the Age Discrimination Act of 1975. Consistent with the mandates of these authorities, one

- 19 -

of the legal responsibilities of a school is to protect students from bullying. <u>Lowery v. Euverard</u>, 497 F.3d 584, 596 (6th Cir. 2007) ("School officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place").

The District's challenged policies are carefully tailored to maintain a learning environment that is conducive for all students. To that end, the District prohibits, in accordance with state and federal law, bullying and direct harassment of other students. That prohibition extends to intentionally misgendering other students *to the extent that such intentional misgendering qualifies as harassment as defined*. PDE's anonymous members, through their parents, declare that is *not* the type of speech they wish to engage in. They affirm they have no ill will and simply want to participate in civil discussions on the issue, which is not proscribed. The policies are not speech codes; rather, they exist to protect students from the psychological injury and invasion of personal rights that stem from direct, targeted harassment. Viewing these policies through the K-12 overbreadth lens and understanding they need not be as detailed as criminal codes, they pass constitutional muster.

### D. Appellant's Relied-Upon Authority is Outside the Realm of the K-12 Context and *Davis* does not Apply.

In that the Supreme Court—and this Court—have patently recognized the unique environment in the K-12 context and the corresponding ability for school districts to regulate far more speech and conduct that could be regulated with adults,

it is important to take note of the substantial reliance PDE places on authority *outside* this special context. Moreover, even the cases within the K-12 context relied upon by PDE are factually and legally distinguishable.

First, PDE relies heavily on Meriwether v. Hartop, 992 F.3d 492 (6th Cir.2021), in its contention that the District's directive on pronoun usage is compelled speech through compelled silence. In that case, a university professor objected to using a student's preferred pronouns on religious grounds. Moreover, the professor himself proposed alternatives: to address students by last name or to note his disagreement with the use of preferred pronouns in his syllabus, but the college told him that would violate policy. Eventually, the professor was disciplined for violating the university's nondiscrimination policy. See id. This Court held the university had forbidden the professor from describing his views on gender identity and therefore "silenced a viewpoint that could have catalyzed a robust and insightful in-class discussion." See id. at 506.

In relying on Meriweather, PDE ignores the facts that: (1) the issues in that case involved academic freedom for university professors, the regulation of employee speech, and rejection of an employee's religious beliefs, none of which are present in this case; and (2) courts have continually emphasized the distinction between public K-12 schools and universities in addressing speech and other constitutional issues. See, e.g., Grutter v. Bollinger, 539 U.S. 306, 329, 123 S. Ct.

FREUND, FREEZE & ARNOLD
A Legal Professional Association

2325, 156 L. Ed. 2d 304 (2003) (recognizing that "universities occupy a special niche in our constitutional tradition"). Supreme Court precedent makes patently clear the differing environments demand different considerations which often lead to different outcomes. In fact, this Court itself in Meriwether made this important distinction, noting that it would *not* apply the same analysis in that case to one involving a teacher in a K-12 school environment. Meriwether, at n.1 ("[In Evans-Marshall v. Bd. of Edn. of the Tipp City Exempted Vill. Sch. Dist., 624 F.3d 332 (6th Cir.2010], [w]e distinguished college and university professors and made clear that our holding was limited to schoolteachers").

The Wyoming District Court just recently analyzed Meriwether in the K-12 context and agreed the decision itself was self-limiting to the university context. Willey v. Sweetwater Cty. Sch. Dist. No. 1 Bd. of Trustees, D.Wyo. No. 23-CV-069-SWS, 2023 U.S. Dist. LEXIS 113818, at *60-61 (June 30, 2023). The court found:

> crucial to the Meriwether court's analysis was the teacher at issue was a public university professor lecturing in class. The court specially recognized "the expansive freedoms of speech and thought associated with the university environment, [and] **universities occupy a special niche in our constitutional tradition**." Id. at 504 (quoting Grutter v. Bollinger, 539 U.S. 306, 329, 123 S. Ct. 2325, 156 L. Ed. 2d 304 (2003)). It repeatedly emphasized Garcetti does not apply to "public university professors" in the "academic context of a public university." Id. at 505 (emphasis added). The [plaintiffs] do not identify—nor can the Court locate—any decision

- 22 -

> extending <u>Meriwether's</u> reasoning to a public K-12
> setting. Given <u>Meriwether's</u> justifications and lack of
> caselaw extending its reasoning to the K-12 setting, the
> Court likewise declines to do so today.

<u>Id.</u> (emphasis added).

PDE likewise relies on <u>Doe v. Marshall</u>, 367 F. Supp. 3d 1310 (M.D.Ala.2019). In that case, the plaintiffs were convicted sex offenders who argued that printing "CRIMINAL SEX OFFENDER" on their state-issued identification cards was unconstitutional. The court agreed, holding that the branded-ID requirement both compels speech *and* was not the least restrictive means of advancing a compelling state interest. <u>Id.</u> at 1324. The State of Alabama's decision to brand sex offender IDs most certainly did not take place in the public K-12 environment and most certainly did not involve pronouns.

As explained above, even existing precedent pertaining to K-12 student speech is overwhelmingly focused on *general* student speech and potential disruption from other students' reactions to that expression. But neither an arm band nor a t-shirt nor a flag are akin to direct, targeted bullying and harassment of a fellow student.

PDE and several amici have likewise attempted to implicate the standard from <u>Davis v. Monroe Cty. Bd. of Edn.</u>, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). However, <u>Davis</u> is not a First Amendment case. Rather, <u>Davis</u> supplied the standard for when a school district faces civil liability under Title IX for permitting

peer harassment. In <u>Davis</u>, a student was allegedly the victim of a prolonged pattern of sexual harassment by one of her fifth-grade classmates at a public school in Georgia. According to the complaint, the harassment was reported to school authorities, but no disciplinary action was taken in response nor was any effort made to separate the classmate from the student-victim. On appeal, the Supreme Court explicitly held that a public school district, as a funding recipient pursuant to Title IX, is liable for civil damages to the victim of peer harassment when the victim can prove the school had actual notice and acted with deliberate indifference. <u>Id.</u> at 648. Moreover, the harassment must be "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." <u>Id.</u> at 651. Aside from the dissent's criticism for the majority's failure to distinguish the standard between elementary schools, secondary schools, and universities, the Court never discussed the First Amendment. Moreover, the Court did not hold that a school is *unable* to prevent or proscribe peer harassment before it reaches the level that would subject it to civil liability. To that end, a student can be the victim of harassment that is so severe and pervasive to qualify under the first part of the <u>Davis</u> standard and the school can still avoid civil liability for damages by taking actions intended to end the harassment, even if unsuccessful.

- 24 -

Although <u>Davis</u> and its progeny establishes the threshold for civil liability based on third-party conduct, it does not follow that a school district is powerless to prevent or proscribe peer harassment unless and until deliberate indifference is shown. Importing the <u>Davis</u> standard in the First Amendment context is a Catch-22 given the unique nature of the K-12 environment. It also fails to appreciate the <u>Davis</u> Court's own recognition of the flexibility schools are granted in supervising student conduct—that the Court "should refrain from second-guessing the disciplinary decisions made by school administrators." <u>Id.</u> Indeed, there is no case which holds that a public school district is prohibited under the First Amendment from proscribing verbal bullying unless and until it meets the <u>Davis</u> standard. This dearth is for good reason—the First Amendment and Title IX are not to be judged by the same standards. That is in part because enforcement of Title IX is through the Spending Clause and is interpreted on contract principles. Accordingly, reliance on Title IX jurisprudence is inapposite.

## III.    **PDE Fails to Establish the Remaining Elements for a Preliminary Injunction.**

### A. PDE Cannot Show an Imminent, Irreparable Injury.

"The failure to show irreparable harm, by itself, can justify the denial of preliminary injunctive relief without consideration of the other three factors." <u>Essroc Cement Corp. v. CPRIN, Inc.</u>, 593 F. Supp. 2d 962, 970 (W.D. Mich. 2008) (citation omitted). This "factor is indispensable: If the plaintiff isn't facing *imminent and*

*irreparable* injury, there's no need to grant relief now as opposed to at the end of the lawsuit." D.T. v. Sumner Cty. Sch., 942 F.3d 324, 327 (6th Cir.2019) (emphases added).

In its Motion and Brief, PDE simply *concludes* that the harm is irreparable because it is likely to prevail on its constitutional claims. However, as demonstrated above, PDE is unlikely to succeed on the merits of its First Amendment claims. However, even if the Court finds PDE is likely to succeed on one or more of its claims, there is *no imminent threat of irreparable harm* and PDE must satisfy this element to justify a grant of a preliminary injunction. PDE must show irreparable harm is likely in the absence of an injunction and "of such *imminence* that there is a clear and present need for equitable relief." Lucero v. Detroit Pub. Sch., 160 F. Supp. 2d 767, 801 (E.D. Mich. 2001). A risk of future irreparable harm is not enough; "there must be a clear showing of immediate irreparable injury." Id. (quotation omitted). PDE has not identified any imminent risk of irreparable harm that the students face absent injunctive relief. There is no allegation that any student has been disciplined for violating the policies which have been in place for essentially the entire time the students have attended school within the District. PDE simply filed for emergency relief after the anti-harassment policy underwent a technical correction, erroneously assuming that the prohibition on harassing students based on gender identity was a recent amendment. The parents reaffirm this

misunderstanding, claiming they've watched their children lose self-confidence over the course of the **2022-2023** school year *because of* the District's policies that have been effective for a decade. Declaration of Parent A, R.7-3, PAGEID# 362-68; Declaration of Parent C, R. 7-5, PAGEID#383-389. Yet, the reality is there is no risk of imminent harm based solely on the students' newfound awareness of the policies. The anonymous students herein are simply worried about what could theoretically happen in the future. Because PDE cannot establish any threat of irreparable harm, it cannot meet the test for a preliminary injunction.

### B. The Balance of Harms and Public Interest Elements Weigh Against Granting an Injunction.

The third and fourth requirements for issuance of a preliminary injunction— the balance of harms and whether the requested injunction will disserve the public interest—" merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009).

The first portion of this requirement is to determine "whether issuance of the injunction would cause substantial harm to ***others***." Tumblebus Inc. v. Cranmer, 399 F.3d 754, 760 (6th Cir.2005) (emphasis added). Here, it is evident that issuance of the injunction would cause substantial harm to others. PDE seeks to *completely enjoin* enforcement of the District's policies protecting students from "discriminatory harassment based on race, color, national origin, sex (including sexual orientation and gender identity), disability, age (except as authorized by law),

- 27 -

religion, ancestry, or genetic information (collectively, "Protected Classes") that are protected by Federal civil rights laws" as well as the Code of Conduct's prohibition on discriminatory language and harassment. PDE likewise seeks to *completely invalidate* the policy regarding personal communication devices. Should the Court grant PDE the relief it seeks, the Court would open students and staff up to harassment and discrimination in violation of federal laws. Not only would it harm the victims of such court-authorized discrimination, but it would likewise open the District up to civil liability. This harm is likewise contrary to the public interest.

PDE again does not make an attempt to substantively argue it meets either of the final elements. Rather, it relies on its own assumption that it has established a likelihood of success on the merits of its flawed constitutional claims. Because PDE cannot establish the two final elements, it cannot meet the test for a preliminary injunction.

## CONCLUSION

PDE has failed to establish the necessary elements for a preliminary injunction in this case because it is unlikely to succeed on the merits of the students' First Amendment claims. The District policies that prohibit harassment of other students, including on the basis of gender identity and which have been effect for a decade, do not infringe on the anonymous students' First Amendment rights to freedom of speech. The policies do not prevent the students from engaging in civil discussions

FREUND, FREEZE & ARNOLD
A Legal Professional Association

or robust debates on the topics of transgenderism, gender identity, and gender expression as they assert they wish to do. Instead, in accordance with the Supreme Court's holding in <u>Tinker</u>, the policies prohibit students from interfering with the rights of other students by preventing direct, targeted harassment. Protecting students from harassment in school is compelling and the First Amendment does not grant dispensation to the anonymous students to invade the rights of their classmates. The subject policies fall squarely within the exceptions carved out for the unique K-12 environment.

Despite being subject to the challenged policies for the entirety of their schooling with the District, no student has been punished or threatened with punishment for discussing their views on gender. Moreover, the students were likewise offered accommodations from the policies on religious grounds but declined to avail themselves of such. Therefore, PDE cannot establish there is any imminence to the theoretical possibility of punishment for violating the challenged policies. Because PDE does not have a substantial likelihood of success and there is no imminence, the urgent extraordinary relief sought in the form of a preliminary injunction is inappropriate. Furthermore, PDE's sought injunction is overbroad itself in that it seeks complete enjoinment, removing protections for members of protected classes and opening the District up to potential liability for its failure to protect those students. PDE's requested relief is simply inappropriate.

**FREUND, FREEZE & ARNOLD**
**A Legal Professional Association**

/s/ Bartholomew T. Freeze
_____
Bartholomew T. Freeze (0086980)
Genevieve M. Hoffman (0089281)
FREUND, FREEZE & ARNOLD
620 E. Broad St. Suite F
Columbus, OH  43215
Phone: (614) 827-7300
Fax: (614) 827-7303

*Counsel for Defendant-Appellants*
*Olentangy Local School District Board*
*of Education, Mark T. Raiff, Randy*
*Wright, Peter Stern, Kevin Daberkow,*
*Brandon Lester, Kevin O'Brien, Libby*
*Wallick and LaKesha Wyse*

*and*

Jessica K. Philemond (0076761)
Sandra R. McIntosh (0077278)
Mitchell L. Stith (0096759)
SCOTT SCRIVEN LLP
250 E. Broad St., Suite 900
Columbus, OH 43215

*Co-Counsel for Defendant-Appellant*
*Olentangy Local School District Board*
*of Education*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7) because it contains 7,102 words, excluding the portions permitted to be excluded.

This document likewise complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally space typeface using Times New Roman in 14 point.

/s/ Bartholomew T. Freeze
_____
Bartholomew T. Freeze (0086980)
October 24, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing was served this 24th day of October 2023 by electronic mail and/or CM/ECF upon the following:

Emmett E. Robinson
Trial Attorney
ROBINSON LAW FIRM LLC
6600 Lorain Ave. #731
Cleveland, OH 44102
Telephone: (216) 505-6900
Facsimile: (216) 649-0508

*Counsel for Appellant*

J. Michael Connolly
Taylor A.R. Meehan
James F. Hasson
Thomas S. Vaseliou
CONSOVOY McCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209

*/s/ Bartholomew T. Freeze*
Bartholomew T. Freeze (0086980)

- 31 -

FREUND, FREEZE & ARNOLD
A Legal Professional Association

## ADDENUDM/ DESIGNATION OF RELEVANT
## DISTRICT COURT DOCUMENTS

| R. | Description | PageID# |
|---|---|---|
| 1 | Complaint | 1-55 |
| 7 | PDE Motion for Preliminary Injunction | 88-115 |
| 7.1 | Declaration of Thomas Vaseliou | 116-344 |
| 7.2 | Declaration of Nicole Neily | 345-361 |
| 7.3 | Declaration of Parent A | 362-368 |
| 7.4 | Declaration of Parent B | 369-376 |
| 7.5 | Declaration of Parent C | 377-382 |
| 7.6 | Declaration of Parent D | 383-389 |
| 13 | Defendants' Memorandum in Opposition to PDE's Motion for Preliminary Injunction | 423-442 |
| 13-1 | Counsel Email Exchange, Exhibit A to Defs. Memorandum in Opposition | 43-445 |
| 28 | Order Denying Preliminary Injunction | 810-850 |
| 33 | Transcript of Preliminary Injunction Hearing | 869-918 |

**FREUND, FREEZE & ARNOLD**
**A Legal Professional Association**