No. 23-3630

In the United States Court of Appeals for the Sixth Circuit

PARENTS DEFENDING EDUCATION,
*Plaintiff-Appellant,*

*v.*

OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, *et al.*,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Ohio
Case No. 2:23-cv-01595

**BRIEF OF *AMICUS CURIAE* FOUNDATION FOR MORAL LAW IN
SUPPORT OF PLAINTIFF/APPELLANT AND REVERSAL**

Talmadge Butts
*Counsel of Record*
John Eidsmoe
Roy S. Moore
Katrinnah Darden
FOUNDATION FOR MORAL LAW
One Dexter Avenue
Montgomery, AL 36104
(334) 262-1245
talmadge@morallaw.org

October 2nd, A.D. 2023      Counsel for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amicus* makes the following disclosures under R. App. P. R. 26.1 and 6th Cir. R. 26.1:

**1. Is any *Amicus* a subsidiary or affiliate of a publicly owned corporation?**

No. Each *Amicus* is a natural person, and as such has no parent company and has not issued stock.

**2. Is there a public corporation, not a party to the appeal or an *Amicus*, that has a financial interest in the outcome?**

None known.

*/s/ Talmadge Butts*

Talmadge Butts
FOUNDATION FOR MORAL LAW
One Dexter Avenue
Montgomery, AL 36104
(334) 262-1245
talmadge@morallaw.org

*Counsel for Amicus Curiae*

C-1

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................C-1

TABLE OF CONTENTS..........................................................................................i

TABLE OF AUTHORITIES .................................................................................. ii

INTEREST OF THE *AMICUS* ..................................................................................1

ARGUMENT ...........................................................................................................2

I.     Compelled speech is an especially egregious violation of the First Amendment ...........................................................................................3

II.    The Olentangy policy discriminates on the basis of both content and viewpoint................................................................................................7

III.   The enumerated right of freedom of speech should take priority over the unenumerated right to be identified by preferred gender pronouns......................................................................................11

IV.   The Olentangy policy violates the right of parents to make decisions concerning the lives of their children ...........................................14

CONCLUSION .......................................................................................................15

CERTIFICATE OF COMPLIANCE.......................................................................18

CERTIFICATE REGARDING SERVICE...............................................................19

# TABLE OF AUTHORITIES

## Cases

*Carey v. Brown*,
447 U.S. 455, 467 (1980) ................................................................13

*Brinsdon v. McAllen Indep. Sch. Dist.*,
863 F.3d 338 (5th Cir. 2017) .................................................. 9-10

*Dumbrowski v. Pfister*,
380 U.S. 479 (1965)....................................................................10

*Farrington v. Tokushige*,
273 U.S. 284 (1927).............................................................. 14-15

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*,
879 F.3d 101 (4th Cir. 2018) ............................................4-5, 7-8

*Karnoski v. Trump*,
139 S. Ct. 950 (2019)..................................................................12

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) .....................................................12

*Kennedy v. Bremerton Sch. Dist.*,
142 S. Ct. 1612 (2022)................................................................11

*Lawrence v. Texas*,
539 U.S. 558 (2003)....................................................................12

*Meyer v. Nebraska*,
262 U.S. 390 (1923).............................................................. 14-15

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974).....................................................................4

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982)....................................................................13

*Nat'l Inst. of Family and Life Advocates v. Becerra*,
138 S. Ct. 1275 (2018)..................................................................5

*Obergefell v. Hodges*,
576 U.S. 644 (2015)................................................................... 10-11

*Parham v. J.R.*,
442 U.S. 584 (1979)...................................................................14

*Parents Defending Educ. v. Olentangy Local Sch. Dist.*,
No. 2:23-cv-01595 (Jul. 28, 2023) ................................................ 6, 8-9

*Pierce v. Society of Sisters*,
268 U.S. 510 (1925)...................................................................14

*Shelton v. Tucker*,
364 U.S. 479 (1960)...................................................................11

*Stuart v. Camnitz*,
114 F.3d 238 (4th Cir. 2014) .........................................................5

*Tinker v. Des Moines Indep. Comty. Sch. Dist.*,
383 U.S. 503 (1969)...................................................................11

*Troxel v. Granville*,
530 U.S. 57 (2000)....................................................................14

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943)................................................................. 3-5, 10

*Wisconsin v. Yoder*,
406 U.S. 205 (1972)...................................................................14

*Wooley v. Maynard*,
430 U.S. 705 (1977)............................................................. 4, 10-11, 13

## Constitutions

U.S. Const. amend. I ...................................................................13

## Statutes

California Reproductive Freedom, Accountability, Comprehensive
Care, and Transparency Act (2018)..................................................6

Olentangy Local School District Code of Conduct, High School
Student Handbook (2022–23)..........................................................6

## Other Authorities

David Smolin, *Fourteenth Amendment Unenumerated Rights Jurisprudence: An Essay in Response to* Stenberg v. Carhart, 24 HARV. J. L. & PUB. POL'Y 815 (2001) ........................................................13

*Do Children Grow Out of Gender Dysphoria?*, TRANSGENDER TREND, https://www.transgendertrend.com/children-change-minds/ .................. 15-16

James Cantor, *Do Trans Kids Stay Trans When They Grow Up?*, SEXOLOGY TODAY (Jan. 11, 2016), http://www.sexologytoday.org/2016/01/do-trans-kids-stay-trans-when-they-grow_99.html .............................................................. 15-16

Lewis Carroll, *Through the Looking Glass* (MacMillan 1871)...............................12

## INTEREST OF THE *AMICUS*[1]

*Amicus curiae* Foundation for Moral Law ("the Foundation") is a 501(c)(3) non-profit, national public interest organization based in Montgomery, Alabama, dedicated to defending religious liberty, God's moral foundation upon which this country was founded, and the strict interpretation of the Constitution as intended by its Framers who sought to enshrine both. To those ends, the Foundation directly assists, or files *amicus* briefs, in cases concerning religious freedom, the sanctity of life, and others that implicate the fundamental freedoms enshrined in our Bill of Rights.

The Foundation has an interest in this case because it believes that the challenged legislation places an unconstitutional burden on the speech of students and teachers who believe, sometimes because of religious conviction, that sex is assigned at conception or birth and cannot be changed by a personal decision or even by hormones or surgery. Although none of the petitioners in this case are teachers in the Olentangy Local School District, this Court should take cognizance of the rights of teachers to freedom of expression.

---

[1] No party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund its preparation or submission; and no person other than the *amicus curiae,* its members, or its counsel, contributed money that was intended to fund the preparation or submission of this brief.

## ARGUMENT

Suppose, for a moment, that you are a vehement opponent of President Donald Trump. You intensely dislike him personally, you find his style of leadership abhorrent, you consider his "tweets" repulsive, you consider his policies immoral and destructive, and you fervently hope he is not reelected. And you take it for granted that your right to express your opinion about him is protected by the First Amendment.

Suppose, then, that a law is enacted that prohibits you from saying or writing anything critical of President Trump, his style, or his policies, under severe legal penalties for violating this law. You would feel outraged, and rightly so, because your right of freedom of expression has been violated. But you might decide to grit your teeth and remain silent rather than face the penalties.

But suppose, instead, that the law is changed, and now requires you not just to remain silent but to affirmatively say: "I love President Trump, I admire his style, I love his tweets, I hope his policies are enacted, and, above all, I fervently hope he is reelected in 2024." You would then be doubly outraged. You might think: "I might begrudgingly keep my mouth shut about President Trump, but there's no way I'm going to speak his praises. I'll go to jail instead."

The point is this: Compelled speech is an even more egregious First Amendment violation than suppressed speech. And a requirement that students and

teachers address people by their "preferred" names and pronouns is clearly compelled speech.

## I.    Compelled speech is an especially egregious violation of the First Amendment.

Compelled speech is an even more egregious First Amendment violation than prohibited speech. Forcing someone to say what one does not believe is worse than forcing a person to remain silent, just as forcing someone to contribute to President Trump's campaign is more outrageous than prohibiting donations to his opponent.

The Supreme Court has recognized that compelled speech is a First Amendment violation ever since *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), in which the Court held that public schools could not force students to say the Pledge of Allegiance if they or their parents objected. Justice Jackson stated for the Court at 634, "To sustain the compulsory flag salute we are required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind."[2]

---

[2] Although Barnette and other plaintiffs objected to the Pledge for religious reasons, the Court stated at 634, "[n]or does the issue as we see it turn on one's possession of particular religious views or the sincerity with which they are held. While religion supplies appellees' motive for enduring the discomforts of making the issue in this case, many citizens who do not share these religious views hold such a compulsory rite to infringe constitutional liberty of the individual."

In *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), the Court held unconstitutional a Florida statute requiring newspapers to publish replies of political candidates whom they had criticized, again invoking the compelled-speech doctrine.

Likewise, in *Wooley v. Maynard*, 430 U.S. 705 (1977), the Court held that New Hampshire could not compel Maynard to display the state motto "Live Free or Die" on his vehicle license plate. Chief Justice Burger held for the majority at page 713:

> We are thus faced with the question of whether the State may constitutionally require an individual to participate in the dissemination of an ideological message by displaying it on his private property in a manner and for the express purpose that it be observed and read by the public. We hold that the State may not do so.

On January 5, 2018, the Fourth Circuit held that a Baltimore ordinance requiring pregnancy clinics that do not offer or refer for abortion to disclose that fact through signs posted in their waiting rooms violated the First Amendment. *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 879 F.3d 101 (4th Cir. 2018).

The Fourth Circuit concluded that the Baltimore ordinance constitutes compelled speech because it "compel[s] a politically and religiously motivated group to convey a message fundamentally at odds with its core beliefs and mission." *Id.* at 105. The Court noted further that an integral component of

4

freedom of expression is "the right not to utter political and philosophical beliefs

that the state wishes to have said." *Id.* at 111 (citing *Barnette*, 319 U.S. at 642 ).

> This Court has in the past struck down attempts to compel speech
> from abortion providers. [*Stuart v. Camnitz*, 114 F.3d 238, 242 (4th
> Cir. 2014)]. And today we do the same with regard to compelling
> speech from abortion foes. We do so in belief that earnest advocates
> on all sides of this issue should not be forced by the state into a corner
> and required essentially to renounce and forswear what they have
> come as a matter of deepest conviction to believe.

*Id.* at 113.

The Fourth Circuit concluded:

> Weaponizing the means of government against ideological foes risks a
> grave violation of our nation's dearest principles: "that no official,
> high or petty, can prescribe what shall be orthodox in politics,
> nationalism, religion, or other matters of opinion or force citizens to
> confess by word or act their faith therein." *Barnette,* 319 U.S. at 642.
> It may be too much to hope that despite their disagreement, pro-choice
> and pro-life advocates can respect each other's dedication and
> principle. But, at least in this case, as in *Stuart,* it is not too much to
> ask that they lay down the arms of compelled speech and wield only
> the tools of persuasion. The First Amendment requires it.

*Id.*

On June 26, 2018, the Supreme Court decided *National Institute of Family*

*and Life Advocates v. Becerra*, 138 S. Ct. 1275 (2018). The California

Reproductive Freedom, Accountability, Comprehensive Care, and Transparency

Act (2018) required crisis pregnancy centers to post notices informing their

patients that California provides free or low-cost pregnancy services, including

abortion and providing information as to how those services could be obtained.

5

NIFLA objected, because telling people how and where they can obtain abortions runs contrary to their belief that abortion is wrong. The Court sided with NIFLA, holding that the required notice was compelled speech that violated the First Amendment.

The policy enacted by the Olentangy Local School District is compelled speech of the most egregious nature. It requires students and teachers to address students by their "preferred pronouns" and chosen names, even though those pronouns and names may differ from the student's gender as determined at birth or conception or as stated on the student's birth certificate or other official documents. Olentangy's Code of Conduct prohibits speech that involves "discriminatory language," which is defined to include failing to address a student by their "preferred pronouns." Olentangy Local School District Code of Conduct, High School Student Handbook (2022–23); *Parents Defending Educ. v. Olentangy Local Sch. Dist.*, No. 2:23-cv-01595, at *1, *6 (Jul. 28, 2023). Refusing to use these politically correct names and pronouns subjects a student to discipline under the discrimination policy. Olentangy Local School District Code of Conduct, High School Student Handbook (2022–23); *Parents Defending Educ.*, No. 2:23-cv-01595 at *7, *12. Because Olentangy's policy applies primarily to student speech, attempts by respondents in *NIFLA* and *Greater Baltimore* to downgrade the level

of constitutional protection to "business speech," "commercial speech," or "professional speech" obviously do not apply to this case.

A student's or teacher's reasons for not using the politically correct name or pronouns could be many and varied. It could be accidental. Or, it could be because the "offending" student or teacher sincerely does not believe the other person's gender has changed. The student or teacher may believe one's gender is determined at conception by one's DNA and cannot be changed by a personal choice or even by hormone therapy or surgery. If a student believes this, he is (from his perspective) lying if he calls or addresses someone by a name or pronoun that is different from that assigned at birth or conception. If he believes, as many do, that gender is determined by God, he may believe he is sinning against God if he calls someone by a different gender from that which God has assigned to that person. To compel him to use terminology he does not want to use is to compel him to lie and/or to sin.

## II.    The Olentangy policy discriminates on the basis of both content and viewpoint.

The Fourth Circuit's *Greater Baltimore* decision recognized that the signs required by the Baltimore ordinance were content-based and viewpoint-based.

> The compelled speech at issue here raises particularly troubling First Amendment concerns. At bottom, the disclaimer portrays abortion as one among a menu of morally equivalent choices. While that may be the City's view, it is not the Center's. The message conveyed is antithetical to the very moral, religious, and ideological reasons the

7

Center exists. Its avowed mission is to "provid[e] alternatives to abortion." . . . Its "pro-life Christian beliefs permeate all that the Center does."

*Greater Baltimore*, 879 F.3d 110.

The Fourth Circuit further stated:

Particularly troubling in this regard is (1) that the ordinance applies solely to speakers who talk about pregnancy-related services but not to speakers on any other topic; and (2) that the ordinance compels speech from pro-life pregnancy centers, but not other pregnancy clinics that offer or refer for abortion.

*Id.* 112. The Court drove home its point: "A speech edict aimed directly at those pregnancy clinics that do not provide or refer for abortions *is neither viewpoint nor content neutral.*" *Id.* (emphasis added).

The Olentangy policy is likewise both content and viewpoint based. It is content based because it directly applies to a certain type of speech and to a specific issue: the gender of students who consider themselves to be of a different gender from that assigned at birth or conception. It is viewpoint based because it requires speech that takes a specific viewpoint about transgenderism (that one's gender can be chosen) and forbids speech that takes a different viewpoint about transgenderism (that gender is assigned by God and cannot be changed). The District Court said the policy is facially viewpoint neutral because it prohibits "misgendering" transgender and cis-gender students alike (*Parents Defending Educ. v. Olentangy Local Sch. Dist.*, No. 2:23-cv-01595, at *6, *33-34 (Jul. 28,

8

2023)), but it clearly discriminates in favor of one viewpoint and against another. Suppose a biologically male student claims to have transgendered into female and changes his name from John to JoAnn. One who believes transgenderism is legitimate is free to address that student as JoAnn and use female pronouns. But another who believes transgenderism is unscientific or immoral will be punished if he addresses the student as John and uses male pronouns.

The lower court also concluded that Olentangy's policies "may compel speech, [but] PDE has failed to show a substantial likelihood that they do so outside the bounds of what is permissible for public schools [because they] requir[e] the use of preferred pronouns promotes 'legitimate pedagogical concerns,' without 'compel[ling] the speaker's affirmative belief.'" *Parents Defending Educ.*, No. 2:23-cv-01595 at *32 (quoting *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 350 (5th Cir. 2017)). This is contrary to clear rulings of the Supreme Court that a free speech violation exists if it has a "chilling effect" on speech. *See Dumbrowski v. Pfister*, 380 U.S. 479 (1965). If the Code of Conduct forces Student A to choose between either (1) saying what he believes, that is, addressing Student B by the pronoun he believes to be correct, or (2) keeping silent, the code clearly has a chilling effect on the Student A's freedom of speech.

As we have seen above, the law disfavors content discrimination and strongly disfavors viewpoint discrimination.

9

This bias violates the neutrality required of government in the marketplace of ideas. As Justice Jackson said in *Barnette* at 641-42:

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.

But that is precisely what Olentangy has done. By enacting this policy, Olentangy has prescribed what shall be orthodox in matters of transgenderism: Recognition and acceptance of transgenderism is orthodox, and all must say so, while the traditional view of gender is now unorthodox, and none may breathe a word of dissent.

Government may have some limited flexibility to advance ideas and policies by what is called "government speech,"[3] but it may not advance those policies by prohibiting private speech, much less by compelling individuals to speak in support of the government's position. For example, the State of New Hampshire may adopt "Live Free or Die" as its motto and place that motto on license plates, but the State may not compel individuals to display that motto. *Wooley v.*

---

[3] In light of the Supreme Court's recent decision in *Kennedy v. Bremerton School District*, 142 S. Ct. 1612 (2022), in which Coach Kennedy's prayers at the 50-yard line after football games were held not to constitute government speech, there is no possibility that students' use of names and gender pronouns could be considered government speech.

*Maynard*, 430 U.S. 705 (1977) (holding that New Hampshire may not prohibit Maynard, a Jehovah's Witness, from covering the motto). As the Court said at 717, "where the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for the State's ideological message." By enacting such a one-sided policy, Olentangy has demonstrated a clear animus against those who hold a more traditional view of gender identity.

### III. The enumerated right of freedom of speech should take priority over the unenumerated right to be identified by preferred gender pronouns.

As the Supreme Court said in *Tinker v. Des Moines Independent Community School District*, 383 U.S. 503, 506 (1969), neither students nor teachers "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Further, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). Freedom of speech is therefore a highly-protected right, especially in the academic setting.

By contrast, the right to change one's gender identification, and *a fortiori* the right to force others to address one by those preferred names and pronouns, is not found anywhere in the Constitution and is, at most, a "right" some have tried to read into the "emanations" and "penumbras" of the Constitution. Even *Lawrence v. Texas*, 539 U.S. 558 (2003) (recognizing a right to engage in homosexual acts) and

*Obergefell v. Hodges*, 576 U.S. 644 (2015) (recognizing a right to same-sex marriage) did not recognize transgenderism. After the uncertain conclusion of *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019); 139 S. Ct. 950 (2019), the Foundation believes there is no constitutional right to change one's gender identification or to require others to recognize one's gender preference.

The right to change one's gender identification is far different from the right to engage in homosexual acts or to enter into a same-sex marriage. The right to change one's gender identification is actually a right to re-define reality. It is, as described in Lewis Carroll's conversation between Alice and the Queen in *Through the Looking Glass*, the power to believe impossible things:

> Alice laughed. "There's no use trying," she said: "one can't believe impossible things." "I daresay you haven't had much practice," said the Queen. "When I was your age, I always did it for half-an-hour a day. Why, sometimes I've believed as many as six impossible things before breakfast."[4]

The relative weight of the alleged right to change one's gender identification and to be addressed by the gender one prefers must be measured against the First Amendment right of freedom of speech.

---

[4] Lewis Carroll, *Through the Looking Glass* (MacMillan 1871). One might even say those who identify with the opposite gender despite clear DNA evidence are "science deniers."

The First Amendment expressly states that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. And "expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'" *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)).

Thus, the First Amendment inherently carries more weight than the conjured right to change one's gender identification. "It is one thing for the Court . . . to invalidate legislation found to be in clear violation of an explicit constitutional command; it is quite another for the Court to claim the authority to invalidate legislation based on rights not mentioned in the Constitution." David Smolin, *Fourteenth Amendment Unenumerated Rights Jurisprudence: An Essay in Response to* Stenberg v. Carhart, 24 HARV. J. L. & PUB. POL'Y 815, 817 (2001).

When this new alleged right to transgenderism is weighed against the historic and clearly enumerated right to free speech, unquestionably, the right to free speech takes precedence. As the Court said in *Wooley*, 430 U.S. at 715, "[t]he First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster . . . an idea they find morally objectionable." That applies to students and teachers who find transgenderism morally or scientifically objectionable, be they a minority or a majority.

**IV.   The Olentangy policy violates the right of parents to make decisions concerning the lives of their children.**

In a series of decisions, the Supreme Court has recognized that parents have a fundamental right to make decisions concerning the raising and education of their children. *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Farrington v. Tokushige*, 273 U.S. 284 (1927); *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Parham v. J.R.*, 442 U.S. 584 (1979); *Troxel v. Granville*, 530 U.S. 57 (2000). In *Pierce*, the Court stated at 535:

> The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.

These cases limit the power of the state to intrude upon parental rights in a variety of ways: prohibiting parents from having their children instructed in any other language except English (*Meyer*); forcing parents to send their children to public schools (*Pierce*); requiring private schools to be substantially the same as public schools (*Farrington*, *Yoder*); disregarding the authority of parents in committing their children to mental hospitals (*Parham*); requiring parents to allow visitation with grandparents (*Troxel*).

But Olentangy's intrusion upon the rights of parents goes far beyond anything contemplated in the above cases. Olentangy's Code of Conduct allows

14

students to identify with a different gender from that of their birth and change their names to reflect that chosen gender and requires all employees and students to address the child by his chosen name and pronoun, regardless of whether the child's parents' object. This means that school officials will recognize the child's chosen gender and act accordingly, even if the parents do not agree with the child's choice and even if the parents object to this gender transition.

Few decisions, if any, are more life-altering than a decision to change one's gender identification. Not only will this permanently change the child's life in very substantial ways; it will alter the family as well. As parents discover that they no longer have a daughter but rather a "son" instead, as siblings discover that they no longer have a sister but rather a "brother" instead, the entire family dynamic is dramatically and drastically changed. That the Olentangy School District would allow this change in children and families without parental consent is an egregious violation of parental rights as identified by the Supreme Court.

**CONCLUSION**

Transgenderism is a relatively new subject, at least in the public arena, and there is much to be learned. Dr. James Cantor reports that, according to a consensus of ten scientific studies, "[t]he exact number varies by study, but

roughly 60-90% of trans-kids turn out no longer to be trans by adulthood."[5] One can only imagine how much damage can be done to children and to their families by facilitating or encouraging children to identify with the opposite gender. For example, a child who identifies with the opposite sex may decide to take puberty blockers or undergo surgery, only to change his/her mind later. The physical, mental, social, emotional, and/or psychological damage to children and their families may be severe and irreparable.

It is tempting to leave this matter to the political process. However, the constitutional rights of parents and children are at stake. A basic purpose of a bill of rights is to place certain matters above and outside the political process.

Olentangy's Code of Conduct violates the free speech rights of students and teachers and violates the right of parents to control the upbringing of their children.

This Court should reverse the decision of the District Court.

Respectfully submitted,

> Talmadge Butts
> *Counsel of Record*
> John Eidsmoe
> Roy S. Moore
> Katrinnah Darden

---

[5] James Cantor, *Do Trans Kids Stay Trans When They Grow Up?*, SEXOLOGY TODAY (Jan. 11, 2016), http://www.sexologytoday.org/2016/01/do-trans-kids-stay-trans-when-they-grow_99.html; *See also*, *Do Children Grow Out of Gender Dysphoria?*, TRANSGENDER TREND, https://www.transgendertrend.com/children-change-minds/.

FOUNDATION FOR MORAL LAW
One Dexter Avenue
Montgomery, AL 36104
(334) 262-1245
talmadge@morallaw.org

Counsel for *Amicus Curiae*

October 2nd, A.D. 2022

17

## CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Rule 32(a)(7), Fed. R. App. P.,
   because, excluding the parts of the document exempted by Rule 32(f), Fed. R.
   App. P., and 6th Cir. R. 32(b)(1), this document contains 3,874 words.

2. This document complies with the typeface requirements of Fed. R. App. P.
   32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it
   was prepared using Microsoft Word in 14-point Times New Roman.

/s/ *Talmadge Butts*

Talmadge Butts
FOUNDATION FOR MORAL LAW
One Dexter Avenue
Montgomery, AL 36104
(334) 262-1245
talmadge@morallaw.org

Counsel for *Amicus Curiae*

18

## CERTIFICATE REGARDING SERVICE

I certify that on October 2nd, A.D. 2022, a true copy of this document is being filed electronically (via CM/ECF) and will thereby be served on all counsel of record.

/s/ *Talmadge Butts*

Talmadge Butts
FOUNDATION FOR MORAL LAW
One Dexter Avenue
Montgomery, AL 36104
(334) 262-1245
talmadge@morallaw.org

Counsel for *Amicus Curiae*