Case No. 23-3630

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | |
|---|---|
| PARENTS DEFENDING EDUCATION<br><br>    Plaintiff-Appellant<br><br>v.<br><br>OLENTANGY LOCAL SCHOOL DISTRICT<br>BOARD OF EDUCATION, *ET AL*.<br><br>    Defendants-Appellees | Civil Appeal from<br>United States District Court<br>for the Southern District of Ohio<br>Case No. 2:23-cv-01595 |

## BRIEF OF *AMICUS CURIAE* EQUALITY OHIO
## SUPPORTING AFFIRMANCE AND
## SUPPORTING DEFENDANTS-APPELLEES

ATTORNEYS FOR *AMICUS CURIAE* EQUALITY OHIO:

Mark P. Herron  (Lead Counsel)
Herron Law Offices
5001 Mayfield Road, Suite 318
Lyndhurst, Ohio 44124
Phone: 216-280-2828
E-mail: HerronLaw@msn.com

Robert S. Chaloupka
Law Office of Robert S. Chaloupka
579 East Clearview Avenue
Seven Hills, Ohio 44131
Phone: 216-570-3154
E-mail: Rob@ChaloupkaLaw.com

Paul Giorgianni
Giorgianni Law LLC
1538 Arlington Avenue
Columbus, Ohio 43212-2710
Phone: 614-205-5550
E-mail: Paul@GiorgianniLaw.com

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: _____          Case Name: _____

Name of counsel: _____

Pursuant to 6th Cir. R. 26.1, _____
                                            *Name of Party*

makes the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

---

CERTIFICATE OF SERVICE

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/_____

_____

_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

TABLE OF CONTENTS

Table of Authorities .................................................................... v

Interest of *Amicus Curiae* Equality Ohio .............................. vii

Argument ..................................................................................... 1

   I.   This *amicus* brief addresses only intentional-misgendering harass-
      ment and Counts I and II of PDE's Complaint. ........................ 1

  II.  The School District's policies and PDE's free-speech challenge. ............. 2

 III. The School District's policies do not compel speech in violation of
      the Free Speech Clause. ............................................................. 5

      A.  The School District's policies do not compel speech at all. ............... 6

      B.  To the extent the School District's policies compel speech, such
          compulsion is incidental to the civil conduct the policies require
          and does not offend the Free Speech Clause. ....................... 9

      C.  To the extent the School District's policies compel non-incidental
          speech in the context of school activities, such compulsion pro-
          motes a "legitimate pedagogical concern." ...................... 12

 IV. The Free Speech Clause does not bar public primary and secondary
      schools from regulating intentional misgendering that rises to the
      level of harassment, threat, humiliation, embarrassment or intimi-
      dation. ..................................................................................... 16

      A.  The Free Speech Clause does not protect harassing speech in
          primary and secondary schools. ....................................... 16

      B.  Intentional misgendering can constitute harassment. .......... 17

      C.  Public primary and secondary schools may regulate intentional-
          misgendering harassment. ................................................ 20

Conclusion .................................................................................. 22

Certificate of Compliance with Type-Volume Limit ............................................ 24

Certificate of Service ............................................................................................. 24

# TABLE OF AUTHORITIES

## CASES

*Bethel Sch. Dist. v. Fraser*, 478 U.S. 675 (1986) .................................................. 14

*Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001) ................................................. 16

*Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3rd Cir. 2018) ........................ 21

*Doe v. Pennsylvania Dep't of Corrections*, No. 4:19-CV-01584,
    2022 U.S. Dist. LEXIS 141656, 2022 WL 3219952
    (M.D. Pa. Aug. 9, 2022) .................................................................... 18

*Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115 (E.D. Pa. 2020) ............. 19

*Eller v. Prince George's Cty. Pub. Sch.*, 580 F. Supp. 3d 154 (D. Md. 2022) .... 18

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949) ............................... 10

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) ...................... 12-13, 20

*Mahanoy Area Sch. Dist. V. B.L.*, 141 S. Ct. 2038 (2021) ............................. 16, 17

*Membreno v. Atlanta Restaurant Partners, LLC*,
    517 F. Supp. 3d 425 (D. Md. 2021) .................................................. 19

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) .......................................... 22

*Myers v. Cuyahoga Cty.*, 182 F. App'x 510 (6th Cir. 2006) ............................... 18

*Nichols v. Azteca Rest. Enters.*, 256 F.3d 864 (9th Cir. 2001) ............................ 19

*Poling v. Murphy*, 872 F.2d 757 (6th Cir. 1989) ................................................. 14

*Rumble v. Fairview Health Servs.*, No. 14-cv-2037,
    2015 U.S. Dist. LEXIS 31591, 2015 WL 1197415
    (D. Minn. Mar. 16, 2015) .................................................................. 19

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ...................................................................... 10-11

*Tay v. Dennison*, 475 F. Supp. 3d 657 (S.D. Ill. 2020)  ........................................ 19

*Tinker v. Des Moines Indep. Community Sch. Dist.*,
   393 U.S. 503 (1968) ............................................................................. 16, 17, 21

*Wood v. Arnold*, 915 F.3d 308 (4th Cir. 2019)  ...................................................... 13

## Constitution & Rule

U.S. Const., First Am., Free Speech Clause  ................................................... *passim*

Fed. R. Civ. P. 12(b)  ............................................................................................ 22

## Other Authorities

American Dialect Society, 2015 Word of the Year is singular "they,"
https://perma.cc/F3MD-V296 (accessed Oct. 28, 2023)  ........................................ 8

McLemore, Kevin A., A Minority Stress Perspective on Transgender
Individuals' Experiences with Misgendering, 3 Stigma & Health 53 (2018)  ...... 21

McWhorter, John, Goodbye to "He" and "She" and Hello to "Ze"?,
https://www.cnn.com/2015/10/14/opinions/mcwhorter-pronouns-gender-
neutral/index (accessed Oct. 29, 2023)  .................................................................. 8

The Trevor Project, 2020 National Survey on LGBTQ Youth Mental Health
(2020), https://perma.cc/MYV9-R696 (accessed Oct. 29, 2023)  ........................ 21

Webster's Third New International Dictionary (2002)  ............................................7

## INTEREST OF *AMICUS CURIAE* EQUALITY OHIO

***Identity.***  Equality Ohio is an Ohio non-profit corporation founded in 2005. Equality Ohio is a member of the Equality Federation.  Equality Ohio's core values include:

- belief in the intrinsic worth and dignity of all people;

- trust that LGBTQ+ people know what they need;

- individual self-determination, free of societal barriers erected by bias, ignorance, fear, and oppression; and

- promoting equity and equality in our institutions.

***Interest.***  Equality Ohio's interests in this case are

- seeing that transgender students are treated with dignity and respect in Ohio's primary and secondary schools, and

- seeing that the policies of the Defendant-Appellee school district are upheld with regard to the legal theories by which Appellant challenges the policies and singles out transgender students for harassment.

***Source of authority to file.***  Equality Ohio is filing with this brief a motion for leave to file this brief, under Rule 29(a)(3) of the Federal Rules of Appellate Procedure.

***Rule 29(a)(4)(E) statement.***  Equality Ohio's counsel authored this brief in whole.  Neither Equality Ohio, nor Equality Ohio's counsel, nor any other person contributed money that was intended to fund preparing or submitting this brief.

ARGUMENT

**I.    This *amicus* brief addresses only intentional-misgendering harassment and Counts I and II of PDE's Complaint.**

Plaintiff-Appellant Parents Defending Education ("PDE") alleges that three policies of Defendant Olentangy Local School District Board of Education ("School District") "violate the First Amendment by impermissibly compelling speech, regulating speech based on viewpoint and content, and imposing overbroad restrictions on speech." (Doc. 28, PDE Brief 13, ¶ 3.) PDE alleges that the School District's policies infringe a free-speech right of public school students to express transgender denialism. (R. 1, Complaint ¶¶ 75, 77-79, 83, PageID 22-24).

This *amicus* brief of Equality Ohio considers the School District's policies only to the extent that they regulate intentional-misgendering harassment. This brief addresses three issues:

- whether the School District's policies compel speech in violation of the Free Speech Clause;

- whether intentional misgendering *never* constitutes harassment and therefore can *never* be regulated by public primary and secondary schools; and

- whether intentional-misgendering harassment is a form of harassment that transgender primary- and secondary-school students must endure for the sake of protecting the ostensible free-speech rights of fellow students who deny transgender identity.

Those issues arise from Counts I and II of PDE's Complaint. This brief does not address Count III (alleging overbreadth in violation of the Free Speech Clause).

PDE's appeal brief *sub silentio* abandons Count IV (alleging violation of parental rights protected by the Fourteenth Amendment).

## II.   The School District's policies and PDE's free-speech challenge.

The **Anti-Harassment Policy (Policy 5517)** provides:

> Harassment means any threatening, insulting, or dehumanizing gesture, use of technology, or written, verbal or physical conduct directed against a student or school employee that:
>
> A. places a student or school employee in reasonable fear of harm to his/her person or damage to his/her property;
>
> B. has the effect of substantially interfering with a student's educational performance, opportunities, or benefits, or an employee's work performance; or
>
> C. has the effect of substantially disrupting the orderly operation of a school.

(R. 7-1, PageID 123, ¶ 1.) (*See* R. 1, Complaint, ¶¶ 3, 38-44, PageID 2, 14-15 (quoting policy).)

The **Personal Communication Devices Policy (Policy 5136)** provides:

> Students may not use a PCD in any way that might reasonably create in the mind of another person an impression of being threatened, humiliated, harassed, embarrassed or intimidated. See Policy 5517.01 – Bullying and Other Forms of Aggressive Behavior. In particular, students are prohibited from using PCDs to: (1) transmit material that is threatening, obscene, disruptive, or sexually explicit or that can be construed as harassment or disparagement of others based upon their race, color, national origin, sex (including sexual orientation / transgender identity), disability, age, religion, ancestry, or political beliefs; and (2) engage in "sexting" – i.e., sending, receiving, sharing, viewing, or possessing pictures, text messages, e-mails or other mate-

rials of a sexual nature in electronic or any other form.  Violation of
these prohibitions shall result in disciplinary action.  . . . .

(R. 7-1, PageID 134, ¶ 3.)  (*See* R. 1, Complaint ¶¶ 4, 45-47, PageID 2, 15-16

(quoting policy).)

The **Code of Conduct** within the School District's *High School Student*

*Handbook 2022-2023* provides:

> Use of Obscene or Discriminatory Language / Materials / Actions /
> Gestures — Students shall not use obscene, vulgar, profane, or dis-
> criminatory language, make inappropriate gestures / actions or possess
> vulgar materials.  Note: Discriminatory language is defined as verbal
> or written comments, jokes, and slurs that are derogatory towards an
> individual or group based on one or more of the following characteris-
> tics: race, color, national origin, sex (including sexual orientation and
> transgender identity), disability, age, religion, ancestry, or genetic in-
> formation.

(R. 7-1, PageID 150, ¶ #4.)  (*See* R. 1, Complaint ¶¶ 5, 48-56, PageID 2, 16-17

(quoting policy).)

We know that the School District construes one or more of these policies as

prohibiting intentional-misgendering harassment, because the School District has

admitted as much.  (Complaint ¶ 6, PageID 2-3.)  But PDE overstates what those

policies prohibit.  PDE fears that when issues involving gender identity arise in

class or in school-sponsored activities, the speech of PDE students will be chilled

because they "want[] to speak about these topics and want[] to repeatedly state

their belief that biological sex is immutable." (R. 7-3, Parent A Decl. ¶ 10, PageID

363; *see* R. 7-4, Parent B Decl. ¶ 10, PageID 370; R. 7-5, Parent C Decl. ¶ 9, Page-

ID 378-79; R. 7-6, Parent D Decl. ¶ 10, PageID 384-85.)  Such fear is not reasona-

bly prompted by the School District's policies:

> ▪ The Anti-Harassment Policy is expressly limited to "threatening, in-
> sulting, or dehumanizing" speech and conduct "directed against a
> student or school employee" that either "places a student or school
> employee in reasonable fear of harm;" "has the effect of substantial-
> ly interfering with a student's educational performance, opportuni-
> ties, or benefits, or an employee's work performance;" or "has the
> effect of substantially disrupting the orderly operation of a school."

> ▪ The Devices Policy is expressly limited to "reasonably creat[ing] in
> the mind of another person an impression of being threatened, hu-
> miliated, harassed, embarrassed or intimidated."

> ▪ The Code of Conduct, as relevant here, prohibits only "discriminato-
> ry" speech that is "derogatory."

The School District underscores the limited scope of these policies in its re-

porting policy (R. 7-1, Exh. F, PageID 198-207).  In a "Frequently Asked Ques-

tions" section dedicated to transgender students, the School District states:

> **How can students safely express their views?**  [¶] The District rec-
> ognizes the First Amendment rights of students and community mem-
> bers to express their opinions and beliefs on controversial topics.  But
> while at school, students' expression cannot disrupt or attempt to dis-
> rupt the educational process.  The classrooms are places for learning,
> and the District's focus will be on educating all of its students.  . . . .

(*Id*. at PageID 205.)

PDE's Complaint seeks to establish a right under the Free Speech Clause for

public primary- and secondary-school students to intentionally misgender a fellow

student, even when such misgendering:

- is "directed against a student," is "threatening, insulting, or dehumanizing," and "has the effect of substantially interfering with a student's educational performance, opportunities, or benefits" (the Anti-Harassment Policy);

- "might reasonably create in the mind of another person an impression of being threatened, humiliated, harassed, embarrassed or intimidated" (the Devices Policy); and/or

- is "derogatory" (the Code of Conduct).

(*See* Complaint ¶¶ 76, 96, 134, PageID 23, 27, 36 (indicating that intentional misgendering is the only form of "'insulting,' 'humiliating,' and 'dehumanizing'" speech that PDE's representative students wish to perpetrate against transgender classmates).) This insult, humiliation, and dehumanizing, PDE alleges, is not PDE students' intent but rather an unfortunate consequence of PDE students' desire to exercise their free-speech right in school. (*Id*. at ¶¶ 76, 96, 134 (claiming "no ill will").)

What PDE's parents and students seek in this case is a constitutional right to psychologically wound each primary- and secondary-school transgender student, at every encounter, during school hours and on school grounds, by refusing to refrain from intentional misgendering.

### III.   The School District's policies do not compel speech in violation of the Free Speech Clause.

The target of PDE's "compelled speech" challenge is one particular form of transgender denialism: intentional misgendering.

The School District's policies either do not compel speech at all or compel speech only incidentally and not contrary to the Free Speech Clause. And even assuming the policies compel non-incidental speech, the policies would not violate the Free Speech Clause to the extent they regulate speech in the context of school activities. This is so because the policies enforce the "legitimate pedagogical concerns" of civility and grammar.

## A. The School District's policies do not compel speech at all.

PDE wrongly asserts that the School District's policies compel speech—that "[t]he Policies require students to refer to their peers with their 'preferred pronouns.'" (Complaint ¶ 8, PageID 3. *Accord id*. ¶ 10, PageID 4. *See id.* at ¶¶ 27-31, PageID 9-12 (referring to "'preferred pronoun policies'" generally), PageID 39-42 (Count I).)

PDE is incorrect in three respects.

*First:* None of the challenged policies so much as mention pronouns, much less compel the use of a referent person's chosen pronouns.

*Second:* Pronouns are not, as PDE contends, "'required by the English language.'" (Doc. 28, PDE brief, p. 20, ¶ 2 (quoting district court opinion).) PDE students can refer to students by their proper names instead of pronouns. (*See* R. 33, Hrg. Tr. 33:15-19, PageID 878 (PDE counsel stating that use of a proper name "does not contain a statement about whether or not I am male or female"); *id*. at

33:25, PageID 901 (School District counsel noting that PDE students "can call Terrence 'Terri'"—that is, use proper names instead of pronouns).)

PDE wrongly asserts that "even if students alter their speech to avoid using pronouns (*e.g.*, 'George went to George's locker to get the book that George borrowed from Sarah'), the Policies still compel the speaker to alter the message by making it more acceptable to others." (Doc. 28, PDE brief p. 20 (quotation marks and brackets omitted). A pronoun is "a substitute for a noun or noun equivalent" and "has little or no fixed meaning except one of relation or limitation." Webster's Third New International Dictionary, p. 1816 (2002). Using the referent person's proper name instead of a pronoun does not "alter the message" in any meaningful way.

*Third:* The School District's policies do not require use of the referent person's chosen pronouns. With regard to pronouns, the policies require only that students refrain from intentional misgendering—using pronouns *contrary* to the referent person's gender identity. (Doc. 28, PDE brief, p. 9, ¶ 2.) Thus, use of the gender-neutral "they," "them," and "their" as singular pronouns universally—that is, when referring to *any* person—would not violate the policy. PDE's students can use the pronouns "they," "them," and "their" for *everyone*, to the exclusion of

he/him/her and she/her/hers.[1]  And PDE's filings in this case demonstrate PDE's

approval of the universal use of the singular they/them/their:

- PDE's complaint uses the pronoun "their" at least 53 times to refer to a single PDE parent, PDE student, or other individual (including transgender individuals).  (R. 1, Complaint ¶¶ 10, 71, 72 (thrice), 73 (twice), 75, 76 (thrice), 77, 78 (twice), 79 (twice), 80, 82 (thrice), 84, 85 (twice), 86, 87 (twice), 88 (thrice), 91, 92 (thrice), 109, 110, 113 (twice), 114, 120 (twice), 125, 126 (thrice), 129, 130 (twice), 131, 142 (twice), 148 (twice), 152 (twice).)

- PDE's complaint uses the pronoun "them" once to refer to a single individual.  (*Id*. at ¶ 85.)

- PDE's complaint uses the pronoun "they" at least seven times to refer to a single individual.  (*Id*. at ¶¶ 79 (twice), 80, 84, 87, 105, 143.)

- PDE's brief uses the pronoun "their" twice to refer to a single individual.  (Doc 28, p. 9, ¶ 2, p. 10, ¶ 1.)

---

[1]  "[T]he American Dialect Society voted for *they* used as a gender-neutral singular pronoun as the Word of the Year for 2015."  American Dialect Society, 2015 Word of the Year is Singular "They," https://perma.cc/F3MD-V296 (accessed Oct. 28, 2023).  The ADS explained:

> The use of singular *they* builds on centuries of usage, appearing in the work of writers such as Chaucer, Shakespeare, and Jane Austen.  In 2015, singular *they* was embraced by the Washington Post style guide.  Bill Walsh, copy editor for the Post, described it as "the only sensible solution to English's lack of a gender-neutral third-person singular personal pronoun."

*Id*.  The waxing and waning of the conceit that "they" is exclusively plural has precedent.  "Once upon a time, you 'was plural' while thou was used in the singular.  Today, you 'is' singular as well and no one bats an eye."  John McWhorter, Goodbye to "He" and "She" and Hello to "Ze"?, ¶ 15 https://www.cnn.com/2015/10/14/opinions/mcwhorter-pronouns-gender-neutral/index (accessed Oct. 29, 2023).

PDE's parents and students can stay within the bounds of the School District's policies by using proper names and non-gendered pronouns instead of gendered pronouns.[2]  The School District's policies thus do not compel speech at all.

**B.  To the extent the School District's policies compel speech, such compulsion is incidental to the civil conduct the policies require and does not offend the Free Speech Clause.**

This subpart B assumes that the School District's policies generally[3] compel speech.

PDE asserts that the School District's general requirement that students use pronouns not contrary to the referent person's gender identity violates the Free Speech Clause.  (Doc. 28, PDE brief, pp. 18-23.)  PDE asserts that when PDE's students use a transgender classmate's chosen pronouns (which they never want to do), the students "'affirm' that a biologically female classmate is actually a male—

---

[2] Equality Ohio advocates that schools should require students to use other students' chosen pronouns.  Equality Ohio believes that universal use of they/them/their insufficiently respects students whose chosen pronouns are gendered (he/him/his or she/her/hers).  But the policies challenged in this case do not require use of chosen pronouns.  This case thus does not present the question of whether the School District could require chosen pronouns.  The question at issue here is whether the School District's policies compel speech; and the answer is that they do not, because the policies tolerate gender-neutral alternatives to intentional misgendering.

[3] The School District's requirement that students use pronouns not contrary to the referent person's gender identity is not absolute.  The School District makes an exception to accommodate those students whose transgender denialism is purported to be a religious belief.  (*See* R. 28, Dist. Ct. Op. pp. 7-8, PageID 816-17.)

or vice versa." (Complaint ¶ 7, PageID 3. *Accord id.* at ¶¶ 37, 73, 82, 84, 93, 103, 104, 106, 114, 120, 122, 131, 142, 144, 153, 157.)

Compelled speech that is merely incidental to lawfully compelled conduct does not offend the Free Speech Clause. "'[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). In *Rumsfeld*, the Court unanimously upheld a federal statute providing that if any part of an institution of higher education denies military recruiters access equal to that provided other recruiters, the entire institution would lose certain federal funds. The Court acknowledged that the statute compelled speech by requiring the plaintiff law schools to send e-mails and post notices on behalf of military recruiters to the same extent the law schools did so on behalf of non-military recruiters. *Id.* at 61-62. But the Court rejected the law schools' free-speech claim because "[t]he compelled speech to which the law schools point is plainly incidental to the [statute's] regulation of conduct." *Id.* at 62. The Court explained:

> Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading "White Applicants Only" hardly means that the law should be analyzed as one regulating the employer's

> speech rather than conduct.  Compelling a law school that sends
> scheduling e-mails for other recruiters to send one for a military re-
> cruiter is simply not the same as forcing a student to pledge alle-
> giance, or forcing a Jehovah's Witness to display the motto "Live Free
> or Die," and it trivializes the freedom protected in *Barnette* and
> *Wooley* to suggest that it is.

*Id*. at 62 (citation omitted).

If a person given the name William at birth wishes to be referred to as Bill or Billy, civility requires, and a public primary or secondary school can require, respecting the person's wishes.  So too with pronouns.  Even a policy (unlike the policies here) that requires students to refer to fellow students by their chosen names and chosen pronouns compels civil conduct and only incidentally speech.  The fact that compelling civil conduct incidentally compels a miniscule amount of speech—merely the chosen names and pronouns of a small number of people[4]—does not offend the Free Speech Clause.

This point is underscored by PDE's "altered speech" argument.  PDE argues that "even if students alter their speech to avoid using pronouns (*e.g.*, 'George went to George's locker to get the book that George borrowed from Sarah'), the Policies still compel the speaker to alter the message by making it more acceptable to others."  (PDE brief p. 20 (quotation marks and brackets omitted).)  In other

---

[4] The School District's attorney told the District Court that the School District is aware of about 50 transgender students among its population of about 23,000 students.  (R. 33, Hrg. Tr. 34:4-16, PageID 902.)

words, PDE is claiming that compelling students to use a transgender student's chosen *proper name* violates the Free Speech Clause. (This is new. PDE's counsel indicated to the District Court that PDE's students and parents were *willing* to use transgender students' chosen proper names. (*See* Part I-A above.)) The unwillingness of PDE students to use even the chosen *proper names* of transgender students or even the non-gendered singular they/them/their further demonstrates that the semantics of pronouns—in free-speech lexicon, the "content" or "viewpoint" of pronouns—is only incidental to the civil conduct the School District's policies require.

By requiring use of pronouns not contrary to the referent person's gender identity, the School District is not acting as "thought police." The School District is acting, as primary and secondary schools must, as *conduct* police. To the extent the School District's policies compel speech at all, such compulsion is incidental to the civil conduct the policies require and thus does not offend the Free Speech Clause.

### C. To the extent the School District's policies compel non-incidental speech in the context of school activities, such compulsion promotes a "legitimate pedagogical concern."

"[T]he First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings and must be applied in light of the special characteristics of the school environment." *Hazelwood Sch.*

*Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (citations and quotation marks omitted). In the context of school activities, schools are free to compel student speech to promote "legitimate pedagogical concerns." "[E]ducators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273 (ruling that school could regulate speech in student newspaper). "[A] student's right against compelled speech in a public school . . . has limited application in a classroom setting in which a student is asked to study and discuss materials with which she disagrees." *Wood v. Arnold*, 915 F.3d 308, 318-19 (4th Cir. 2019).

The School District's pronoun policy is part of a legitimate pedagogy in two ways.

First, the policy falls within the pedagogical authority of schools to inculcate the school's choice of grammar. PDE students do not have a constitutional right to be intractably conservative grammarians. The School District does not offend the Free Speech clause by teaching and enforcing a curriculum in which they/them/their are universal, gender-neutral, singular pronouns.[5]

---

[5] To reiterate: Equality Ohio advocates that schools should require students to use other students' chosen pronouns and proper names and that universal use of non-

*(Footnote continues on next page)*

The second legitimate pedagogical concern is teaching and enforcing civility.

"Civility is a legitimate pedagogical concern[.]" *Poling v. Murphy*, 872 F.2d 757,

758 (6th Cir. 1989).  Public schools need not restrict their inculcation of civility to

the lowest common denominator of an uncivil cohort of students:

> [F]undamental values of habits and manners of civility essential to a
> democratic society . . . must also take into account consideration of
> the sensibilities of others, and, in the case of a school, the sensibili-
> ties of fellow students.  . . . .
>
> . . . .
>
> . . . .  Nothing in the Constitution prohibits the states from insisting
> that certain modes of expression are inappropriate and subject to
> sanctions.  The inculcation of these values is truly the work of the
> schools.  The determination of what manner of speech in the class-
> room or in school assembly is inappropriate properly rests with the
> school board.

*Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 681-83 (1986) (citations and quotation

marks omitted) (approving school's punishment of student for vulgar speech dur-

ing school assembly).  Compared to *Poling* and *Bethel*, this case is an even strong-

er case for school regulation in that this case involves speech that targets an indi-

vidual student based upon that student's personal characteristics.

The School District's general requirement that students use pronouns not con-

trary to the referent person's gender identity is an exercise of pedagogical discre-

---

gendered pronouns insufficiently respects students whose chosen pronouns are
gendered.  But that is not what the policies challenged in this case require.

tion that protects both the well-being of transgender students and the sensibilities of PDE's students.  The *effect* of the School District's requirement is to instruct all students of essentially this: In our building, and in our school activities, when we use pronouns to refer to people, our referent is the person without reference to sex assigned at birth.  Under that protection, all students know that in school activities, a speaker's use of a pronoun merely respects the referent student's wishes and is not an affirmation of *any belief* of the speaker.[6]

The parties, the Court, and the other *amici* may debate the geographic extent to which the School District may require civil conduct and a certain grammar from its students, and may debate what constitutes a school activity within which the School District may regulate civil conduct and a certain grammar.  But the Free Speech Clause does not, as PDE suggests, categorically prohibit the School District from compelling the use of pronouns not contrary to the referent person's gender identity.

---

[6] Which raises the question: What do PDE parents and students believe about intersex people, about which PDE is conspicuously silent?  The existence of intersex people destroys PDE's "compelled speech" case, which rests upon the scientific fallacy that "people are either male or female."  (Doc. 28, PDE brief p. 20, ¶ 1.)

IV. **The Free Speech Clause does not bar public primary and secondary schools from regulating intentional misgendering that rises to the level of harassment, threat, humiliation, embarrassment or intimidation.**

    A. **The Free Speech Clause does not protect harassing speech in primary and secondary schools.**

The scope of the Free Speech protection is reduced in primary and secondary schools due to the "special characteristics of the school environment." *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506 (1968). The Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id*. at 507. "Speech that rises to the level of harassment—whether based on sex, race, ethnicity, or other invidious premise—and which creates a hostile learning environment that ultimately thwarts the academic process, is speech that a learning institution has a strong interest in preventing." *Bonnell v. Lorenzo*, 241 F.3d 800, 824 (6th Cir. 2001). "During the entire school day, a school must have the authority to protect everyone on its premises, and therefore schools must be able to prohibit threatening and harassing speech." *Mahanoy Area Sch. Dist. V. B.L.*, 141 S. Ct. 2038, 2052 (2021) (Alito, J., concurring)).

That interest justifies regulation of intentional-misgendering harassment in primary and secondary schools. The free-speech right of public-school students to express transgender denialism extends only up to the point of "colliding with the

rights of others," *Tinker*, 393 U.S. at 513. "[C]onduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is . . . not immunized by the constitutional guarantee of freedom of speech." *Id.*

Student speech, otherwise protected by the Free Speech Clause, can fall outside of the category of protected speech when the speech is directed to specific individuals. *See Mahanoy Area School Dist. v. B.L.*, 141 S. Ct. 2038, 2047 (2021) (indicating that speech that "target[s] any member of the school community" is more likely fall within the regulatory power of a school).

PDE's argument seems to be (1) that intentional misgendering can *never* rise to the level of harassment, and/or (2) intentional misgendering is a form of harassment that transgender primary- and secondary-school students must endure for the sake of protecting the ostensible free-speech rights of fellow students who deny transgender identity. PDE is not likely to succeed in the District Court with either argument.

## B. Intentional misgendering can constitute harassment.

Nearly *any* speech or conduct can rise to the level of harassment if perpetuated long enough—even truthful speech. An African-American student is victimized if fellow students repeatedly refer to them by a derogatory racial slur. A female

student is victimized if fellow students repeatedly referred to them by a derogatory gendered term.  An admitted homophobe is victimized if fellow students repeatedly refer to them only as "the homophobe."  And a transgender student is victimized when fellow students intentionally and repeatedly misgender them.

Courts recognize that deliberately misgendering a transgender person can constitute harassment and/or discrimination:

- This Court stated: "We agree . . . that calling a transsexual or transgendered person a 'he/she' is a deeply insulting and offensive slur, and we agree that using that term is strongly indicative of a negative animus towards gender nonconforming people." *Myers v. Cuyahoga Cty.*, 182 F. App'x 510, 520 (6th Cir. 2006).

- The District Court of Maryland overruled a defendant's summary judgment motion, ruling that "[w]here [the plaintiff school teacher] has presented evidence that students, parents, and co-workers engaged in harassment that was explicitly sexual in nature or targeted [the plaintiff's] transgender status—including calling [the plaintiff] sexually degrading epithets . . . , continuously misgendering her, and threatening to rape her, the Court finds that there is sufficient evidence to establish that the harassment of [the plaintiff] was based on sex." *Eller v. Prince George's Cty. Pub. Sch.*, 580 F. Supp. 3d 154, 172 (D. Md. 2022).

- A district court in Pennsylvania ruled that "[f]rom [t]he testimony about physical intimidation, discriminatory comments, and almost daily misgendering, a reasonable juror could find a hostile work environment." *Doe v. Pennsylvania Dep't of Corrections*, No. 4:19-CV-01584, 2022 U.S. Dist. LEXIS 141656, *12, 2022 WL 3219952 (M.D. Pa. Aug. 9, 2022).

- The District Court of Maryland overruled a defendant's motion for summary judgment, stating that "a reasonable factfinder could conclude that the persistent personal gender-based remarks that single out individuals for ridicule were sufficient to create a hostile work

environment." *Membreno v. Atlanta Restaurant Partners, LLC*, 517 F. Supp. 3d 425, 442 (D. Md. 2021) (quotation marks omitted).

- A district court in Pennsylvania ruled that allegations of harassing and discriminatory conduct, including that "coworkers regularly misgendered [the plaintiff] with a male name and male pronouns despite her requests to use her female name and female pronouns," stated multiple civil-rights claims. *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 129 (E.D. Pa. 2020).

- A district court in Illinois ruled that the harassment of a plaintiff in a prison, including that "correctional and medical staff constantly misgender Plaintiff, referring to her as 'mister' and using male pronouns even though they are aware that she is a transgender woman," "rises to the level of a constitutional violation." *Tay v. Dennison*, 475 F. Supp. 3d 657, 683 (S.D. Ill. 2020).

- The District Court of Minnesota ruled that "Fairview's misgendering of Rumble could be considered objectively offensive behavior" justifying civil rights claims. *Rumble v. Fairview Health Servs*., No. 14-cv-2037, 2015 U.S. Dist. LEXIS 31591, 2015 WL 1197415, *25-26 (D. Minn. Mar. 16, 2015).

Anyone, including cisgender persons, can be the victim of intentional-misgendering harassment. *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 869-70, 874-75 (9th Cir. 2001) (reversing defense verdict and ruling that "verbal abuse . . . closely linked to gender" directed against male employee, including "referring to him as 'she' and 'her,'" violated civil rights laws).

### C. Public primary and secondary schools may regulate intentional-misgendering harassment.

Intentional misgendering is a form of harassment that transgender primary- and secondary-school students should not be forced to endure for the sake of ostensible free-speech rights of those who deny transgender identity.

"[T]he First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (citations and quotation marks omitted).

Public schools have a compelling governmental interest in protecting their transgender students:

> [T]ransgender students face extraordinary social, psychological, and medical risks[,] and the School District clearly had a compelling state interest in shielding them from discrimination. There can be no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity. The risk of experiencing substantial clinical distress as a result of gender dysphoria is particularly high among children and may intensify during puberty. The Supreme Court has regularly held that the state has a compelling interest in protecting the physical and psychological well-being of minors. . . . . Mistreatment of transgender students can exacerbate gender dysphoria, lead to negative educational outcomes, and precipitate self-injurious behavior. When transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening.

*Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 528-29 (3rd Cir. 2018) (footnotes
and quotation marks omitted) (upholding school district's policy allowing students
to use bathrooms and locker rooms consistent with gender identity).

One study of 410 transgender individuals "demonstrates that being mis-
gendered is reliably associated with markers of psychological distress."  Kevin A.
McLemore, A Minority Stress Perspective on Transgender Individuals' Experienc-
es with Misgendering, 3 Stigma & Health 53, 59 (2018).  "Transgender and nonbi-
nary youth who report having their pronouns respected by all or most of the people
in their lives attempted suicide at half the rate of those who did not have their pro-
nouns respected."  The Trevor Project, 2020 National Survey on LGBTQ Youth
Mental Health, p. 9 (2020) (bold-face omitted) (reporting results of nationwide
survey of over 40,000 LGBTQ individuals ages 13 to 24), https://perma.cc/MYV9-
R696 (accessed Oct. 29, 2023).

PDE relies upon *Tinker*, in which the Supreme Court protected the wearing of
black armbands in school because wearing black armbands was "a silent, passive
expression of opinion, unaccompanied by any disorder or disturbance."  393 U.S.
at 508.  Intentional-misgendering harassment of an individual is different, because
it is neither silent nor passive.  It is vocalized.  And it is both targeted at an indi-
vidual and uncivil.  It is "speech . . . that intrudes upon the work of the schools
[and] the rights of other students."  *Id*.

PDE's reliance upon *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), is misplaced. *Meriwether* involved a college environment of adult students who chose to be there—not a public primary or secondary school whose students' presence is mandated by law. Moreover, this Court in *Meriwether* ruled that Professor Meriwether's complaint stated a claim and reversed a Rule 12(b) dismissal. The Court did *not* rule that Professor Meriwether was likely to succeed on the merits—which is the ruling PDE seeks from this Court.

There is no free-speech right to intentionally harass a school child. Public primary and secondary schools may regulate intentional-misgendering harassment.

## CONCLUSION

The Court should rule

- either (1) that the School District's policies do not compel speech; or (2) that the School District's policies compel speech, if at all, only incidentally and not contrary to the Free Speech Clause; or (3) that in the context of school activities, any speech compelled by the policies is outside the protection of the Free Speech Clause because the policies enforce a "legitimate pedagogical concern;" and

- that the Free Speech Clause does not bar primary and secondary schools from regulating intentional-misgendering harassment.

Respectfully submitted,

s/ Mark P. Herron  (Lead Counsel)
Herron Law Offices
5001 Mayfield Road, Suite 318
Lyndhurst, Ohio 44124
Phone: 216-280-2828
E-mail: HerronLaw @msn.com

/s/ Robert S. Chaloupka
Law Office of Robert S. Chaloupka
579 East Clearview Avenue
Seven Hills, Ohio 44131
Phone: 216-570-3154
E-mail: Rob@ChaloupkaLaw.com

/s/ Paul Giorgianni
Giorgianni Law LLC
1538 Arlington Avenue
Columbus, Ohio 43212-2710
Phone: 614-205-5550
E-mail: Paul@GiorgianniLaw.com

*Attorneys for* Amicus Curiae *Equality Ohio*

## RULE 32(G)(1) CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMIT

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,121 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2309 in 14-point Times New Roman.

/s/ Paul Giorgianni
*Attorney for Equality Ohio.*
October 31, 2023

## CERTIFICATE OF SERVICE

This document was served on all counsel of record via filing in the Court's CM/ECF system on October 31, 2023.

/s/ Paul Giorgianni
*Attorney for Equality Ohio*
October 31, 2023