Case No. 23-3630

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

---

## PARENTS DEFENDING EDUCATION

*Plaintiff-Appellant,*

v.

## OLENTANGY LOCAL SCHOOL DISTRICT
## BOARD OF EDUCATION, et al.

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Southern District of Ohio
Eastern Division, No. 2:23-cv-01595

---

**BRIEF OF *AMICI CURIAE* OHIO SCHOOL BOARDS ASSOCIATION AND
OHIO ASSOCIATION OF SCHOOL BUSINESS OFFICIALS IN SUPPORT
OF DEFENDANT-APPELLEE OLENTANGY LOCAL SCHOOL DISTRICT
BOARD OF EDUCATION AND AFFIRMANCE**

---

Scott C. Peters
Sherrie C. Massey
Daniel R. Shisler
Peters Kalail & Markakis Co., L.P.A.
6480 Rockside Woods Blvd. S., Suite 300
Cleveland, Ohio 44131
Telephone:  (216) 503-5055
speters@ohioedlaw.com
smassey@ohioedlaw.com
dshisler@ohioedlaw.com

*Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to 6th Cir. R. 26.1, counsel for *amici* certifies that there is no parent corporation or publicly held corporation that owns 10% or more of stock in either *amici curiae* described below.

*/s/ Scott C. Peters*

Scott C. Peters (0059408)
Sherrie C. Massey (0067471)
Daniel R. Shisler (0098943)
Peters Kalail & Markakis Co., L.P.A.
6480 Rockside Woods Blvd. S., Suite 300
Cleveland, Ohio 44131
Telephone:  (216) 503-5055
speters@ohioedlaw.com
smassey@ohioedlaw.com
dshisler@ohioedlaw.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................................... ii

TABLE OF AUTHORITIES.................................................................................. iv

STATEMENT OF INTEREST..............................................................................1

INTRODUCTION ................................................................................................3

ARGUMENT .......................................................................................................6

**The Policies prevent speech that would cause substantial
disruption in the school environment** ........................................................7

    A.    The Policies are tied directly to *Tinker's* "substantial disruption"
        standard and should survive facial challenge.......................................9

        1.   Board Policy 5517 - Anti-Harassment .........................................10

        2.   Board Policy 5136 - Personal Communication Devices...............12

        3.   Code of Conduct Provisions .........................................................14

    B.    School districts may reasonably forecast substantial disruption
        caused by the intentional misgendering of transgender students........16

CONCLUSION ...................................................................................................19

CERTIFICATE OF COMPLIANCE.....................................................................20

CERTIFICATE OF SERVICE .............................................................................21

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Bethel Sch. Dist. v. Fraser*,
478 U.S. 675, 681 (1986) ................................................................5, 11, 12, 14, 16

*Brown v. Bd. of Educ.*,
347 U.S. 483, 494 (1954) ....................................................................................6

*Epperson v. Arkansas*,
393 U.S. 97, 104 (1968) ......................................................................................4

*Hazelwood v. Kuhlmeier*,
484 U.S. 260, 266 (1988) ....................................................................................5

*Kutchinski v. Freeland Cmty. Sch. Dist.*,
69 F.4th 350, 359 (6th Cir. 2023) ................................................................. 7, 18

*Lowery v. Euverard*,
497 F.3d 584, 592-93 (6th Cir. 2007) ......................................................... 7, 8, 18

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy,*
141 S.Ct. 2038, 2046 (2021) ................................................... 3, 5, 8, 9, 10

*Meyer v. Nebraska*,
262 U.S. 390, 402 (1923) ....................................................................................4

*Morse v. Frederick*,
551 U.S. 393, 410 (2006) ............................................................................. 5, 10

*Nuxoll ex rel. Nuxoll v. Indian Prairie School Dist. #204*,
523 F.3d 668, (7th Cir. 2008) ............................................................................17

*Sypniewski v. Warren Hills Regional Bd. of Educ.*,
307 F.3d 243, 262 (3rd Cir. 2002) ............................................................... 12, 14

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503, 506 (1969) ................................ 2, 4, 6, 7, 9, 11, 12, 13, 14, 17, 18, 19

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7, 20 (2008) .........................................................................................6

*Zamecnik v. Indian Prairie School Dist. #204*,
636 F.3d 874, 877-78 (7th Cir. 2011) ........................................................... 8, 18

## <u>Statutes</u>

Ohio Revised Code (O.R.C.) § 3313.666 ....................................................... 13, 15

## STATEMENT OF INTEREST[1]

The Ohio School Boards Association (OSBA) is a nonprofit 501(c)(4) corporation that engages and serves Ohio's public school board members and the diverse districts they represent.  More than 700 boards of education representing the city, municipal, local, exempted village and career technical school districts and educational service centers throughout the State of Ohio are members of OSBA. OSBA's services and programs include extensive informational support, advocacy and consulting, board development and training, legal information, and policy service and analysis.

Founded in 1936, the Ohio Association of School Business Officials (OASBO) is a not-for-profit, professional association empowering Ohio's public school finance and operations professionals to achieve excellence through collaboration, continuous learning, and advocacy.  Its members include public school district treasurer/CFOs, business managers, transportation directors, food service supervisors, and administrative support staff.

---

[1] *Amici* certify that no counsel for a party authored this brief in whole or in part. Additionally, the cost of this brief was funded, in part, by the OSBA Legal Assistance Fund ("OSBA LAF"). Olentangy Local School District Board of Education has not contributed to or been a member of the OSBA LAF in calendar year 2022 or 2023, and, as such, no party or party's counsel contributed money to fund the preparation or submission of this brief.  Further, no person, other than *amici*, their members, or counsel contributed money to fund the preparation or submission of this brief. Counsel for *amici* make no representation as to whether the Appellee Olentangy Board of Education may have contributed to or been a member of the OSBA LAF prior to 2022.

Together, OSBA and OASBO ("Associations") have significant interest in the outcome of this case. A ruling in Appellant's favor risks diminishing the ability of the boards of education and the administrators that the Associations serve to maintain order and discipline within their schools. The Associations respectfully urge this Court to affirm the Southern District's denial of the requested preliminary injunction and leave the policies of the Olentangy Local School District ("Olentangy" or "District") intact. The policies under challenge[2] ("Policies") have also been adopted by school districts throughout Ohio; either with identical language or with minimal deviation. Harassment and bullying by identity-based comments directed at specific students is speech that school districts must have the ability to limit to prevent substantial disruption in the school.

As such, the stakes are high for the Associations' collective membership. The boards of education and school district administrators served by the Associations rely on the rule first articulated in *Tinker* to adopt and enforce policies that aim to prohibit speech or expression that substantially disrupts the learning environment or encroaches on the rights of other students. Any erosion of the *Tinker* rule, or an

---

[2] Appellant challenges the validity of Olentangy's Board Policy 5517 – *Anti-harassment*, Board Policy 5136 – *Personal Communication Devices*, and the *Use of Obscene or Discriminatory Language / Materials / Actions / Gestures* and *Hazing, Harassment, Intimidation, Bullying, and Sexual Harassment* provisions of the High School Student Handbook, 2022-2023 ("Code of Conduct), generally authorized by Board Policy 5500 – *Student Conduct*. *See* Opinion at Page ID # 810-11.

express limitation on the ability of school districts to discipline students for identity-based comments directed at specific students are outcomes that must be avoided so that school districts may retain flexible authority to discipline behavior that results in substantial disruption in the school setting.

## INTRODUCTION

The Associations embrace the adage that public schools are the "nurseries of democracy," and recognize the importance of protecting the "marketplace of ideas." *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy,* 141 S.Ct. 2038, 2046 (2021). Increasingly, however, the romantic notion of the "nursery" gives way to the reality that public schools are microcosms of the broader world's societal controversies. Teachers and school district administrators thus walk a proverbial tightrope when called upon to protect students' First Amendment rights while simultaneously maintaining an environment conducive to the education of children. Just as Olentangy carefully clarified to an anonymous parent, the Associations' members do not seek to stifle thoughtful debate, respectful argument, or general expression of religious beliefs. The Associations' members do not seek to declare winners and losers, nor do they have an interest in advancing one viewpoint above another. However, school districts have an interest in preventing specific harms to specific people when it has the potential to disrupt and/or interfere with a school's basic mission: educating students.

Any argument invoking *Tinker* cannot commence without first reciting the phrase that has become axiomatic of student expression in the five decades since the landmark case was decided: students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). This principle is properly juxtaposed by a recognition of the need of school officials to retain "comprehensive authority … to prescribe and control conduct in the schools." *Id.* at 507 (citing *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) and *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923)). This highlights the universal understanding and recognition of the need to balance the First Amendment rights of students against the school districts' imperative to maintain control, order and discipline over their schools and their pupils.

*Tinker* initially struck the balance between these two important interests by establishing a standard whereby school districts may proscribe student speech or expression that causes a substantial disruption in the educational environment or invades the rights of others. *Id.* at 513. Through the years, *Tinker*'s progeny has adapted this fundamental standard to the contemporary issues of the evolving

schoolhouse; but the delicate balance between the rights of students and the interests of the schools has been preserved.[3]  Today, that balance is in jeopardy.

Invalidating Olentangy's policies, policies that are shared either in form or substance by many school districts in Ohio – or worse yet, declaring that identity-based comments directed by some students toward a specific student enjoy absolute First Amendment protection thereby categorically preventing school districts from prohibiting it *under any circumstance* – will only serve to upset the balance and hinder the ability of school administrators to maintain control and discipline within their schools.

This matter arose from a concerned Olentangy parent inquiring as to whether their child would face discipline under the district's various non-discrimination policies ("Policies") for using pronouns inconsistent with a transgender student's stated gender identity.  *See* Opinion and Order Denying Preliminary Injunction ("Opinion"), R. 28, Page ID # 816.  Notably, the district has not enforced the Policies

---

[3] Following *Tinker*, the Supreme Court has addressed student speech on several occasions and has long-recognized the need to balance the First Amendment rights of students with school districts' interest in maintaining discipline in schools.  *See Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 681 (1986) ("The undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior."); *Hazelwood v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (citing *Fraser* at 685, "A school need not tolerate student speech that is inconsistent with its 'basic educational mission[.]'"); *Morse v. Frederick*, 551 U.S. 393, 410 (2006) ("The First Amendment does not require schools to tolerate at school events student expression that contributes to those dangers."); *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2044 (2021) (citing *Hazelwood* at 266, "[C]ourts must apply the First Amendment 'in light of the special characteristics of the school environment.'").

or disciplined any students for these kind of comments, or any other speech directed at or about transgender students.  *Id.*  Below the Associations examine how policies limiting the use of identity-based comments directed at a specific student fit neatly within *Tinker*'s purview.

## ARGUMENT

The Associations understand that Appellant appeals the Southern District's denial of its requested preliminary injunction seeking to enjoin Olentangy from enforcing the Policies.  Accordingly, this Court reviews whether Appellant's First Amendment claims, among others, present a substantial likelihood of success on their merits.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Though in doing so, this Court will necessarily address the *Tinker* standard, and potentially alter its course.

The Policies, which seek to prevent identity-based comments directed at specific students, pass muster under either of *Tinker'*s prongs.  Identity-based comments directed toward a specific student certainly have the potential to cause substantial disruption in the school environment.  The Southern District found that identity-based comments aimed at a specific student can "cut to the core of who we are as individuals and belittle our sense of place in society … reinforc[ing] a feeling of inferiority[.]"  *Id.* at Page ID # 831, citing *Brown v. Bd. of Educ.*, 347 U.S. 483, 494 (1954).  Such behavior can have severe effects on a student's educational

performance, and as such, school districts may "reasonably forecast" that substantial disruption will follow. Moreover, repeated identity-based comments, if left unchecked, may amount to an "invasion" of the targeted students' rights, including those bestowed by state law. Whether this behavior occurs in person or online, school districts have the ability to prevent the disruptive and harmful consequences that follow and are likely to directly impact the schools' environment and students' ability to participate or benefit from the school districts' educational programs and activities.

### The Policies prevent speech that would cause substantial disruption in the school environment.

*Tinker*'s first and most commonly applied prong allows school districts to regulate student speech and expression that causes substantial disruption in the school environment. *Tinker*, 393 U.S. at 513. Disruption need not actually occur before a school district may step in and regulate speech, nor must any disruption occur with certainty – in other words, school officials need not "wait until the horse has left the barn before closing the door." *Lowery v. Euverard*, 497 F.3d 584, 592-93 (6th Cir. 2007). However, for a school district to regulate speech *before* disruption occurs, the anticipated disruption must be "reasonably forecast" to follow. *Kutchinski v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 359 (6th Cir. 2023) (citing *Barr v. Lafon*, 538 F.3d 554, 565 (6th Cir. 2008)).

As the Seventh Circuit emphasizes:

> School authorities are entitled to exercise discretion in determining when student speech crosses the line between hurt feelings and substantial disruption of the educational mission, because they have the relevant knowledge and responsibility for the consequences.

*Zamecnik v. Indian Prairie School Dist. #204*, 636 F.3d 874, 877-78 (7th Cir. 2011). There is practical wisdom in this deference. A requirement to rely on evidence of past disruption is too rigid a standard. It would deny school districts the flexibility to be proactive, and instead force them to *react* to a disruption that otherwise could have been prevented. In *Lowery*, this Court recognized the potential conundrum: "school officials would be between the proverbial rock and hard place: either they allow disruption to occur, or they are guilty of a constitutional violation." 497. F.3d at 596.

In *Mahanoy*, the majority declined to "set forth a broad, highly general First Amendment rule" concerning the nature of off-campus speech and the extent to which school districts may regulate it. 141 S.Ct. at 2045. However, the majority did recognize schools' important interest in regulating speech amounting to "serious or severe bullying or harassment targeting particular individuals," even when such speech may occur off-campus. *Id.* at 2044-45.

Comments of the kind controlled by the policies in this case, such as identity-based comments directed at individual students, can constitute "harassment" or

"bullying" under definitions contained in the Policies,[4] and necessarily "target" an individual by virtue of the conventions of language.  The discipline of students for engaging in this type of speech would not merely be borne out of a desire to avoid "the discomfort and unpleasantness [of] an unpopular viewpoint," but rather, out of a legitimate and important need for orderly and effective instruction and student protection."  *Id.* at 2054 (Alito, J., concurring); *see Tinker*, 393 U.S. at 509.

Here, Olentangy's Policies, as written, are consistent with *Tinker*'s substantial disruption requirement and should survive facial challenge.  Further, classroom disruption resulting from the identity-based comments of the kind controlled by the policies and directed toward specific students can be "reasonably forecast," and thus may be specifically regulated by school districts.  Further still, comments of this kind constitute the "serious or severe bullying or harassment targeting particular individuals," that *Mahanoy* permits school districts to regulate – whether it takes place on or off-campus.

### A.    The Policies are tied directly to *Tinker*'s "substantial disruption" standard and should survive facial challenge.

Board Policy 5517 – *Anti-Harassment*, Board Policy 5136 – *Personal Communication Devices*, and the relevant Code of Conduct provisions contain

---

[4] Beyond the board policies under direct challenge, identity-based comments directed at specific students could also fit within the definition of "bullying" contained in Board Policy 5517.01 – *Bullying and Other Forms of Aggressive Behavior* or constitute "cyberbullying" in the context of off-campus speech using personal communication devices.

language that directly limits their scope to touch upon speech that is permissibly regulated under *Tinker*.

### 1.    Board Policy 5517 – *Anti-Harassment*:

Board Policy 5517 prohibits several categories of behavior generally identified as harassment.  *See* Policy 5517, R.7-1, Page ID# 120-31.  The policy defines "harassment" as:

> [A]ny threatening, insulting, or dehumanizing gesture, use of technology, or written, verbal, or physical conduct directed against a student or school employee that:
>
> A. places a student or school employee in a reasonable fear of harm to his/her person or damage to his/her property;
>
> B. has the effect of substantially interfering with a student's educational performance, opportunities, or benefits, or an employee's work performance; or
>
> C. has the effect of ***substantially disrupting the orderly operation of a school.***

*Id.* at Page ID# 122-23 (emphasis added).  By definition, speech constituting "harassment" under Board Policy 5517's Paragraph C necessarily implicates *Tinker*'s substantial disruption standard.  Threatening speech prohibited by Paragraph A would most likely be considered disruptive.  *See Mahanoy Area Sch. Dist. v. B.L.*, 141 S.Ct. 2038, 2045 (2021); *see Morse v. Frederick*, 551 U.S. 393, 425 (2007) (Alito, J., concurring).  Likewise, any speech causing substantial interference with a student's "educational performance, opportunities, or benefits" under

Paragraph B would cause disruption by undermining the school district's basic mission of educating its students. *See Bethel v. Fraser*, 478 U.S. 675, 685 (1986).

*Tinker*'s safeguards are implicitly built into Policy 5517's definition of "sexual harassment." That definition contains the following language:

> "Sex-based or gender-based conduct must be sufficiently severe, pervasive, and persistent such that it adversely affects, limits, or denies an individual's … education, or such that it creates a hostile … educational environment, or … has the effect of denying or limiting a student's ability to participate in or benefit from the educational program or activities.

R. 7-1, at Page ID# 124. By the same logic as employed above, Board Policy 5517's definition of "sexual harassment" grounds its regulation of speech in *Tinker*, as speech that disrupts a district's basic educational mission by denying students the ability to participate in or benefit from the district's educational program or activities.

The remaining categories of harassment proscribed by Board Policy 5517 are tethered to the *Tinker* standard in similar fashion. The policy further prohibits Race/Color, Religious (Creed), National Origin/Ancestry, and Disability Harassment. *Id*. All four additional categories of harassment include identical language, identifying behavior that would have the effect of "interfering with one's ability to participate in or benefit from a class or an educational program or activity," as a type of harassment. *Id.* Again, interference with a student's ability to participate

11

in an educational program or activity would necessarily disrupt the District's mission to educate.

Moreover, all distinct types of harassment defined by the policy include components whereby speech creating a "hostile environment" equate to harassment. *Id*. The existence of hostile environment in the educational setting interferes with a student's ability to learn, thus undermining the school's basic educational mission. *See Fraser* at 685.

Board Policy 5517's language does not "presume away" *Tinker*'s substantial disruption standard, and does not require that one "read a disruption standard into the policy," a practice criticized by the Third Circuit in *Sypniewski v. Warren Hills Regional Bd. of Educ.*, 307 F.3d 243, 262 (3rd Cir. 2002). The disruption standard is already there in black and white – providing the required "substantial textual anchor." *Id.* Because the types of harassing speech prohibited by Board Policy 5517 may be constitutionally regulated in accordance with *Tinker*'s substantial disruption standard, the policy is facially constitutional.

### 2. Board Policy 5136 – *Personal Communication Devices*

In similar fashion to Board Policy 5517, Board Policy 5136 – *Personal Communication Devices* contains textual limitations on its scope and is tied to *Tinker*'s standard for regulation of student speech. The portion of the policy at issue reads:

Students may not use a PCD in any way that might reasonably create in the mind of another person an impression of being threatened, humiliated, harassed, embarrassed or intimidated. See Policy 5517.01 – Bullying and Other Forms of Aggressive Behavior. In particular, students are prohibited from using PCDs to: (1) transmit material that is threatening, obscene, disruptive, or sexually explicit or that can be construed as harassment or disparagement of others based upon their race, color, national origin, sex (including sexual orientation/transgender identity), disability, age, religion, ancestry, or political beliefs[.]

Board Policy 5136, R.7-1, Page ID# 134.

On first reading, the first sentence of the excerpt may appear to cover an impermissibly broad category of speech. However, the subsequent sentence cross-referencing Board Policy 5517.01 provides critical context and a nexus to *Tinker* within the policy's language. Board Policy 5517.01 – *Bullying and Other Forms of Aggressive Behavior* is required by Ohio Revised Code "(O.R.C.)" § 3313.666 and incorporates the statute's definition of "harassment, intimidation, or bullying" into its text.[5] By referencing Board Policy 5517.01, Board Policy 5136 frames the behavior described in the first sentence within the definition contained therein – limiting punishable speech to that which "both causes mental or physical harm to the other student(s) and is sufficiently severe, persistent, or pervasive that it creates

---

[5] O.R.C. § 3313.666 and Board Policy 5517.01 both define "harassment, intimidation, or bullying," in relevant part, as: "any intentional written, verbal, electronic, or physical act that a student or group of students exhibits toward another particular student(s) more than once and the behavior both causes mental or physical harm to the other student(s) and is sufficiently severe, persistent, or pervasive that it creates an intimidating, threatening, or abusive educational environment for the other student(s)[.]"

an intimidating, threatening, or abusive educational environment for the other student(s)."  Within this context, speech that meets this definition should be considered to have the potential to cause disruption.

The third sentence's connection to *Tinker* is even clearer.  As discussed above, the ability of schools to punish actual threats is not in dispute.  Nor is a school's ability to punish obscenity or sexually explicit speech.  *See Fraser*, 478 U.S. at 685-86.  "Disruptive" speech necessarily invokes the *Tinker* standard.  With respect to the "harassment or disparagement" category, Board Policy 5517.01's statutorily-required definitions are again incorporated by reference.  With the defined types of speech addressed by the policy firmly rooted in state law, coupled with such speech's potential for disruption, the "harassment or disparagement" category passes muster.  *See Sypniewski*, 307 F.3d at 264 ("a particular form of harassment or intimidation can be regulated by [school districts] only if it meets the requirements of *Tinker*; that is, if the speech at issue gives rise to a well-founded fear of disruption or interference with the rights of others").

With Board Policy 5136's textual connections to the *Tinker* standard clearly identified, the policy should withstand facial attack.

### 3.    Code of Conduct Provisions

Both the *Hazing, Harassment, Intimidation, Bullying and Sexual Harassment* and *Use of Obscene or Discriminatory Language / Materials / Actions / Gestures*

provisions of the Code of Conduct should survive facial attack because they both contain appropriate textual limitations on the types of speech they seek to regulate.

The *Hazing, Harassment, Intimidation, Bullying and Sexual Harassment* provision defines "harassment, intimidation, and bullying," in relevant part, as:

> Any intentional written, verbal, electronic, or physical act that a student has exhibited toward another particular student or students more than once and the behavior causes mental or physical harm to the other student(s) and is sufficiently severe, persistent or pervasive that it creates an intimidating, threatening or abusive educational environment for the other student(s).

R.7-1, Page ID# 157.  This definition is identical to the one set forth in Board Policy 5517.01 – *Bullying and Other Forms of Aggressive Behavior*.  As previously discussed, this definition is directly required by state law in O.R.C. § 3313.666.  *See* Note #4, *supra*.  With the exact same language as Board Policy 5517.01's definition of "harassment, intimidation, and bullying" incorporated by reference into Board Policy 5136, this Code of Conduct provision is facially valid for the same reasons as Board Policy 5136.

The Code of Conduct's *Use of Obscene or Discriminatory Language / Materials / Actions / Gestures* provision reads, in its entirety:

> Students shall not use obscene, vulgar, profane or discriminatory language, make inappropriate gestures / actions or possess vulgar materials. Note: Discriminatory language is defined as verbal or written comments, jokes, and slurs that are derogatory towards an individual based on one or more of the following characteristics: race, color,

national origin, sex (including sexual orientation and transgender identity), disability, age, religion, ancestry or genetic information.

R.7-1, Page ID# 150.  It is well-settled that school districts may regulate "vulgar" speech that occurs on campus.  *See Fraser*, 478 U.S. at 683-684.  As such, the prohibition against using "obscene," "vulgar," or "profane" language does not appear at issue.  Particularly offensive to Appellant is the provision's definition of "discriminatory language."

The categories of derogatory comments, jokes, and slurs that this provision prohibits constitute "attacks on the social standing of individual students on account of their identity, rather than pure disagreements with their choices or beliefs." Opinion, R.28, Page ID# 835.  As recognized by the Southern District, "comments, slurs, and jokes rooted in an individual's identity and in their personal characteristics," are likely to have the disruptive effect of creating a hostile environment for the target of such speech.  *Id.* at Page ID# 831.

Because the Code of Conduct provisions prohibit speech that is likely to cause substantial disruption, they must withstand facial challenge.

**B.    School districts may reasonably forecast, and adopt policies guarding against, substantial disruption caused by identity-based comments directed at specific students.**

Given the pre-enforcement nature of Appellant's challenge to Olentangy's Policies, it should be noted that no students have yet been disciplined for violations

16

of the Policies due to behavior about which the Appellant is concerned. Opinion, R.28, Page ID # 816. With no specific facts to work with, one can only address the hypothetical. However, it remains an important objective for the Associations to advocate for the flexibility of school districts to regulate student speech, within the confines of *Tinker* and its progeny, where that speech may give rise to substantial disruption in school.

The Southern District engaged in a thoughtful and informed discussion of the negative effects that the identity-based comments in this situation may cause targeted students to suffer within the educational setting and beyond. *See id.,* Pages ID# 831-37. The contemporary scholarship relied upon by the District Court recognizes a multitude of potential harms that these students face, from poor academic performance and a hampered ability or willingness to learn, to being the victims of bullying and violence at school, and even demonstrating higher rates of suicide. *Id.*

These harmful outcomes would indeed be "symptoms of substantial disruption." *See Nuxoll ex rel. Nuxoll v. Indian Prairie School Dist. #204*, 523 F.3d 668, (7th Cir. 2008) (noting that "that if there is reason to think that a particular type of student speech will lead to a decline in students' test scores, an upsurge in truancy, or other symptoms of a sick school—symptoms therefore of substantial disruption—the school can forbid the speech"). Accordingly, even in the absence of evidence that these harms would consistently occur with certainty, Olentangy and the school

districts of Ohio may exercise their discretion in forecasting substantial disruption resulting from identity-based comments directed at specific students. *See Kutchinksi*, 69 F.4th at 359 (citing *Lowery*, 597 F.3d at 592); *Zamecnik*, 636 F.3d at 877-78.

One key issue in this situation is local control. In Ohio, locally elected school board members are responsible for determining policy and establishing procedures, within the confines of federal and state constitutions, laws and regulations. District leaders must be able to respond to situations that are occurring, or that they can reasonably anticipate will occur, within their buildings, their student bodies, and their communities, when those situations are likely to result in substantial disruption. School boards must be able to work with their legal counsel and policy providers to craft measured policies and procedures that protect students from discrimination, harassment, intimidation and bullying while balancing Constitutional protections consistent with *Tinker*. In this instance, that is what the Olentangy Board of Education has done: acted within the scope of local control, and within the confines of the Constitution as interpreted in *Tinker*, to craft policies that protect all students in the District from the substantial disruption that the Board of Education has determined would likely result from identity-based comments targeting specific students.

# CONCLUSION

As discussed herein, Olentangy's Policies are facially constitutional, and the use of identity-based comments directed at specific students constitutes speech that is likely to cause substantial disruption under the *Tinker* standard. For that reason, the Associations respectfully urge this Court to affirm the Southern District's denial of Appellant's requested preliminary injunction.

*/s/ Scott C. Peters*
Scott C. Peters (0059408)
Sherrie C. Massey (0067471)
Daniel R. Shisler (0098943)
Peters Kalail & Markakis Co., L.P.A.
6480 Rockside Woods Blvd. S., Suite 300
Cleveland, Ohio 44131
Telephone:  (216) 503-5055
speters@ohioedlaw.com
smassey@ohioedlaw.com
dshisler@ohioedlaw.com

*Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the word limit requirements of Fed. R. App. P. 29(a)(5) because it contains 4,260 words, excluding the parts of the document exempted from calculation by Fed. R. App. P. 32(f), as calculated by Microsoft Word.

I further certify that this document complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface with 14-point Times New Roman font using Microsoft Word.

*/s/ Scott C. Peters*
Scott C. Peters (0059408)
*One of the Attorneys for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2023, an electronic copy of the *Ohio School Boards Association and Ohio Association of School Business Officials Brief of Amicus Curiae* was filed with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

*/s/ Scott C. Peters*
Scott C. Peters (0059408)
*One of the Attorneys for Amici Curiae*