# IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

PARENTS DEFENDING EDUCATION

*Plaintiff-Appellant*,

v.

OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, ET AL.,

*Defendants-Appellees*.

On Appeal from the United States District Court for the
Southern District of Ohio, No. 2:2-cv-01595 (Marbley, J.)

## SUPPLEMENTAL EN BANC BRIEF OF PLAINTIFF-APPELLANT PARENTS DEFENDING EDUCATION

Emmett E. Robinson
ROBINSON LAW FIRM LLC
6600 Lorain Ave. #731
Cleveland, OH 44102
Telephone: (216) 505-6900
Facsimile: (216) 649-0508
erobinson@robinsonlegal.org

J. Michael Connolly
Cameron T. Norris
Thomas S. Vaseliou
Paul R. Draper
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for Plaintiff-Appellant*

December 11, 2024

# TABLE OF CONTENTS

Table of Authorities.................................................................................................ii

Introduction ..............................................................................................................1

Background ................................................................................................................2

Argument....................................................................................................................8

    I.     Olentangy's recent changes to some of the challenged policies do not
           meaningfully change this appeal..........................................................8

    II.    Contra the panel, Olentangy's policies likely violate the First
           Amendment......................................................................................11

           A.    *Tinker* ....................................................................................12

           B.    Viewpoint discrimination ...................................................16

           C.    Compelled speech................................................................18

           D.    Overbreadth .........................................................................19

    III.   The remaining factors favor granting PDE a tailored preliminary
           injunction. .......................................................................................23

Conclusion ..............................................................................................................25

Certificate of Compliance .....................................................................................26

Certificate of Service..............................................................................................26

# TABLE OF AUTHORITIES

## Cases

*303 Creative v. Elenis,*
600 U.S. 570 (2023) ................................................................19

*AFPF v. Bonta,*
594 U.S. 595 (2021) ................................................................19

*Alabama v. U.S. Sec'y of Educ.,*
2024 WL 3981994 (11th Cir. Aug. 22) .........................................23

*Ashcroft v. ACLU,*
542 U.S. 656 (2004) ................................................................15

*Bailey v. Iles,*
87 F.4th 275 (5th Cir. 2023) ......................................................21

*Barr v. Lafon,*
538 F.3d 554 (6th Cir. 2008) .....................................1, 12, 15, 18

*Bays v. City of Fairborn,*
668 F.3d 814 (6th Cir. 2012) .................................................. 8, 23

*Brown v. EMA,*
564 U.S. 786 (2011) ................................................................12

*Cam I, Inc. v. Louisville/Jefferson Cnty. Metro Gov't,*
460 F.3d 717 (6th Cir. 2006) .................................................. 9, 10

*Castorina v. Madison Cnty. Sch. Bd.,*
246 F.3d 536 (6th Cir. 2001) ................................14, 15, 16, 17, 21

*Chabad of S. Ohio & Congregation Lubavitch v. Cincinnati,*
363 F.3d 427 (6th Cir. 2004) ......................................................25

*Connection Distributing Co. v. Holder,*
557 F.3d 321 (6th Cir. 2009) ................................................ 20, 24

*Dahl v. Bd. of Trs. of WMU,*
15 F.4th 728 (6th Cir. 2021) ......................................................23

*Davis v. Monroe Cnty. Bd. of Educ.,*
526 U.S. 629 (1999) ........................................................6, 23, 24

*Dep't of Educ. v. Louisiana,*
603 U.S. 866 (2024) ..................................................................6

*Doe v. Cooper,*
842 F.3d 833 (4th Cir. 2016) ......................................................20

*Fischer v. Thomas,*
  52 F.4th 303 (6th Cir. 2022) ...................................................... 23

*G&V Lounge v. Mich. Liquor Control Comm'n,*
  23 F.3d 1071 (6th Cir. 1994) ...................................................... 25

*Gonzales v. O Centro,*
  546 U.S. 418 (2006) .................................................................. 15

*Green v. Miss USA,*
  52 F.4th 773 (9th Cir. 2022) ...................................................... 11

*Houston v. Hill,*
  482 U.S. 451 (1987) .................................................................. 22

*Iancu v. Brunetti,*
  588 U.S. 388 (2019) ............................................................ 16, 21

*Ison v. Madison Loc. Sch. Dist. BOE,*
  3 F.4th 887 (6th Cir. 2021) .................................................. 17, 21

*Janus v. AFSCME,*
  585 U.S. 878 (2018) .................................................................. 18

*John Doe No. 1 v. Reed,*
  561 U.S. 186 (2010) .................................................................. 10

*Kennedy v. Bremerton Sch. Dist.,*
  597 U.S. 507 (2022) ............................................................ 13, 15

*Kutchinski v. Freeland CSD,*
  69 F.4th 350 (6th Cir. 2023) ...................................................... 13

*L.D. Mgmt. v. Gray,*
  988 F.3d 836 (6th Cir. 2021) ...................................................... 17

*L.W. v. Skrmetti,*
  83 F.4th 460 (6th Cir. 2023) ........................................................ 2

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy,*
  594 U.S. 180 (2021) .................................................................. 12

*Matal v. Tam,*
  582 U.S. 218 (2017) .................................................................. 16

*McCauley v. Univ. of V.I.,*
  618 F.3d 232 (3d Cir. 2010) ...................................................... 23

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021) ........................ 1, 11, 14, 15, 16, 17, 18, 19

*Moody v. NetChoice*,
144 S.Ct. 2383 (2024) .................................................................... 20

*N.J. ex rel. Jacob v. Sonnabend*,
37 F.4th 412 (7th Cir. 2022) ......................................................... 13

*Nat'l Fed'n of the Blind of Tex. v. Abbott*,
647 F.3d 202 (5th Cir. 2011) ......................................................... 22

*Newsom v. Norris*,
888 F.2d 371 (6th Cir. 1989) ......................................................... 25

*Norris v. Cape Elizabeth Sch. Dist.*,
969 F.3d 12 (1st Cir. 2020) ........................................................... 15

*Parents Protecting Our Child. v. Eau Claire ASD*,
2024 WL 5036271 (U.S. Dec. 9) .................................................... 14

*PDE v. Linn Mar CSD*,
83 F.4th 658 (8th Cir. 2023) .......................................................... 22

*R.A.V. v. St. Paul*,
505 U.S. 377 (1992) ................................................................ 16, 21

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ........................................................................ 12

*Saxe v. State Coll. Area Sch. Dist.*,
240 F.3d 200 (3d Cir. 2001) ................................... 12, 13, 21, 22

*SBA List v. Driehaus*,
573 U.S. 149 (2014) ........................................................................ 13

*Sisters for Life v. Louisville-Jefferson Cnty.*,
56 F.4th 400 (6th Cir. 2022) ..................................................... 21, 23

*Speech First v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022) ..................................................... 22

*Speech First v. Schlissel*,
939 F.3d 756 (6th Cir. 2019) ......................................................... 11

*State v. Loe*,
692 S.W.3d 215 (Tex. 2024) ............................................................ 2

*Tennessee v. Cardona*,
2024 WL 3453880 (6th Cir. July 17) .............................................. 6

*Tennessee v. Cardona*,
2024 WL 3631032 (E.D. Ky. July 10) ............................................. 6

*Texas v. Johnson*,
    491 U.S. 397 (1989) ................................................................................17

*TGP Commc'ns v. Sellers*,
    2022 WL 17484331 (9th Cir. Dec. 5) ....................................................25

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) ..............................................................1, 13, 14, 15

*United States v. Sineneng-Smith*,
    590 U.S. 371 (2020) ................................................................................24

*Vlaming v. W. Point Sch. Bd.*,
    895 S.E.2d 705 (Va. 2023) ......................................................................11

*W.V. Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ..................................................................1, 12, 18

*Young v. Giles Cnty. BOE*,
    181 F. Supp. 3d 459 (M.D. Tenn. 2015) ................................................14

*Zamecnik v. Indian Prairie Sch. Dist. No. 204*,
    636 F.3d 874 (7th Cir. 2011) ..................................................................22

## Other Authorities

*Amended Policy 5136*, Olentangy Schs.,
    perma.cc/3LA4-LTEE (last revised Sept. 26, 2024) ................................6

*Amended Policy 5517*, Olentangy Schs.,
    perma.cc/LK9F-WSMM (last revised Sept. 26, 2024) ......................... 5, 22

*H.S. Student Handbook 2024-2025*, Olentangy Schs.,
    perma.cc/G646-BTXP ............................................................................3

Henry, *Ohio Gov. Mike DeWine Signs Transgender Bathroom Ban Bill into Law*,
    Ohio Capital J. (Nov. 27, 2024), perma.cc/SR64-BM6U ...........................2

*Policy 2266*, Olentangy Schs.,
    perma.cc/G8ZR-YUJ6 (last revised Sept. 26, 2024) ....................... 6, 23, 24

## Regulations

34 C.F.R. §106.10 ................................................................................................6

34 C.F.R. §106.2 (2024) ......................................................................................6

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
    Federal Financial Assistance, 85 FR 30,026 (May 19, 2020) .......................6

**INTRODUCTION**

Under *Meriwether v. Hartop*, public colleges cannot punish professors for using pronouns that match students' sex. 992 F.3d 492 (6th Cir. 2021). School policies on harassment and discrimination violate the First Amendment when they require speakers to use "preferred pronouns." *Id.* at 498-99, 501. They punish speakers based on "viewpoint." *Id.* at 509. They "compe[l]" speech. *Id.* at 510. And they cannot be justified based on unproven fears of disruption. *Id.* at 511.

The question on rehearing is whether *Meriwether*'s reasoning disappears when the speaker is a *student* and the censor is a *K-12* school. The answer is no. Children have, if anything, greater speech rights at school than state employees do at work. Panel-Dis. (CA6-Doc.89) at 38. Schools have no more authority than colleges to engage in viewpoint discrimination. *Barr v. Lafon*, 538 F.3d 554, 571 (6th Cir. 2008). They have no more authority to compel speech. *W.V. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). And when they submit no evidence that their speech restrictions are necessary to prevent substantial disruption, they're supposed to lose. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969).

Because Olentangy's policies ban students from using non-preferred pronouns (and more), Parents Defending Education is entitled to a preliminary injunction. The reasons why are fully explored in PDE's briefs to the panel. *See* Blue-Br. (CA6-Doc.28); Gray-Br. (CA6-Doc.79). This supplemental brief will focus on what has happened since: why Olentangy's minor changes to some of the challenged policies do not affect

the question presented, why the panel majority erred on the likely merits, and why the panel majority erred on the other factors. This Court should not follow the now-vacated panel opinion. It should reverse the district court, and Olentangy should be preliminarily enjoined from punishing students for "misgendering" other students.

## BACKGROUND

In response to the recent surge of children identifying as transgender, *see L.W. v. Skrmetti*, 83 F.4th 460, 468 (6th Cir. 2023), Ohio's fourth largest school district adopted an "affirming" approach. Under this worldview, individuals' "'sex assigned at birth'" can differ from their "'gender identity'" and, when it does, "gender identity should be given priority." *State v. Loe*, 692 S.W.3d 215, 239 (Tex. 2024) (Blacklock, J., concurring). So when students "consistently, persistently, and insistently" express a "gender that differs from their sex-assigned-at-birth," Olentangy affirms their stated gender. Reporting Guidelines, R.7-1, PageID#202-03. It ensures that, for example, a male who identifies as female can play girls' sports, use the girls' bathroom, and room with girls on overnight trips. Transgender Guidelines, R.7-1, PageID#196-97. *But see* Henry, *Ohio Gov. Mike DeWine Signs Transgender Bathroom Ban Bill into Law*, Ohio Capital J. (Nov. 27, 2024), perma.cc/SR64-BM6U. Olentangy's staff also use the "name and pronoun" that matches students' gender identity. Transgender Guidelines, R.7-1, PageID#195. And in most cases, staff cannot "out" older students by telling their parents that they're expressing a different gender identity at school. PageID#196.

Olentangy makes its students conform their speech to this worldview. A concerned parent emailed the school in late February 2023, asking for an "official statement" on whether her "devoutly Christian child" would be punished for not "usin[g] the pronouns that a transgender child identifies with." Emails, R.7-2, PageID#357. When Olentangy's lawyer responded "on behalf of the District," she confirmed that "Board Policy" and "the code of conduct" forbid students from "purposefully referring to another student by using gendered language they know is contrary to the other student's identity." PageID#356. Students' constitutional "rights," the lawyer added, "do not relieve them of th[is] obligation"; students "must comply with Board Policy and school rules." PageID#356. In a follow-up email, the lawyer offered to "discuss accommodations" for "religious" students, though the idea was that these students would "avoid using pronouns" altogether. PageID#355.

Olentangy's policies are a maze of overlapping, internally contradictory restrictions on speech; but all agree that four policies ban students from using non-preferred pronouns: two provisions of the code of conduct, Board Policy 5517, and Board Policy 5136. *See* Panel-Maj.18; PI-Order, R.28, PageID#829; Red-Br. (CA6-Doc.65) at 4. After PDE petitioned for rehearing, Olentangy amended the two board policies. Rehearing-Opp. (CA6-Doc.126) addend. But Olentangy made no changes to the code provisions. *Compare* Code of Conduct, R.7-1, PageID#150, 157-58, *with H.S. Student Handbook 2024-2025*, at 15, 23, Olentangy Schs., perma.cc/G646-BTXP. And Olentangy agrees that all four policies still ban students from using non-preferred pronouns.

*See* Rehearing-Opp.3-4. Students who violate these policies face a range of punishments. R.7-1, PageID#129, 134, 149. PDE will discuss the policies as they exist today.

**Code of Conduct**: Olentangy's code of conduct appears in the student handbook. The code governs student conduct, whether on or off campus, that's "connected to" the school. R.7-1, PageID#136, 149. The handbook never discusses the First Amendment, except to say that students' "right" is "not unlimited" and does not include "speech that … violates the Code of Conduct." PageID#177. Olentangy has "zero tolerance" for code violations. PageID#136, 149. The code lists 24 violations, including a catch-all for "[o]ther conduct violations not covered." PageID#150-53.

One of the code's violations contains a ban on "discriminatory language." Discriminatory language is "verbal or written comments, jokes, and slurs that are derogatory towards an individual or group based on one or more of the following characteristics: race, color, national origin, sex (including sexual orientation and transgender identity), disability, age, religion, ancestry, or genetic information." PageID#150.

Another violation contains a ban on "harassment." This ban is violated by "any intentional written, verbal, electronic, or physical act" toward "particular" students that occurs "more than once," "causes mental or physical harm," and is "sufficiently severe, persistent or pervasive that it creates an intimidating, threatening or abusive educational environment." PageID#150, 157. That environment exists when the harassment "interferes with or limits" a student's "ability to participate in or benefit from" a school program. PageID#150. Harassment is "strictly prohibited"; "sexist … comments" in

particular "will not be tolerated" and "will result in suspension." PageID#157-58. This policy is violated even when students have the listener's "permission" or "consent," and even when students merely "plan" or "encourage" the harassment. PageID#158.

**Policy 5517**: Policy 5517 bans "discriminatory harassment." *Amended Policy 5517*, Olentangy Schs., perma.cc/LK9F-WSMM (last revised Sept. 26, 2024). This "unlawful" harassment is based on one of several "Protected Classes," including "gender identity." *Id.* The policy has a general definition of "harassment" that, for students, bans

> any threatening, insulting, or dehumanizing gesture, use of technology, or written, verbal or physical conduct directed against a student … that:
>
> A. places a student … in reasonable fear of harm to their person or damage to their property;
>
> B. has the effect of substantially interfering with a student's educational performance, opportunities, or benefits …; or
>
> C. has the effect of substantially disrupting the orderly operation of a school.

*Id.* Policy 5517 also gives examples of specific types of harassment that fit the general definition, including "sexual harassment" and "bullying." *Id.* (Though Olentangy's recent amendments tweaked the definition of bullying, Olentangy agrees that the changes are cosmetic and do not change the policy's scope. Rehearing-Opp.12.) Policy 5517 is "vigorously" enforced. *Amended Policy 5517*. It can be violated by "negative comments"; nonsexual "[v]erbal … hostility" based on "sex stereotyping"; and "gender-based conduct" that "is intended to, or has the effect of, denying or limiting a student's ability to participate in or benefit from" a program or activity. *Id.*

Policy 5517 says it does not cover "Sexual Harassment covered by Policy 2266," *id.*, which is the policy that Olentangy uses to comply with "Title IX," *Policy 2266*, Olentangy Schs., perma.cc/G8ZR-YUJ6 (last revised Sept. 26, 2024). Policy 2266 defines sexual harassment to include "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, ***and*** objectively offensive that it effectively denies a person equal access to the District's education program or activity." *Id.* (emphasis in original). This definition incorporates the Trump administration's Title IX rule, which in turn incorporates the Supreme Court's definition of Title IX harassment in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999). *See* 85 FR 30,026, 30,162-65 & nn.738-39, 30,037 (May 19, 2020). The Biden administration issued a new Title IX rule that defines harassment more broadly. 34 C.F.R. §106.2 (2024). But that definition is preliminarily enjoined because it likely violates Title IX and the First Amendment. *Tennessee v. Cardona*, 2024 WL 3631032 (E.D. Ky. July 10), *denying stay*, 2024 WL 3453880 (6th Cir. July 17), *denying stay*, 603 U.S. 866 (2024). Like the Biden administration's rule, Olentangy's Policy 2266 covers "gender identity." *Policy 2266*; 34 C.F.R. §106.10.

**Policy 5136**: Olentangy allows students to use cell phones, laptops, and other personal devices at school, and Policy 5136 regulates students' use of those devices on and off campus. *Amended Policy 5136*, Olentangy Schs., perma.cc/3LA4-LTEE (last revised Sept. 26, 2024). When PDE sued, Policy 5136 had a sweeping ban on any use that "can be construed as harassment or disparagement of others" based on "transgender identity." R.7-1, PageID#134. After Olentangy's recent amendments, the policy now

has a separate section on "In-School Speech." *Amended Policy 5136*. That section contains a ban on "harassment" that simply incorporates "Policy 5517." *Id.* The policy now has a disclaimer about students' "First Amendment rights" too, but only their right to engage in "a reasoned and civil exchange of opinions" or "debate" at "appropriate times and places during the school day." *Id.*

PDE filed this lawsuit in early May 2023 on behalf of its members, including parents whose children attend Olentangy schools. Those children vehemently disagree with Olentangy that someone's gender can differ from their sex. *E.g.*, B Decl., R.7-4, PageID#370-71. They all believe that sex is immutable—some for religious reasons, others for scientific reasons—and wish to speak consistently with that view, including by using biological pronouns when addressing their peers. *E.g.*, PageID#370-73; C Decl., R.7-5, PageID#378-79. But Olentangy's policies force them to alter their speech or remain quiet. *E.g.*, A Decl., R.7-3, PageID#364.

The same day it sued, PDE sought a preliminary injunction. Olentangy opposed. Its opposition attached *zero* evidence, other than the email confirming that it bans misgendering (which PDE had already submitted). It submitted no declarations from school officials, provided no regulatory history for these policies, and cited no study or article. Panel-Dis.50. Yet the district court denied PDE's motion. PI-Order, R.28. A divided panel affirmed, albeit on largely different reasoning. The majority held that Olentangy's policies do not compel speech or discriminate based on viewpoint because students could simply eschew pronouns altogether (and speak using first names only).

Panel-Maj.12-18. And it relieved Olentangy of its burden under *Tinker* because the disruptive effect of non-preferred pronouns is "common-sense." Panel-Maj.7-11. Judge Batchelder dissented, detailing how the majority's opinion "shortchanges" *Meriwether*, "creates a circuit split," and "countenances what [*Tinker*] forbade." Panel-Dis.55.

This Court granted rehearing en banc. The panel's opinion is now vacated, and this Court is reviewing whether the district court should have granted PDE a preliminary injunction. In a First Amendment case like this one, that review is de novo. *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012).

## ARGUMENT

This supplemental brief focuses on three main points. It first explains why, even though Olentangy changed a few of the challenged policies when it unsuccessfully opposed rehearing, those changes do not affect the key question on appeal. It then explains why Olentangy's policies likely violate the First Amendment, with a special focus on the panel's now-vacated reasoning. It ends by briefly addressing the other preliminary-injunction factors and the scope of relief.

### I. Olentangy's recent changes to some of the challenged policies do not meaningfully change this appeal.

After the panel issued its opinion and this Court ordered Olentangy to respond to PDE's petition, Olentangy tried to defeat rehearing by changing some of the challenged policies. In late September 2024, it approved minor deletions in Policy 5517 and more substantial revisions in Policy 5136. Olentangy then claimed that these changes made the whole appeal "moot." Rehearing-Opp.11. This Court was apparently

unpersuaded, since it granted rehearing and did not order the parties to brief mootness. But for the sake of clarity and caution, PDE will address the (non)effect of these changes.

Olentangy's suggestion of mootness was baseless. The key question on appeal is whether the First Amendment forbids Olentangy from punishing students for misgendering. That question is what the parties briefed, the district court decided, and both the panel majority and dissent addressed. All agree that Olentangy punishes that speech in each of the *four* challenged policies, including "the code of conduct." Emails, R.7-2, PageID#356; *see* Panel-Maj.18. Yet Olentangy did not change the code at all. Because its bans on discriminatory language and harassment have not changed, PDE's challenges to them cannot be moot. And because those provisions ban misgendering on their own, PDE's injuries, claims, and appeal cannot be moot either.

Even for the board policies that Olentangy amended, nothing is moot. Amendments do not moot an appeal if the new policy is "'substantially similar'" to the old one or if the amendments "'arguably do not remove the harm or threatened harm underlying the dispute.'" *Cam I, Inc. v. Louisville/Jefferson Cnty. Metro Gov't*, 460 F.3d 717, 720 (6th Cir. 2006). Here, the amended Policy 5517 is substantially similar to the original one. Though Olentangy struck out parts of the definition of "bullying," the policy treats bullying as an *example* of prohibited harassment. *See* Rehearing-Opp. addend. (defining when bullying "rises to the level of unlawful harassment"). Olentangy made no changes to the operative definition of "harassment." *See id.* Hence why Olentangy concedes that

the language it deleted was "superfluous," Rehearing-Opp.12, and that Policy 5517 still bans misgendering, *see* Rehearing-Opp.3-4. Policy 5136 still bans misgendering too, since the new part on in-school speech now incorporates Policy 5517. *See* Rehearing-Opp. addend. The "'threatened harm'" to PDE's members thus remains unchanged. *Cam I*, 460 F.3d at 720.

Though nothing is moot, Olentangy's changes affect PDE's focus on rehearing. In terms of relief, PDE now prefers a preliminary injunction that bars Olentangy from punishing students for misgendering other students, over one that bars Olentangy from enforcing the challenged policies in full or in part. PDE asked for both below. *See* Proposed Order, R.7-7. And it's entitled to both, since the challenged provisions of the code are facially overbroad, Policy 5517 is facially overbroad, and Policy 5136 is facially overbroad at least to the extent it incorporates Policy 5517. But because Olentangy concedes that all four policies ban misgendering, this Court can hold that each policy is facially unconstitutional "to the extent it covers" that speech. *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). Enjoining Olentangy from punishing that speech would remedy the most acute threat to PDE and its students' rights. And it would be simpler than trying to figure out which provisions and clauses of Olentangy's labyrinthine policies to enjoin, including the new and unexplained parts of Policy 5136.

If this Court does consider overbreadth or enters policy-specific relief, PDE does not object to this Court considering the *current* version of Olentangy's policies. *See, e.g.*, *Cam I*, 460 F.3d at 719 (reviewing, in similar circumstances, the challenged statute "as

amended"). PDE has already explained why the original versions are overbroad, and its challenges to the original policies remain live because Olentangy's unilateral maneuvers cannot carry its heavy burden to prove mootness through voluntary cessation. *See Speech First v. Schlissel*, 939 F.3d 756, 767-70 (6th Cir. 2019). But for purposes of this preliminary-injunction appeal, the current policies now threaten PDE's members. And if they are unconstitutional, then the original policies are necessarily unconstitutional too.

## II. Contra the panel, Olentangy's policies likely violate the First Amendment.

All agree that "pronouns matter," Panel-Maj.13, and none deny that Olentangy's policies restrict speech that's protected by the First Amendment, Red-Br.9-10; PI-Order, R.28, PageID#839-40; Panel-Maj.12-13. Titles and pronouns "convey a powerful message implicating a sensitive topic of public concern." *Meriwether*, 992 F.3d at 508; *accord Green v. Miss USA*, 52 F.4th 773, 784 n.12 (9th Cir. 2022); *Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705, 713 (Va. 2023). Using the word "'[h]e' conveys that the person addressed is a male. 'She' expresses the idea that the subject is a female." ADF-Amicus-Br. (CA6-Doc.51) at 15-16. Using biological pronouns for transgender people reflects the speaker's "conviction that one's sex cannot be changed." *Meriwether*, 992 F.3d at 508. And using nonbiological pronouns affirms that people can "have a gender identity inconsistent with their sex at birth." *Id.* at 507. For the children of PDE's members, that affirmation would state a falsehood that violates their core views of scientific reality and, for most, their religious faith. *E.g.*, B Decl., R.7-4, PageID#370-73.

Students do not "'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,'" *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 187 (2021), and Olentangy's content-based restrictions on this protected speech could not satisfy normal strict scrutiny, *Brown v. EMA*, 564 U.S. 786, 794-95 (2011). Though a grade school gets "more leeway" under strict scrutiny when it regulates "specific categories of student speech" that "occurs under its supervision," Olentangy's policies can only arguably be justified under *Tinker*'s category for "speech that 'materially disrupts classwork or involves substantial disorder.'" *Mahanoy*, 594 U.S. at 187-88; *see* Panel-Maj.16-17 & n.8. But even when a school can prove this "special interest," *Mahanoy*, 594 U.S. at 188, its content-based restrictions on speech still must be narrowly tailored. The school's policies cannot discriminate based on viewpoint. *Barr*, 538 F.3d at 571. They cannot involve unlawful compulsion. *Barnette*, 319 U.S. at 642. And they cannot be overbroad. *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215-16 (3d Cir. 2001) (Alito, J.). Olentangy's policies violate each of these rules.

### A.   *Tinker*

Olentangy's policies are "certainly content-based," PI-Order, R.28, PageID#842, and schools are not exempt from the general rule that content-based restrictions on protected speech are "presumptively unconstitutional," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Though *Tinker* recognizes that schools have a special interest in preventing disruption, the *Tinker* standard is "demanding." *Mahanoy*, 594 U.S. at 193. The school must specifically articulate and "reasonably forecast" how the banned speech

will "cause material and substantial disruption to schoolwork and school discipline." *Kutchinski v. Freeland CSD*, 69 F.4th 350, 359 (6th Cir. 2023); *accord Saxe*, 240 F.3d at 211 (fear of disruption must be "specific and significant"). "Undifferentiated fear or apprehension of disturbance is not enough." *Tinker*, 393 U.S. at 508. Nor is the desire to "avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint," *id.* at 509, else students' rights would be subject to the "'heckler's veto,'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022). *Tinker* understood that offensive speech "may start an argument or cause a disturbance" at school, but "our Constitution says we must take this risk." 393 U.S. at 508.

Importantly, the "burden of justifying student-speech restrictions" under *Tinker* falls "squarely on school officials." *N.J. ex rel. Jacob v. Sonnabend*, 37 F.4th 412, 426 (7th Cir. 2022); *accord* Panel-Dis.46-47. *Tinker* itself said that, "[i]n the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression." 393 U.S. at 511. That allocation of proof makes sense. The school, not its students, should already "ha[ve] the evidence that forms the basis for its substantial-disruption judgment." Panel-Dis.47. And putting the burden on students would be the "death-knell to pre-enforcement challenges." Panel-Dis.48. In cases where "no prohibited speech has yet occurred," Panel-Maj.11, a student with the burden of disproving disruption would have to violate the school's speech policy and "expose himself to actual [punishment]"—the very dilemma that preenforcement challenges were designed to avoid. *SBA List v. Driehaus*, 573 U.S. 149, 158 (2014).

Olentangy did not carry this burden below—or even try. It made no developed argument about *Tinker* in the district court. *See generally* PI-Opp., R.13. It didn't submit declarations from school officials suggesting why (or even *whether*) they reasonably forecasted substantial disruption. And it attached zero evidence: no testimony, findings, or any document suggesting its policies are "necessary to avoid material and substantial interference with schoolwork or discipline." *Tinker*, 393 U.S. at 511. It didn't even cite articles about other schools, like the district court researched on its behalf. *See* PI-Order, R.28, PageID#832-36. And it didn't try to contort PDE's evidence into its own proof of disruption, like the panel majority did on its behalf. *See* Panel-Maj.9-10 & n.3. Olentangy's complete no-show in the district court could not possibly carry its burden under *Tinker*. *See, e.g.*, *Castorina v. Madison Cnty. Sch. Bd.*, 246 F.3d 536, 542 (6th Cir. 2001) (school failed *Tinker* "without any showing of disruption"); *Young v. Giles Cnty. BOE*, 181 F. Supp. 3d 459, 464 (M.D. Tenn. 2015) (school failed *Tinker* with no "showing whatsoever" on disruption).

Bans on non-preferred pronouns cannot be justified based on evidence-free appeals to "common-sense." Panel-Maj.10. *Meriwether* denies that non-preferred pronouns "'can be presumed'" to create a "'disturbance'" under *Tinker*. 992 F.3d at 511. Whether it helps or hurts a child to affirm their stated gender identity is hotly disputed. *See Parents Protecting Our Child. v. Eau Claire ASD*, 2024 WL 5036271, at *1 (U.S. Dec. 9) (Alito, J., dissental). And it's hardly evident that transgender students are uniquely incapable of "tolerat[ing]" speech they disagree with—of "'learning how to live in a pluralistic

society'" where "they are sure to encounter" the same views. *Kennedy*, 597 U.S. at 538-39. Because "'[t]olerance is a two-way street,'" Olentangy needs an evidentiary "showing" before it can deem certain speech too disruptive to hear. *Meriwether*, 992 F.3d at 511. Olentangy especially needs "evidence" given its strange position that substantial disruption will occur if students use non-preferred pronouns, but not if students *tell* transgender students things like "transgender females are really males." *Tinker*, 393 U.S. at 510-11; *see* Panel-Maj.16-17 & n.8. This Court's opinions on the Confederate flag, which reach different outcomes based on different records specific to each school, make little sense if the panel's breezy appeal to common sense were enough under *Tinker*. *Compare Barr*, 538 F.3d at 565-69, *with Castorina*, 246 F.3d at 540-44.

The panel effectively flipped Olentangy's burden under *Tinker*, faulting PDE for failing to *dis*prove substantial disruption. Panel-Dis.48. Yet even on a preliminary-injunction motion, PDE's burden was to show only that Olentangy's policies regulate "protected speech." *Norris v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 25 (1st Cir. 2020); *accord Gonzales v. O Centro*, 546 U.S. 418, 428-30 (2006). Once it did, the burden shifted to Olentangy to prove that its policies satisfy *Tinker*. *See Tinker*, 393 U.S. at 511. If the record was insufficient on disruption, then PDE "must be deemed likely to prevail" and its preliminary injunction should have been granted. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). Olentangy should not have been given a free pass to keep irreparably harming its students until "summary judgment." Panel-Maj.11.

## B.    Viewpoint discrimination

Even when schools can regulate speech under *Tinker*, this circuit requires those regulations to be viewpoint neutral. *See Castorina*, 246 F.3d at 544. That rule, which dates back at least a quarter-century, makes sense. Viewpoint discrimination is "'egregious,'" and its unconstitutionality is a "'bedrock First Amendment principle.'" *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019). The Supreme Court treats viewpoint discrimination as a red line. *See id.* at 398-99. Viewpoint discrimination is not allowed even when the government can regulate speech's content, *see Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality), and even when the speech is unprotected, *see R.A.V. v. St. Paul*, 505 U.S. 377, 391-94 (1992). Viewpoint discrimination is *especially* bad in schools, lest our "next generation of leaders" become "'closed-circuit recipients of only that which the State chooses to communicate.'" *Meriwether*, 992 F.3d at 507 (quoting *Tinker*, 393 U.S. at 511). Schools can prevent substantial disruption under *Tinker* with policies that are content-neutral or, at most, content-based. The "only interest distinctively served by" a viewpoint-discriminatory policy is "displaying the [state's] special hostility towards" certain views—"precisely what the First Amendment forbids." *R.A.V.*, 505 U.S. at 396.

Olentangy's policies discriminate based on viewpoint. When students use pronouns to refer to a transgender student, they "advanc[e] a viewpoint on gender identity." *Meriwether*, 992 F.3d at 509. If they use preferred pronouns, they "validate" their classmate's self-professed gender identity. *Id.* If they use non-preferred pronouns, they affirm that sex is fixed at birth. *Id.* But Olentangy's policies prohibit only *one* of those

views. Students are free to use "preferred pronouns to refer to transgender students," Panel-Maj.17, but they can be expelled for "purposefully referring to another student by using gendered language they know is contrary to the other student's identity," Emails, R.7-2, PageID#356. Viewpoint discrimination is also the policies' conceded purpose. *L.D. Mgmt. v. Gray*, 988 F.3d 836, 839 (6th Cir. 2021). By barring "purposefu[l]" uses of nonpreferred pronouns but not accidental uses, Email, R.7-2, PageID#356, Olentangy's policies ban non-preferred pronouns precisely *because* they express the view that someone "is not really" their stated gender, Panel-Maj.17; *see* Panel-Dis.45.

To hold otherwise, the panel majority had to keep changing the meaning of viewpoint discrimination. The majority first said bans on non-preferred pronouns regulate based on "divisive[ness]." Panel-Maj.16-17. But speech's divisiveness is not a viewpoint-neutral or a valid reason to ban it. *Ison v. Madison Loc. Sch. Dist. BOE*, 3 F.4th 887, 894-95 (6th Cir. 2021). The majority then said bans on non-preferred pronouns merely regulate "*how*" a viewpoint is expressed. Panel-Maj.17. But the rule against viewpoint discrimination "is not dependent on the particular mode in which one chooses to express an idea," *Texas v. Johnson*, 491 U.S. 397, 416 (1989); and for pronouns, the "mode of address [i]s the message," *Meriwether*, 992 F.3d at 508. The majority also suggested that viewpoint discrimination might work differently "in the public school context." Panel-Maj.16. But public schools must follow the Supreme Court's broader "line of … decisions prohibiting viewpoint discrimination." *Castorina*, 246 F.3d at 540. Their

17

speech regulations must comply with the "prohibition on viewpoint discrimination" from "*Rosenberge*[*r*]," a case about public universities. *Barr*, 538 F.3d at 571. Olentangy's policies do not comply, as *Meriwether* (another case about universities) confirms.

## C.     Compelled speech

With potential exceptions not relevant here, Panel-Maj.12 n.6, schools cannot compel students to mouth controversial viewpoints as their own, even to prevent disruption, *see* Red-Br.7, 9-10; PI-Order, R.28, PageID#825; Panel-Maj.12. As the Supreme Court famously put it in *Barnette*, "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." 319 U.S. at 642. A school that wants to prevent disruption never needs to cross the line from prohibition to compulsion. Compelling citizens' speech is uniquely "demeaning." *Janus v. AFSCME*, 585 U.S. 878, 893 (2018). Letting schools do it would "strangle the free mind at its source" by conditioning children to parrot government orthodoxy instead of thinking freely. *Barnette*, 319 U.S. at 637.

Olentangy's policies "'compe[l]'" speech. *Meriwether*, 992 F.3d at 510. Children must attend school; students must speak at school; and speaking proper English is "impossible" without pronouns. *Id.* at 517. So if students must call a male "she," they must "communicate" the "message" that "[p]eople can have a gender identity inconsistent with their sex." *Id.* at 507.

It's no answer to say that children can avoid pronouns altogether—like "Ryan said Ryan will do Ryan's work by Ryan's-self." Avoiding pronouns only for "transgender" students, Panel-Maj.14, still compels the speaker to affirm that these students are *not* their sex, Panel-Dis.26-27, 39-40. It still compels the speaker to "alter" what they would otherwise say. *Meriwether*, 992 F.3d at 500; *see 303 Creative v. Elenis*, 600 U.S. 570, 596 (2023). And it imposes unnecessary burdens. This manner of speaking is "impossible" to do consistently. *Meriwether*, 992 F.3d at 517. It's also unlikely to satisfy anyone. The transgender student in *Meriwether*, after all, eventually soured on the no-pronouns compromise. *See id.* at 499-500. And courts have chided lawyers for communicating this way, complaining that their use of no pronouns is "awkward" and hurts "readability." *E.g.*, Doc.124 at 118-19, *Doe v. Ga. DOC*, No. 1:23-cv-5578 (N.D. Ga. Feb. 12, 2024). The First Amendment does not let the state put anyone, least of all children, to this "Hobson's Choice." *Meriwether*, 992 F.3d at 517.

### D.    Overbreadth

Even when a school can regulate certain speech, it cannot use a policy that's facially unconstitutional. Facial challenges work differently in First Amendment cases. Under the overbreadth doctrine, a speech restriction can be facially unconstitutional even when many of its applications are constitutional. *AFPF v. Bonta*, 594 U.S. 595, 615 (2021). If a "'substantial number'" of its applications are unconstitutional relative to its "'legitimate sweep,'" then the policy is facially invalid. *Id.* Though this analysis requires weighing the constitutional applications against the unconstitutional ones, overbreadth

is a qualitative judgment that's "not readily reduced to a mathematical formula." *Doe v. Cooper*, 842 F.3d 833, 845 (4th Cir. 2016). Courts must exercise "judgment" and consider the "nature of [the] law's suppression of speech" as well. *Connection Distributing Co. v. Holder*, 557 F.3d 321, 340 (6th Cir. 2009) (en banc).

As explained above, this Court needn't reach whether Olentangy's policies are overbroad. It can simply enjoin Olentangy from punishing students for "using biological pronouns instead of preferred pronouns." Panel-Dis.52. PDE's "compelled-speech, viewpoint-discrimination, and *Tinker*-standard challenges" are "sufficient" for that relief. Panel-Dis.53. Importantly, though, this Court also shouldn't endorse the panel's reasoning on overbreadth or leave the district court's analysis intact. That reasoning was incomplete. By assuming these policies can constitutionally ban misgendering, Panel-Maj.18, the courts "g[o]t wrong at least one significant input" into the overbreadth analysis. *Moody v. NetChoice*, 144 S. Ct. 2383, 2409 (2024). That error is highly significant, since "[p]ronouns are ubiquitous in everyday speech" and far more common than any constitutional applications of the policies. Panel-Dis.40. So the district court's overbreadth analysis must at least be vacated and remanded, after its error on misgendering is corrected. *See Moody*, 144 S.Ct. at 2409. If necessary, though, its analysis should be reversed because Olentangy's policies are likely overbroad.

The code of conduct's ban on discriminatory language is badly overbroad. Because the policy governs "comments, jokes, and slurs," *every* application regulates speech. R.7-1, PageID#150. And because that speech is regulated only when it is

"derogatory" based on a protected characteristic, PageID#150, *every* application is viewpoint discriminatory. *Ison*, 3 F.4th at 894; *Iancu*, 588 U.S. at 395. Though Olentangy can regulate fighting words and speech that causes a substantial disruption under *Tinker*, it cannot do so with a viewpoint-discriminatory policy. *R.A.V.*, 505 U.S. at 383-86; *Castorina*, 246 F.3d at 544.

Even if the discriminatory-language policy had lawful applications, those applications would be outweighed by the unlawful ones. Any lawful applications—like "racial slurs" that substantially "disrupt the educational environment," Panel-Maj.22—are small in number and rare in frequency. The mine run of "derogatory" speech by students will not rise to that level and cannot be banned, even if some find it "discriminatory" or "in poor taste." *Saxe*, 240 F.3d at 209; *Bailey v. Iles*, 87 F.4th 275, 283 (5th Cir. 2023). And Olentangy's policy is not remotely "tailored" to disruptive or unprotected speech. *Sisters for Life v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 407 (6th Cir. 2022). The policy applies no matter what effect the discriminatory language has on the listener or the school. *Contra Saxe*, 240 F.3d at 217. It extends off-campus. Panel-Dis.52-53. And it applies when the language is derogatory towards "an individual or group"—even if the derogated "individual" is not the listener, even if the listener is not a member of the derogated "group," and even if the speaker *is* a member of the derogated group. R.7-1, PageID#150. A policy that bans speech ranging from criticisms of a politician's age, Panel-Maj.22, to self-deprecating jokes about one's own religion, ACLU-Amicus-Br. (CA6-Doc.47) at 12-13, to controversial takes on gender identity, B Decl., R.7-4,

PageID#373, is plainly overbroad. Any suggestion that this policy "does not restrict 'general opinions' about gender identity" has no relation to the policy's "text." *PDE v. Linn Mar CSD*, 83 F.4th 658, 667 (8th Cir. 2023).

Olentangy's bans on harassment are likely overbroad too. Overbreadth applies "provision by provision." *Nat'l Fed'n of the Blind of Tex. v. Abbott*, 647 F.3d 202, 210 (5th Cir. 2011); *e.g.*, *Saxe*, 240 F.3d at 217. And the overbreadth of each provision must be judged by its broadest independent clause, *e.g.*, *Houston v. Hill*, 482 U.S. 451, 461 (1987), else states could insulate an overbroad regulation of speech by packaging it with a regulation of conduct. Consider the revised Policy 5517 (and the part of the revised Policy 5136 that incorporates Policy 5517). That policy independently covers any "insulting" or "dehumanizing" "verbal … conduct directed against a student" that "has the effect of substantially interfering with a student's educational performance." *Amended Policy 5517*. This clause covers only speech. *See Saxe* 240 F.3d at 204, 211, 216-17 (First Amendment protects "harassing" speech). And because it requires speech to be "discriminatory" against a protected class (and "insulting" or "dehumanizing" to the listener), *Amended Policy 5517*, every application is a viewpoint-based restriction. *Speech First v. Cartwright*, 32 F.4th 1110, 1127 & n.6 (11th Cir. 2022).

Even if the harassment policies were neutral, they sweep too broadly. Though Policy 5517 requires the speech to have a substantial effect on the listener, it does not require that effect to be objectively reasonable. *Contra Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 879 (7th Cir. 2011). Plus, Olentangy has many other policies that

bar all sorts of disruptive and unprotected speech. *E.g.*, Code of Conduct, R.7-1, PageID#150-53 ("Disruption of School," "Intimidation and/or Threats," "Obscen[ity]," causing "physical injury," "excessively disruptive" behavior, "Other conduct violations"). Whatever "subset" of proscribable speech is left for Policy 5517 is insubstantial when compared to the "the harm done to students' speech rights." *McCauley v. Univ. of V.I.*, 618 F.3d 232, 252 (3d Cir. 2010). In fact, Olentangy has a separate policy that simply adopts the Supreme Court's definition of harassment from *Davis. See Policy 2266*. By deliberately exceeding *Davis* in its other harassment policies, Olentangy "runs headlong into the First Amendment concerns animating" that decision. *Alabama v. U.S. Sec'y of Educ.*, 2024 WL 3981994, at *6 (11th Cir. Aug. 22).

## III. The remaining factors favor granting PDE a tailored preliminary injunction.

Because Olentangy's policies likely violate the First Amendment, the other preliminary-injunction factors necessarily favor PDE. *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022). Even "'minimal'" violations of First Amendment rights are irreparable. *Sisters for Life*, 56 F.4th at 408. Enforcing those constitutional rights is "'always'" in the public interest. *Dahl v. Bd. of Trs. of WMU*, 15 F.4th 728, 736 (6th Cir. 2021). And Olentangy has no meaningful interest in policies that are likely unconstitutional (and thus unenforceable anyway). *Bays*, 668 F.3d at 825.

Olentangy's interests are especially weak because a preliminary injunction should be properly tailored, removing the chill on speech without disabling the school from

addressing misconduct. *See* Panel-Dis.54-55. PDE asks for an injunction barring Olentangy from punishing students for, in the school's words, "purposefully referring to another student by using gendered language they know is contrary to the other student's identity." Emails, R.7-2, PageID#356; *see Connection*, 557 F.3d at 342 (noting that courts "may enjoin the unconstitutional *applications*" of a law, instead of the entire thing). That targeted relief would leave Olentangy free to regulate a wide range of student conduct. Even if the challenged provisions were frozen in full, Olentangy could still enforce its broad policies against "Disruption of School," "General Misconduct," "Other violations," and more. Code of Conduct, R.7-1, PageID#150-53. And Olentangy showed during its rehearing opposition that it can amend policies quickly. If its current policies were preliminarily enjoined, it could enact constitutional versions the next day. It could, for example, adopt the *Davis* standard, as Policy 2266 already does.

Finally, this Court should not revive the panel's now-vacated suggestion that PDE lacks irreparable harm based on "delay." Panel-Maj.23-24. The majority raised this argument sua sponte. Olentangy did not raise it below, brief it on appeal, or even defend it when opposing rehearing. *Cf. United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) (stressing the importance of party presentation). And the district court, if anything, ruled otherwise. It found that PDE "would" suffer irreparable harm if its free-speech claims were likely to succeed, since Olentangy's policies objectively chill students' speech about pronouns now. PI-Order, R.28, PageID#848.

The panel's sua-sponte invocation of delay was mistaken, both legally and factually. Though delay sometimes suggests an alleged harm is remote or compensable with money damages, *see* Panel-Maj.23 (citing commercial cases), it does not disprove irreparability in this "First Amendment" case, *Chabad of S. Ohio & Congregation Lubavitch v. Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004). The chilling effect from Olentangy's policies is "a present injury" that is "ongoing." *G&V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1076 (6th Cir. 1994); *TGP Commc'ns v. Sellers*, 2022 WL 17484331, at *6 (9th Cir. Dec. 5). And this constitutional harm is never reparable with money damages because it's "'intangible.'" *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989); *G&V Lounge*, 23 F.3d at 1078-79. No meaningful delay happened here anyway. Though the panel faulted PDE for not suing in 2013, Panel-Maj.23 & n.10, PDE didn't exist until 2021. And it moved for a preliminary injunction just two months after Olentangy officially confirmed, for the first time in writing, that it construed its broad bans on "harassment" to cover students' use of non-preferred pronouns. *Compare* Emails, R.7-2, PageID#356, *with* PI-Mot., R.7, PageID#88. The equities strongly favor PDE.

## CONCLUSION

This Court should reverse.

Respectfully submitted,

Dated: December 11, 2024

Emmett E. Robinson
ROBINSON LAW FIRM LLC
6600 Lorain Ave. #731
Cleveland, OH 44102
Telephone: (216) 505-6900
Facsimile: (216) 649-0508
erobinson@robinsonlegal.org

*/s/ Cameron T. Norris*
J. Michael Connolly
Cameron T. Norris
Thomas S. Vaseliou
Paul R. Draper
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's briefing letter because it is 25 pages long.

This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: December 11, 2024                    */s/ Cameron T. Norris*

## CERTIFICATE OF SERVICE

I e-filed this brief with the Court, which will email everyone requiring notice.

Dated: December 11, 2024                    */s/ Cameron T. Norris*