**No. 23-3630**

**In the
United States Court of Appeals for the Sixth Circuit**

PARENTS DEFENDING EDUCATION,
*Plaintiff-Appellant*,
v.
OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, *et al.*,
*Defendants-Appellees*.

**On Appeal from the
United States District Court for
the Southern District of Ohio**

**Brief *Amicus Curiae* of America's Future, Public Advocate of the United States, Public Advocate Foundation, Free Speech Coalition, Free Speech Defense and Education Fund, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund in Support of Plaintiff-Appellant and Reversal**

PATRICK M. MCSWEENEY
  3358 John Tree Hill Rd.
  Powhatan, VA  23139

RICK BOYER
  INTEGRITY LAW FIRM, PLLC
  P.O. Box 10953
  Lynchburg, VA  24506

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA  22180-5615
  (703) 356-5070
*Attorney of Record
*Attorneys for Amici Curiae*
December 18, 2024

*Attorneys for Amici Curiae*

## DISCLOSURE STATEMENT

The *amici curiae* herein, America's Future, Public Advocate of the United States, Public Advocate Foundation, Free Speech Coalition, Free Speech Defense and Education Fund, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund, through their undersigned counsel, submit this Disclosure Statement pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A).  These *amici curiae* are non-stock, nonprofit corporations, none of which has any parent company, and no person or entity owns them or any part of them.

*s/William J. Olson*
William J. Olson

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.    THE SCHOOL BOARD FAILED TO MEET ITS BURDEN TO JUSTIFY ITS
      POLICY CENSORING THE SPEECH OF STUDENTS UNDER *TINKER* . . . . . . . 4

      A.    The *Tinker* Standard . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    Erroneously Assuming "Substantial" or "Material" Disruption . . 5

      C.    Applying *Tinker* Correctly . . . . . . . . . . . . . . . . . . . . . . 9

II.   IT IS ERROR TO ASSUME THE NORMAL SPEECH OF APPELLANTS'
      CHILDREN IS INJURIOUS, WHILE DISCOUNTING THE INJURY
      SUFFERED BY THE CENSORED CHILDREN . . . . . . . . . . . . . . . . . . 11

      A.    The District Court Assumed a Great Deal. . . . . . . . . . . . . . 11

      B.    The Panel Implicitly Adopts the Cult of Transgenderism . . . . . . 13

      C.    The Censorship Allowed by the District Court and Panel
            Could Sweep Broadly . . . . . . . . . . . . . . . . . . . . . . . 14

      D.    Pronouns Are Not Limited to He/She . . . . . . . . . . . . . . . . 16

III. THE PANEL'S FOUNDATIONAL STATEMENT THAT GOVERNMENT MAY CONSTITUTIONALLY REGULATE "DIVISIVE SPEECH" CONSTITUTES A DIRECT ASSAULT ON THE FIRST AMENDMENT LONG SOUGHT BY CRITICAL LEGAL THEORISTS . . . . . . . . . . . . . . . . . . . . 18

    A. Critical Legal Theorists Have Targeted the First Amendment for Destruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    B. The Courts Below Erred in Adopting Critical Theory's Attack on the First Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

iii

# TABLE OF AUTHORITIES

<u>Page</u>

**HOLY BIBLE**

Genesis 1:27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 14
Deuteronomy 22:5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Mark 10:6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**CONSTITUTION**

Amendment I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, *passim*

**CASES**

*Castorina ex rel. Rewt v. Madison Cnty. Sch. Bd.*, 246 F.3d 536 (6th
    Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
*Matal v. Tam*, 582 U.S. 218 (2017) . . . . . . . . . . . . . . . . . . . . . . . . 23
*Tinker v. Des Moines Independent Community School District*, 393 U.S.
    503 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, *passim*
*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) . . . . . . . . . . . 23

**MISCELLANEOUS**

"Acclaimed legal scholars and professors return to Seattle University
    School of Law," Seattle University (June 21, 2022) . . . . . . . . . . . . 19
<u>The American Heritage Dictionary of the English Language</u>, "Pronoun" . . . . 11
M. Batrinos, "Testosterone and Aggressive Behavior in Man," INT'L J. OF
    ENDOCHINOLOGY AND METABOLISM 563-68 (June 30, 2012) . . . . . . . 7
J. Butcher & M. Gonzalez, "Critical Race Theory, the New Intolerance,
    and Its Grip on America," *Heritage Foundation* (Dec. 7, 2020) . . . . . . 19
"Critical Disability Theory," *Stanford Encyclopedia of Philosophy* (Sept.
    23, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
R. Delgado and J. Stefancic, <u>Critical Race Theory: An Introduction</u>, 4th ed.
    (New York Univ. Press: 2023) . . . . . . . . . . . . . . . . . . . . . . . . 21
R. Delgado and J. Stefancic, "Hateful Speech, Loving Communities: Why
    Our Notion of 'A Just Balance' Changes So Slowly," 82 CAL L.
    REV. 851 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

R. Delgado and J. Stefancic, "Living History Interview with Richard Delgado & Jean Stefancic," 9 TRANSNAT'L L. & CONTEMP. PROBS. 221 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

R. Delgado and J. Stefancic, Must We Defend Nazis? (New York Univ. Press: 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

R. Delgado, "Words That Wound: A Tort Action for Racial Insults, Epithets, and Name-Calling," 17 HARV. C. R.-C. L. L. REV. 133 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

R. Foley, "US street preacher arrested in London says speaking truth is now a 'hate crime,'" *Christian Post* (Aug. 7. 2021) . . . . . . . . . . . 15

D. Frudd, "Pics: Nashville trans school shooter's manifesto revealed," AmericanMilitaryNews.com (Sept. 3, 2024) . . . . . . . . . . . . . . . . 8

I. Giatti, "Street preacher arrested for reading Bible verses at LGBT pride event" (June 8, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

T. Kristensen, "Effects of testosterone therapy on constructs related to aggression in transgender men: A systematic review," HORMONES AND BEHAVIOR, vol. 128 (Feb. 2021) . . . . . . . . . . . . . . . . . . . 7

R. Krotoszynski, The First Amendment in Cross-Cultural Perspective (New York Univ. Press: 2006) . . . . . . . . . . . . . . . . . . . . . . 22

A. Kumar, "Seattle police arrest street preacher for reading the Bible: 'Risk to public safety,'" *Christian Post* (July 2, 2022) . . . . . . . . . . 15

S. Lepore & R. Bowman, "Police chief slams questions about shooter's gender identity," *DailyMail.com* (Dec. 17, 2024) . . . . . . . . . . . . . 7

T. Massaro, "Equality and Freedom of Expression: The Hate Speech Dilemma," 32 WM. & MARY L. REV. 211 (1991) . . . . . . . . . . . . 22

M. Matsuda, C. Lawrence, R. Delgado and K. Crenshaw, Words That Wound (Westview Press: 1993) . . . . . . . . . . . . . . . . . . . . 20, 21, 24

L. Menand, ed., The Future of Academic Freedom (Univ. Of Chicago Press: 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

A. Powell, "How a hormone affects society," *The Harvard Gazette* (Sept. 17, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

C. Rufo, "DEI and the End of the Constitutional Order," AmericanMind.org (July 20, 2023) . . . . . . . . . . . . . . . . . . . . . . 20

D. Schoen, "A bipartisan, commonsense approach to gun control is in the works," *The Hill* (June 5, 2022) . . . . . . . . . . . . . . . . . . . . . 9

## INTEREST OF *AMICI CURIAE*[1]

America's Future, Public Advocate of the United States, Public Advocate Foundation, Free Speech Coalition, Free Speech Defense and Education Fund, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund, are nonprofit organizations, exempt from federal taxation under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code. Each is dedicated, *inter alia*, to the correct construction, interpretation, and application of law.

## STATEMENT OF THE CASE

The Olentangy School District, the fourth-largest school district in Ohio, adopted policies forbidding what it termed "'discriminatory language,' including … failing to address a student by their preferred pronouns" rather than pronouns reflecting their biological sex. *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 684 F. Supp. 3d 684, 689-90, 692 (S.D. Oh. 2023) ("*Parents Defending I*"). A group of anonymous students and their parents sought a preliminary injunction against these policies because such rules

---

[1] This *amicus* brief is accompanied by a motion for leave to file. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

"unconstitutionally compel speech, are impermissible viewpoint-and content-based restrictions on speech, and are overbroad." *Id.* at 694.

The district court denied the requested preliminary injunction as it believed that "a hostile environment created by discriminatory speech [*e.g.*, use of biologically correct pronouns] is enough to cause a substantial disruption on its own." *Id.* at 701. "Identity-based comments cut to the core of who we are as individuals and belittle our sense of place in society — especially, though not exclusively, for individuals who are members of minority groups that have been historically oppressed," the district judge wrote. *Id.* The court ruled that the plaintiffs "have not shown that the Policies fail to satisfy rational-basis review," and denied a preliminary injunction. *Id.* at 711.

A divided panel upheld the district court ruling, asserting that it is a "common-sense conclusion that the dehumanizing and humiliating effects of non-preferred pronouns could create a substantial 'disrupt[ion] [to] the educational process' justifying restricting the use of those pronouns." *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 109 F.4th 453, 464 (6th Cir. 2024) ("*Parents Defending II*"), vacated 2024 U.S. App. LEXIS 27759 (6th Cir. Nov. 1, 2024). The panel rejected the compelled speech argument,

2

because "[s]tudents who do not want to use their transgender classmates' preferred pronouns may permissibly use no pronouns at all." *Id.* at 466-67. Thus, the panel found, there was no compelled speech. It rejected the viewpoint discrimination claim because students could voice their views on the transgender issue in ways other than applying pronouns to fellow students. *Id.* at 469.

Finally, it rejected the overbreadth claim because "to strike down a regulation as overbroad, its unconstitutional applications must be … substantially disproportionate to the [regulation's] lawful sweep." *Id.* at 470 (internal quotation omitted).

Judge Batchelder dissented, asserting that the school district had not made the required showing that the speech "'would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.'" *Id.* at 476 (Batchelder, J., dissenting) (citing *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508-09 (1969)).

On November 1, 2024, this Court vacated the panel opinion, granted rehearing *en banc*, and stayed the mandate. *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 2024 U.S. App. LEXIS 27759 (6th Cir. Nov. 1, 2024).

## ARGUMENT

I. **THE SCHOOL BOARD FAILED TO MEET ITS BURDEN TO JUSTIFY ITS POLICY CENSORING THE SPEECH OF STUDENTS UNDER *TINKER*.**

### A.    The *Tinker* Standard.

The now-vacated panel opinion correctly identified the issue and then accurately identified and quoted the relevant language from the controlling Supreme Court authority, but then reached a profoundly incorrect result.

The panel correctly determined the central issue was whether the **school could demonstrate** that the prohibited "on-campus and some off-campus speech … **materially disrupts** classwork or the order of the school…." *Id.* at 462 (citing *Kutchinski ex rel. H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 356-57 (6th Cir. 2023)) (emphasis added).  The panel stated:

> Under *Tinker*, a school policy may prohibit [such] speech … only where officials have a reasonable basis to believe that the speech will … **substantially disrupt** school activities….  This requires **evidence** of "something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint…." *Tinker* thus sets forth a "demanding standard" to regulate student speech … that **school officials bear the burden** to meet…."  [*Id.* at 463 (emphasis added).]

Although *Tinker* clearly puts this burden of proof on "school officials," the panel believed that, since the appeal was taken from the denial of a motion for a

4

preliminary injunction, that burden of proof should be placed on plaintiffs. The panel affixed the burden on plaintiff in a curious way, asserting that plaintiff "must clearly show that the District has failed to meet its burden of reasonably forecasting substantial disruption." *Id*. at 463, n.2. Thus, the panel believed that even though the issue it was assessing is likelihood of prevailing on the merits, the school's burden is lessened because "the nature of that burden depends on the stage at which the record is evaluated." *Id*. Regardless of the merit of the panel's curious inversion of burden, the school has made no showing whatsoever of a risk of "material" or "substantial" disruption.

**B.    Erroneously Assuming "Substantial" or "Material" Disruption.**

The school offered literally nothing on which the panel could rely to find sufficient "evidence of the substantial disruption that repeated, intentional use of non-preferred pronouns to refer to transgender students can cause." *Id.* at 463. The panel based its belief that such use would cause "substantial disruption" on three factors:

- parents of these children believe the words will be considered insulting, humiliating, dehumanizing, derogatory, and unwanted;
- an article by a therapist asserts that students who have been "misgendered" all day often become traumatized, humiliated, and cry after school; and

5

- literature asserts measurable psychological and physiological harms. *See id*. at 463-64.

Notably, none of this "evidence" cited by the panel even mentions "disruption" of any sort, and certainly not "substantial" or "material" disruption. Rather, all of this "evidence" better falls in the category that *Tinker* described as "the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker* at 509. Here, the discomfort is that of students unwilling to conform to transgender ideology.

To fill this void, the panel offers only "common-sense conclusions based on human experience." *Parents Defending II* at 464. There is likely to be substantial dispute about what constitutes "common sense." These *amici* can envision two possible meanings.

By "common sense" proof of disruption, did the panel mean that a girl who suffers from the mental disturbance of gender dysphoria, and who then is infused with large amounts of testosterone which is known to make people more

aggressive,[2] a hormone now present at a level which her body was never designed to handle, could behave violently towards others?

Those who embrace the doctrine of transgenderism can be blinded to the reality of what is happening to young people. Beginning the investigation of the December 16, 2024 shooting at Abundant Life Christian School, "Madison Police Chief Shon Barnes dismissed questions about the female student's gender identity.... 'I don't know whether Natalie was transgender or not. And quite frankly, I don't think that's important at all'...." S. Lepore & R. Bowman, "Police chief slams questions about shooter's gender identity," *DailyMail.com* (Dec. 16, 2024). This Police Chief's faith in the doctrine of transgenderism blinded him to even investigate whether she identified as a male, whether she was prescribed testosterone, and, if so, whether that powerful hormone could

---

[2] *See, e.g.,* A. Powell, "How a hormone affects society," *The Harvard Gazette* (Sept. 17, 2021). T. Kristensen, *et al.*, "Effects of testosterone therapy on constructs related to aggression in transgender men: A systematic review," HORMONES AND BEHAVIOR, vol. 128 (Feb. 2021) ("Transgender men are assigned female sex at birth, but identify as men. The anabolic and androgenic sex hormone testosterone has been positively associated with aggression. Therefore, **transgender men** are warned of **increasing aggression** when initiating testosterone therapy." (Emphasis added.) It is not seriously disputed that testosterone can cause aggression. *See* M. Batrinos, "Testosterone and Aggressive Behavior in Man," INT'L J. OF ENDOCHINOLOGY AND METABOLISM 563-68 (June 30, 2012) ("Testosterone plays a significant role in the arousal of these behavioral manifestations in the brain centers involved in aggression....").

have affected her behavior.  On March 27, 2023, another biological female who it has been confirmed was transgender (born Audrey Elizabeth Hale, renamed Aiden Hale) killed three nine-year-old children and three adults at The Covenant School in Nashville, Tennessee before being shot and killed.  *See* D. Frudd, "Pics: Nashville trans school shooter's manifesto revealed," AmericanMilitaryNews.com (Sept. 3, 2024).

However, if that biological fact about the dangers of hormone therapy for girls were to be admitted, would the school system be able to restrict the freedoms of other students simply in order to avoid triggering emotionally unstable and chemically imbalanced students?  Of course, if that connection was ever acknowledged, it would raise the issue as to whether any girl should be pumped up with testosterone which could injure herself or cause her to injure others.  However, acknowledgment of such a fact would violate transgender ideology.

Alternatively, by "common sense," is the court adopting a mild form of "judicial notice" as to important and disputed policy issues, such as those who

demand for "common sense" gun control, irrespective of how a law may infringe on Second Amendment rights?[3]

If there is "common sense" involved here, it should be that biological sex is real and immutable, and that a person who believes he or she was born in the wrong body is wrong as a matter of science, revealed truth, and thousands of years of accumulated wisdom of the human species.[4]  Yet, without a shred of "evidence," the panel concludes, "PDE has not carried its burden to clearly show that prohibiting this speech likely violates *Tinker*...."  *Parents Defending II* at 465.  Actually, the truth is that the school has not carried its burden to demonstrate that using biological pronouns causes a "substantial" or "material" risk of disturbances of the educational experience.

**C.   Applying *Tinker* Correctly.**

In dissent, Judge Batchelder clearly identified the key principles drawn both from *Tinker* and from an earlier decision of this court.  *See Parents Defending II* at 476 (Batchelder, J., dissenting).

_____

[3]  *See, e.g.,* D. Schoen, "A bipartisan, commonsense approach to gun control is in the works," *The Hill* (June 5, 2022).

[4]  *See, e.g.,* Genesis 1:27; Deuteronomy 22:5; Mark 10:6.

9

- Schools cannot prohibit students from expressing certain viewpoints simply by deeming them "divisive." *Castorina ex rel. Rewt v. Madison Cnty. Sch. Bd.*, 246 F.3d 536, 544 (6th Cir. 2001).
- Divisive speech is part of the "hazardous freedom" that is "the basis of our national strength." *Tinker*, 393 U.S. at 508-09.
- Nor can schools restrict speech based on an "undifferentiated fear or apprehension of disturbance."[5] *Id.* at 508.
- To justify its restricting student speech, a school must show that the speech "would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Id.* at 509 (quotation marks omitted).

Judge Batchelder was puzzled how the *Tinker* standard could be met when the School had admitted "there has never been a disruption caused by a student's referring to another student using a nonpreferred pronoun." *Parents Defending II* at 476 (Batchelder, J., dissenting). And yet, here the school district would assume disruption, and go so far as to prevent students from sending a text off campus that could cause someone else to feel embarrassed, and to prohibit all jokes. *Id.* After all, "[a]ny difference of opinion 'may start an argument or cause a disturbance.'" But the First Amendment prevents schools from banning

---

[5] Disregarding *Tinker's* express requirement of substantial disruption, the district court believed that there was a "carve-out" to the First Amendment rights of schoolchildren to "prohibit … speech that gives rise to fears of … psychological harm … or create a hostile educational environment." Is the use of a biologically correct pronoun now to be deemed sufficient to create a "hostile educational environment"? The district court cited no legal support for its expansion of the *Tinker* constitutional "carve-out" to justify censorship of certain words that might make some people feel bad. *Parents Defending I* at 690.

10

speech based on the "undifferentiated fear" that comes from "[a]ny variation of the majority's opinion." *Id.*

## II.    IT IS ERROR TO ASSUME THE NORMAL SPEECH OF APPELLANTS' CHILDREN IS INJURIOUS, WHILE DISCOUNTING THE INJURY SUFFERED BY THE CENSORED CHILDREN.

### A.    The District Court Assumed a Great Deal.

The district court "concludes that a hostile environment created by discriminatory speech is enough to cause a substantial disruption on its own." *Parents Defending I* at 701.  This one sentence incorporates many assumptions.  First, when a student deliberately chooses to refer to certain other students using biologically correct pronouns, it constitutes "discriminatory speech" — whatever that may mean.  Second, such discriminatory speech creates a "hostile environment."  And third, that such a "hostile environment" "cause[s] a substantial disruption on its own."  None of these statements can be supported.

First, a pronoun is "The part of speech that substitutes for nouns or noun phrases and designates persons or things asked for, previously specified, or understood from the context."[6]  Two of the most commonly used pronouns are

---

[6] The American Heritage Dictionary of the English Language, "Pronoun." The personal pronouns in English are I, thou or you, he, she, it, we, ye, and they.

"he" to refer to biological males and "she" to refer to biological females. The district court has apparently decreed that as of some recent date — it doesn't identify when — the use of biologically accurate pronouns became "discriminatory speech" when used in reference to persons with gender dysphoria preventing the acknowledgment of reality, believing they were born in the wrong body. This is a foundational tenet of the Cult of Transgenderism, to which others must now bow down. Each person with a certain disorder is empowered to choose their own pronoun, and others must use that pronoun, or the speaker is presumed, without any evidence of motive, to be acting in a discriminatory and defaming manner triggering hostility. In other words, the court is ordering some students to indulge the fantasy of other students or suffer punishment for believing in reality.

Second, all government schools are places where students from time to time speak to each other in both civil and uncivil manners. Students make fun of others based on their looks, their name, their dress, their family situation, their school performance, their manner of speaking, their grades, etc. Those who have at one point attended government schools will recall that all of these forms of speech created a "hostile environment," which is unpleasant. However, on

the pantheon of values, the district court sanctions the school district's view that transgenderism is the highest value to be a protected characteristic, automatically creating a "hostile environment" when such girls or boys are the object of an unpreferred pronoun.

Lastly, while hostile environments exist routinely in every school, they do not cause "substantial disruption" under *Tinker* sufficient to justify the abrogation of First Amendment rights. Deliberate insults are permitted; use of scientifically correct speech is punished. This type of rule causes disrespect for the school system, and all authority, and is harmful to the students being muzzled, whose interests were wholly disregarded.

**B.    The Panel Implicitly Adopts the Cult of Transgenderism.**

Likewise, the panel spilled considerable ink on its concern for the feelings of "transgender" children who might prefer to be addressed by a pronoun misaligned with their biological sex. The court believed having to hear such pronouns would be "dehumanizing, degrading, and humiliating." *Parents Defending Education II* at 466. It was concerned such children would be "traumatized." *Id.* at 464. But the potential for negative effect on students

13

whose speech would be forcibly suppressed by the school district appeared to be of no concern to the panel.

Appellants' children would choose to refer to their classmates by pronouns reflecting their biological sex, on the basis of their own religious beliefs about transgenderism. These beliefs, which the school district and the panel describe as "dehumanizing," have been accepted as foundational presuppositions by Christianity for its entire existence, and indeed by the world's three major monotheistic religions, including Islam and Judaism. In Genesis, it is revealed: "So God created man in his own image, in the image of God created he him; male and female created he them." Genesis 1:27. The Cult of Transgenderism challenges the Biblical view that God is omniscient and omnipotent and does not make mistakes. Those who embrace the Cult of Transgenderism may choose to teach their children that there is no God, or that God makes mistakes, but they do not have the right to require the rest of the school to worship at the Idol of Transgenderism.

### C.    The Censorship Allowed by the District Court and Panel Could Sweep Broadly.

Under the district court and panel approach, it is not a stretch to predict that, should public school students even to quote certain portions of the Christian

14

sacred text, it would likely be viewed as "dehumanizing hate speech," and render the students liable to punishment.  Olentangy schools are effectively telling impressionable students that their sincerely held religious beliefs are unacceptable, contemptible, and deserving of punishment.  But that victimization appears not to concern the panel at all.

There are multiple instances in the past several years of street preachers being arrested in U.S. cities, including Seattle, Washington, and Reading, Pennsylvania, for "disorderly conduct" or as a "risk to public safety" for reading Bible verses in protest at gay pride parades.[7]  Other "Western democracies," such as Britain and Canada, have also begun to pass laws that threaten the reading of "divisive" Bible passages, and to arrest street preachers for preaching against homosexuality and transgenderism.[8]  Would such speech be allowed by the Olentangy school code?

---

[7] *See, e.g.,* A. Kumar, "Seattle police arrest street preacher for reading the Bible: 'Risk to public safety,'" *Christian Post* (July 2, 2022); I. Giatti, "Street preacher arrested for reading Bible verses at LGBT pride event" (June 8, 2023).

[8] *See, e.g.,* R. Foley, "US street preacher arrested in London says speaking truth is now a 'hate crime,'" *Christian Post* (Aug. 7, 2021).

Silencing speech does not remove oppression; it can only change the targets.  This Court should not countenance the panel's complete discounting of the victimization imposed on children by its speech suppression.  The Constitution gives the state no right to decide which side to bully.  It must simply protect speech.

### D.    Pronouns Are Not Limited to He/She.

The school's requirement that the student's preferred pronoun be used raises another question.  The courts below assumed that a biological boy's preferred pronoun would be "she," and the biological girl's pronoun would be "he."  There is nothing in the student conduct statement that limits students to demanding they be called by one of these two pronouns.  However, what if the transgender person were more creative?  If a biological boy wanted to be referred to by the pronoun "Queen," would use of that pronoun be required?  What about a biological boy who wanted to be known as "Butch."  If a boy or girl felt themselves to be "non-binary people who don't identify exclusively as men or women," would the other students be required to call them "they/them"?[9]

---

[9] Guide to Pronouns, Transgender Training Institute.

16

Additionally, what about "non-binary and gender non-conforming people who don't strictly identify as either male or female."[10]  What about a student who wanted to be referred to with a "Neopronoun" defined as "third-person pronouns that are not officially recognized in their language.  There have historically been quite a few neopronouns in the English language, with origins in trans and non-binary communities…."  Guide to Pronouns.  A non-comprehensive list of these neopronouns is:  "Ze/hir/hir/hirs/hirself or zie/hir/hir/hirs/hirself" and "Xe/xem/xyr/xyrs/xemself" and "Fae/fem/faers/faerself."  *Id*.

Lastly, transgender training advises "There are certain people who will want to go by some combination of pronouns.  This can look a lot of different ways.  There are people who might want to go by they/them in certain contexts and she/her in others."  *Id*.  Would the students be required to know the context in which the student wants to be referred that day?  Additionally, "[t]here might be people who will use he/him and ze/zir interchangeably and alternating.  There might be people who give you an option of they/them or xe/xem, and you can use either of those."  *Id*.

---

[10]  LGBTQNation, "An (incomplete) list of gender pronouns."

Would requiring students to know and remember which of these "pronouns" to use in addressing dozens of school mates really be conducive to good order and discipline in a government school? Is this really what we want our students to be focused on during the school day — or reading, writing, and arithmetic?

## III. THE PANEL'S FOUNDATIONAL STATEMENT THAT GOVERNMENT MAY CONSTITUTIONALLY REGULATE "DIVISIVE SPEECH" CONSTITUTES A DIRECT ASSAULT ON THE FIRST AMENDMENT LONG SOUGHT BY CRITICAL LEGAL THEORISTS.

Should the position advanced by the school district be adopted, it opens a dangerous hole in the protections afforded Americans by the First Amendment, achieving a result called for by "critical legal theorists." The school district's ban on biologically correct pronouns should be viewed in its broader context, where considerations of race, sex, and equity overrule the mandate of free speech.

The past several decades have witnessed a "burgeoning literature urging the regulation" of speech.[11] The school of "critical legal theory" developed in

---

[11] L. Menand, ed., The Future of Academic Freedom at 121 (Univ. Of Chicago Press: 1998).

18

the 1970s[12] and exploded in the 1990s as an adjunct to "critical race theory," and has since expanded into other manifestations including "critical feminist theory," "critical LGBTQ theory," and even "critical disability theory."[13]  Critical theory is laced with distaste for notions of equal justice and contempt for the First Amendment, and believes viewpoint discrimination is an indispensable tool for its success.  Without saying so, the panel appears to have adopted an important tenet of critical theory.

### A.    Critical Legal Theorists Have Targeted the First Amendment for Destruction.

A wide spectrum of "critical legal theorists" are oftentimes quite frank about their contempt for free speech.  Seattle University law professor Richard Delgado, "[c]redited as a founder of critical race theory"[14] has written, "[u]ntil now, the following argument has been determinative:  the First Amendment condemns that; therefore it is wrong.  We are raising the possibility that the correct argument may sometimes be: the First Amendment condemns that,

---

[12]  J. Butcher & M. Gonzalez, "Critical Race Theory, the New Intolerance, and Its Grip on America," *Heritage Foundation* (Dec. 7, 2020).

[13]  "Critical Disability Theory," *Stanford Encyclopedia of Philosophy* (Sept. 23, 2019).

[14]  "Acclaimed legal scholars and professors return to Seattle University School of Law," Seattle University (June 21, 2022).

therefore the First Amendment (or the way we understand it) is wrong."[15]  He

wrote, "The first amendment and free speech … [are] in short, an instrument of

majoritarian identity politics."[16]  Seattle University describes its professor as "the

first to question free speech ideology."[17]

In 1993, four law professors, including Delgado and professors Mari

Matsuda, Charles Lawrence, III, and Kimberle Williams Crenshaw, wrote a

book entitled Words That Wound, calling for criminalization specifically of

speech they define as "racist."  The authors are self-described "critical race

theorists."  Recognizing that the First Amendment bars criminalization of

speech, the authors simply declare war on it, in "a strategy of revolt against the

Constitution."[18]  They openly admit to "arguing against existing law."[19]  The

---

[15]  R. Delgado and J. Stefancic, Must We Defend Nazis? at 44 (New York
Univ. Press:  2018).

[16]  Id. at 160.

[17]  R. Delgado and J. Stefancic, "Living History Interview with Richard
Delgado & Jean Stefancic," 9 TRANSNAT'L L. & CONTEMP. PROBS. 221, 222
(2011).

[18]  C. Rufo, "DEI and the End of the Constitutional Order,"
AmericanMind.org (July 20, 2023).

[19]  M. Matsuda, C. Lawrence, R. Delgado and K. Crenshaw, Words That
Wound at 136 (Westview Press: 1993).

authors (who notably do not capitalize the "First Amendment" in their book) claim a "contradiction between first amendment absolutism and the goals of liberty and equality."[20]  The authors propose that indeed the American notion of "law is both a product and a promoter of racism."[21]  As Delgado writes, "critical race theory questions the very foundations of the liberal order, including ... legal reasoning ... and neutral principles of constitutional law."[22]  Amazingly, Delgado admits that the critical theorists, at their core, are "suspicious of another liberal mainstay, namely, rights....  [R]ights are ... alienating.  They separate people from each other — 'stay away, I've got my rights' — rather than encouraging to form close, respectful communities."[23]

Some critical theorists call for a "balancing" test between free speech and "preventing harm" from speech.  But they view the First Amendment as the wrong "balance."  Professor Toni Massaro argues that "[d]efining the proper balance between private freedom and preventing human suffering is an ongoing

---

[20]  *Id*. at 9.

[21]  *Id*. at 19.

[22]  R. Delgado and J. Stefancic, <u>Critical Race Theory: An Introduction</u>, 4th ed. 3. (New York Univ. Press: 2023).

[23]  *Id*. at 28-29.

liberal inquiry, not a matter of ready reference to a canon" such as the First Amendment.[24]  Others, such as Delgado and Stefancic, argue that judges cannot even reach the correct balance, because they themselves are infected by oppression.[25]  As to matters such as that at issue in this case, Delgado "argu[es] for valuing racial and gender equality more highly than freedom of speech" as a default position.[26]

Critical theory calls for eliminating First Amendment protection for "language that injures the dignity and self-regard" of the hearer, on the grounds that it causes "humiliation, isolation, and self-hatred."[27]

The vacated panel decision adopted critical theory wholesale.  "[T]he District may constitutionally distinguish between divisive and non-divisive speech, and choose to regulate the former but not the latter," the panel declared.

---

[24]  T. Massaro, "Equality and Freedom of Expression: The Hate Speech Dilemma," 32 WM. & MARY L. REV. 211, 229 (1991).

[25]  R. Delgado and J. Stefancic, "Hateful Speech, Loving Communities: Why Our Notion of 'A Just Balance' Changes So Slowly," 82 CAL L. REV. 851, 857-858 (1994).

[26]  R. Krotoszynski, The First Amendment in Cross-Cultural Perspective at 4 (New York Univ. Press: 2006).

[27]  R. Delgado, "Words That Wound: A Tort Action for Racial Insults, Epithets, and Name-Calling," 17 HARV. C. R.-C. L. L. REV. 133, 135, 137 (1982).

*Parents Defending II* at 469.  The panel adopted the critical theorists' exact justification for punishing speech, that "the use of non-preferred pronouns [is] dehumanizing, degrading, and humiliating." *Id.* at 466.

However, "[g]iving offense is a viewpoint," the Supreme Court has noted. The "'public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Matal v. Tam*, 582 U.S. 218, 243-44 (2017).  Of course, religious students' wish to simply refer to fellow students by proper pronouns cannot *ipso facto* be said to be intended to give offense.  Regardless, a student's wish to acknowledge scientific reality and his or her religious beliefs cannot constitutionally be prohibited.

In 1943, Justice Jackson famously warned about where employing censorship to achieve unanimity can lead:

> Those who begin coercive elimination of dissent soon find themselves exterminating dissenters.  Compulsory unification of opinion achieves only the unanimity of the graveyard.  [*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641 (1943).]

**B.    The Courts Below Erred in Adopting Critical Theory's Attack on the First Amendment.**

The district court actually cited articles by a number of critical theorists in support of its decision.  It declared that "[i]dentity-based comments cut to the

core of who we are as individuals and belittle our sense of place in society —
especially, though not exclusively, for individuals who are members of minority
groups that have been historically oppressed." *Parents Defending I* at 701.  As
support, the court cited to an article by Charles Lawrence, a co-author of <u>Words
That Wound</u>, in which Lawrence argues that "First Amendment doctrine … must
be guided by the principle of antisubordination."  Lawrence laments that the First
Amendment "treat[s] the marketplace of ideas as if all voices are equal.…"  *Id.*
at 792.  The district court quotes Lawrence for the strange proposition that
"allowing for discriminatory or harassing speech in the name of vindicating First
Amendment rights too often silenc[es] the voices of already-marginalized
listeners, by 'den[ying] [them] the humanizing experience of self-expression.'"
*Id.* at 712 (quoting Lawrence at 803).  The district court only highlights the
blatant viewpoint discrimination here; because the government believes one
perspective is good and the other bad, it may prohibit the perspective it doesn't
like.

While the panel opinion did not directly cite the critical theorists, it
appeared to adopt wholesale their reasoning, and that of the district court.  The
panel proclaims that "the District may constitutionally distinguish between

24

divisive and non-divisive speech, and choose to regulate the former but not the latter," and insists that children who identify as "transgender" may "experience the use of preferred pronouns as a vital part of affirming their existence and experience the use of non-preferred pronouns as dehumanizing, degrading, and humiliating." *Parents Defending II* at 469, 466. The panel's approach is directly identical to the Delgado/Matsuda approach of "telling stories" from "victims," as being superior to affirming the freedom of all speakers as the First Amendment commands.

## CONCLUSION

For the foregoing reasons, the district court's denial of a preliminary injunction should be reversed and a preliminary injunction should issue.

Respectfully submitted,

   */s/ William J. Olson*

PATRICK M. MCSWEENEY          WILLIAM J. OLSON*
 3358 John Tree Hill Rd.      JEREMIAH L. MORGAN
 Powhatan, VA  23139           WILLIAM J. OLSON, P.C.
                               370 Maple Avenue W., Suite 4
RICK BOYER                     Vienna, VA  22180-5615
 INTEGRITY LAW FIRM            (703) 356-5070
 P.O. Box 10953               *Attorney of Record
 Lynchburg, VA  24506         *Attorneys for Amici Curiae*

December 18, 2024

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of America's Future, *et al.*, in Support of Plaintiff-Appellant and Reversal, was made, this 18th day of December, 2024, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

_/s/William J. Olson_
William J. Olson
Attorney for *Amici Curiae*