No. 23-3630

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

PARENTS DEFENDING EDUCATION,

*Plaintiff-Appellant*,

v.

OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, *et al.*

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Southern District of Ohio, Eastern Division,
Case No. 23-cv-01595, The Honorable Algenon L. Marbley

## BRIEF FOR PROFESSORS PAMELA S. KARLAN AND MARTIN S. LEDERMAN AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

Pamela S. Karlan
559 Nathan Abbott Way
Stanford, CA 94305

Martin S. Lederman
600 New Jersey Ave., NW
Washington, D.C. 20001

January 28, 2025

Jaime A. Santos
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

Andrea S. Goodman
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

*Counsel for Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

Amici makes the following disclosures under R. App. P. R. 26.1 and 6th Cir. R. 26.1:

1. **Is any Amicus a subsidiary or affiliate of a publicly owned corporation?**

    No. Each Amicus is a natural person, and as such has no parent company and has not issued stock.

2. **Is there a public corporation, not a party to the appeal or an Amicus, that has a financial interest in the outcome?**

    None known.

*s/ Jaime A. Santos*
Jaime A. Santos
GOODWIN PROCTER LLP
1900 N Street N.W.
Washington, D.C. 20036
Telephone: (202) 346-4000
jsantos@goodwinlaw.com

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

                                                                              **Page**

INTEREST OF THE *AMICI CURIAE* ...................................................................1
INTRODUCTION ..................................................................................................1
ARGUMENT ..........................................................................................................5
I.     Public schools may prohibit student speech that insults or humiliates specific fellow students whether or not that speech might substantially disrupt school activities. ...............................................................................5
II.    Appellant's attempts to distinguish this case are unpersuasive.....................10
CONCLUSION.....................................................................................................12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Barr v. Lafon*,
    538 F.3d 554 (6th Cir. 2008) ........................................................................4, 13

*Bethel Sch. Dist. No. 403 v. Fraser*,
    478 U.S. 675 (1986) ...............................................................3, 8, 9, 10, 11

*Castorina v. Madison Cnty. Sch. Bd.*,
    246 F.3d 536 (6th Cir. 2001) ...........................................................................4

*Chen ex rel. Chen v. Albany Unified Sch. Dist.*,
    56 F.4th 708 (9th Cir. 2022) ............................................................................6

*Kowalski v. Berkeley Cnty. Schs.*,
    652 F.3d 565 (4th Cir. 2011) .......................................................................6, 11

*L.M. ex rel. Morrison v. Town of Middleborough*,
    103 F.4th 854 (1st Cir. 2024), *petition for cert. docketed*, No. 24-
    410 (U.S. Oct. 9, 2024) ...................................................................................4

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*,
    594 U.S. 180 (2021) .......................................................................................11

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ...........................................................................5

*Morse v. Frederick*,
    551 U.S. 393 (2007) ..........................................................................8, 9, 12, 13

*Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*,
    523 F.3d 668 (7th Cir. 2008) ...........................................................................4

*S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*,
    696 F.3d 771 (8th Cir. 2012) ...........................................................................6

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.*,
    307 F.3d 243 (3d Cir. 2002) ...........................................................................11

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
   393 U.S. 503 (1969) ...................................................................................7, 8, 12

*West Virginia State Bd. of Ed. v. Barnette*,
   319 U.S. 624 (1943) ..................................................................................................4

**Other Authorities**

20 U.S.C. 1681(a) ...............................................................................................8

Robert Post, *Theorizing Student Expression: A Constitutional Account
   of Student Free Speech Rights*, 76 Stan. L. Rev. 1643, 1656 (2024) ...................9

Mark Walsh, *A Supreme Court Rebuke Over Use of Proper Pronouns
   in Transgender Case*, Education Week, Mar. 3, 2017,
   https://perma.cc/7C8X-GTCH...............................................................................10

# INTEREST OF THE *AMICI CURIAE*[1]

Pamela S. Karlan is the Kenneth and Harle Montgomery Professor of Public Interest Law and the Co-Director of the Supreme Court Litigation Clinic at Stanford Law School. Martin S. Lederman is Professor from Practice and Senior Fellow of the Supreme Court Institute at the Georgetown University Law Center. Amici's teaching and scholarship focus on constitutional law. As relevant here, they have a particular interest in how constitutional law bears upon public education.

# INTRODUCTION

The students whom appellant represents wish to be able to refer to fellow students using pronouns that they assume—accurately or not—to be "consistent with their classmates' biological sex," and to do so "repeatedly and at all times, including inside and outside the classroom, in the classmates' presence, and when referring to the classmates outside of their presence."[2] What's more, they would do so even though they "understand that their speech will be considered 'insulting,' 'humiliating,' 'dehumanizing,' 'derogatory,' and 'unwanted' to those who want to

---

[1] Amici certify that no person or entity, other than amici and their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. *See* Fed. R. App. P. 29(a)(4)(E).

[2] Verified Complaint ¶ 96, R. 1, PageID #27 (quoting Declaration of Parent B ¶ 11, R. 7-4, PageID #371) (emphasis added); *see also id.* ¶¶ 76, 134, R. 1, PageID ##22-23, 36 (quoting virtually identical declarations of Parent A ¶ 11, R. 7-3, PageID ##363-64; and Parent D ¶ 11, R. 7-6, PageID #385).

1

go by different pronouns."[3] Because the speakers' proposed use of pronouns would inflict such harms upon their fellow students, the Olentangy Local School District prohibits that conduct.

Accordingly, the discrete question before the en banc court is simple and narrow: May a public school prohibit its students from repeatedly referring to particular, identified fellow students in a manner that causes such harm? *See* Pl.-Appellant's Reply Br. in Support of Pet. for Rehearing En Banc 2 (characterizing that as the "core question presented" for en banc rehearing).

The answer to that question is equally straightforward: Of course a school may do so. The Constitution permits public schools to inculcate students in "the habits and manners of civility" that are "indispensable to the practice of self-government in the community and the nation," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986) (citation and quotation marks omitted), including the common norm of treating other members of their institutional community with dignity and respect. Moreover, a school's authority to forbid student speech that violates that norm does not depend—as the district court and the three-judge panel assumed it did—upon whether the school can also establish that such speech would "materially disrupt[] classwork or the order of the school." Panel Op. 8.

---

[3] See the portions of the Verified Complaint and Declarations cited in footnote 2.

Critically, this en banc proceeding does *not* involve two other, more fact-dependent questions commonly presented in cases involving student speech.

First, the case does not concern the rights of students to express views in school about controversial *topics* of public concern even when other students find those views offensive or otherwise substantively objectionable.[4] The School District has confirmed that its policies do not limit general student speech—*i.e.*, speech not targeted to or about particular other students—regarding gender identity, the appropriateness of gender transition, or even what names or pronouns transgender individuals ought to use. *See* Defs.-Appellees' Supp. En Banc Br. 1 ("students are free to openly discuss their views on this topic without fear of disciplinary action"). The students represented by appellant therefore may freely express in school "that their religion teaches that gender is immutable" (Parent A Decl. ¶ 10, R. 7-3, PageID #363). *See* Defs.-Appellees' Panel Br. 15 (confirming that the District's policies "do not even arguably proscribe" such speech).

Second, the District's policies at issue here do not *compel* any student to affirm the truth of anything the student does not believe—something that would raise

---

[4] *See, e.g.*, *Castorina v. Madison Cnty. Sch. Bd.*, 246 F.3d 536 (6th Cir. 2001) (shirts depicting Confederate flag); *Barr v. Lafon*, 538 F.3d 554 (6th Cir. 2008) (clothing with Confederate flag); *see also Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668 (7th Cir. 2008) (student wearing t-shirt with "Be Happy, Not Gay" slogan and making negative comments about homosexuality); *L.M. ex rel. Morrison v. Town of Middleborough*, 103 F.4th 854 (1st Cir. 2024) (t-shirt reading "There Are Only Two Genders"), *petition for cert. docketed*, No. 24-410 (U.S. Oct. 9, 2024).

an obvious constitutional issue under *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943). To the contrary, the District does not even require students to refer to their peers using pronouns that are inconsistent with the speaking students' beliefs about the "true" nature of their fellow students' sex, let alone to make an "affirmation [that] would state a falsehood that violates [the appellant's members' children's] core views of scientific reality and, for most, their religious faith." Pl.-Appellant's Supp. En Banc Br. 11. Instead, students are free not to refer at all to particular students they assume to be transgender or nonbinary, or they can refer to such students by their given names or last names or use the pronoun "they." *See* Panel Op. 14 n.7. Accordingly, this case is nothing like *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), where a college required a professor to refer in class to a transgender woman student using female pronouns ("Ms.") and prohibited that professor from adopting what the Court called the "win-win" option of referring to the student by her last name alone, *id.* at 510-11.

Appellant contends that the option of referring to a fellow student by their name "doesn't work if, say, a male student starts going by a female name." Pet. for Rehearing En Banc 8. But even if a school *required* students to refer to other students (and teachers, etc.) by their names, surely that would raise no serious constitutional concern, even as applied to a student whose name is not a traditional match for what the speaker assumes to be that person's sex (something that might

4

happen even if the student is cisgender—think, for example, of Evelyn Waugh, Lynn Swann, Judge Frank Hull, or Glenn Close).

## ARGUMENT

I. **Public schools may prohibit student speech that insults or humiliates specific fellow students whether or not that speech might substantially disrupt school activities.**

For as long as there have been public schools, school administrators have had to deal with students who speak to or about other students in ways that insult or humiliate those classmates—often on the basis of real or perceived sex characteristics or stereotypes. Recent examples include students who posted to a webpage a photograph of a classmate captioned "portrait of a whore," *Kowalski v. Berkeley Cnty. Schs.*, 652 F.3d 565, 568 (4th Cir. 2011), and students who published a website containing sexually explicit and degrading comments about named female classmates, *see S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 773 (8th Cir. 2012); s*ee also, e.g.*, *Chen ex rel. Chen v. Albany Unified Sch. Dist.*, 56 F.4th 708 (9th Cir. 2022) (involving insults and invective about other characteristics of particular students).

And for just as long, school administrators have forbidden such derogatory or otherwise harmful speech about fellow students and disciplined students who engaged in it. As the courts in the cases cited above have held, the First Amendment

5

permits schools to do so when they reasonably conclude that the insulted students are likely to learn of the insults and thus be humiliated by them.

The reasoning of those cases applies here, too. Amici agree with the panel majority that the speech appellant insists the District must permit can have "dehumanizing and humiliating effects" that "could create a substantial 'disrupt[ion] [to] the educational process,'" at the very least with respect to the students who are misgendered, thus "justifying restricting the use of [the misgendering] pronouns." Panel Op. 10. (By "misgendering," Amici refer to a speaker's use of a name or pronoun that is inconsistent with the referred-to individual's own understanding of their sex, whether or not the referenced person is transgender.)

The en banc Court should not assume, however—as the panel did—that a school may prohibit such student speech about identified fellow students "*only* where officials have a reasonable basis to believe that the speech will either substantially disrupt school activities or interfere with the rights of others." Panel Op. 8 (emphasis added) (citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)). The Supreme Court articulated the "substantial disruption" test in *Tinker* with an eye to a very different type of controversial student speech—namely, expression on a matter of public concern that is not about, or directed to, particular fellow students. As subsequent decisions make clear, "the rule of *Tinker*"—in particular, its "substantial disruption" test—"is not the only basis for restricting

6

student speech." *Morse v. Frederick*, 551 U.S. 393, 406 (2007).[5]

In *Morse* itself, for example, the Court held that students could be sanctioned for unfurling a banner offsite that the school reasonably regarded as promoting illegal drug use, notwithstanding the absence of any "evidence of material disruption to classwork or school discipline." *Id.* at 405.

And, most significantly, although the Supreme Court in *Fraser* did not apply *Tinker*'s "substantial disruption" test, it nevertheless held that a school could suspend a student who delivered a speech at a high school assembly that used "an elaborate, graphic, and explicit sexual metaphor," 478 U.S. at 677-78, in light of the school's objective to "inculcate" in its students "the habits and manners of civility as values in themselves conducive to happiness and as indispensable to the practice of self-government in the community and the nation," *id.* at 681 (citation and quotation marks omitted). The Court explained that although the "fundamental values of 'habits and manners of civility' essential to a democratic society must, of

---

[5] Wholly apart from *Tinker*'s "substantial disruption" prong, Amici believe that the proposed misgendering speech would "inva[de] … the rights of others," *Tinker*, 393 U.S. at 513, under Title IX of the Education Amendments Act of 1972. Because the speech here would be based upon the real or perceived sex characteristics of other students and would cause them more than *de minimis* harm, the affected students would, "on the basis of sex, … be subjected to discrimination under any education program or activity receiving Federal financial assistance," 20 U.S.C. 1681(a), if the District (which receives federal financial assistance) did *not* prohibit such misgendering. Space limitations preclude our further discussion of the Title IX question, but the Court need not consider it in light of the alternative rationale we discuss in the text.

7

course, include tolerance of divergent political and religious views, even when the views expressed may be unpopular," they "must also take into account consideration of the sensibilities of others, and, in the case of a school, *the sensibilities of fellow students*." *Id.* (emphasis added). "The undoubted freedom to advocate unpopular and controversial views in schools and classrooms," wrote the Court, "must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior," which "requires consideration for the personal sensibilities of the other participants and audiences." *Id.*; *see also* Robert Post, *Theorizing Student Expression: A Constitutional Account of Student Free Speech Rights*, 76 Stan. L. Rev. 1643, 1656 (2024) (discussing the Court's approval of school efforts "to induce students to internalize community norms that define respect and dignity").

The Court's rationale in *Fraser* applies even more powerfully here, where the School District prohibits students from referring *to other members of the community* in a way that concededly insults and humiliates them. Even though those same insults might be constitutionally protected when made "in a public forum outside the school context," *Morse*, 551 U.S. at 405, avoiding interpersonal insults and inculcating students with an understanding of the importance of respecting others within an institutional community are high among the "habits and manners of

8

civility," *Fraser*, 478 U.S. at 681, that a public school may and should take steps to promote.

Rules requiring speakers to avoid disrespectful speech about other institutional participants are hardly unique to the school setting.  For example, the Court pointed out in *Fraser* that "[i]n our Nation's legislative halls, where some of the most vigorous political debates in our society are carried on, there are rules prohibiting the use of expressions offensive to other participants in the debate." 478 U.S. at 681.  So, for example, pursuant to the Senate Rules of Debate, "Senators have been censured for abusive language directed at other Senators." *Id.*

Such norms apply in a judicial setting, too.  Counsel routinely express strong views, in briefs and in oral arguments, about all manner of controversial topics.  Substantive constraints on such advocacy could certainly raise First Amendment concerns.  Just as surely, however, if an attorney were to deliberately refer to a Judge of this Court, or opposing counsel or a litigant, using pronouns that do not correspond to that person's gender identity and in a way that could have a dehumanizing impact, this Court presumably would (at a minimum) admonish that attorney.  Indeed, the Supreme Court of the United States has already done so.  *See* Mark Walsh, *A Supreme Court Rebuke Over Use of Proper Pronouns in Transgender Case*, Education Week, Mar. 3, 2017, https://perma.cc/7C8X-GTCH.  The assertion of a First Amendment defense to such a rebuke would be frivolous.

This is an even easier case, for two reasons. First, disrespectful or cruel speech about fellow students—including misgendering—can have much more harmful effects on a minor than similar speech does on an adult in a professional setting. Moreover, unlike Congress or the courts, a public school has a "basic educational mission," *Fraser*, 478 U.S. at 685, to inculcate in the minors under its care norms of civility and respect for fellow members of the institution. It is thus unsurprising that courts have held that "[s]tudents cannot hide behind the First Amendment to protect their 'right' to abuse and intimidate other students at school." *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 264 (3d Cir. 2002); *see also Kowalski*, 652 F.3d at 573 (demeaning speech about fellow students is "not the conduct … our educational system is required to tolerate").[6]

## II. Appellant's attempts to distinguish this case are unpersuasive.

Appellant does *not* argue that the First Amendment protects a right of the paradigmatic bully to insult, humiliate, or dehumanize a fellow student on the basis of that student's real or perceived sex characteristics, including by referring to that

---

[6] We do not mean to suggest that a school is wholly free to prohibit students from in any way *criticizing* members of the community—for example, by taking issue with students' or teachers' views on relevant issues or the way in which a coach has treated an extracurricular team. *See Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 191 (2021) (contrasting such criticism with "target[ing] any member of the school community with vulgar or abusive language"). That is a far cry, however, from the sort of repeated insulting, humiliating, dehumanizing, and derogatory references to fellow students based upon their real or perceived sex characteristics that the student speakers here wish to convey.

10

student with unwanted names or pronouns. Nor does appellant assert that any of the appellate decisions rejecting a Free Speech claim in such cases, *see supra*, p. 5, were wrongly decided. Instead, petitioner suggests two bases for distinguishing this case from those others. Neither is persuasive.

First, appellant insists the students here who wish to misgender their peers, unlike the typical bully, bear "no ill will" toward their classmates and seek only to "express their deeply held views." *See* Verified Complaint ¶¶ 76, 96, 134, R. 1, PageID ##23, 27, 36 (quoting paragraph 11 in the Declarations of Parents A, B, and D—*see* R. 7-3, PageID ##363-64; R. 7-4, PageID #371; R. 7-6, PageID #385).

Their intent does not matter. As the Court in *Morse* explained, what is relevant in this context is not what the student's *motive* might have been, but the reasonableness of the school's assessment of the likely *impact* of the speech. 551 U.S. at 401-02. And here, the parties agree, and the panel majority correctly found, that the repeated misgendering of fellow students would significantly harm such students, regardless of the speakers' motives. *See supra*, pp. 1-2. That harm-causing speech would also undermine the school's effort to inculcate respect for members of the community, regardless of the speaker's purported lack of ill will.

Second, appellant argues that even if a school's speech restriction satisfies the *Tinker* line of decisions, it nonetheless violates the Free Speech Clause if the school

discriminated on the basis of the viewpoint expressed in the speech. Pl.-Appellant's Supp. En Banc Br. 16. That argument is also unavailing.

For one thing, the school practice at issue here is not viewpoint-discriminatory as that term is properly understood. Like school districts throughout the land, the Olentangy Local School District forbids students from repeatedly referring to their peers in *any* insulting or humiliating manner, regardless of the nature of the particular insult or what "viewpoint" the speaking student intends to convey.

More fundamentally, the Court's precedents in this area permit schools to restrict certain forms of student speech even on a viewpoint-dependent basis. *Morse* is the best example of this. The reason the school in that case sanctioned the students who unfurled the banner was that it expressed a viewpoint about drug use that undermined the contrary lesson the school was entitled to convey. Yet that viewpoint-based rationale was precisely the ground on which the Court rejected the First Amendment claim. Therefore, to the extent Sixth Circuit panel decisions might suggest that the First Amendment imposes an independent prohibition on viewpoint discrimination in this context, *see, e.g.*, *Barr v. Lafon*, 538 F.3d 554, 570-71 (6th Cir. 2008), the en banc Court should reject that idea.

## CONCLUSION

This Court should affirm the judgment of the district court.

|  | Respectfully submitted, |
|---|---|
|  | *s/ Jaime A. Santos* |
| Pamela S. Karlan | Jaime A. Santos |
| 559 Nathan Abbott Way | GOODWIN PROCTER LLP |
| Stanford, CA 94305 | 1900 N Street, NW |
|  | Washington, DC 20036 |
| Martin S. Lederman | (202) 346-4000 |
| 600 New Jersey Ave., NW |  |
| Washington, D.C. 20001 | Andrea S. Goodman |
|  | GOODWIN PROCTER LLP |
| January 28, 2025 | 100 Northern Avenue |
|  | Boston, MA 02210 |
|  | (617) 570-1000 |
|  | *Counsel for Amici Curiae* |

# CERTIFICATE OF COMPLIANCE

This brief complies with the type volume limitations of Federal Rules of Appellate Procedure 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and 6th Circuit Rule 32(b)(1), it is twelve pages long.

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it appears in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: January 28, 2025                     <u>*s/ Jaime A. Santos*</u>
                                                                    Jaime A. Santos

                                                                    *Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 28, 2025, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

*s/ Jaime A. Santos*
Jaime A. Santos

*Counsel for Amici Curiae*
