Case No. 23-3630

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| PARENTS DEFENDING EDUCATION<br><br>　　Plaintiff-Appellant<br><br>v.<br><br>OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, *ET AL*.<br><br>　　Defendants-Appellees | Civil Appeal from<br>United States District Court<br>for the Southern District of Ohio<br>Case No. 2:23-cv-01595 |

SUPPLEMENTAL BRIEF UPON REHEARING *EN BANC*
OF
*AMICUS CURIAE* EQUALITY OHIO
SUPPORTING AFFIRMANCE AND
SUPPORTING DEFENDANTS-APPELLEES

ATTORNEYS FOR *AMICUS CURIAE* EQUALITY OHIO:

Mark P. Herron  (Lead Counsel)
Herron Law Offices
5001 Mayfield Road, Suite 318
Lyndhurst, Ohio 44124
Phone: 216-280-2828
E-mail: HerronLaw@msn.com

Robert S. Chaloupka
Nicola, Gudbranson & Cooper
Terminal Tower, Suite 2900
50 Public Square
Cleveland, Ohio 44113
Phone: 216-621-7227
E-mail: chaloupka@nicola.com

Paul Giorgianni
Giorgianni Law LLC
1538 Arlington Avenue
Columbus, Ohio 43212-2710
Phone: 614-205-5550
E-mail: Paul@GiorgianniLaw.com

## TABLE OF CONTENTS

Table of Authorities .................................................................................... iii

Argument ...................................................................................................... 1

    I.   Introduction. ................................................................................... 1

    II.  The School District's policies do not compel speech in violation of the Free Speech Clause. .................................................................. 2

        A.  The School District's policies do not compel speech at all. ................ 2

        B.  To the extent the School District's policies compel speech, such compulsion is incidental to the civil conduct the policies require and does not offend the Free Speech Clause. ......................................... 5

        C.  To the extent the School District's policies compel non-incidental speech in the context of school activities, such compulsion promotes a "legitimate pedagogical concern." ........................................... 6

    III. The Free Speech Clause does not bar public primary and secondary schools from regulating targeted, intentional misgendering that rises to the level of harassment, threat, humiliation, embarrassment or intimidation. ...................................................................................... 7

Conclusion ................................................................................................... 10

Certificate of Compliance with Type-Volume Limit .................................. 12

Certificate of Service .................................................................................. 12

¶

# TABLE OF AUTHORITIES

## CASES

*Castorina v. Madison Cty. Sch. Bd.*,
　246 F.3d 536 (6th Cir. 2001) ........................................................................ 7, 8

*Hazelwood Sch. Dist. v. Kuhlmeier*,
　484 U.S. 260 (1988) ............................................................................................ 6

*Mahanoy Area School Dist. v. B.L.*,
　141 S. Ct. 2038 (2021) ........................................................................................ 8

*Meriwether v. Hartop*,
　992 F.3d 492 (6th Cir. 2021) ............................................................................. 4

*Tinker v. Des Moines Indep. Community Sch. Dist.*,
　393 U.S. 503 (1968) ........................................................................................ 7-8

*West Virginia State Bd. of Educ. v. Barnette*,
　319 U.S. 624 (1943) ............................................................................................ 4

*Wooley v. Maynard*,
　430 U.S. 705 (1977) ............................................................................................ 3

## CONSTITUTION

U.S. Const., First Am., Free Speech Clause .................................................. *passim*

ARGUMENT

**I.   Introduction.**

Equality Ohio filed an *amicus* brief on October 31, 2023 (Doc. 71). That brief is hereby incorporated by reference and is supplemented by this brief.

This brief, like the 2023 brief, addresses only the "pronoun" policy established by the challenged school-district policies—the question being whether the School District may, consistent with the Free Speech Clause, regulate targeted, intentional-misgendering harassment.

PDE makes two general Free-Speech arguments regarding targeted, intentional-misgendering harassment: (1) that the School District's policies ***compel*** speech—specifically, gendered pronouns when referring to transgender students; and (2) that the School District's policies ***forbid*** speech—specifically, gendered pronouns when used to harass fellow students.

The School District's policies do not compel speech in violation of the Free Speech Clause. And the Free Speech Clause does not bar public primary and secondary schools from forbidding targeted, intentional misgendering that rises to the level of harassment, threat, humiliation, embarrassment or intimidation.

## II. The School District's policies do not compel speech in violation of the Free Speech Clause.

The School District's policies either do not compel speech at all or compel speech only incidentally and not contrary to the Free Speech Clause. And even assuming the policies compel non-incidental speech, the policies would not violate the Free Speech Clause to the extent they regulate speech in the context of school activities. This is so because the policies enforce the "legitimate pedagogical concerns" of civility and grammar.

### A. The School District's policies do not compel speech at all.

1. PDE wrongly asserts that the School District's policies compel speech—that "[t]he Policies require students to refer to their peers with their 'preferred pronouns.'" (Complaint ¶ 8, PageID 3.) PDE is incorrect in two respects.

*First:* Pronouns are not, as PDE contends, "'required by the English language.'" (Doc. 28, PDE brief, p. 20, ¶ 2 (quoting district court opinion).) The panel majority indicated correctly that "compelled speech" requires "actual compulsion" and that there is no compulsion when speakers "have options" that "do not violate their conscience." (Doc. 89-2, p. 13, ¶ 3 (quotation marks omitted).) PDE students can refer to transgender students by their proper names instead of pronouns.

2

PDE, like the dissenting panel judge, relies upon the straw-man fallacy that "speaking proper English is 'impossible' without pronouns." (Doc. 134, PDE supp. brief, p. 24, ¶ 3.) The School District does not require students to speak without pronouns. The School District requires students to refrain from targeted harassment by intentional misgendering. PDE students can so refrain by referring to the few transgender students they encounter by the transgender students' proper names. The relatively small number of transgender individuals means that the infrequency of such references is nothing like Americans' reliance on motor vehicles, which was the decisive factor in *Wooley v. Maynard*, 430 U.S. 705 (1977) (holding that compelled display of state motto on license plates violated the Free Speech Clause).

*Second:* As Equality Ohio pointed out in its initial brief (Doc. 71, pp. 7-9), the School District's policies do not require use of preferred pronouns. With regard to pronouns, the policies require only that students refrain from targeted, harassing, intentional misgendering—using pronouns *contrary* to the target's gender identity. PDE's students can use the genderless pronouns "they," "them," and "their" for *everyone*, to the exclusion of gendered pronouns. The dissenting panel judge ventured far from the text of the School District's policies by asserting that "using no pronouns[] requires the speaker to recognize and accept that gender transition is a real thing" (Doc. 89-2, p. 27, ¶ 1) and that "the policies demand that students pro-

3

fess fealty to a specific viewpoint on the contested issue of gender identity" (Doc. 89-2, p. 40, ¶ 3).

2. *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) (the "pledge of allegiance" case), is not the talisman the dissenting panel judge makes it out to be. The Supreme Court in *Barnette* noted that the case was distinguished in that "[t]he freedom asserted by these appellees does not bring them into collision with rights asserted by any other individual." *Id*. at 630. Here, in contrast, the School District's pronoun policy does no more than prohibit harassment of other students.

3. The dissenting panel judge opined that *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), in which the speaker was a public-college professor, is dispositive on the issue of compelled speech. (*See* Doc. 89-2, p. 37, ¶ 2.) The dissenter stated that "student speech receives *greater* First Amendment protection than employee speech" and that "*Meriwether* sets a floor, not a ceiling, on First Amendment protection." (*Id*. at 38, ¶ 2.) Those propositions are not dispositive here. All of the following may be true regarding the Free Speech Clause:

- College teachers have greater protection than K-12 teachers.
- College students have greater protection than K-12 students.
- K-12 students have greater protection than K-12 teachers.

4

But that would *not* mean, as the dissenter seems to suggest, that, all else equal, K-12 students have greater Free-Speech protection than does Professor Meriwether and other college teachers. As the panel majority noted regarding K-12 students, the Free Speech guarantee "is subject to some restrictions for public school students 'in light of the special characteristics of the school environment.'" (Doc. 89-2, p. 7, ¶ 2.)

### B. To the extent the School District's policies compel speech, such compulsion is incidental to the civil conduct the policies require and does not offend the Free Speech Clause.

The panel majority concluded that the School District's policies do not compel speech. Therefore, the panel majority did not reach the question of whether, assuming otherwise, such compulsion is constitutionally permissible as an incident to the policies' civil-conduct requirements. Nor did the dissenting panel judge address that question.

To the extent the School District's policies compel speech at all, such compulsion is incidental to the civil conduct the policies require and thus does not offend the Free Speech Clause. (*See* Equality Ohio brief, Doc. 71, pp. 9-12).

5

**C. To the extent the School District's policies compel non-incidental speech in the context of school activities, such compulsion promotes a "legitimate pedagogical concern."**

The panel majority expressly avoided all of the "legitimate pedagogical concern" issues. (Doc. 89-2, p. 12, n. 6.) The dissenting panel judge summarily rejected the pronoun issues as "far afield from legitimate pedagogical concerns." (*Id*. at p. 41, ¶ 1.)

In the context of school activities, schools are free to compel student speech to promote "legitimate pedagogical concerns." "[E]ducators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). The School District's pronoun policy is part of a legitimate pedagogy in two ways:

- The policy falls within the authority of schools to inculcate the school's choice of grammar.
- The policy falls within the authority of schools to enforce civility.

(*See* Equality Ohio brief, Doc. 71, pp. 9-12).

Not the least of schools' concerns should be the protection of intersex students. The existence of intersex people destroys PDE's "compelled speech" case, which rests upon the scientific fallacy that "people are either male or female." (Doc. 28, PDE brief p. 20, ¶ 1.) Among all the briefs and judicial opinions in this

6

case thus far, Equality Ohio is alone (with one telling exception[1]) in acknowledging the existence of intersex people.

### III. The Free Speech Clause does not bar public primary and secondary schools from regulating targeted, intentional misgendering that rises to the level of harassment, threat, humiliation, embarrassment or intimidation.

1. The dissenting panel judge would require the School District to prove "substantial disruption" of school activity to justify the School District's pronoun policy. In that regard, the dissenting judge asserts that this case "closely resemble[s]" *Castorina v. Madison Cty. Sch. Bd.*, 246 F.3d 536 (6th Cir. 2001), a case in which students were punished for wearing Hank Williams, Jr. shirts displaying confederate flags. (Doc. 89-2, p. 50, ¶ 1.)

But the free-speech right of public-school students to express transgender denialism extends only up to the point of "colliding with the rights of others," *Tinker*

---

[1] An *amicus* brief filed by four religion-driven entities acknowledges the existence of intersex people. (Doc. 55, pp. 21-22 & n. 39.) That brief is concerned primarily with the Free Exercise Clause of the First Amendment rather than the Free Speech Clause. The Free Exercise Clause is not the basis of any of PDE's claims, presumably because the School District accommodates students whose transgender denialism is purported to be a religious belief. (*See* R. 28, Dist. Ct. Op. pp. 7-8, PageID 816-17.) Regarding intersex people, the aforementioned *amicus* brief asserts that "Muslims' belief [is] that sex is binary, fixed, and immutable," and that "[m]en and women in Islam have different roles, responsibilities, and accountabilities." (Doc. 55, pp. 19-20.) The brief asserts that intersex people must "be designated as a certain sex, in order to be able to perform his or her duties as a Muslim." (*Id*. at 21, ¶ 2.)

*v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 513 (1968). "[C]onduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is . . . not immunized by the constitutional guarantee of freedom of speech." *Id*. *See Mahanoy Area School Dist. v. B.L.*, 141 S. Ct. 2038, 2047 (2021) (indicating that speech that "target[s] any member of the school community" is more likely to fall within the regulatory power of a school).

The speech in this case, unlike the speech in *Castorina*, is targeted harassment of individual students. The result in *Castorina* would have been different if those students had written on their shirts, underneath the confederate-flag image, "This means you, Martin."

The panel majority correctly analyzed this issue. (Doc. 89-2, p. 17-3, ¶ 3.)

2. The School District's pronoun policy does not discriminate based on viewpoint. Forbidding harassment by targeted, intentional misgendering is a "manner" restriction on speech. The panel majority correctly pointed out that "although school officials may not silence viewpoints based on offensiveness, they may—in service of avoiding substantial disruption—regulate *how* potentially offensive viewpoints are expressed." (Doc. 89-2, p. 17, ¶ 3.) PDE students are generally free to express transgender denialism at any time, in any place, and in any

8

manner. The only thing they cannot do is target individual students with harassment by intentional misgendering.

Contrary to the assertion of the dissenting panel judge, it does not appear that the School District has "chosen a particular viewpoint on gender identity, namely that it is not fixed at birth." (Doc. 89-2, p. 44, ¶ 1.) Nor is the School District requiring students to accept that "gender transition is a real thing." (*Id.* at 26, ¶ 3.) The dissenting judge incorrectly states that "the speech at issue here concerns the *existence* of gender transition, not just a debate about gender-identity issues or misgendering." (*Id.* at 26, ¶ 2.)

The panel majority was correct: "[D]iscussing sex and gender identity [which the School District permits up to the point of harassment] is different from using non-preferred pronouns to state that one's transgender classmate is not really a girl." (*Id.* at 17, ¶ 3.) The School District's pronoun policy does not express ideology. It does not adopt, reject, or otherwise opine on whether transgender students are "real." The policy addresses the legitimate pedagogical concern of teaching and maintaining civility and respect for all students.

Far from discriminating against any viewpoint, the School District is protecting *all* students from *any* other student's using pronouns contrary to gender identity for the purposes of targeted harassment:

> ▪ It matters not that a student's expressive content, embodied in a pronoun targeting a transgender student, is transgender denialism.

9

- It matters not that a student's expressive content, embodied in a pronoun targeting a PDE student or other non-transgender student (referring to a boy as "she" or a girl as "he") is disdain for transgender denialism.

The School District forbids using pronouns as weapons of harassment. The School District's policy does not discriminate based upon viewpoint.

## CONCLUSION

The Court should rule

- either (1) that the School District's policies do not compel speech; or (2) that the School District's policies compel speech, if at all, only incidentally and not contrary to the Free Speech Clause; or (3) that in the context of school activities, any speech compelled by the policies is outside the protection of the Free Speech Clause because the policies enforce a "legitimate pedagogical concern;" and

- that the Free Speech Clause does not bar primary and secondary schools from regulating targeted intentional-misgendering harassment.

10

Respectfully submitted,

/s/ Mark P. Herron  (Lead Counsel)
Herron Law Offices
5001 Mayfield Road, Suite 318
Lyndhurst, Ohio 44124
Phone: 216-280-2828
E-mail: HerronLaw@msn.com

/s/ Robert S. Chaloupka
Nicola, Gudbranson & Cooper
Terminal Tower, Suite 2900
50 Public Square
Cleveland, Ohio 44113
Phone: 216-621-7227
E-mail: chaloupka@nicola.com

/s/ Paul Giorgianni
Giorgianni Law LLC
1538 Arlington Avenue
Columbus, Ohio 43212-2710
Phone: 614-205-5550
E-mail: Paul@GiorgianniLaw.com

*Attorneys for* Amicus Curiae *Equality Ohio*

RULE 32(G)(1) CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMIT

1.  This document complies with the page limit established by the November 1, 2024 briefing letter (Doc. 133) and Fed. R. App. P. 29(a)(5), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1) this document is no more than 12½ pages (one half of the 25 pages the briefing letter allots the parties).

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2309 in 14-point Times New Roman.

/s/ Paul Giorgianni
*Attorney for Equality Ohio.*
January 28, 2025


CERTIFICATE OF SERVICE

This document was served on all counsel of record via filing in the Court's CM/ECF system on January 28, 2025.

/s/ Paul Giorgianni
*Attorney for Equality Ohio*
January 28, 2025