RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0159p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────

PARENTS DEFENDING EDUCATION,

*Plaintiff-Appellant*,

*v.*

OLENTANGY LOCAL SCHOOL DISTRICT BOARD OF
EDUCATION; MARK T. RAIFF, in his official capacity as
Superintendent of Olentangy Local School District;
PETER STERN, in his official capacity as Olentangy's
Assistant Director of Equity and Inclusion; RANDY
WRIGHT, in his official capacity as Olentangy's Chief
of Administrative Services; KEVIN DABERKOW, in his
official capacity as a member of the Olentangy Board
of Education; BRANDON LESTER, in his official
capacity as a member of the Olentangy Board of
Education; KEVIN O'BRIEN, in his official capacity as
a member of the Olentangy Board of Education;
LIBBY WALLICK, in her official capacity as a member
of the Olentangy Board of Education; LAKESHA WYSE,
in her official capacity as a member of the Olentangy
Board of Education,

*Defendants-Appellees*.

> No. 23-3630

───────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:23-cv-01595—Algenon L. Marbley, Chief District Judge.

Argued:  February 1, 2024

Decided and Filed:  July 29, 2024

Before:  BATCHELDER, STRANCH, and DAVIS, Circuit Judges.

––––––––––––––––––

## COUNSEL

**ARGUED:** J. Michael Connolly, CONSOVOY MCCARTHY PLLC, Arlington, Virginia, for Appellant. Bartholomew T. Freeze, FREUND, FREEZE & ARNOLD, Columbus, Ohio, for Appellees. **ON BRIEF:** J. Michael Connolly, Taylor A.R. Meehan, Cameron T. Norris, James F. Hasson, Thomas S. Vaseliou, CONSOVOY MCCARTHY PLLC, Arlington, Virginia, Emmett E. Robinson, ROBINSON LAW FIRM LLC, Cleveland, Ohio, for Appellant. Bartholomew T. Freeze, Genevieve M. Hoffman, FREUND, FREEZE & ARNOLD, Columbus, Ohio, Jessica K. Philemond, Sandra R. McIntosh, Mitchell L. Stith, SCOTT SCRIVEN LLP, Columbus, Ohio, for Appellees. Joseph D. Spate, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, Scott C. Peters, Sherrie C. Massey, Daniel R. Shisler, PETERS KALAIL & MARKAKIS CO., L.P.A., Cleveland, Ohio, Deborah J. Dewart, Hubert, North Carolina, Adam E. Schulman, HAMILTON LINCOLN LAW INSTITUTE, Washington, D.C., Benjamin Isgur, SOUTHEASTERN LEGAL FOUNDATION, Roswell, Georgia, David J. Carey, AMERICAN CIVIL LIBERTIES UNION OF OHIO FOUNDATION, Columbus, Ohio, Freda J. Levenson, Amy R. Gilbert, AMERICAN CIVIL LIBERTIES UNION OF OHIO FOUNDATION, Cleveland, Ohio, Tyson C. Langhofer, Matthew W. Hoffmann, ALLIANCE DEFENDING FREEDOM, Lansdowne, Virginia, John J. Bursch, ALLIANCE DEFENDING FREEDOM, Washington, D.C., Kayla A. Toney, FIRST LIBERTY INSTITUTE, Washington, D.C., Steven W. Fitschen, NATIONAL LEGAL FOUNDATION, Chesapeake, Virginia, Ronald G. London, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, Washington, D.C., Talmadge Butts, FOUNDATION FOR MORAL LAW, Montgomery, Alabama, Mark P. Herron, HERRON LAW OFFICES, Lyndhurst, Ohio, Paul Giorgianni, GIORGIANNI LAW LLC, Columbus, Ohio, for Amici Curiae.

STRANCH, J., delivered the opinion of the court in which DAVIS, J., joined. BATCHELDER, J. (pp. 26–55), delivered a separate dissenting opinion.

––––––––––––––––––

## OPINION

––––––––––––––––––

JANE B. STRANCH, Circuit Judge. This case concerns a pre-enforcement challenge to school district policies that prohibit harassment based on a variety of protected characteristics, including—as relevant here—gender identity. The Olentangy Local School District, Ohio's fourth largest, promulgated several anti-harassment and anti-bullying policies. The policies prohibit students from repeatedly and intentionally using non-preferred pronouns to refer to their classmates. On behalf of certain parents and students, Plaintiff Parents Defending Education (PDE) seeks to enjoin the policies' enforcement based on the First Amendment's Free Speech

Clause. The district court determined that PDE had not met its burden to justify injunctive relief. We **AFFIRM.**

## I.  BACKGROUND

### A.  The District's Policies and This Lawsuit

PDE is a nationwide membership organization consisting primarily of parents of school-aged children, whose mission is "to reclaim our schools from activists promoting harmful agendas." *Parents Defending Education*, https://perma.cc/WKX6-8HYY. In February 2023, a PDE parent-member emailed the District to ask if their "devoutly Christian child who believes in two biological genders" would "be forced to use the pronouns that a transgender child identifies with or be subject to reprimand from the district." In response, the District's counsel stated that "[a] student purposefully referring to another student by using gendered language they know is contrary to the other student's identity would be an example of discrimination under" the District's policies. In a follow-up email, the District clarified that it was happy to discuss accommodations to avoid using pronouns where such use would contradict a student's religious beliefs.

Three of the District's Policies prohibit the intentional use of pronouns inconsistent with a student's gender identity where such use rises to the level of harassment. Although the District reserves the right to enforce its Policies, PDE does not allege that the District has disciplined any student for speech related to gender identity. The Policies are laid out in relevant part below.

#### 1.  Policy 5517—The Anti-Harassment Policy

The District adopted Policy 5517 "to maintain an education and work environment that is free from all forms of unlawful harassment." The Policy prohibits "discriminatory harassment" based on "gender identity" and many other protected characteristics; gender identity has been a protected characteristic since 2013. Policy 5517 defines harassment as:

> [A]ny threatening, insulting, or dehumanizing gesture, use of technology, or written, verbal or physical conduct directed against a student or school employee that . . . places a student or school employee in reasonable fear of harm to his/her person or damage to his/her property; . . . has the effect of substantially interfering

with a student's educational performance, opportunities, or benefits, or an
employee's work performance; or . . . has the effect of substantially disrupting the
orderly operation of a school.

R. 7-1, Vaseliou Decl., PageID 123.

The Policy also has a separate section on bullying, which explains that:

Bullying rises to the level of unlawful harassment when one (1) or more persons
systematically and chronically inflict physical hurt or psychological distress on
one (1) or more students or employees and that bullying is based upon one (1) or
more Protected Classes, that is, characteristics that are protected by Federal civil
rights laws. It is defined as any unwanted and repeated written, verbal, or
physical behavior, including any threatening, insulting, or dehumanizing gesture,
by an adult or student, that is severe or pervasive enough to create an intimidating,
hostile, or offensive educational or work environment; cause discomfort or
humiliation; or unreasonably interfere with the individual's school or work
performance or participation[.]

R. 7-1, PageID 122.

### 2. Policy 5136—The Personal Communication Devices (PCD) Policy

Policy 5136 governs student usage of personal communication devices (PCDs). Among
other prohibitions, this Policy forbids the usage of "a PCD in any way that might reasonably
create in the mind of another person an impression of being threatened, humiliated, harassed,
embarrassed or intimidated." The Policy further specifies that, "[i]n particular," students may
not use PCDs to "transmit material that is threatening, obscene, disruptive, or sexually explicit or
that can be construed as harassment or disparagement of others based upon their race, color,
national origin, sex (including sexual orientation/transgender identity), disability, age, religion,
ancestry, or political beliefs." R. 7-1, PageID 134. Although this section of Policy 5136 is silent
as to where its prohibitions apply, the district court found that it applies both on and off campus.

### 3. The Code of Conduct

The District's Code of Conduct promulgates rules for students meant to promote, among
other things, "[r]espect for the rights of others." PDE challenges two of the Code's provisions.
First, the Code prohibits the use of discriminatory language, "defined as verbal or written

Case: 23-3630    Document: 89-2    Filed: 07/29/2024    Page: 5

No. 23-3630                    *Parents Defending Educ. v. Olentangy*                    Page 5
*Local Sch. Dist. Bd. of Educ.*

comments, jokes, and slurs that are derogatory towards an individual or group based on one or more of the following characteristics:   race, color, national origin, sex (including sexual orientation and transgender identity), disability, age, religion, ancestry, or genetic information." R. 7-1, PageID 150.   Second, the Code prohibits "[h]arassment, intimidation, or bullying," defined as

> any intentional written, verbal, electronic, or physical act that a student has exhibited toward another particular student or students more than once and the behavior causes mental or physical harm to the other student(s) and is sufficiently severe, persistent or pervasive that it creates an intimidating, threatening or abusive educational environment for the other student(s).

R. 7-1, PageID 157.

### B.  Procedural History

In May 2023, PDE filed suit against the District and numerous District officials, along with a motion to "preliminarily enjoin [the District] from enforcing the Policies" at issue.   In support, PDE filed four declarations from pseudonymous parent-members (Parents A-D), each of whom have one or more children in District schools.   Parents A-D explain that their children have been raised to believe that biological sex is immutable and that individuals cannot transition from one sex to another.   Additionally, Parents A-D aver that their children want to "express[] their belief that sex is immutable . . . by using biologically accurate pronouns"—that is, pronouns that correspond to the sex assigned at birth rather than gender identity—"repeatedly and at all times," including in their transgender "classmates' presence."   The Parents also represent that their children wish to "otherwise explain[] their views" about gender identity.   The Parents' declarations state that their children refrain from using non-preferred pronouns and expressing their beliefs, however, because they fear that the District's Policies prohibit such speech.

The district court held that PDE had standing to challenge the Policies, but failed to show that the Policies were likely to violate the First Amendment on the merits.   The court noted that although the Policies prohibited "intentional misgendering of students," there was "nothing to suggest" that other discussions of gender identity issues are "prohibited under the Policies."   R. 28, Op. & Order, PageID 836.   Thus construed, the court explained, the challenged Policies

accord with the standard for regulating student speech established in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969). It then held that the Policies did not unconstitutionally compel speech, constitute unconstitutional viewpoint discrimination, or represent impermissibly overbroad restrictions. Reasoning that the remaining preliminary injunction factors also favored the District, the district court denied PDE's preliminary injunction motion. PDE timely appealed pursuant to our jurisdiction over denials of injunctive relief. *See* 28 U.S.C. § 1292(a)(1).

## II. STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy." *James B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)). This extraordinary remedy may "only be awarded upon a clear showing that" the four preliminary injunction factors—likelihood of success on the merits, danger of irreparable harm, balance of the equities, and the public interest—point in the plaintiff's favor. *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). When assessing an appeal of a preliminary injunction decision involving the First Amendment, we "review the District Court's legal rulings *de novo* (including its First Amendment conclusion), and its ultimate conclusion as to whether to grant the preliminary injunction for abuse of discretion." *O'Toole v. O'Connor*, 802 F.3d 783, 788 (6th Cir. 2015) (quoting *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 454 (6th Cir. 2014)). Factual findings are reviewed for clear error. *Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 403 (6th Cir. 2022).

The standard of review matters here. The dissent describes the preliminary injunction inquiry as a matter of weighing the four factors listed above. That is accurate but incomplete. The relevant factors are to be balanced, but the balancing is governed by the movant's burden to show clearly that the factors weigh in its favor to such a degree that the extraordinary remedy of a preliminary injunction is warranted. *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020). That burden pervades the preliminary injunction analysis, and is accordingly applied throughout the discussion below.

### III.  ANALYSIS

**A.  Likelihood of Success**

In assessing PDE's likelihood of success on the merits, the district court concluded that PDE had not met its burden to clearly show that the relevant Policies (1) violate *Tinker*'s baseline student-speech standard, (2) unconstitutionally compel speech, (3) represent illicit viewpoint-based discrimination, or (4) are impermissibly overbroad.  In contesting the first three of these findings, PDE primarily focuses on the Policies' applicability to the use of non-preferred pronouns.  Its overbreadth argument then considers the Policies' possible application to other speech.  Recognizing that "we review judgments, not reasoning," *In re Big Rivers Elec. Corp.*, 355 F.3d 415, 442 (6th Cir. 2004), we turn to the basis upon which we affirm the district court.

1. <u>*Tinker* and Speech in Public Schools</u>

The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits the government from "abridging the freedom of speech."  U.S. Const. amend. I; *see Kutchinski ex rel. H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 356 (6th Cir. 2023).  Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  *Tinker*, 393 U.S. at 506.  But as the Supreme Court has long recognized, the First Amendment's guarantee is subject to some restrictions for public school students "in light of the special characteristics of the school environment."  *Id.*

This precedent reflects the competing values inherent in the public school setting.  As "nurseries of democracy," public schools have "an interest in protecting a student's unpopular expression" and preserving the "marketplace of ideas."  *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 190 (2021).  This "tolerance of divergent political and religious views, even when the views expressed may be unpopular," constitutes a "fundamental value[]" of elementary and secondary education.  *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986).  Even so, the breadth of students' constitutional rights must be tailored to "what is appropriate for children in school."  *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995).  In our compulsory educational system, students are often a "captive audience" for the speech of their peers.  *Fraser*, 478 U.S. at 684.  As a result, free speech rules for schoolchildren must "take into

account consideration of the sensibilities of . . . fellow students," *id.* at 681, and schools are
entitled to regulate speech that "would undermine the school's basic educational mission," *id.* at
685.  That authority is not limitless.  *See id.* at 689-90 (Brennan, J., concurring).  But "[t]he
determination of what manner of speech in the classroom or in school assembly is inappropriate
properly rests with the school board" in the first instance.  *Id.* at 683.

    We recently synthesized four categories of speech that Supreme Court caselaw permits
schools to regulate:  (1) indecent or vulgar speech made during a school assembly on school
grounds; (2) speech during school or at a school-sponsored event that may be reasonably
construed as promoting illegal drug use; (3) speech in school-sponsored expressive activities if
the schools' actions are related to pedagogical concerns; and (4) on-campus and some off-
campus speech that materially disrupts classwork or the order of the school, or invades the rights
of others.  *Kutchinski*, 69 F.4th at 356-57 (6th Cir. 2023).  As the district court recognized,
because the proposed speech at issue in this case is "not lewd, does not involve illegal drug use,
and is not school-sponsored," it implicates the fourth category.

    The fourth category was established in *Tinker*.  In that landmark case, school officials
suspended students who wore black armbands to protest the Vietnam War.  *Tinker*, 393 U.S. at
504.  The Court found that "the record [did] not demonstrate any facts which might reasonably
have led school authorities to forecast substantial disruption of or material interference with
school activities" from the wearing of the armbands, "and no disturbances or disorders on the
school premises in fact occurred."  *Id.* at 514.  Nor was there any evidence that the armbands
intruded upon the rights of other students.  *Id.* at 508.  The Court held that suspension of the
students violated the First Amendment.  *Id.* at 514.

    Under *Tinker*, a school policy may prohibit speech in the fourth *Kutchinski* category only
where officials have a reasonable basis to believe that the speech will either substantially disrupt
school activities or interfere with the rights of others.[1]  This requires evidence of "something

---

[1]As the district court recognized, *Tinker*'s second prong allowing for regulation of speech that invades
others' rights has rarely been litigated, and its scope is generally seen as "unclear."  R. 28, PageID 827 (quoting
*Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001) (Alito, J.)).  For that reason, this section
focuses on *Tinker*'s first prong (reasonable fear of substantial disruption).  PDE argues in its reply brief that the

more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. *Tinker* thus sets forth a "demanding standard" to regulate student speech, *Mahanoy*, 594 U.S. at 193, that school officials bear the burden to meet, *see N.J. ex rel. Jacob v. Sonnabend*, 37 F.4th 412, 426 (7th Cir. 2022).**[2]**

*Tinker*, however, does not require school authorities to wait for a disturbance before regulating speech, nor does it "require certainty that disruption will occur." *Lowery v. Euverard*, 497 F.3d 584, 591-92 (6th Cir. 2007) (quoting *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 767 (9th Cir. 2006)). To do so would place school officials "between the proverbial rock and hard place: either they allow disruption to occur, or they are guilty of a constitutional violation." *Barr v. Lafon*, 538 F.3d 554, 565 (6th Cir. 2008) (quoting *Lowery*, 497 F.3d at 596). "Such a rule is not required by *Tinker*, and would be disastrous public policy" because it would strip officials of their "affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place." *Lowery*, 497 F.3d at 596.

Even this limited preliminary injunction record contains evidence of the substantial disruption that repeated, intentional use of non-preferred pronouns to refer to transgender students can cause. The PDE parent-members themselves "understand[]" that use of non-preferred pronouns "will be considered 'insulting,' 'humiliating,' 'dehumanizing,' 'derogatory,' and 'unwanted' to those who want to go by different pronouns." R. 7-3, Parent A Decl., PageID 364; R. 7-4, Parent B Decl., PageID 371; R. 7-6, Parent D Decl., PageID 385.**[3]** PDE also

---

District failed to make a substantial-disruption argument on appeal. But the District's briefing on *Tinker* blends, and cites cases relying on, both aspects of *Tinker*'s test. As a result, no part of the District's *Tinker* argument was waived or forfeited.

**[2]**Our recognition that school officials bear the burden to justify speech regulations does not, as the dissent contends, create a circuit split on this issue. As explained below, however, the nature of that burden depends on the stage at which the record is evaluated. Because PDE has moved for a preliminary injunction, it must clearly show that the District has failed to meet its burden of reasonably forecasting substantial disruption.

**[3]**We do not construe the parent-members' declarations as seeking an injunction to allow their children to dehumanize or humiliate others. We nonetheless disagree with the dissent on how this declaration is most naturally read. *See Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022) (noting that courts evaluating preliminary injunction motions do not give a plaintiff "the benefit of all reasonable inferences in [its] favor, as would be the case in evaluating a motion to dismiss on the pleadings"). The dissent reads the statement to aver that the District—and only the District—will consider the use of non-preferred pronouns to be insulting, humiliating, and the like. But the statement is more naturally read to signify the parents' understanding that transgender students, as the subjects of

attached to its preliminary injunction motion an article containing a therapist's explanation that students who "have been misgendered all day" often become "traumatized," "humiliated," and "cry after school."  R. 7-1, PageID 329.  This evidence dovetails with a study, cited by the district court, collecting literature on the "measurable psychological and physiological harms" that can be caused by use of non-preferred pronouns.  R. 28, PageID 836 (quoting Chan Tov McNamarah, *Misgendering as Misconduct*, 68 UCLA L. Rev. Discourse 40, 43 (2020)).  And it supports the conclusion that transgender students experience the use of non-preferred pronouns as dehumanizing and that, as a result, the repeated use of such pronouns can have severely negative effects on children and young adults.[4]

PDE argues that this evidence was insufficient to "prove" that the use of non-preferred pronouns "will cause substantial disruption warranting the suppression" of speech, which renders this case like those that have barred speech restrictions.  But proving that disruption will occur before restricting speech is not the standard—*Tinker* permits regulation of student speech where officials "reasonably forecast" that it will cause substantial disruption, even if disruption is not a certainty.  *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 335 (6th Cir. 2010); *see also Lowery*, 497 F.3d at 591-92.  Given administrators' need to affirmatively protect the learning environment, moreover, officials will sometimes be unable "to offer any 'proof' [of disruption] beyond common-sense conclusions based on human experience."  *Lowery*, 497 F.3d at 594.  Such "common-sense conclusions," we have reasoned, "do not require substantial evidentiary support."  *Id.*  It takes no great inferential leap—actually no leap at all—for the District to reach the common-sense conclusion that the dehumanizing and humiliating effects of non-preferred pronouns could create a substantial "disrupt[ion] [to] the educational process" justifying restricting the use of those pronouns.  R. 7-1, PageID 205.

PDE responds that we have declined to uphold a restriction on the wearing of confederate flags "without any showing of disruption."  *Castorina ex rel. Rewt v. Madison Cnty. Sch. Bd.*,

---

non-preferred pronouns, will consider the use of such pronouns to be derogatory—even though, as the parent-members stress and we accept, no such derision is intended.

[4]The intentional use of non-preferred pronouns is punishable only "to the extent" that it rises to the level of "harassment as defined."  Appellees' Br. 20, ECF No. 65 (emphasis omitted).  There is no need to set out the exact conditions that would be required to violate the Policies, as this litigation will provide more clarity as it progresses.

246 F.3d 536, 542 (6th Cir. 2001); *cf. Barr*, 538 F.3d at 568 (upholding a similar restriction where there was evidence that "racial tension [was] high and serious racially motivated incidents" had occurred); *Defoe*, 625 F.3d at 334 (upholding a confederate-flag restriction while noting evidence of "racial violence, threats, and tensions").  But this case differs from *Castorina* in several respects.

First, PDE chose to bring a pre-enforcement challenge, which was its right.  But a consequence of PDE's choice is that no prohibited speech has yet occurred, and a defendant cannot be faulted for failing to identify disruption from speech that is merely hypothesized.  The pre-enforcement nature of PDE's suit renders it meaningfully distinct from *Castorina*, where the lack of disruption after students wore shirts bearing confederate flags undercut the school's contention that fear of disruption was reasonable.  *See Castorina*, 246 F.3d at 538-39, 544.[5]

Second, PDE's challenge is at the preliminary injunction stage.  Many school-speech cases, by contrast, are decided on summary judgment or later.  By that time, the parties have developed a factual record that courts can interrogate for evidence supporting or undermining a prediction that substantial disruption is likely to flow from student speech.  *See, e.g.*, *Barr*, 538 F.3d at 556; *Defoe*, 625 F.3d at 326.  Again, consider *Castorina*.  There, we did *not* hold that the lack of evidence of disruption mandated an injunction against the school policy banning confederate flags.  Rather, "[v]iewing the facts in the light most favorable to the students" as necessary on summary judgment for the school district, we found a "need for a trial to determine the precise facts" and whether those facts supported a reasonable fear of substantial disruption.  *Castorina*, 246 F.3d at 542.

*Castorina*, *Barr*, and *Defoe* all signal that at the summary judgment stage, the District may need to provide additional evidence regarding the likelihood of disruption from the repeated use of non-preferred pronouns.  But at this point, PDE has not carried its burden to clearly show that prohibiting this speech likely violates *Tinker* or its progeny.  *See Neate*, 98 F.4th at 672.

---

[5]*Castorina* does not signify that, where prohibited speech occurs but predicted disruption does not, a school's forecast that disruption would result from the speech is necessarily unreasonable.  *See Lowery*, 497 F.3d at 591-93.  Such a forecast may be reasonable even if disruption, for one reason or another, ultimately fails to materialize.  But if disruption does not occur as anticipated, it may provide *evidence* that the school's prediction of disruption was not reasonable to begin with.

2. Compelled Speech

PDE also argues that the District's Policies unconstitutionally compel speech.  In addition to *Tinker*'s limit on regulation of student speech, the First Amendment's "free-speech guarantee also generally prohibits . . . compelling an individual 'to utter what is not in her mind' . . . in the public school setting."  *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012) (brackets omitted) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943)).[6]  Indeed, the seminal case on compelled speech—*Barnette*—occurred in a public school.  In *Barnette*, the Supreme Court held that school officials could not compel students with a religious objection to say the Pledge of Allegiance or salute the flag.  319 U.S. at 642.  Despite the interest in national unity during World War II, *id.* at 640, the Court explained in soaring terms the Constitution's protection of the right not to speak the government's preferred message:  "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."  *Id.* at 642.

One premise of PDE's compelled-speech argument—that the intentional use of one pronoun rather than another represents speech subject to the First Amendment's protection—is supported in caselaw.  Although restrictions on "ministerial action[s]" that communicate no message are not within the First Amendment's ambit, "expressive" speech or material is constitutionally protected.  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 229 (1990).  In the university context, we have concluded that because a professor's refusal to use preferred pronouns to address his transgender student "reflected his conviction that one's sex cannot be changed" and "convey[ed] a powerful message" about gender identity, the intentional use of specific pronouns to refer to transgender individuals is free speech within the First Amendment's meaning.  *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021).  The district court was correct that *Meriwether* is an imperfect analogy here given the differences between the use of

---

[6]In assessing the compelled-speech question, the district court looked to the District's pedagogical interests.  Pedagogical interests, however, justify regulation of speech only in "school-sponsored expressive activities," *Kutchinski*, 69 F.4th at 357 (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)), and the District's Policies extend to non-sponsored activities.  We affirm the district court's conclusion regarding the compelled-speech issue based on the reasoning presented in this section.

pronouns by a college professor and students in a K-12 public school.  The declarations in the record, however, show that Parent A-D's children intend to communicate a message by using non-preferred pronouns to refer to their classmates.

The pleadings in this case, in fact, underscore that perhaps the single thing on which the parties agree is that pronouns matter.  That is true for transgender students in the District, who experience the use of preferred pronouns as a vital part of affirming their existence and experience the use of non-preferred pronouns as dehumanizing, degrading, and humiliating.  It is also true for Parent A-D's children, whose parents aver that using pronouns inconsistent with a person's biological sex at birth contradicts their "deeply held beliefs" about the immutability of sex.  The intentional use of preferred or non-preferred pronouns therefore represents speech protected by the First Amendment.

In addition to showing that the speech of Parent A-D's children is protected, PDE must show that it has been compelled.  "A 'general principle of compelled speech jurisprudence . . . is that a violation of the First Amendment right against compelled speech occurs only in the context of actual compulsion.'"  *Wilkins v. Daniels*, 744 F.3d 409, 415 (6th Cir. 2014) (quoting *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 189 (3d Cir. 2005)).  The constitutional compulsion analysis considers whether people "have options" to act in a way that does not violate their conscience.  *Id.* at 416.  If so, their conduct has not been compelled—even if the options do not present "a choice they welcome"—unless the cost of the alternative choice is "so exorbitantly high as to present an illusory" or "sham option."  *Id.* at 415-16 (internal quotation marks omitted).  In describing what constitutes an illusory option, the Supreme Court has explained that a license plate motto compels speech because "driving an automobile [is] a virtual necessity for most Americans"; the option to stay silent by not driving is no option at all. *Wooley v. Maynard*, 430 U.S. 705, 715 (1977).  Similarly, a lower court has concluded that statements on sex offenders' state-issued identification cards constitute compelled speech because the additional cost associated with getting a passport renders it an insufficient alternative option.  *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1325-26 (M.D. Ala. 2019).

Students who do not want to use their transgender classmates' preferred pronouns may permissibly use no pronouns at all, and refer to their classmates using first names.[7]  PDE argues that using first names may create stilted sentences when Parent A-D's children speak to or about their transgender classmates.  But in *Wooley* and *Doe 1*, there was a tangible, material sacrifice required to use the "option" provided to avoid otherwise compelled speech—either not driving (*Wooley*) or buying a passport (*Doe 1*).  At this stage, PDE has not shown that Parent A-D's children will incur a similar cost by referring to their transgender classmates by first names.

Parents A-D, to be sure, have made clear that this option is not their preference because their children "don't want to avoid using pronouns . . . they want to use biologically correct pronouns."  Reply Br. 4, ECF No. 79 (internal citation and quotation marks omitted).  But using first names is remarkably similar to a proposed "compromise" we praised in *Meriwether*—the plaintiff's proposal to "call on [the transgender student in his class] using [that student's] last name alone," rather than any honorifics.  992 F.3d at 510.  As we explained, that proposal "seemed like a win-win.  [The plaintiff] would not have to violate his religious beliefs, and [the student] would not be referred to using pronouns [the student found] offensive."  *Id.* at 510-11.  Far from viewing this compromise as compelled speech, we treated it as a means of respecting both sides' deeply held beliefs concerning gender identity.

Outside instructional time, moreover, students may elect to not refer to their transgender classmates at all.  This choice to not speak mirrors the generally accepted accommodation for students morally opposed to reciting the Pledge of Allegiance.  *See Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1038 n.33 (9th Cir. 2010) (noting that where "[n]o student is required to recite . . . the Pledge, nor can any student be disciplined for refusing to participate . . . the free speech claim that was involved in *Barnette*, where the students were forced to say the Pledge, is

---

[7]The District's email offering accommodations to those who oppose using preferred pronouns because of "religious beliefs" was responding to an email requesting information about the District's policies from a parent who referenced their child's faith-based beliefs.  *See* R. 7-2, Neily Decl., PageID 355-56.  In its briefing, the District has explained that no students, religious or otherwise, will be forced to "affirm a belief they [do] not hold," or be "coerced into speaking a message they disagree with."  Appellees' Br. 10.  We understand that language to mean that any student may "refer to transgender students by their first names . . . or employ gender-neutral pronouns" without fear of discipline.  R. 28, PageID 849.

not at issue"). PDE has, accordingly, not demonstrated *Barnette*-like unconstitutional compulsion.

Finally, PDE asserts that school officials may not even require students to alter a message by making it more acceptable to others. This contention relies on precedent from outside the public school context holding that alteration of a speaker's preferred message is impermissible. But PDE's argument has no purchase here given "the special characteristics of the school environment." *Mahanoy*, 594 U.S. at 187 (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988)); *see also Fraser*, 478 U.S. at 681. For example, officials may restrict speech at school that can be "reasonably viewed" as advocating illegal activity, even if that advocacy "falls short of inviting 'imminent' lawless action" and thus could not be censored outside the school. *Morse v. Frederick*, 551 U.S. 393, 406, 409 (2007). Or consider a more mundane example— students may be required to refer to teachers throughout the school day using honorifics rather than first names, even though a student may prefer to use first names in protest of the hierarchical system supported by honorifics. These and similar rules are commonly and constitutionally imposed, regardless of the extent to which they restrict students' preferred messages, to protect the "basic educational mission" of public schools. *Fraser*, 478 U.S. at 685. At bottom, PDE has failed to make a clear showing that the District's prohibition on the intentional use of non-preferred pronouns unconstitutionally compels speech. *See Neate*, 98 F.4th at 672.

### 3. Viewpoint Discrimination

PDE next asserts that by preventing the use of non-preferred pronouns, the District's policies unconstitutionally discriminate based on viewpoint. Depending on the speech's forum, the government may sometimes enact content-based restrictions on speech, but "viewpoint discrimination"—that is, "regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction"—is typically "presumed impermissible." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995). Although the Supreme Court has suggested that "it might well be appropriate to tolerate some targeted viewpoint discrimination in [the] unique setting" of public schools, *Morse*, 551 U.S. at

409, our precedent requires that restrictions on student speech be consistent "with both the *Tinker* standard and *Rosenberger*'s prohibition on viewpoint discrimination." *Barr*, 538 F.3d at 571; *see also Defoe*, 625 F.3d at 336-37. As a result, a school may engage in content discrimination, which is "permissible if it preserves the purposes of" the forum (e.g., prohibiting disruption), but not "viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations" (e.g., prohibiting selected forms of disruption based on the ideology expressed). *Rosenberger*, 515 U.S. at 829-30.

Applying this standard in the public school context, we have explained "that a blanket ban on the use of 'odious racial epithets' by 'proponents of all views' constitutes mere content-based regulation, while a ban on the use of racial slurs by one group of speakers but not 'those speakers' opponents' constitutes viewpoint-discrimination." *Barr*, 538 F.3d at 572 (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992)). Likewise, a dress code that bars all clothing exhibiting "symbols which 'cause[] disruption to the educational process'" is a permissible content-based regulation, *id.*, whereas one banning certain "racially sensitive symbols and not others" is impermissible viewpoint discrimination, *Castorina*, 246 F.3d at 544. In other words, schools may permissibly enact and enforce blanket bans on particularly disruptive symbols or speech, but may not regulate speech as a means of silencing a particular viewpoint.

The challenged Policies here proscribe harassment, misconduct, and other disruptive speech across a variety of categories. That structure, and the District's position that students may communicate their belief that sex is immutable through means other than the use of non-preferred pronouns, indicate that the District is not attempting to prohibit any viewpoints.[8] Nor is there any evidence, on this preliminary injunction record, that the District's enforcement of the

---

[8]Comparison with sister circuit caselaw emphasizes this point. The First Circuit recently concluded that a middle school reasonably forecasted disruption from, and was entitled to prohibit the wearing of, a shirt reading "There Are Only Two Genders." *See L.M. v. Town of Middleborough*, 103 F.4th 854, 860, 879-83 (1st Cir. 2024). Without endorsing or criticizing that decision, we note that the District here has explicitly stated that it would permit students to wear apparel bearing the similar message "gender is not fluid." In other words, the District will permit controversial speech on gender identity above and beyond what one federal appellate court has stated is required by the First Amendment. The District's allowance for substantial speech on all sides of the debate regarding gender identity suggests that its prohibition on the repeated use of non-preferred pronouns reflects a genuine effort to limit disruption, not an attempt to favor one viewpoint over another.

Policies is different regarding gender identity as compared to any other protected characteristic. *See Barr*, 538 F.3d at 572 (recognizing that such disparate enforcement would violate viewpoint neutrality).

PDE contends that because the District permits the use of preferred pronouns to refer to transgender students, but prohibits the use of non-preferred pronouns, it has imposed a viewpoint-specific ban on some divisive pronouns and not others. There is no evidence here, however, that preferred and non-preferred pronouns are analogously divisive. As explained, transgender students experience the use of non-preferred pronouns as dehumanizing and humiliating. By contrast, there is no suggestion that, when some students use preferred pronouns to refer to their classmates, any students are similarly debilitated. Under our precedent, the District may constitutionally distinguish between divisive and non-divisive speech, and choose to regulate the former but not the latter. *See Barr*, 538 F.3d at 572; *Defoe*, 625 F.3d at 336 & n.7.

Finally, PDE submits that policies prohibiting derogatory, identity-focused speech are viewpoint-discriminatory because "[g]iving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017). But our confederate flag cases demonstrate that although school officials may not silence viewpoints based on offensiveness, they may—in service of avoiding substantial disruption—regulate *how* potentially offensive viewpoints are expressed. *See Barr*, 538 U.S. at 571-72, *Defoe*, 625 F.3d at 336-37. As the district court noted, studies show that intentional, repeated use of non-preferred pronouns is more disruptive than discussions about transgender issues. Those studies represent a "common-sense conclusion[] based on human experience": Speech criticizing the identity of specific classmates, including the use of non-preferred pronouns, is more likely to cause disruption than speech about social issues in the abstract. *Lowery*, 497 F.3d at 594; *see Mahanoy*, 594 U.S. at 206-09 (Alito, J., concurring) (recognizing, in the context of off-campus speech, that "hurtful remarks about other students" are more regulable than mere "intemperate and crude" speech). Expressing distasteful views on race is different from referring to a mixed-race student as not really Black. Sharing controversial religious beliefs is different from describing a Mormon student as not a real Christian. By the same token, discussing sex and gender identity is different from using non-preferred pronouns to state that one's transgender classmate is not really a girl. The District is entitled to recognize that

speech about specific students' identities is particularly harmful and likely to disrupt the educational experience, and to regulate that speech accordingly. PDE has failed to clearly show that, by doing so, the District engages in viewpoint discrimination. *See Neate*, 98 F.4th at 672.

### 4. Overbreadth

For the reasons provided above, the District may permissibly restrict students' intentional, repeated use of non-preferred pronouns to refer to their classmates. Because each of the challenged Policies prohibits that conduct, each Policy has some constitutional applications. That conclusion, however, does not necessarily render the Policies constitutional, as PDE also challenges them as overbroad. The First Amendment's "overbreadth doctrine prohibits the government from proscribing a 'substantial' amount of constitutionally protected speech judged in relation to the [regulation's] plainly legitimate sweep." *J.L. Spoons, Inc. v. Dragani*, 538 F.3d 379, 383 (6th Cir. 2008) (quoting *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003)). It "exists to allay the concern that the threat of enforcement of an overbroad law may deter or chill constitutionally protected speech." *Id.* By doing so, it "protect[s] the marketplace of ideas and reduce[s] the social costs of withheld speech." *Id.* at 384.

As the Supreme Court recently reiterated, however, "[a]n overbreadth challenge is unusual" for good reason. *United States v. Hansen*, 599 U.S. 762, 769 (2023). By invalidating a law with both constitutional and unconstitutional applications, a successful overbreadth challenge necessarily "destroys some good along with the bad." *Id.* at 770. Because overbreadth is "strong medicine" not to be "casually employed," *id.* (quoting *United States v. Williams*, 553 U.S. 285, 293 (2008)), several of the doctrine's limitations—particularly in this context—warrant emphasis.

First, to strike down a regulation as overbroad, its "unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the [regulation's] lawful sweep." *Id.* Second, "[t]he overbreadth claimant bears the burden of demonstrating from the text of the law and from actual fact that substantial overbreadth exists." *J.L. Spoons*, 538 F.3d at 384. Third, although we may not rewrite a regulation to make it constitutional, *United States v. Stevens*, 559 U.S. 460, 481 (2010), we should seek a "limiting

construction or partial invalidation" of the regulation, where possible, "to remove the seeming threat or deterrence to constitutionally protected expression," *J.L. Spoons*, 538 F.3d at 383 (quoting *Hicks*, 539 U.S. at 119); *see also Hansen*, 599 U.S. at 781 (describing the "canon of constitutional avoidance," whereby courts "seek harmony, not to manufacture conflict," when regulations "and the Constitution brush up against each other").

Finally, as several of our sister circuits have noted, "[b]ecause of the duties and responsibilities of the public elementary and secondary schools, the overbreadth doctrine warrants a more hesitant application in [the public school] setting than in other contexts." *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 441 (4th Cir. 2013) (quoting *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 258 (4th Cir. 2003)); *see also J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 935 (3d Cir. 2011) (articulating the same principle). For example, courts provide K-12 administrators more regulatory leeway than university officials because of "the differing pedagogical goals of each institution, the *in loco parentis* role of public elementary and high school administrators, the special needs of school discipline in public elementary and high schools, the maturity of the students, and, finally, the fact that many university students reside on campus and thus are subject to university rules at almost all times." *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 242-43 (3d Cir. 2010). School boards are not legislatures, and "[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code." *Fraser*, 478 U.S. at 686. With these cautionary principles in mind, we turn to the Policies themselves.

### a.   *Policy 5517—The Anti-Harassment Policy*

Policy 5517 prohibits "discriminatory harassment" based on "gender identity" and many other categories, defining harassment as "any threatening, insulting, or dehumanizing gesture . . . or written, verbal or physical conduct directed against a student" that places a student in reasonable fear of physical harm, "has the effect of substantially interfering with a student's educational performance," or "has the effect of substantially disrupting the orderly operation of

[the] school."  R. 7-1, PageID 121-23.  This definition is not overbroad because it is tied directly to *Tinker*'s substantial disruption standard.  *See* 393 U.S. at 514.

The Policy also prohibits bullying, which becomes "unlawful harassment" when a student "systematically and chronically inflict[s] physical hurt or psychological distress" on another based on a protected characteristic.  R. 7-1, PageID 122.  Bullying is further defined as "any unwanted and repeated written, verbal, or physical behavior . . . that is severe or pervasive enough to create an intimidating, hostile, or offensive educational or work environment; cause discomfort or humiliation; or unreasonably interfere with the individual's school or work performance or participation."  R. 7-1, PageID 122.  Arguably, the word "discomfort" could be read to prohibit some constitutional speech; under *Tinker*, "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" is an insufficient reason to restrict speech.  393 U.S. at 509.  But here, "discomfort" is also categorized with humiliation, and the broader provision limits discipline to rhetoric or action that is both (a) systematic and chronic and (b) severe or pervasive.  On this preliminary injunction record, and given the proper deference accorded to school officials, we cannot definitively conclude that speech the regulation may improperly prohibit (that which causes only discomfort) is "substantially disproportionate to the [regulation's] lawful sweep."  *Hansen*, 599 U.S. at 770.  PDE has not met its burden of clearly showing that Policy 5517 is overbroad.

### b.  *Policy 5136—The Personal Communication Devices (PCD) Policy*

Policy 5136 forbids the use of "a PCD in any way that might reasonably create in the mind of another person an impression of being threatened, humiliated, harassed, embarrassed or intimidated," and specifically forbids any student to "transmit material that is threatening, obscene, disruptive, or sexually explicit or that can be construed as harassment or disparagement of others based upon their race, color, national origin, sex (including sexual orientation/transgender identity), disability, age, religion, ancestry, or political beliefs."  R. 7-1, PageID 134.  Assigning a broad reading to the prohibition of anything that "can be construed as . . . disparagement of others" could allow the District, for example, to discipline students for off-campus social media posts disparaging a politician's political beliefs, or a text sent that could

embarrass someone, even if the text is not about a student or teacher at a school.  On the other hand, the PCD Policy ties back to the (constitutional) definition of bullying in the Anti-Harassment Policy, and therefore is susceptible to a limiting construction that incorporates the Anti-Harassment Policy's severity and pervasiveness requirements.  *See* R. 7-1, PageID 134 (the PCD Policy, which cites Policy 5517); *J.L. Spoons*, 538 F.3d at 383.

However it is construed, the PCD Policy plainly governs a good deal of speech that the District may constitutionally restrict both on-and-off-campus.  For example, it prevents the transmission of obscene or sexually explicit material about students or teachers, threatening or disruptive speech, and speech that harasses other students based on a protected characteristic.  R. 7-1, PageID 134.  Supreme Court precedent establishes that schools may regulate "harassment targeting particular individuals" and "threats aimed at teachers or other students" wherever they occur, *Mahanoy*, 594 U.S. at 188, and our caselaw similarly allows regulation of off-campus "serious or severe harassment" of students and teachers, *Kutchinski*, 69 F.4th at 358.  Given the ample speech that the PCD Policy constitutionally regulates, PDE has not established through "actual fact," *J.L. Spoons*, 538 F.3d at 384, that the Policy's "unconstitutional applications" are "substantially disproportionate to" its permissible ones.  *See Hansen*, 599 U.S. at 770; *cf. Stevens*, 559 U.S. at 481 (noting that a statute was overbroad where there was no serious question "that the presumptively impermissible applications of" the relevant statute "far outnumber[ed] the permissible ones").  PDE has failed to meet its burden at this stage to show that the PCD Policy is overbroad.

### c.   The Code of Conduct

PDE challenges two provisions of the District's Code of Conduct.  The first challenged provision prohibits the use of discriminatory language, which is "defined as verbal or written comments, jokes, and slurs that are derogatory towards an individual or group based on . . . race, color, national origin, sex (including sexual orientation and transgender identity), disability, age, religion, ancestry, or genetic information."  R. 7-1, PageID 150.  This provision contains no severity requirement and does not tie its prohibitions to *Tinker*'s substantial disruption standard.  It therefore appears to permit the District to punish some speech that it may constitutionally

restrict, such as racial slurs that will obviously disrupt the educational environment, and some that it may not, such as jokes about a politician's age that are unlikely to be disruptive.

As with the PCD Policy, the relevant burdens and presumptions are dispositive here. Although this provision is not a model policy, and appears to prohibit some constitutionally protected conduct, PDE has not met its burden to show a likelihood that this provision of the Code of Conduct prohibits *substantially more* protected than unprotected speech.

The second provision that PDE challenges is the Code's prohibition of harassment, intimidation, or bullying, defined as:

> any intentional written, verbal, electronic, or physical act that a student has exhibited toward another particular student or students more than once and the behavior causes mental or physical harm to the other student(s) and is sufficiently severe, persistent or pervasive that it creates an intimidating, threatening or abusive educational environment for the other student(s).

*Id.*, PageID 157. This section prohibits only targeted, severe-or-pervasive conduct that affects other students' educational environments. PDE has not carried its burden to demonstrate that this provision is overbroad.[9]

### B. Remaining Preliminary Injunction Factors

PDE has not made the requisite "clear showing" that it is likely to prevail on the merits. *Neate*, 98 F.4th at 672 (quoting *Winter*, 555 U.S. at 22). The likelihood-of-success inquiry is generally dispositive in First Amendment preliminary injunction cases. *See Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012). Nonetheless, the remaining preliminary injunction factors further demonstrate that the district court did not abuse its discretion in denying PDE a preliminary injunction. *See O'Toole*, 802 F.3d at 788.

---

[9]The holdings in this section are based on the pre-enforcement, preliminary injunction nature of PDE's facial challenge, and the accordant difficulty that PDE faces to meet its overbreadth burden. We do not rule out the possibility that PDE could later show, based on "actual fact[s]" about how relevant Policies operate, that one or more of the Policies may be overbroad. *J.L. Spoons*, 538 F.3d at 384.

    1.  <u>Irreparable Harm</u>

A showing of irreparable injury is an "indispensable" prerequisite to the granting of preliminary injunctive relief.  *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019). That is because "[i]f the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit."  *Id.*  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Bays*, 668 F.3d at 825 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  But a plaintiff must also show that the irreparable harm it alleges is both "likely" and "immediate."  *Fischer v. Thomas*, 78 F.4th 864, 868 (6th Cir. 2023).

As discussed in the overbreadth section, most of the challenged Policies limit their application only to speech that substantially, severely, or pervasively disrupts a student's environment.  The likelihood that the District would restrict any pseudonymous student's speech is further reduced by the positions it has taken during this litigation, including that its Policies only limit speech that rises to the level of harassment, that the Policies do not generally prohibit speech about gender identity, and that the District is willing to discuss accommodations as necessary.  Without more details than exist in this record concerning both the nature of students' anticipated speech and how the District would react to it, PDE has not shown that any enforcement is "likely" or "immediate."  *Fischer*, 78 F.4th at 868.

PDE's litigation conduct, moreover, reinforces the unlikelihood of immediate harm.  The District's Policies have protected students from harassment based on gender identity since 2013. Yet PDE did not seek any relief, let alone the "extraordinary" relief of a preliminary injunction, for a decade.  *Neate*, 98 F.4th at 672 (quoting *Munaf*, 553 U.S. at 689).  That delay "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."  *Cheetah Miner USA, Inc. v. 19200 Glendale, LLC*, No. 23-1410, 2023 WL 6601863, at *3 (6th Cir. Oct. 10, 2023) (quoting *Bourne Co. v. Tower Recs., Inc.*, 976 F.2d 99, 101 (2d Cir. 1992)).[10]  In sum, PDE has not shown that any harm from

---

[10]That PDE may not have known that the District's Policies protected gender identity until a parent-member sent an email in early 2023, R. 7-2, PageID 355-57, further undermines the argument that PDE faces likely, immediate injury.  If, from 2013-2023, the pseudonymous students were not engaging in the speech that Parents A-

the District's Policies is likely or immediate—precluding its entitlement to injunctive relief. *See Fischer*, 78 F.4th at 868.

### 2. Balance of Equities and Public Interest

The final two factors—balance of harms and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The district court concluded that these considerations favored the District, and this case does not present the rare circumstances justifying reversal of that determination. *See Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004). As the district court recognized, because PDE has not shown that the challenged Policies are unconstitutional, enjoining them is unlikely to prevent harm or be in the public interest. On the contrary, granting PDE's request to "preliminarily enjoin [the District] from enforcing the [challenged] Policies" in their entirety would create an immediate risk of harm to all students in District schools. These Policies, as noted above, protect students from harassment across a variety of characteristics. Without the ability to enforce such anti-harassment policies, the District would be unable to protect students—including the children of Parents A-D—who are subject to abuse based on their race, gender, religious beliefs, or other protected characteristics. On this record, PDE has not shown that enjoining the challenged Policies in their entirety would promote, rather than harm, the public interest. As a result, these factors also militate against PDE's entitlement to emergency relief.

## IV. CONCLUSION

The proposed speech in this case concerns a topic that is the subject of significant discussion and dispute. Resolving such disputes, however, is not our role. *See L.W. v. Skrmetti*, 83 F.4th 460, 491 (6th Cir. 2023). We are limited to adjudicating particular cases and controversies, *see* U.S. Const. art. III, and we are to do so by applying established legal standards to a specific record.

---

D describe, that fact undercuts the urgency of their professed desire to do so now. On the other hand, if students were engaging in such speech, it suggests that the District—which has never punished any of the pseudonymous students for violation of its Policies—does not view that speech as harassing. Either way, PDE has not shown a likelihood of immediate harm from the District's policies.

Our disagreement with the dissent is situated within these limitations. Governing precedent permits the issuance of a preliminary injunction only where the movant carries its substantial burden of demonstrating clear entitlement to immediate relief from an imminent harm. PDE has failed to plainly show that, on this record, the relevant factors weigh in its favor to such a degree that this extraordinary relief is warranted. *Enchant Christmas*, 958 F.3d at 539. On that basis, the district court's decision is **AFFIRMED**.

---------------

**DISSENT**

---------------

ALICE M. BATCHELDER, Circuit Judge, dissenting.  As I understand it, the plaintiffs' position—based on their scientific (biology, physiology, and genetics) and religious beliefs—is that biological gender is immutable, people are either male or female, and there is no such thing as "gender transition"; that is a made-up thing, imaginary or make believe, and a public school cannot force their children to pretend it is a real thing.  Agree or disagree, but that is their position.

In that light, the speech at issue here concerns the *existence* of gender transition, not just a debate about gender-identity issues or misgendering.  The Olentangy Local School District's view—contrary to Parents Defending Education's—is that there is such a thing as gender transition; it is real, worthy of recognition and, in fact, worthy of protection in the public schools.  Why else would the District require preferred pronouns, prohibit biological pronouns, or press the odd compromise of no pronouns at all?  Therefore, the governmental authority (the District) has taken a clear position (viewpoint) in which all of its captive subjects (students) must affirm the existence of gender transition (either through words or silence), regardless of their own view.  This is a viewpoint-based regulation of speech.  *See Tennessee v. Cardona*, --- F. Supp. 3d ---, 2024 WL 3019146, at *23 (E.D. Ky. June 17, 2024).

And in this light, it is also compelled speech—the students' only options begin from the District's viewpoint that gender transition is a real thing; from there the students must conform their own expression around that viewpoint.  The Constitution prohibits this.  *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in . . . matters of opinion or force citizens to confess by word or act their faith therein."); *Tinker v. Des Moines Ind. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (schoolchildren do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate").

The majority proceeds from this premise as well, concluding that there is no compelled speech because students are not compelled to use preferred pronouns; they can comply by avoiding the use of otherwise ordinary and commonplace biological pronouns and by instead referring to these particular classmates by name only, using no pronouns at all.  Obviously, this awkward adjustment (of using no pronouns) requires the speaker to recognize and accept that gender transition is a real thing and that it applies to these particular students.  The majority also concludes that there is no viewpoint problem here because the District has expressed no view about whether gender transition is good or bad, and the students remain free to discuss or debate it.  That is like saying the school has taken no viewpoint on ghosts when it has students debate whether ghosts are good or evil.  But the plaintiffs' point would be that *there is no such thing as ghosts!*  And the school has no business forcing children to believe in ghosts.  Again, whether you agree or disagree, PDE's position is that gender transition is fictitious, just like ghosts.

Because it appears that the majority misapprehends the speech at issue in this case, I must respectfully disagree with its analysis and conclusion.  But I do agree that this case raises a topic of significant public concern.  *See*, *e.g*., *Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021) (whether individuals can have a gender identity inconsistent with their sex assigned at birth is "a hotly contested matter of public concern"); *see also Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 913–14 (2018) (describing gender identity as a "sensitive political topic[]" that is a "matter[] of profound value and concern to the public" (cleaned up)).  Therefore, I will endeavor to explain my view of this as thoroughly as the majority has its own.

## I.  Overview

What does the First Amendment say about how schools can regulate student speech?  A school can neutrally enforce a "legitimate school curriculum."  *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012).  But this does not allow schools to "compel an individual to utter what is not in her mind and indeed what she might find deeply offensive."  *Id.* (cleaned up) (quoting *Barnette*, 319 at 634).  Schools also cannot prohibit students from expressing certain viewpoints simply by deeming them "divisive."  *Castorina ex rel. Rewt v. Madison Cnty Sch. Bd.*, 246 F.3d 536, 544 (6th Cir. 2001).  Divisive speech is part of the "hazardous freedom" that is "the basis of our

national strength." *Tinker*, 393 U.S. at 508–09.   Nor can schools restrict speech based on an "undifferentiated fear or apprehension of disturbance."   *Id.* at 508.   To justify its restricting student speech, a school must show that the speech "would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school."   *Id.* at 509 (quotation marks omitted).

Has the Olentangy Local School District made this showing?   No.   Despite admitting that there has never been a disruption caused by a student's referring to another student using a nonpreferred pronoun, the District insists it can force students to always use preferred pronouns instead of biological ones.   Oral Arg. at 25:16–26:15.   It does this by declaring *ipse dixit* that biological pronouns are "dehumanizing" speech that "cause[s] discomfort."   But *Tinker* requires more than that.   So does Sixth Circuit precedent.   *Meriwether*, 992 F.3d at 508 (recognizing that "[p]ronouns can and do convey a powerful message implicating a sensitive topic of public concern").   Nor can the District prohibit students from using their personal electronic devices in their own time to send a message that causes someone else to feel "embarrassed."   The Supreme Court said just three years ago that a school's ability to regulate off-campus speech is "diminished" compared even to its normal authority under *Tinker*.   *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 190 (2021).   The District would also prohibit all jokes about protected characteristics, as it believes that such jokes constitute discriminatory speech.   *See* ACLU Amicus Br. 12 (observing that the District's policies would ban "jokes about men, boys, girls, Catholics, or British nationals," as well as any joke "that began, 'a priest, a rabbi, and an imam walked into a restaurant'—almost no matter how it ended").

Instead, the First Amendment prevents schools from banning speech based on the "undifferentiated fear" that comes from "[a]ny variation from the majority's opinion."   *Tinker*, 393 U.S. at 508.   Any difference of opinion "may start an argument or cause a disturbance."   *Id.* But the First Amendment's protection "include[s] the protection of unpopular ideas."   *Mahanoy*, 594 U.S. at 190.   That includes students' expression of their views on gender through the use of biological pronouns instead of individually selected ones.   For this reason, PDE is entitled to an injunction against the District's policies insofar as they prevent students from engaging in this

speech.   The district court's judgment denying it one should be reversed.   Therefore, I respectfully dissent.

## II.  Background

Parents Defending Education is a nationwide organization whose mission is to prevent the politicization of K–12 education.  Its members include parents whose children attend school in the Olentangy Local School District and the children themselves.  Olentangy Local School District is Ohio's fourth-largest school district, operating twenty-five schools in Delaware and Franklin Counties.  PDE sued the District over policies that PDE alleges will require students to conform to (and speak) certain views on gender identity that are contrary to the students' sincerely held beliefs.

### a.  The Policies

PDE challenges three policies.  First, Policy 5517 prohibits speech that the District considers "harassment" or "bullying."  It defines harassment as "any threatening, insulting, or dehumanizing gesture, use of technology, or written, verbal or physical conduct directed against a student or school employee"[1] that has one of three prohibited effects: it either (1) "places a student or school employee in reasonable fear of harm to his/her person or damage to his/her property"; (2) "has the effect of substantially interfering with a student's educational performance, opportunities, or benefits, or an employee's work performance"; or (3) "has the effect of substantially disrupting the orderly operation of a school."  Policy 5517 defines bullying as "unwanted and repeated written, verbal, or physical behavior, including any threatening, insulting, or dehumanizing gesture" that is "severe or pervasive enough" to cause one of three things: it (1) "create[s] an intimidating, hostile, or offensive educational or work environment"; (2) "cause[s] discomfort or humiliation"; or (3) "unreasonably interfere[s] with the individual's school or work performance or participation."   Policy 5517 states that bullying becomes "unlawful harassment" if someone "systematically and chronically inflict[s] physical hurt or

---

[1]The District's policies often refer to speech as written or verbal "conduct," "behavior," or "acts."  The policies' Orwellian description of student speech as "conduct" does not lessen its First Amendment protection.  *See Blau v. Fort Thomas Public Sch. Dist.*, 401 F.3d 381, 388–89 (6th Cir. 2005) (discussing the difference between conduct, expressive conduct, and speech).

psychological distress" on a student or employee based on one or more "[p]rotected [c]lasses," by which it means "characteristics that are protected by [f]ederal civil rights laws." The District promises to "vigorously enforce its prohibition against discriminatory harassment," including against harassment based on "sex," "sexual orientation," and "gender identity." The District first adopted Policy 5517 in 2011, and the policy has included transgender identity as a protected class since 2013.

Next, Policy 5136 prohibits students from using "personal communication devices"—which the policy defines to include computers, tablets, electronic readers, cell phones, smartphones, and any other "web-enabled devices of any type"—"in any way that might reasonably create in the mind of another person an impression of being threatened, humiliated, harassed, embarrassed or intimidated." In particular, the policy prohibits students from "transmit[ting] material that is threatening, obscene, disruptive, or sexually explicit or that can be construed as harassment or disparagement of others" based on certain protected characteristics, which include "sex," "sexual orientation," and "transgender identity." Violating this prohibition "shall result in disciplinary action." And Policy 5136 governs students' use of personal communication devices both on and off campus.

Finally, the Code of Conduct contains its own prohibitions. It prohibits "discriminatory language," which it defines as "verbal or written comments, jokes, and slurs that are derogatory towards an individual or group" based on protected characteristics, including "sex," "sexual orientation," and "transgender identity." It also prohibits "harassment, intimidation, or bullying," which it defines as "any intentional written, verbal, electronic, or physical act" exhibited more than once toward a "particular student or students" that "causes mental or physical harm to the other student(s) and is sufficiently severe, persistent or pervasive that it creates an intimidating, threatening or abusive educational environment" for other students. Violations of the prohibition on harassment, intimidation, or bullying "are strictly prohibited and will not be tolerated." The Code of Conduct applies whenever "students are under the authority of school personnel or involved in any school activity." It also applies to behavior or "[m]isconduct" that either (1) "occurs off school district property but is connected to activities or incidents that have occurred on school district property"; or (2) "regardless of where [the

misconduct] occurs, is directed at a district official or employee or the property of an official or employee."

Together, the policies regulate a wide range of student speech.  For instance, Policy 5517 prohibits written or verbal speech that places another student in reasonable fear of physical harm.  It also prohibits unwanted and repeated verbal or written speech that causes "discomfort."  Policy 5136 prohibits students from sharing both obscene or sexually explicit material and material that harasses others based on protected characteristics.  It also prohibits students from sharing material that is "disruptive" or would cause a reasonable person to feel "embarrassed."  The Code of Conduct prohibits written or verbal speech that causes mental or physical harm and is so severe or pervasive that it creates a threatening or abusive educational environment.  It also prohibits "discriminatory language," which includes "jokes . . . that are derogatory towards an individual or group" based on enumerated protected characteristics.

### b.  PDE Contacts the District

Concerned about the impact of these policies, a parent contacted the District and asked whether the parent's "devoutly Christian child who believes in two biological genders" would be "forced to use the pronouns that a transgender child identifies with or be subject to reprimand from the [D]istrict if they refuse to do so."  Jessica Philemond, an attorney for the District, responded and said that although children possess religious-freedom rights at school, "those rights do not relieve them of the obligation to comply with Board Policy and the [C]ode of [C]onduct.  A student purposely referring to another student by using gendered language they know is contrary to the other student's identity would be an example of discrimination under Board Policy."[2]  The parent then asked whether the child would be disciplined for expressing that "marriage is between a man and a woman" or that "homosexuality is a sin."  This time, Philemond responded that the District would not discipline the child for his or her religious beliefs.  Instead, she said that if the child "would like to discuss accommodations to avoid using pronouns whe[n] doing so would be contrary to [the child's] religious beliefs, the District is

---

[2]Policy 5517 states that the District will "vigorously enforce" its ban on "discriminatory harassment," and the Code of Conduct says the District "will not [] tolerate[]" discriminatory language.

Case: 23-3630    Document: 89-2    Filed: 07/29/2024    Page: 32

No. 23-3630          *Parents Defending Educ. v. Olentangy*          Page 32
*Local Sch. Dist. Bd. of Educ.*

happy to discuss those options with [the child]."  The parent responded that he or she did not want the District to "instruct my children on such matters without me being present" and asked Philemond "how to proceed."  The record contains no further e-mails.

### c. This Litigation

PDE then sued the District.  It seeks a declaratory judgment that the policies violate the First Amendment; preliminary and permanent injunctions preventing the District from enforcing the policies, barring it from "compelling speech to affirm another person's gender identity," and barring it from "punish[ing] students for speech occurring off school grounds that is not for or during a school-sponsored activity"; and reasonable costs and expenses of the action.

With its motion for a preliminary injunction, PDE submitted declarations from parents of children in the District.  Each declaration contains similar attestations. For instance, Parent A and Parent A's child are both members of PDE.  Both believe that biological gender is immutable, that people are either male or female, and that children cannot transition from one gender to another.  Being forced to affirm that a biologically female classmate is actually a male would contradict the family's deeply held beliefs, as would the reverse.  Parent A's child has "no ill-will toward children or adults who identify as transgender or nonbinary" and "knows and routinely comes into contact with students that identify as transgender or nonbinary."  Parent A's child wants to speak about issues involving gender identity by repeatedly stating that child's belief that biological gender is immutable.  The child also wants to use pronouns "that are consistent with a classmate's biological sex, rather than the classmate's 'preferred pronouns.'" Although he or she wants to share these messages at school and at home, the child self-censors due to the fear that expressing the belief that gender is immutable will incur "punish[ment] for violating school policies."  The other three plaintiff parents and their children feel the same.

The parent declarations also stated that their children "understand[]" that referring to students by biological pronouns "will be considered 'insulting,' 'humiliating,' 'dehumanizing,' 'derogatory,' and 'unwanted' to" students who want to be referred to by preferred pronouns.[3]

---

[3]Notably, the declaration from Parent C did not include this language.  Parent C Dec., R.7-5, PageID#377–81.

Parent A Dec., R.7-3, PageID#364; Parent B Dec., R.7-4, PageID#371; Parent D Dec., R.7-6, PageID#385. However, the parents were not agreeing that the use of biological pronouns is dehumanizing and humiliating. They were merely explaining that the children "ha[ve] no ill will" against students who want others to use preferred pronouns when referring to them—the children "just want to express their deeply held views." At oral argument, counsel for PDE made clear that the parents included that language to ensure they would have standing to challenge the District's policies. Oral Arg. at 3:05. So the parents are not saying that *they* (or their children) consider biological pronouns to be dehumanizing and humiliating—they are recognizing that *the District* will consider biological pronouns that. *Id.* This is why the declarations include the descriptions in quotes, showing that they are referring to the District's understanding of biological pronouns. And the declaration from PDE's president confirms this understanding when it says that PDE's members "reasonably fear [using biological pronouns] will be considered 'harassment,' 'bullying,' 'discriminatory,' or otherwise prohibited" by the District's policies. The parents clearly do not seek an injunction to allow their children to dehumanize and humiliate others.

The district court held a hearing on PDE's preliminary-injunction motion. At the hearing, the district court stated that it would question the parties based on its "own independent research" of "what the law really says." The district court asked PDE whether using a preferred pronoun instead of a biological one "necessarily carries a statement that you believe the idea that gender is a spectrum." PDE answered that *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021), held that pronouns do convey a statement about what the speaker believes about gender. When asked the same question, the District agreed that *Meriwether* controlled. However, it encouraged the district court to distinguish *Meriwether* as applying only to the university context, not to K–12 schools. The District lamented that the litigation would be easily resolved "if there was a little bit [of] respect and tolerance shown by certain folks to others."

The district court filed its opinion denying PDE's preliminary-injunction motion just four days later. After determining that PDE had standing to bring its First Amendment claim, it held that the District could constitutionally prohibit "derogatory language" such as biological pronouns to refer to transgender students. The district court determined that the use of pronouns

"contrary to an individual's preferences" is "deeply harmful" because it "evinces disrespect for the individual," "plays into stereotypes," "lacks basis in scientific reality," and "'inflict[s] measurable psychological and physiological harms.'"  Op., R.28, PageID#836 (citing Chan Tov McNamarah, *Misgendering as Misconduct*, 68 UCLA L. Rev. Discourse 40, 43 (2020)).  In making this finding, the district court relied on evidence that the District never submitted, including law-review and journal articles, newspaper stories, examples from its other pending cases, and its own personal opinions.  Then the district court invoked *Tinker*'s second, lesser-used prong to determine that misgendering constituted an invasion of the rights of transgender students.

The district court recognized that students "do not enjoy a right to be free from mere offense or from the exchange of ideas."  So the First Amendment protected students' "questioning the prevalence of gender dysphoria and discussing issues of gender identity" because that is speech that "discusses a political, social, or religious perspective in a non-derogatory manner."  In the district court's telling, "neutral, respectful, and generalized discussions of gender[-]identity issues" are allowed because that "neither targets nor expresses disrespect for particular individuals or groups."  But the District could prohibit student's using biological pronouns because doing so "creates a threat of physical harm, interferes with students' educational opportunities, substantially disrupts the operation of schools, or causes or contributes to a hostile environment."

Because the district court determined that the First Amendment does not protect students' right to use biological pronouns, it said that PDE failed to show that it would suffer an irreparable injury without an injunction.  It also stated that enjoining the policies would leave students in the District completely unprotected against bullying and harassment.[4]  For this reason, the district court determined that the balance of equities favored leaving the District's policies in place during this litigation.

---

[4]Of course, preliminary injunctive relief need not be a machete when a scalpel will do.  *See McCullen v. Coakley*, 573 U.S. 464, 492 (2014) ("[G]iven the equitable nature of injunctive relief, courts can tailor a remedy to ensure that it restricts no more speech than necessary.").

### III.  Legal Standard

The court considers four factors to determine whether to issue a preliminary injunction: (1) whether the moving party "has shown a likelihood of success on the merits"; (2) whether that party "will be irreparably injured" without an injunction; (3) whether an injunction will "harm other parties to the litigation"; and (4) whether the injunction is "in the public interest." *Kentucky v. Biden*, 57 F.4th 545, 550 (6th Cir. 2023) (citation omitted).  We review de novo the likelihood of success on the merits, *id.* (citing *Thompson v. DeWine*, 976 F.3d 610, 614–15 (6th Cir. 2020)), which is the "most important" factor, *id.* (citing *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020 (per curiam)).  We review for abuse of discretion the district court's decision to issue a preliminary injunction.  *Id.* (citing *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019)).

Even when a party establishes that it is likely to succeed, it still must show that without an injunction it will suffer an irreparable harm.  This showing is "indispensable" because "[i]f the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit."  *Sumner Cnty. Schs.*, 942 F.3d at 327.  But binding Supreme Court precedent "has long held that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'"  *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (alteration in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (collecting cases).  Circuit precedent echoes the rule.  *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (noting that if "a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated").

First Amendment violations allow for pre-enforcement challenges.  A plaintiff shows an imminent injury by "demonstrating (1) an intent to engage in 'expression that the Free Speech Clause arguably protects,' (2) that this expression is arguably prohibited by [the speech restriction], and (3) that there exists a 'credible threat of enforcement' for engaging in that expression."  *Kareem v. Cuyahoga Cnty Bd. of Elections*, 95 F.4th 1019, 1022 (6th Cir. 2024) (quoting *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (per curiam)).  Pre-enforcement challenges are an important part of the First Amendment's protections because "'self-censorship'

is 'a harm that can be realized even without an actual prosecution.'" *Id.* at 1023 (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988)). "[A] defendant's refusal to disavow" a law is one factor showing a credible threat of enforcement. *Id.* (quoting *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016)). The ease of enforcing the restriction is another factor, as are steps warning that enforcement is likely or imminent. *See id.* But our Circuit has also recognized that a "lack of discipline . . . could just as well indicate that speech has already been chilled." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 766 (6th Cir. 2019).

## IV.  Compelled Speech

PDE's first challenge is that the policies unconstitutionally compel District students to speak in a certain way. Compelled speech violates the First Amendment because "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. The First Amendment's protection of free speech "includes both the right to speak freely and the right to refrain from speaking." *Janus*, 585 U.S. at 892 (quotation marks omitted). The Supreme Court has stated that "in most contexts, any such effort" to compel an individual to express support for a view that individual finds objectionable "would be universally condemned." *Id.*

In the public-school context, a student's First Amendment rights are considered "'in light of the special characteristics of the school environment.'" *Ward*, 667 F.3d at 733 (quoting *Tinker*, 393 U.S. at 506). So a school may compel speech by implementing a "legitimate school curriculum." *Id.* And schools may limit student speech "'in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.'" *Id.* (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)). But this exception is not so broad as to allow schools to "force[] individual expression that happen[s] to occur in a school." *Id.* at 734. Otherwise, schools would "wield alarming power to compel ideological conformity." *Meriwether*, 992 F.3d at 506.

It's worth remembering the educational goals the state relied upon in *Barnette*. The State of West Virginia required public-school students to profess the Pledge of Allegiance, deeming

students who refused to do so insubordinate and subject to expulsion. *Barnette*, 319 U.S. at 628–29.  Supporters of the requirement believed that it "promot[ed] good citizenship and national allegiance," *id.* at 654 (Frankfurter, J., dissenting), and that "national unity is the basis of national security," *id.* at 626 n.2 (citation omitted) (majority opinion).  But whether the First Amendment permits schools to compel speech "does not depend upon whether . . . we would think [the compulsion] to be good, bad[,] or merely innocuous." *Id.* at 634.  Instead, the "very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." *Id.* at 638.  The Supreme Court, cognizant of the United States' then-present "totalitarian enemies" in World War II, observed that "[t]hose who begin coercive elimination of dissent soon find themselves exterminating dissenters.  Compulsory unification of opinion achieves only the unanimity of the graveyard"—even if that compulsion is "in support of some end thought essential to the[] time and county." *Id.* at 640–41.  So the First Amendment's "freedom to differ is not limited to things that do not matter much.  That would be a mere shadow of freedom.  The test of its substance is the right to differ as to things that touch the heart of the existing order." *Id.* at 642.

  *Barnette* tells us what we must ask about the District's speech restriction: Does forcing students to use others' self-selected or "preferred" pronouns compel these students to convey a message with which they do not agree (namely that biology does not determine gender)? *See id.* at 631.  Circuit precedent answers yes.  In *Meriwether*, a public university fired a college professor who refused to comply with the university's pronoun policy that required him to address students by their preferred pronouns instead of biological ones.  992 F.3d at 498–99.  The *Meriwether* court determined that "titles and pronouns carry a message," namely that "[p]eople can have a gender identity inconsistent with their sex at birth." *Id.* at 507.  Which pronoun to use for transgender individuals is "an issue of contentious political . . . debate." *Id.* at 508 (citation omitted).  In fact, the *Meriwether* court noted that how to properly use pronouns—and whether pronouns even have a gender at all—was a contentious issue as far back as 1745. *Id.* at 508–09.  That year, a British schoolteacher wrote a grammar book that encouraged using the "generic masculine pronoun" as a gender-neutral one—a position the feminist movement

later rejected as prejudicial.  *Id.* (citation omitted).  Based on this history and the current political debates, we said that pronouns "can and do convey a powerful message implicating a sensitive topic of public concern."  *Id.* at 508.  This is published and binding precedent.  6 Cir. R. 32.1(b).

Attempts to distinguish *Meriwether*'s holding from the students' situation here amount to confining that case to its facts.  The District claims that *Meriwether* confined itself to university professors and disclaimed that it would apply to K–12 students.  That statement is not true.  As PDE noted in reply, the quoted footnote in *Meriwether* drew a distinction only between college professors and K–12 teachers, not between college professors and K–12 students.  *See Meriwether*, 992 F.3d at 505 n.1.  Contra the District, student speech receives *greater* First Amendment protection than employee speech.  For First Amendment claims brought by government employees, Supreme Court precedent requires courts to "balance the interests of government employees, as citizens, in commenting upon matters of public concern" against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 586 (6th Cir. 2008) (cleaned up); *see also* Hamilton Lincoln Law Inst. Amicus Br. 4–8.  This *Pickering* balancing test protects government employees from retaliation only when they speak on matters of public concern.  *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Connick v. Myers*, 461 U.S. 138, 142 (1983).  But our Circuit has expressly disclaimed the applicability of the public-concern test to any context other than for government employees.  *Jenkins*, 513 F.3d at 586–87.  So as a public-university employee, Meriwether's speech was protected by the First Amendment only when he spoke on matters of public concern.  *Meriwether*, 992 F.3d at 507–08.  Because the First Amendment protects student speech even when it is not about a matter of public concern, *Meriwether* sets a floor, not a ceiling, on First Amendment protection.  What matters here is that the District's policies require students' "affirmation of a belief and an attitude of mind"—something the First Amendment prohibits.  *See Barnette*, 319 U.S. at 633.

The District fully intended that *Meriwether* required the district court to find that the policies required students to affirm a certain belief about transgenderism.  When the district court asked whether *Meriwether* meant that the District's policies "require the speaker to affirm a certain belief," the District answered that "[t]he Sixth Circuit in *Meriwether* said it did.  I think

that that follows from *Meriwether*."  Prelim. Inj. Hr'g Tr., R.33, PageID#907.  The District cannot now walk away from its admission.  *See United States v. Artrip*, 364 F. App'x 204, 205 (6th Cir. 2010) (noting that "a party cannot tell the district court one thing and then tell us the opposite").  The District's admission should be enough to demonstrate that its policies compel students to affirm a belief—exactly what the First Amendment prohibits.  *Barnette*, 319 U.S. at 633.

But in this appeal the District argues that the policies do not actually compel student speech at all.  It says that its policies—even though they prohibit students from using biological pronouns—still permit students to engage "in civil discussions regarding their views on gender." And the District claims that "no students have been, and no students will be, coerced into speaking a message they do not agree with."  But this stance on appeal contradicts the District's promises to vigorously enforce the policies—promises made both by its attorney when answering questions from a concerned parent and by the text of the policies themselves. Regardless of whether students can also discuss gender ideology in the abstract—which is also protected speech—the students' protected speech here is their use of biological pronouns to affirm their own belief that "people are either male or female and that a child cannot 'transition' from one sex to another."

Recognizing that the students want "to repeatedly state their belief that biological sex is immutable," the proposed accommodation to refer to transgender students exclusively using first names does not save the District's policies.  This accommodation would still force students to fundamentally alter the message they wish to send.[5]  And the District's "[d]isapproval of a private speaker's statement does not legitimize use of the [District's] power to compel the speaker to alter the message by [making it] more acceptable to others."  *See Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557, 581 (1995).  "No government . . . may affect a speaker's message by forcing her to accommodate other views; no government may alter the expressive content of her message; and no government may interfere with her desired

---

[5]In *Meriwether*, the professor himself suggested the accommodation to use proper names instead of pronouns.  992 F.3d at 510–11.  Here, PDE has not, instead claiming that the accommodation to never use pronouns is nearly impossible to obey and impermissibly alters its members' speech.

message." *303 Creative LLC v. Elenis*, 600 U.S. 570, 596 (2023) (cleaned up).  Pronouns are ubiquitous in everyday speech.  A sentence without pronouns would read awkwardly and sound unnatural compared to one with them.  And that accommodation still compels students to send a message they do not wish to send—under the hypothetical accommodation, remaining silent instead of affirming their belief that biological gender is immutable.

Some examples help crystalize how the District's policies compel speech by forcing students to affirm a belief they do not hold.  Consider a district that requires students to address teachers using the honorific "Ms.," "Mrs." or "Mr." before the teacher's last name.  Although that requirement may carry with it hierarchical connotations, it is commonly and traditionally used to maintain discipline in schools.[6]  Certainly, and obviously, schools have more leeway to regulate how students address teachers as part of the authority teachers have when a student's "actual parents cannot protect, guide, and discipline" him or her.  *Mahanoy*, 594 U.S. at 189.  But imagine a school district that required students to address teachers using "Comrade" before the teacher's first name, to convey that the student and teacher are equal members of the proletariat.  Unlike an honorific, a student could reasonably challenge the "comrade" requirement as compelling the student to express a belief he or she does not hold.  *Barnette*, 319 U.S. at 633.  And at any rate, PDE challenges how students must address other students, not how students must address teachers.

Nor is it accurate to say that the District's policies simply prevent speech that criticizes the identity of specific classmates.  Instead, the policies demand that students profess fealty to a specific viewpoint on the contested issue of gender identity.  The policies are not akin to allowing a student to express distasteful views on race while prohibiting her from referring to a mixed-race student as not really Black.  Instead, the policies would compel students—including Black students—to state that mixed-race students are equally as Black as any Black students without mixed racial heritage.  Similarly, the policies are not akin to preventing a student from describing a Mormon student as not really Christian.  Instead, the policies would compel students to state that Mormon students are just as Christian as Baptist, Methodist, or Catholic students, for

---

[6]Not to mention, schools *do* have a hierarchy between teachers and students.

example.  But just like adults, students may hold diverse beliefs on race or theology—even beliefs that government officials consider offensive or wrong.  Requiring students to affirm beliefs they do not hold, *Meriwether*, 992 F.3d at 507–08—and that are far afield from legitimate pedagogical concerns, *Ward*, 667 F.3d at 733—is unconstitutional, *Barnette*, 319 U.S. at 633.  So PDE's compelled-speech claim is likely to succeed.

## V.  Viewpoint Discrimination

PDE also challenges the District's policies as impermissibly viewpoint based. Viewpoint discrimination is "an egregious form of content discrimination."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  The First Amendment does not allow the government to "prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."  *Texas v. Johnson*, 491 U.S. 397, 414 (1989).  Viewpoint discrimination occurs when "speech is restricted because of the speaker's viewpoint on the topic–i.e., but for the perspective of the speaker, the speech would normally be permissible."  *Hartman v. Thompson*, 931 F.3d 471, 479 (6th Cir. 2019).  And the First Amendment's protection against viewpoint discrimination applies in "the public[-]school setting."  *Ward*, 667 F.3d at 733 (citing *Barnette*, 319 U.S. at 634).

At oral argument, the District argued that its policies were content-based restrictions, not viewpoint-based ones.  Oral Arg. at 23:07.  So a review of speech-restriction types is in order.  Speech restrictions come in three flavors: content-neutral, content-based, and viewpoint-based.  In the school context, a content-neutral regulation seeks "to regulate the time, place, and manner of [student] speech irrespective of its content or [the student's] viewpoint."  *M.A.L. ex rel. M.L. v. Kinsland*, 543 F.3d 841, 849 (6th Cir. 2008).  In that case, the content-neutral restriction arose when the school prevented a student from "handing out leaflets in school hallways between classes" but permitted him to "post his leaflets on hallway bulletin boards" and share the leaflets "during lunch hours from a cafeteria table."  *Id.* at 843.  Next are content-based restrictions, those that "target speech based on its communicative content."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (sign-restriction case).  This category includes "regulations that differentiate among subject matter[] or prohibit discussion of a topic altogether."  *Norton*

*Outdoor Advertising, Inc. v. Village of St. Bernard, Ohio*, 99 F.4th 840, 847 (6th Cir. 2024). The third flavor is a more pernicious subcategory of content-based regulations: viewpoint-based ones. These arise when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. In other words, with a viewpoint-based restriction, the government exhibits "hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992). Even when the government could otherwise ban certain speech, it cannot do so if its motive is viewpoint based. *See id.* at 384–85 (although a government can ban all obscene books, it could not ban only obscene books critical of the government; although government can ban flag-burning by prohibiting outdoor fires, it cannot ban burning the flag by prohibiting dishonoring it).

In summary, a content-neutral restriction does not depend in any way on the content of the speech. Think of school rules stating, "no using bullhorns in the library," or "no talking during roll call." It does not matter what is said; speaking is not allowed—either at that time, in that place, or in that manner. A restriction is content-based when the enforcer needs to examine the speech's subject to determine whether it is prohibited. Consider a school rule that states, "no talking about math during reading class." Students may talk during reading class, so to enforce the rule, the school official needs to determine only what the students are talking about. If it's math, the conversation is prohibited. And viewpoint-based restrictions require the enforcer to examine both the content of the speech and how it is used. For instance, imagine a school rule that prohibited students from criticizing any teacher's hairstyle. Students can talk about a teacher's hairstyle—but to enforce the policy, the school would have to consider both the content of the speech and its message. Is the student merely describing the teacher's hairstyle or criticizing it? If the former, the speech is acceptable; if the latter, it is not.

Back to the District's argument. The lead Sixth Circuit case on viewpoint-based speech regulations confirms that a viewpoint-specific ban cannot survive regardless of whether it meets *Tinker*'s substantial-disruption test. *Castorina*, 246 F.3d at 544. In *Castorina*, a high school's dress code banned clothing "containing any 'illegal, immoral or racist implications.'" *Id.* at 538 (quoting school policy). The principal suspended students who wore t-shirts displaying the

Confederate flag.  *Id.*  We reversed the district court's order granting summary judgment to the school because the record did not reveal whether it selectively enforced its dress code or whether it had experienced any "racially based violence" prior to suspending the students.  *Id.*  We held that wearing a t-shirt qualifies as speech and that, "viewing all of the facts in the light most favorable to the [students], it appears that the school board enforced the dress code in an uneven and viewpoint-specific manner, thereby violating core values of the First Amendment."  *Id.* at 539.  Because the school "has banned only certain racial viewpoints without any showing of disruption," the school violated the students' free-speech rights.  *Id.* at 542.  Although the record did not reveal whether the school selectively enforced the dress code, we held that "even if there has been racial violence that necessitates a ban on racially divisive symbols, the school does not have the authority to enforce a viewpoint-specific ban on racially sensitive symbols and not others."  *Id.* at 544.  In other words, the ban on an authority's engaging in viewpoint-specific speech restrictions applies regardless of whether the authority can satisfy *Tinker*.

Based on this, the District policies' prohibiting students from using biological pronouns to refer to transgender students is an impermissible viewpoint-based restriction.  It censors speech based on what the students want to communicate.  Contrary to what the district court held, a school district cannot defend viewpoint-discriminatory policies merely by saying that the policies' restrictions "appl[y] equally to individuals on either side of a given debate."  This is as if Texas defended its prohibition on burning the American flag by saying that the regulation applied to flag-burners and non-flag-burners alike.  *See Johnson*, 491 U.S. at 414.  Or as if the University of Virginia justified its denying student-activity funding to a Christian-magazine student group because it prohibited both Christian and non-Christian students from using student funds to publish a Christian magazine.  *See Rosenberger*, 515 U.S. at 829.  One side of the issue loses nothing—its inability to express its opponents' views does not magically transform viewpoint-based restrictions into content-based ones.  That would effectively allow "one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." *R.A.V.*, 505 U.S. at 392.  The First Amendment does not allow that.

Nor can the District simply deem the use of biological pronouns divisive (or derogatory) and then prohibit their use on that basis.  By calling this speech derogatory, the school officials

have simply chosen a particular viewpoint on gender identity, namely that it is not fixed at birth. *See Meriwether*, 992 F.3d at 509. But PDE and its member parents and students do not hold that viewpoint. In fact, they want to contest it. The speech that the District deems divisive is really a viewpoint with which it disagrees. It would create a complete end run around the First Amendment to allow a school district to ban speech based on the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. Divisive speech is just another way of describing "that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Id.* at 512 (cleaned up). That "marketplace of ideas" is "nowhere more vital than in the community of American schools." *Id.* (citation omitted). The First Amendment has no carve-out for divisive speech. Especially not in schools.[7]

It also makes no sense to analogize the District's ban on biological pronouns to a ban on racial epithets. In *Barr v. Lafon*, we upheld a school's dress code that prohibited students from wearing clothing that displayed the Confederate flag. 538 F.3d 554, 568 (6th Cir. 2008). The *Barr* plaintiffs argued that the dress code "discriminate[d] on the basis of viewpoint" by "unconstitutionally suppress[ing] particular ideas." *Id.* at 570. They claimed that the school could only "restrict student speech regarding race as a general topic" and could not "ban racially divisive speech while allowing racially inclusive speech." *Id.* at 572. We disagreed, calling the plaintiffs' definition of content-based policies "so abstract as to approach absurdity." *Id.* Instead, we held that a school can ban the Confederate flag based on a specific showing of its disruptive potential without needing to prohibit "all student speech and expression about any topic dealing with race." *Id.* What made the *Barr* ban viewpoint-neutral is that it "applied equally to a student displaying a Confederate flag in solidarity with hate groups" and to "another [student] who displayed a Confederate flag in a circle with a line drawn through it." *Id.* By prohibiting all Confederate flags, regardless of the message, the dress code applied in a viewpoint-neutral fashion.

---

[7]Speech that will cause material and severe disruption is analyzed under *Tinker*. *See* Part VI.

We compared this no-Confederate-flag-clothing policy to a "blanket ban on the use of 'odious racial epithets' by 'proponents of all views.'"  *Id.* (citing *R.A.V.*, 505 U.S. at 391).  But neither policy bears any relation to a ban on biological pronouns.  Under a no-odious-racial-epithets policy, a school prohibits or punishes any student speech that includes racial epithets.  It does not matter whether the student is using the racial epithet offensively, jokingly, endearingly, or in any other manner.  That's a content-based restriction.  But under the District's policies, it must do more than simply listen for prohibited words.  That's because using the masculine pronouns "he/him/his" for a student who is biologically male and who claims to have a male gender identity is allowed—required, in fact.  *See* Oral Arg. at 21:03 (arguing the anti-gender-harassment policy protects all students).  But using masculine pronouns for a student who identifies as a transgender woman is prohibited.  That means that the same words—he, him, and his—are permitted when referring to some students but prohibited when referring to others.  So the District's policies require more than simply prohibiting certain content, like all racial epithets or any display of the Confederate flag.  They ban clothing displaying the Confederate flag, but not if crossed out; they ban a student's using racial epithets but not if used endearingly.  In other words, the policies' application depends on what message a student wishes to send.

The District's policies require officials to determine what message the pronouns advance: Is the student referring to a transgender student using preferred pronouns, thereby sending the message that the student believes individuals can transition from male to female?  That, the policy permits.  Or is the student referring to a transgender student using biological pronouns, thereby sending the message that the student rejects that individuals can transition from male to female?  That, the policy does not permit.  By requiring this analysis of the message, the District's policies constitute viewpoint-based regulations, not content-based ones.  *See Meriwether*, 992 F.3d at 509 ("[C]ontinued refusal to address [a transgender woman] as a woman . . . advance[s] a *viewpoint* on gender identity." (emphasis added)).[8]

---

[8]Perhaps tellingly, the District does not argue on appeal that its policies are content-based restrictions. Instead, it claims that schools can implement viewpoint-discriminatory speech codes if the viewpoint-based regulations otherwise satisfy *Tinker*'s test.  Our circuit precedent resoundingly rejects that view.  *See Ward*, 667 F.3d at 733; *Castorina*, 246 F.3d at 544.

In summary, because the District's policies require it to examine both the content and the intended message, i.e., viewpoint, of a student's speech to determine whether that student has referred to another using biological pronouns instead of preferred ones, the policies are viewpoint-based speech regulations.  And viewpoint-based speech regulations in public schools are unconstitutional.  *Ward*, 667 F.3d at 733.  The District cannot transform its viewpoint-based policies into content-based policies by claiming after-the-fact that the viewpoints it opposes fit into an amorphous category of "divisive speech."  There is no divisive-speech carve-out to the First Amendment.  Because the District's policies unconstitutionally discriminate against certain viewpoints, PDE has again shown that it is likely to succeed on the merits.

## VI.  Lack of Evidence of Substantial Disruption

Even if the District's policies were viewpoint-neutral, content-based restrictions in public schools still must satisfy the *Tinker* test—the basis for PDE's third challenge.  Public schools can restrict speech based on its content only if the speech "materially disrupts classwork or involves substantial disorder or invasion of the rights of others."  *Tinker*, 393 U.S. at 513.[9]  Schools face a "'demanding standard'" to show whether speech "caused, or had the potential to cause, substantial disruption."  *Kutchinski ex rel. H.K. v. Freeland Cmty Sch. Dist.*, 69 F.4th 350, 359 (6th Cir. 2023) (quoting *Mahanoy*, 594 U.S. at 193).  A school must "'show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'"  *Id.* (quoting *Tinker*, 393 U.S. at 509).  And "undifferentiated fear or apprehension . . . is not enough to overcome the right to freedom of expression."  *Id.* (citing *Tinker*, 393 U.S. at 508).  Although a school does not need to wait for a substantial disruption to occur, the school must "reasonably forecast" that the prohibited speech would cause "'material and substantial disruption to schoolwork and school discipline.'"  *Id.* (quoting *Barr*, 538 F.3d at 565).

Which party bears the burden to show that the restricted speech would cause a substantial disruption?  The government.  *Tinker* says as much when it required the state to justify the

---

[9]The other three categories of student speech schools can constitutionally limit are not at issue, as the District has never argued (nor could it) that the speech here (1) is indecent, offensively lewd, or vulgar; (2) promotes illegal drug use; or (3) is part of school-sponsored expressive activities.  *See Kutchinski*, 69 F.4th at 356–57.

speech restriction on wearing black armbands to protest the Vietnam War.  393 U.S. at 509.
When "the record fails to yield evidence" that the speech restriction was needed to prevent a
substantial disruption to the schools' educational mission, the speech restriction is
unconstitutional.  *Id.*  The First Circuit recognized that even when a party seeks a preliminary
injunction, the government still bears the burden to satisfy *Tinker*.  *Norris ex rel. A.M. v. Cape
Elizabeth Sch. Dist.*, 969 F.3d 12, 25 (1st Cir. 2020) (finding on preliminary-injunction posture
that "*Tinker* places the burden on the school to justify student speech restrictions").  So did the
Third Circuit.  *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 253 (3d Cir. 2002).
As did the Fourth.  *Newsom ex rel. Newsom v. Albemarle Cnty.*, 354 F.3d 249, 255 (4th Cir.
2003) (requiring school to point to well-founded expectation of disruption to satisfy *Tinker*).
Other circuits also hold, albeit on appeals from summary judgments, that "*Tinker* places the
burden of justifying student-speech restrictions squarely on school officials." *N.J. ex rel. Jacob
v. Sonnabend*, 37 F.4th 412, 426 (7th Cir. 2022); *Trachtman v. Anker*, 563 F.2d 512, 516–17 (2d
Cir. 1977); *see also B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 321 (3d Cir.
2013) (en banc); *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 439 (4th Cir. 2013); *Bell
v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379, 398 (5th Cir. 2015) (en banc); *C.R. v. Eugene Sch.
Dist. 4J*, 835 F.3d 1142, 1150 (9th Cir. 2016) (all stating government has burden under *Tinker* to
justify speech restrictions).  In sum, the First, Third, Fourth, and Seventh Circuits hold that the
government always has the burden under *Tinker* to justify speech restrictions, even on
preliminary-injunction motions, and the Second, Fifth, and Ninth have all said the same on
appeals from summary judgment.

     It makes good sense for the government to bear this burden.  For starters, the First
Amendment ensures that "students are entitled to freedom of expression of their views."  *Tinker*,
393 U.S. at 511.  To overcome the presumption that students' speech is protected, the
government must make "a specific showing of constitutionally valid reasons" to regulate it.  *Id.*
Moreover, the government has the evidence that forms the basis for its substantial-disruption
judgment.  And it's a well-established evidentiary practice that "the burden of proof lies on the
person who wishes to support his case by a particular fact which lies more peculiarly within his
knowledge, or of which he is supposed to be cognizant."  *See, e.g.*, *Selma, Rome & Dalton R.*

*Co. v. United States*, 139 U.S. 560, 568 (1891) (citation omitted).   It would read *Tinker* backwards to place this burden on the plaintiff.   And it would be a death-knell to pre-enforcement challenges.   *See, e.g.*, *Kareem*, 95 F.4th at 1023 (holding "the rationale for pre-enforcement challenges applies with particular force to the First Amendment" because self-censorship is a harm).

What kind of evidence is required for the District to show that its fear that using biological pronouns would cause a substantial disruption?   Two of our cases set the boundaries.   Take *Castorina* first.   Recall that the school board there banned clothing "containing any 'illegal, immoral or racist implications.'"   *Castorina*, 246 F.3d at 538 (quoting school policy).   What was the school board's justification for disciplining students who wore t-shirts that displayed the Confederate flag with a picture of musician Hank Williams, Jr.?   *Id.* at 538–39.   It was "offensive to other students."   *Id.* at 539.   However, the clothing "did not disrupt school activity or cause unrest during the school day."   *Id.* at 541.

That made the behavior in *Castorina* indistinguishable from *Tinker*.   *Id.*   The school officials in *Tinker* also justified the speech restriction as necessary to prevent disruption.   Amidst the Vietnam War, citing an alumnus who had died in Vietnam, the officials in *Tinker* prohibited students from wearing black armbands to protest the war because they worried that "if any kind of a demonstration existed, it might evolve into something which would be difficult to control."   *Tinker*, 393 U.S. at 509 n.3.   When students wore the black armbands, "a few students made hostile remarks" to them even though "there were no threats or acts of violence on school premises."   *Id.* at 508.   That wasn't enough, the Supreme Court said.   The school officials must show that they reasonably "forecast substantial disruption of or material interference with school activities."   *Id.*   at   514. This   high   standard   recognizes   that   "discomfort   and unpleasantness . . . always accompany an unpopular viewpoint."   *Id.* at 509.   The Constitution requires schools to run the risk that "[a]ny departure from absolute regimentation may cause trouble.   Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance."   *Id.* at 508.   That sort of "hazardous freedom" is "the basis of

our national strength" in our "relatively permissive, often disputatious, society." *Id.* at 508–09. In sum, "undifferentiated fear" doesn't cut it. *Id.* at 508.

What kind of evidence does a school district need to constitutionally restrict speech it thinks might cause a material and substantial interference? *Barr* answers that. In *Barr*, a high school banned clothing that displayed the Confederate flag. 538 F.3d at 557. The school imposed this ban due to "racial tensions" at the school arising from "racist graffiti that made general threats against the lives of African-Americans, graffiti containing 'hit lists' of specific students' names, physical altercations between African-American and white students, and a police lockdown at the school." *Id.* The school's director testified that students' wearing of clothing that displayed the Confederate flag had "a significant disruptive effect on the proper educational environment of the students," especially for African-American students, who made up less than ten percent of the school. *Id.* The director came to this conclusion after conversations with students and parents who felt taunted and feared for their safety because of the Confederate-flag clothing. *Id.* at 560. The director also testified that he observed "a dramatic increase in absenteeism" due to rising racial tensions. *Id.* The *Barr* court examined this evidence and concluded that "school officials could reasonably forecast that permitting students to wear clothing depicting the Confederate flag would cause disruptions to the school environment." *Id.* at 566.

*Lowery v. Euverard* does not lower this burden. 497 F.3d 584 (6th Cir. 2007). In that case, players on a high-school football team circulated a petition stating that they hated their coach and did not want to play for him. *Id.* at 585–86. The coach dismissed the players who signed the petition and would not recant. *Id.* at 586. *Lowery* turned on the Supreme Court's holding that "student athletes are subject to more restrictions than the student body at large." *Id.* at 589 (citing *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995)). The difference arises because "students do not have a general constitutional right to participate in extracurricular athletics." *Id.* at 588 (collecting cases). In other words, *Lowery* addresses "the ability of the government to set restrictions on voluntary programs it administers," not a student's right to express an opinion. *Id.* at 599. So the "lip service" *Lowery* pays to the *Tinker* standard offers little guidance here. *Id.* at 603 (Gilman, J, concurring).

Which case does the evidence in the record here more closely resemble?  *Castorina*, clearly.  The record below contains no evidence that the District court even tried to carry its burden.  To rescue it, the district court had to conjure up law-review articles, newspaper stories, and even a complaint from another pending case to conclude that biological pronouns will "inflict[] measurable psychological and physiological harms" on transgender students.  For starters, courts are generally "not in the business of developing parties' arguments," and the district court should not have done so here.  *MY Imagination, LLC, v. M.Z. Berger & Co.*, 726 F. App'x 272, 276 (6th Cir. 2018) (citation omitted).  Even still, the District's undifferentiated fear doesn't satisfy *Tinker*'s "demanding standard."  *Kutchinski*, 69 F.4th at 359 (citation omitted).  The District confessed at oral argument that there has never been a substantial disruption in the District from a student's referring to a transgender student by a biological pronoun.  Oral Arg. at 25:26. It admitted that, in the thirteen years the policy has been in place, it was "unaware of anyone violating the policy so that it would need to be enforced."  *Id.* at 25:41.  When asked for the case that would most strongly support the speech restriction, the District cited *Tumminello v. Fr. Ryan High School, Inc.*, a case in which we noted that "self-harm is a reasonably foreseeable result of bullying."  678 F. App'x 281, 288 (6th Cir. 2017).

But citing one sentence from *Tumminello* does not satisfy the District's burden under *Tinker*.  First, in that case we *affirmed* the district court's dismissing a complaint under Title IX and state negligence law against a high school alleged to have failed to enforce its anti-bullying policy.  *Id.* at 282.  So it offers limited application to this context.  Second, the conduct there went far beyond the speech that PDE argues the First Amendment protects.  The bullying in *Tumminello* consisted of calling the student slurs, suggesting that the student commit suicide, and whipping the student with belts.  *Id.* at 283.  In contrast, the students here have "no ill will against" transgender students and will be "respectful to others"; they simply want to use biological pronouns instead of preferred ones.  Third, citing *Tumminello* as empowering a school district to prohibit anything it defines as "bullying" subverts *Tinker* entirely.  It would give schools free reign to ignore *Tinker* whenever it declared something to be "bullying."  But the *Tinker* court said that "discomfort and unpleasantness," "trouble," "fear," "argument[s]," and "disturbance[s]" are insufficient to abridge the First Amendment.  393 U.S. at 508–09.

There is one lone record citation that aligns with the District's biological-pronoun assertion.  PDE attached to its motion for a preliminary injunction an article describing a controversy in Frisco, Texas, that arose when a school district enabled students to change their preferred pronouns in its online system.  The article quotes a therapist who told parents that "we can use [students'] preferred pronouns or keep revisiting suicide attempts."  PDE cited that article to support a conclusion *Meriwether* necessitates: that whether to use biological or preferred pronouns implicates students' core religious and philosophical beliefs.  *See Meriwether*, 992 F.3d at 509.  But neither this nor the district court's law-review citations are sufficient.  Neither source says anything about disturbances—historical or forecasted—in the Olentangy Local School District.  And a law-review article's proposing that "misgendering" is misconduct is insufficient if not misleading.  After all, it is easy to find a law-review article taking the contrary position.  Ryan T. Anderson, *A Brave New World of Transgender Policy*, 41 Harv. J.L. & Pub. Pol'y 309, 318–19 (citing amicus brief from medical doctors stating that preferred-pronoun policies may prolong students' gender dysphoria).

Could other school districts cite this law-review article and require all students to refer to transgender students using only biological pronouns?  No.  The First Amendment doesn't permit that either.  *Barnette*, 319 U.S. at 642.  Because the District did not show that its policies were based on any specific and credible fear of a substantial disruption, its policies fail *Tinker*'s "demanding standard."[10]  *Kutchinski*, 69 F.4th at 359 (citation omitted).  PDE has shown it is likely to succeed on the merits with this argument too.

## VII. Overbreadth

PDE's final challenge to the District's policies is that they are overbroad.  A speech restriction is facially overbroad if "'a substantial number of its applications are unconstitutional, judged in relation to the [restriction]'s plainly legitimate sweep.'"  *Ams. for Prosperity Found. v.*

---

[10]The District (and the district court) also tried to justify the policies because *Tinker* allows schools to prohibit speech that interferes "with the rights of other students to be secure and to be let alone."  *Tinker*, 393 U.S. at 508.  But as then-Judge Alito noted, invading the rights of others requires something more serious than "that the speech is merely offensive to some listener."  *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001).  Instead, as other appellate courts have held, *Tinker*'s interference language likely applies only to "independently tortious speech like libel, slander or intentional infliction of emotional distress."  *Id.* (citations omitted).

*Bonta*, 594 U.S. 595, 615 (2021) (citing *United States v. Stevens*, 559 U.S. 460, 473 (2010)). The sheer scope of the District's policies make this a tough call.

First consider examples of unprotected speech that a school district can prohibit consistent with the First Amendment's protection. For instance, the bulk of Policy 5517 addresses harassment that causes fear of physical harm, a substantial interference with educational opportunities or work performance, or creates a hostile educational or work environment. Policy 5136 prohibits students from using electronic devices to transmit obscene or sexually explicit material, harass others based on protected characteristics, or commit academic dishonesty by recording or transmitting test information. And the Code of Conduct addresses student attendance, property damage to school property, insubordination, and the possession of dangerous weapons. These provisions cover speech and conduct that schools can prohibit—and historically have. *See Kutchinski*, 69 F.4th at 356–37 (covering categories of speech schools can prohibit) (citing *Tinker*, 393 U.S. at 513; *Mahanoy*, 594 U.S. at 187–88); *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651–52 (1999) (discussing when a school is liable under Title IX for not preventing harassment, which does not include "simple acts of teasing and name-calling among school children" even if "these comments target differences in gender").

On the other hand, notable portions of the policies fail constitutional scrutiny. For instance, Policy 5517's prohibition on speech that causes mere "discomfort or humiliation" fails the *Tinker* test. And the sweep of Policy 5136 to cover messages causing embarrassment that students send electronically on their own time does the same. Nor can the District prohibit derogatory jokes that it does not like. The application of the policies to prohibit a student's using biological pronouns instead of preferred pronouns does too, as established above.

These sweeping prohibitions—on anything that causes discomfort, humiliation, or embarrassment—are especially problematic because the Code of Conduct states that students "may be subject to discipline" for behavior occurring off school property if that behavior is "connected to activities or incidents that have occurred on school district property." Code of Conduct, R.7-1, PageID#136, 150. The District here claims authority to regulate speech only

remotely related to school activities.  But just a few years ago, the Supreme Court held that the First Amendment protects a student's off-campus sending of profanity-laden messages about unfavorable tryout results for school athletic teams.  *Mahanoy*, 594 U.S. at 184–85.  The Court recognized that "*severe* bullying or harassment targeting particular individuals" would be an example of "off-campus behavior that may call for school regulation."  *Id.* at 188 (emphasis added).  However, it said that a student's speech off-campus "will normally fall within the zone of parental, rather than school-related, responsibility."  *Id.* at 189.  So the off-campus applications of the District's policies are problematic.  Justice Thomas—the sole dissenting justice in *Mahanoy*—recognized that even schools' historical authority to discipline students for off-campus conduct waned when it came to students' expressing political or religious viewpoints.  *Id.* at 215 (Thomas, J., dissenting).  And some—though not all—of the parent declarations note that their view of gender identity as fixed at birth is motivated by their religion.

Still, overbreadth challenges require comparing what the policies can constitutionally prohibit against what they cannot.  *Bonta*, 594 U.S. at 615.  While the policies cannot constitutionally compel students—even while off school property—to profess that gender identity is fluid, the bulk of the policies concern speech that schools have historically prohibited, namely targeted harassment that interferes with the educational environment.  Because the policies' unconstitutional applications are less numerous than their constitutional applications, PDE's overbreadth challenge is unsuccessful.  Instead, its compelled-speech, viewpoint-discrimination, and *Tinker*-standard challenges provide it with sufficient likelihood of success on the merits.

## VIII.  Remaining Factors

Even though PDE has shown that it is likely to succeed on the merits, it still must show that it will suffer an irreparable harm.  Because the policies unconstitutionally infringe on the students' First Amendment rights, PDE will suffer an imminent and irreparable injury.  The district court said as much when it said that "[w]ere PDE likely to succeed on the merits, th[e irreparable-harm] factor would favor PDE."  The District's two arguments against this factor are unpersuasive.  It first says that there "is no allegation that any student has been disciplined for

violating the policies which have been in place for essentially the entire time the students have attended school within the District."  But circuit precedent makes it "well-settled that a chilling effect on one's constitutional rights constitutes a *present* injury in fact."  *McGlone v. Bell*, 681 F.3d 718, 729 (6th Cir. 2012) (emphasis added).  It does not matter that the policies' previously infringing the students' First Amendment rights has gone unnoticed; what matters is whether the policies are currently doing so.  *See id.*[11]

The District next says that the alleged harm is traceable "solely [to] the students' newfound awareness of the policies" based on their worries "about what could theoretically happen in the future."  But this falls far short of disavowing enforcement of the policies.  A lawyer for the District explicitly said that "purposely referring to another student by using gendered language they know is contrary to the other student's identity" would be prohibited discrimination under the policies.  And the District has promised to vigorously enforce the policies with no tolerance for violations.  Besides, the fact that no student has yet chosen to violate the District's policies by using an illicit pronoun presents evidence that student speech "has already been chilled."  *Kareem*, 95 F.4th at 1026 (citation omitted).

Based on the record, there is little dispute that these policies, which infringe upon students' First Amendment rights, thereby inflict irreparable harm upon the students.  So this factor favors PDE.

The analysis for the final two preliminary-injunction factors—whether the injunction will harm other parties to the litigation and whether it is in the public interest—is also straightforward.  When a party shows that its constitutional rights will be violated, the injunction is in the public interest because "it is always in the public interest to prevent the violation of a party's constitutional rights."  *Dahl v. Bd. of Trustees of W. Mich. Univ.*, 15 F.4th 728, 736 (6th Cir. 2021) (citation omitted).  And requiring the District to obey the Constitution will not harm it.  As for preventing harm to non-parties, enjoining the District's policies is not an all-or-nothing proposition.  Courts can tailor injunctions as appropriate.  *LFP IP, LLC v. Hustler Cincinnati,*

---

[11]And at any rate, the fact that the District has never needed to discipline a student for using the wrong pronoun under the policies is an admission that the District cannot meet *Tinker*'s demanding standard.  *See* Part VI.

*Inc.*, 810 F.3d 424, 426 (6th Cir. 2016). We can prevent the District from applying the policies to compel students to affirm beliefs they do not hold while leaving intact the policy's prohibitions on bona fide harassment. *See Biden*, 57 F.4th at 557 (narrowing overbroad injunction).

## IX.  Conclusion

The First Amendment forbids the District from compelling students to use speech that conveys a message with which they disagree, namely that biology does not determine gender. The district court, like the District itself, chose to accept, adopt, and then enforce this viewpoint—thereby rejecting and prohibiting any student from expressing a contrary viewpoint. That is not permitted.

Moreover, by finding that PDE has not carried a burden that *Tinker* places not on PDE but on the District, the majority shortchanges *Meriwether* and *Kutchinski*, creates a circuit split with the First, Third, and Fourth Circuits, and countenances what the Supreme Court forbade in *Tinker* and its progeny. For all these reasons, I respectfully dissent.